**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

----------------------------------------------------------- x
In re:                                                                        :
                                                                              :          **Chapter 15**
                                                                              :
**SYNCREON AUTOMOTIVE (UK) LTD.**          :          **Case No. 19– 11702 (   )**
                                                                              :
             **Debtor in a foreign proceeding.**[1]  :
                                                                              :
----------------------------------------------------------- x

**MOTION FOR RECOGNITION OF FOREIGN MAIN**
**PROCEEDING AND REQUEST FOR CERTAIN RELATED RELIEF**

Carine Van Landschoot, in her capacity as the duly-appointed foreign representative (the "**Foreign Representative**") of syncreon Automotive (UK) Ltd., the above-captioned debtor (the "**Debtor**" and, together with syncreon Group Holdings B.V. ("**OpCo**") and OpCo's subsidiaries, including the Debtor, the "**Company**"), which is the subject of a proceeding (the "**English Proceeding**") currently pending before the High Court of Justice of England and Wales (the "**English Court**") concerning a scheme of arrangement (the "**Scheme**") commenced pursuant to Part 26 of the Companies Act of 2006 (the "**Companies Act**"), has commenced the above-captioned chapter 15 case (the "**Chapter 15 Case**") ancillary to the English Proceeding and submits this motion (this "**Motion**" and, together with the *Voluntary Chapter 15 Petition* (the "**Chapter 15 Petition**") filed contemporaneously herewith, the "**Verified Petition**") and respectfully represents as follows:

---

[1]     The identifying four digits of the Debtor's U.S. federal tax identification number are 1748.  The identifying four digits of the Debtor's local U.K. tax identification number are 2112. The Debtor's (UK) company registration number is 03012604.  The location of the Debtor's corporate headquarters and registered office is Unit 5 Logix Road, R D Park, Hinckley, Watling Street, Leicestershire, LE10 3BQ, United Kingdom.

## PRELIMINARY STATEMENT[2]

1.      The Foreign Representative has commenced this Chapter 15 Case on behalf of the Debtor to ensure the success of a comprehensive balance sheet restructuring that involves approximately $1.1 billion of funded debt, that is supported by the overwhelming majority of the Company's capital structure, and that provides for payment, in full, of all general unsecured claims in the ordinary course of business.  This balance sheet restructuring will further preserve jobs for more than 14,000 men and women employed by the Company in locations across the globe and is supported by commitments for additional funding in excess of $250 million.

2.      The Company, including the Debtor, is a leading logistics services provider to technology and automotive manufacturers across the world.   The Company designs, implements, and executes integrated, customized, flexible, and mission critical logistics solutions for customers focused on reducing operating costs, improving efficiencies, and achieving competitive advantages through the increased outsourcing of their supply chain activities.  As of the date hereof (the "**Commencement Date**"), the Company employs more than 14,000 individuals across 100+ facilities in twenty (20) countries and six (6) continents.  In the year ended December 31, 2018 ("**Fiscal 2018**"), the Company's revenues were approximately $1.2 billion, with the Company reporting approximately $83 million of EBITDA over that same period.  As

---

[2]      Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meaning ascribed to such terms elsewhere in this Motion.

WEIL:\97137397\1\69894.0005

noted above, the Company's funded debt totaled approximately $1.1 billion as of the Commencement Date.

        3.      Pursuant to this Motion, the Foreign Representative requests recognition and enforcement of the Scheme pending before the English Court pursuant to which the Company will, among other things:

- reduce its funded debt load by approximately $625 million;

- repay, in full, obligations outstanding under its asset-based lending facility totaling approximately $80 million as of the Commencement Date;

- obtain a "new money" first-out term loan with up to $125.5 million of commitments backstopped by, among others, members of the Ad Hoc Group;

- incur a new $135 million asset-based lending facility; and

- not impair or otherwise affect general unsecured claims, which the Company will pay in the ordinary course of business and, in turn, ensure the uninterrupted operation of the Company's business.

The Scheme, its ancillary proceedings,[3] and the transactions contemplated thereby are supported by the overwhelming majority of the Debtor's capital structure and memorialized through a Restructuring Support Agreement. Parties to the Restructuring Support Agreement include holders of 100.0% of all Liquidity Loans (totaling approximately $75.5 million outstanding as of the Commencement Date), 96.5% of all obligations outstanding under the Parent Credit Facilities (totaling approximately $680 million outstanding as of the Commencement Date), and 97.6% of all Unsecured Notes (totaling approximately $221 million outstanding as of the Commencement Date).

---

[3]    In addition to this chapter 15 proceeding, the Foreign Representative has commenced recognition proceedings on behalf of the Debtor and the Dutch Borrower (as defined below) in Canada under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c, C-36 as amended, seeking relief substantially similar to that sought by this proceeding with respect to the Scheme.

WEIL:\97137397\1\69894.0005

4.       This consensus results from vigorous, arm's-length negotiations among the Company and its major stakeholders, including: (i) an ad hoc group of Secured Lenders and Noteholders (the "**Ad Hoc Group**"); (ii) syncreon Global Holdings Limited ("**HoldCo**" and, together with its subsidiaries (excluding the Company), the "**HoldCo Group**"),[4] the Company's indirect corporate parent and, through lateral affiliates, the Company's single-largest creditor; and (iii) various other Noteholders and creditors.  During this process, the Company's efforts were supervised by an independent board of directors and experienced legal, business, and financial advisors, including PJT Partners LP, AlixPartners, LLP, and Weil, Gotshal & Manges LLP, as well as experienced Dutch and Canadian counsel, Loyens & Loeff N.V. and Blake, Cassels, & Graydon LLP, respectively.

5.       Following months of hard-fought negotiations, on May 21, 2019, the Company entered into a Restructuring Support Agreement (the "**Restructuring Support Agreement**" and the parties thereto, the "**RSA Parties**")[5] with the Ad Hoc Group, the HoldCo Group, and certain other creditors (collectively, the "**Consenting Creditors**"), pursuant to which the parties agreed to implement a comprehensive balance sheet restructuring of the Company (the "**Restructuring**").   Since that time, additional creditors have become party to the Restructuring Support Agreement and have agreed to support the Scheme and related transactions contemplated thereby.  As of the Commencement Date, parties to the Restructuring Support Agreement collectively hold approximately 97% in value of the Company's Secured Loans and

---

[4]     As it is used herein, the term "**HoldCo Group**" refers, collectively, to the following entities that own, directly or indirectly, OpCo: syncreon Global Holding Limited, syncreon Intermediate Global Holdings Limited, syncreon CayFinance Limited ("**CayCo**"), syncreon Netherlands A B.V., and syncreon Global S.à.r.l.  For the avoidance of doubt, the term "**Company**," as used herein, does not include any of the entities in the HoldCo Group.

[5]     The Restructuring Support Agreement is annexed to the Van Landschoot Declaration as **Exhibit E**.

Unsecured Notes—the only debt to be compromised by the Scheme (collectively, the "**Scheme Debt**").

6.     To effectuate the Scheme, on July 22, 2019, each of the Debtor and syncreon Group B.V. (the "**Dutch Borrower**"), the primary borrower and issuer with respect to the Scheme Debt, applied to the English Court for permission to convene a meeting of creditors for the purpose of considering and approving the Scheme.  The English Court considered that application at a hearing on July 25, 2019 (the "**Convening Hearing**") and issued an order (the "**Convening Order**"), which, among other things, ordered the convening of meetings (the "**Scheme Meetings**") of the holders of the Scheme Debt (collectively, the "**Scheme Creditors**") on September 3, 2019.  If the Scheme is approved by the Scheme Creditors voting at the Scheme Meetings, the English Court is scheduled to hold a hearing on September 10, 2019 (the "**Sanction Hearing**") to consider whether to enter an order sanctioning the Scheme (the "**Sanction Order**" and, together with the Convening Order and any other order that may be entered by the English Court, the "**English Orders**").

7.     The Foreign Representative respectfully submits that the substantive purpose of chapter 15 will be fulfilled here by granting recognition to the rulings of a sister common law jurisdiction, as requested here.  *See* 11 U.S.C. § 1501(a)(1).  As set forth in the Van Landschoot Declaration, all stakeholder recoveries would likely be substantially reduced, and the Company's viability as a going concern put into material jeopardy, if the relief requested herein is not granted and the Scheme is blocked as a result.  Accordingly, and consistent with the objectives of chapter 15 of the Bankruptcy Code, the Foreign Representative commenced this Chapter 15 Case to obtain recognition of the English Proceeding and to give full recognition and enforcement to the English Orders and the Scheme, including the Releases contemplated therein.

## **RELIEF REQUESTED**

8.      By this Motion, the Foreign Representative requests entry of the proposed order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**")  pursuant to sections 105(a), 1145, 1504, 1507, 1510, 1515, 1517, 1520, 1521, and 1522 of title 11 of the United States Code (the "**Bankruptcy Code**") (i) granting recognition of the English Proceeding as a "foreign main proceeding" or, in the alternative, as a "foreign nonmain proceeding" pursuant to chapter 15 of the Bankruptcy Code; (ii) granting recognition of the Foreign Representative as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding; (iii) recognizing, granting comity to, and giving full force and effect in the United States to the English Proceeding, the Scheme, and the English Orders, including the releases contemplated thereby (collectively, the "**Releases**") and described herein; (iv) enjoining parties from taking any action in the United States that is otherwise inconsistent with the Scheme and the English Orders; and (v) granting such other relief as the Court deems just and proper.  The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

9.      In support of this Motion, the Foreign Representative refers the Court to the (i) *Declaration of Carine Van Landschoot in Support of Motion for Recognition of Foreign Main Proceeding and Request for Certain Related Relief* (the "**Van Landschoot Declaration**")[6] and (ii) *Declaration of Andrew J. Wilkinson as English Counsel to Debtor in Support of Motion for Recognition of Foreign Main Proceeding and Request for Certain Related Relief* (the "**Wilkinson**

---

[6]    Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Van Landschoot Declaration.

6

**Declaration**" and, together with the Van Landschoot Declaration, the "**Supporting Declarations**"), filed contemporaneously herewith and incorporated herein by reference.

## JURISDICTION

10.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Foreign Representative properly commenced this Chapter 15 Case pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing a petition for recognition of the English Proceeding under section 1515 of the Bankruptcy Code.

11.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Foreign Representative consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.     Venue is proper before the Court pursuant to 28 U.S.C. § 1410, as the Debtor has assets in the United States located in Delaware, as described further herein and in the Van Landschoot Declaration.

WEIL:\97137397\1\69894.0005

## BACKGROUND

### I.    Overview of the Company's Business

13.    The Company was founded by Mr. Michael Enright and his son, Mr. Brian Enright[7] in 1998 under the name Walsh Western International ("**WWI**").  WWI originally served as a regional provider of outsourced logistics services to the technology sector in Ireland, the United Kingdom, and the Netherlands.  In 2007, WWI acquired TDS Logistics Inc. ("**TDS**"), one of the world's leading global suppliers of value-added supply chain solutions to the automotive industry, and subsequently adopted "syncreon" as the name of the combined company.  The combination of WWI and TDS, both market leaders in their respective industries, created a geographically diverse company with a broad service offering and exposure to industries with complex supply chain requirements.

14.    In December 2009, the Company further expanded its technology industry expertise through the acquisition of Illinois-based NAL Worldwide Holdings Inc. ("**NAL**"), a third-party logistics and supply chain services company providing solutions to the telecommunications, retail, hi-tech, and healthcare industries across North America.  NAL increased the Company's North American footprint, broadened its service offering, and diversified the Company's customer base to include leading wireless network equipment manufacturers.  In 2011, the Company acquired Barcelona-based Compuspar, a supply chain services company with capabilities in the reverse logistics and repair space, expanding the Company's service area to several new geographies.  Through these acquisitions, the Company has become a leading global specialized contract logistics provider.

---

[7]    Mr. Brian Enright is the Chief Executive Officer of syncreon Group Holdings B.V. and a member of its Board of Directors.  Mr. Brian Enright also owns an approximate 2% equity interest in HoldCo.

WEIL:\97137397\1\69894.0005

## II.    Company's Corporate Structure

15.    As of the Commencement Date, the Company employs more than 14,000 employees across 100+ facilities, through approximately sixty (60) entities, in twenty (20) countries, and on six (6) continents.  As discussed above, OpCo is the Debtor's indirect corporate parent and OpCo's ultimate parent, in turn, is HoldCo, a privately held company.  Through an indirect subsidiary, HoldCo is also the Company's single largest creditor.  An abridged corporate organizational chart detailing the relationship between the Company and the HoldCo Group is set forth below.[8]



---

[8]    A more detailed corporate organizational chart is annexed to the Van Landschoot Declaration as **Exhibit D**.

WEIL:\97137397\1\69894.0005

## III.    Company's Capital Structure

16.    As of the Commencement Date, the Company's capital structure comprised

approximately $1.1 billion in funded debt, summarized below:

| As of the Commencement Date<br>Debt Instrument | Principal Outstanding<br>($ millions) |
|---|---|
| **Debtor Obligations** | |
| Liquidity Loan Facilities[9] | 75.5 |
| **Debtor Obligations – Scheme Debt** | |
| Revolving Credit Facility | 109.5 |
| Primary Term Loan Facility | 497.4 |
| Incremental Term Loan Facility | 73.1 |
| **Total Secured Scheme Debt** | **680.0** |
| 8.625% Senior Unsecured Notes | 220.7 |
| **Total Scheme Debt** | **900.7** |
| **Non-Debtor Obligations** | |
| ABL Credit Facility[10] | 79.6 |
| **Total Company Funded Debt** | **1,055.8** |

17.    The Company's corporate capital structure is further characterized by

significant jurisdictional complexity.  In its entirety, the Company includes over sixty (60) separate

entities organized under the laws of twenty (20) different jurisdictions.  Thirty (30) of such entities

are obligors on the Company's funded debt (collectively, the "**Obligors**"), including the various

borrowers, issuers, and guarantors, as applicable, with respect to the Scheme Debt (collectively,

---

[9]    Obligations outstanding with respect to the Liquidity Loan Facilities are not subject to compromise pursuant the Scheme but will be restructured on a fully consensual basis.  Parties to the Restructuring Support Agreement include holders of 100.0% of obligations outstanding with respect to the Liquidity Loan Facilities.

[10]    Obligations outstanding with respect to the ABL Credit Facility are not subject to the Scheme and will repaid, in full, in cash, upon consummation of the transactions contemplated by the Scheme.

WEIL:\97137397\1\69894.0005

the "**Scheme Debt Obligors**").[11]   The Scheme Debt Obligors are organized under the laws of Canada, Germany, Hungary, Ireland, Isle of Man, The Netherlands, Poland, the United Kingdom, and the United States.   These funded debt obligations are described below.

### A.   The Debtor's Funded Debt Obligations

#### 1.   Liquidity Loan Facilities

18.   The Debtor, among others, is a guarantor of the Dutch Borrower's obligations under that certain *Credit Agreement*, dated as of March 15, 2019 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Liquidity Loan Agreement**"), between, among others, (i) the Dutch Borrower, as borrower; (ii) the lenders party thereto (collectively, the "**Liquidity Lenders**"); and (iii) Cantor Fitzgerald Securities, as administrative and collateral agent (the "**Liquidity Loan Agent**").   Pursuant to the Liquidity Loan Agreement, the Liquidity Lenders agreed to provide the Dutch Borrower with term loans in the aggregate principal amount of up to $125.5 million, consisting of (i) an initial term loan in the principal amount of $15.5 million; (ii) an initial delayed draw term loan in the principal amount of $9.5 million; and (iii) a subsequent delayed draw term loan facility in the amount of $100.5 million (such facilities, the "**Liquidity Loan Facilities**" and the loans thereunder, the "**Liquidity Loans**").   As of the Commencement Date, an aggregate principal amount of approximately $75.5 million was outstanding under the Liquidity Loan Facilities.

19.   The Dutch Borrower's obligations under the Liquidity Loan Facilities are jointly and severally guaranteed, subject to certain limitations, by the Debtor and certain non-Debtor affiliates (collectively, the "**Liquidity Loan Guarantors**").   All obligations under the

---

[11]   As used herein, the term "**Scheme Debt Obligors**" shall refer, collectively, to all of the entities identified on **Exhibit B** hereto.

Liquidity Loan Facilities, and the guarantees of such obligations, are secured, subject to certain limitations and exclusions, by substantially all of the assets of the Dutch Borrower and the Liquidity Loan Guarantors, and are senior in all respects to the obligations under the Parent Credit Facilities (as defined below).  The Liquidity Loan Facilities mature on the earliest to occur of (i) October 15, 2019; (ii) the RSA Termination Date (as defined in the Restructuring Support Agreement); and (iii) the date the Liquidity Loans are accelerated pursuant to Article 7 of the Liquidity Loan Agreement.  As detailed below, the Liquidity Loans are not being compromised under the Scheme.  Instead, all accrued but unpaid interest under the Liquidity Loan Facilities will be paid in cash in full and all outstanding Liquidity Loans will be converted, on a fully consensual basis, at par into the New First Out Term Loan (as defined below) issued by the Dutch Borrower.

### 2.    Parent Credit Facilities

20.    The Debtor, among others, is a guarantor of the Dutch Borrower's obligations under that certain *Credit Agreement*, dated as of October 28, 2013 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Parent Credit Agreement**"), among, among others, (i) the Dutch Borrower, as borrower; (ii) syncreon Global Finance (US) Inc. (the "**U.S. Borrower**"), as co-borrower under the Primary Term Loan Facility (as defined below); (iii) the various lenders party thereto (collectively, the "**Secured Lenders**"); and (iv) Wilmington Trust (London) Limited, as successor administrative and collateral agent (the "**Parent Credit Facility Agent**").  Pursuant to the Parent Credit Agreement, the Secured Lenders agreed to provide the Dutch Borrower with the Revolving Credit Facility, the Primary Term Loan Facility, and the Incremental Term Loan Facility (each, as defined below, and collectively, the "**Parent Credit Facilities**" and the loans thereunder,

the "**Secured Loans**").   As of the Commencement Date, an aggregate principal amount of approximately $680 million was outstanding under the Parent Credit Facilities.

21.      The Dutch Borrower's obligations under the Parent Credit Facilities are jointly and severally guaranteed, subject to certain limitations, by the Debtor and certain non-Debtor affiliates (collectively, the "**Parent Credit Facility Guarantors**").  All obligations under the Parent Credit Facilities, and the guarantees of such obligations, are secured, subject to certain limitations and exclusions, by substantially all of the assets of the Dutch Borrower, the U.S. Borrower, and the Parent Credit Facility Guarantors.  Pursuant to the Intercreditor Agreement (as defined below), all liens securing the Parent Credit Facilities are subordinated to the liens securing the Liquidity Loan Facilities.  A description of each of the Parent Credit Facilities is set forth below.

### i.      Revolving Credit Facility

22.      Pursuant to the Parent Credit Agreement, certain of the Secured Lenders (such lenders, the "**Revolving Lenders**") agreed to provide the Dutch Borrower with revolving loans in an aggregate principal amount of up to $100 million (such facility, the "**Revolving Credit Facility**" and the loans thereunder, the "**Revolving Loans**").  As of the Commencement Date, an aggregate principal amount of approximately $109.5 million was outstanding under the Revolving Credit Facility, including paid-in-kind interest.

23.      In addition, the Revolving Loans are secured by creditor support from CayCo, the Dutch Borrower's lateral affiliate, consisting of: (i) cash collateral pledged by CayCo in favor of the Revolving Lenders in an amount not less than approximately $15,000,000

13

(the "**Revolving Lender Cash Collateral**")[12] and (ii) the Pledged Incremental Coupon Loans (as defined below).  The Revolving Credit Facility matures in October 2020.

### ii.       Primary Term Loan Facility

24.     Pursuant to the Parent Credit Agreement, certain of the Secured Lenders agreed to provide the Dutch Borrower and the U.S. Borrower with term loans in an aggregate principal amount of up to $525 million (such facility, the "**Primary Term Loan Facility**").[13]  As of the Commencement Date, an aggregate principal amount of approximately $497.4 million was outstanding under the Primary Term Loan Facility, which was borrowed by the Dutch Borrower on a several, not joint, basis with the U.S. Borrower.  The Primary Term Loan Facility matures in October 2020.

### iii.       Incremental Term Loan Facility

25.     Pursuant to the Parent Credit Agreement, the Dutch Borrower may incur incremental term loans in an aggregate principal amount of up to $95 million (such loans, the "**Main Incremental Term Loans**").   In addition, pursuant to that certain *Reinvestment Commitment Letter*, dated March 22, 2018, CayCo agreed to reinvest in the Dutch Borrower any cash interest it receives with respect to its holdings of the Unsecured Notes (as defined below) in the form of incremental term loans (the "**Pledged Incremental Coupon Loans**" and, together with the Main Incremental Term Loans, the "**Incremental Term Loans**" and such facility, the

---

[12]   Cortland Capital Market Services, LLC serves as the collateral agent with respect to the Revolving Lender Cash Collateral (in such capacity, the "**2020 Extended Revolving Lender Collateral Agent**").

[13]   The relative contractual rights of the Liquidity Loan Lenders, on the one hand, and the Secured Lenders, on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of March 15, 2019 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**").   The Intercreditor Agreement provides that the Liquidity Loans rank senior in priority to the Secured Loans in relation to security and in right of payment from security enforcement proceeds and other distributions in the event of an insolvency or liquidation.

WEIL:\97137397\1\69894.0005

"**Incremental Term Loan Facility**").  The Pledged Incremental Coupon Loans have been pledged in favor of the Revolving Lenders.

26.     All Incremental Term Loans are *pari passu* with the Revolving Loans and the Primary Term Loans and are secured by the same collateral (although the Revolving Loans are secured by additional collateral in the form of the Revolving Lender Cash Collateral and the Pledged Incremental Coupon Loans).  As of the Commencement Date, an aggregate principal amount of approximately $73 million was outstanding under the Incremental Term Loan Facility funded by CayCo, which includes an aggregate principal amount of approximately $13 million of Pledged Incremental Coupon Loans.  The Incremental Term Loan Facility matures in January 2021.

### 3.     Unsecured Notes

27.     The Dutch Borrower and the U.S. Borrower, as co-issuers, the Debtor and each of the other Parent Credit Facility Guarantors, as guarantors, and the Bank of New York Mellon, as trustee (the "**Indenture Trustee**"), are parties to that certain *Indenture*, dated as of October 28, 2013 (as may be amended, supplemented, or otherwise modified from time to time, the "**Indenture**") governing the 8.625% senior unsecured notes (the "**Unsecured Notes**" and the holders of the Unsecured Notes, the "**Noteholders**").  As of the Commencement Date, approximately $221 million in aggregate principal amount of Unsecured Notes was outstanding under the Indenture.  The Unsecured Notes are guaranteed on a senior unsecured basis, jointly and severally, by the Parent Credit Facility Guarantors.

### B.     Non-Debtor Funded Debt Obligations

28.     Non-Debtor affiliate syncreon Financing Ltd. (the "**ABL Borrower**") is party to that certain *Credit Agreement*, dated as of March 9, 2018 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), by and

WEIL:\97137397\1\69894.0005

among (i) the ABL Borrower; (ii) Wells Fargo Bank, N.A., as administrative and collateral agent (the "**ABL Agent**"); and (iii) the lenders from time to time party thereto (the "**ABL Lenders**"), pursuant to which the ABL Lenders agreed to provide the ABL Borrower with revolving loans, subject to borrowing base availability, in an aggregate principal amount of up to $100 million (the "**ABL Credit Facility**").  As of the Commencement Date, an aggregate principal amount of approximately $80 million was outstanding under the ABL Credit Facility.

29.    The ABL Borrower's obligations under the ABL Credit Facility are secured by substantially all assets of the ABL Borrower, consisting primarily of receivables contributed to the ABL Borrower through a series of intercompany transfers.  Although the Debtor does not guarantee the ABL Borrower's obligations under the ABL Credit Facility, the Debtor and other Company affiliates participate as "**Originators**"[14] (as defined in the ABL Credit Agreement) under the ABL Credit Facility.  As an Originator, the Debtor and other Originators transfer various receivables to certain Company subsidiaries, and receivables are ultimately transferred to the ABL Borrower and pledged as collateral to secure the ABL Borrower's obligations under the ABL Credit Facility.  The ABL Credit Facility matures in July 2020.

## IV.    Events Leading to Restructuring

30.    A combination of factors has led to the Company's present restructuring. In recent years, the Company has experienced customer attrition, including the loss of a major tech customer in 2014, and decreased customer volumes from certain of its automotive customers. These challenges have been exacerbated by unfavorable currency fluctuations, as well as

---

[14]    In addition to the Debtor, the following entities participate in the ABL Credit Facility as "**Originators**:" syncreon Deutschland GmbH, syncreon Hungary kft, syncreon Technology (UK) Ltd., syncreon Technology Hungary kft, syncreon Ireland Unlimited Company, syncreon Technology (America) Inc., syncreon America Inc., syncreon Technology (USA) LLC, and syncreon Canada Inc.

WEIL:\97137397\1\69894.0005

increasing labor costs and higher-than-expected launch costs for certain of the Company's new programs. At the same time, the Company has successfully grown revenue by 6.8% and 17.3% in 2017 and 2018, respectively, but remains highly levered when compared to reported EBITDA of $83 million and debt service obligations of approximately $69.5 million in Fiscal 2018.

31.     Faced with these challenges and the prospect of debt maturities commencing in 2020, the Company undertook a broad-based approach to determine a value-maximizing path forward. This process included a marketing process for a potential sale of the business, which process concluded in January 2019 without the Company receiving any formal bids and no indication that any formal bids would be forthcoming.

32.     Additionally, the Company began proactively engaging with certain of its key stakeholders, including the Ad Hoc Group and HoldCo, to build consensus around a de-leveraging transaction. This process was conducted under the supervision of OpCo's board of directors, which board was supplemented with the appointment of two additional independent members holding substantial financial and restructuring expertise. OpCo was also advised by experienced legal and financial advisors during this time. This process of engagement further involved substantial amounts of business, financial, and legal diligence provided to the Ad Hoc Group. This effort, in turn, led to near-constant, arm's-length negotiations, ultimately resulting in entry into the Restructuring Support Agreement on May 21, 2019.

33.     In accordance with the Restructuring Support Agreement, the Company and the relevant creditor parties subsequently (i) amended the Parent Credit Agreement to, *inter alia*, change the governing law of the Parent Credit Agreement to English law and to submit to the non-exclusive jurisdiction of the courts of England and Wales and (ii) amended the Indenture to, *inter alia*, change the governing law of the Indenture to English law and to submit to the exclusive

WEIL:\97137397\1\69894.0005

jurisdiction of the courts of England and Wales and the United States.  Additionally, and in reliance

on the transactions contemplated by the Restructuring Support Agreement, the Company obtained

third-party lending commitments for the $135.0 million exit ABL facility contemplated by the

Scheme.

## V.    The Company's Restructuring and Scheme

34.    A summary of certain key terms and provisions of the transactions

contemplated by the Scheme, including treatment of the Scheme Debt, is set forth below, which

key terms and provisions shall be in accordance with and subject to the Operative Scheme

Documents:[15]

| Term | Description |
|---|---|
| **Liquidity Loan Facility** | <ul><li>All accrued but unpaid interest under the Liquidity Loan Facility will be paid in cash in full.</li><li>Liquidity Loans outstanding will be converted at par into a new first-lien first-out term loan (the "**New First Out Term Loan**") issued by the Dutch Borrower.[16]</li></ul> |
| **New Money** | Commitments by the Ad Hoc Group (in such capacity, the "**New Money Backstop Parties**") to backstop up to $125.5 million in new financing, less outstanding and converted Liquidity Loans (excluding the Liquidity Loans, the "**New Money**"), which will be used to fund the balance of the New First Out Term Loan.<br><br>All Secured Lenders will be offered the opportunity to participate in the $100.5 million of the New First Out Term Loan (inclusive of the New Money). |

---

[15]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the "**Operative Scheme Documents**."  The term "**Operative Scheme Documents**" refers collectively to the Scheme Document, the Deed of Release, and the Restructuring Implementation Deed, each of which are annexed to the Van Landschoot Declaration as **Exhibit F**, **Exhibit G**, and **Exhibit H**, respectively.  In the event of any inconsistency between the foregoing summary table and the Operative Scheme Documents, the Operative Scheme Documents shall control in all respects.  Capitalized terms used in this summary table and the corresponding footnotes but not otherwise defined in this Motion shall have the meaning ascribed to such terms in the Operative Scheme Documents.

[16]    All Liquidity Lenders are parties to the Restructuring Support Agreement and have agreed to consensually convert the Liquidity Loans to loans under the New First Out Term Loan as part of the Restructuring.

WEIL:\97137397\1\69894.0005

| Term | Description |
| --- | --- |
| **Secured Loans** | In exchange for all outstanding Secured Loans, holders will receive:<br><br>• $225 million of reinstated debt in the form of a first-lien second-out term loan (the "**Second Out Term Loan**");<br><br>• 80.0% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP);[17]<br><br>• an additional 5.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) for those Secured Lenders that became party to the Restructuring Support Agreement on or before three (3) business days prior to the Convening Hearing (the "**Lock-Up Deadline**"); and<br><br>• solely for Revolving Lenders, (a) payment of the CayCo Cash Collateral and (b) distribution of any recovery on account of the Pledged Incremental Coupon Loans.<br><br>On the date all conditions precedent to the Restructuring have been satisfied or waived as set forth in the Restructuring Implementation Deed (such date, the "**Restructuring Effective Date**"), the Parent Credit Facilities will be cancelled in their entirety and cease to exist, together with all obligations related thereto (subject to certain limitations). |
| **Unsecured Notes** | In exchange for all outstanding Unsecured Notes, holders will receive:<br><br>• 4.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP);<br><br>• warrants representing the right to purchase 10.0% of Reorganized syncreon Equity (subject to dilution by the MEIP) outstanding immediately after the Restructuring Effective Date (the "**Warrants**"); and<br><br>• an additional 2.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) for those Noteholders that |

---

[17] Note that, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity or Warrants, on the Restructuring Effective Date, each holder of Secured Loans shall first receive, or be deemed to have received, an equivalent proportion of beneficial ownership interests in and right to acquire legal ownership of shares in the capital of the Dutch Borrower ("**NL15 Equity**"), which such holder shall subsequently contribute, or be deemed to have contributed, to NewCo in exchange for its applicable share of Reorganized syncreon Equity in accordance with the Restructuring Implementation Deed.

WEIL:\97137397\1\69894.0005

| Term | Description |
|------|-------------|
| | became party to the Restructuring Support Agreement on or before the Lock-Up Deadline.[18]<br><br>On the Restructuring Effective Date, the Unsecured Notes will be cancelled in their entirety and cease to exist, together with all obligations related thereto (subject to certain limitations). |
| **Trade and Other Unsecured Claims** | Unimpaired and honored in the ordinary course.  The HoldCo Group and certain affiliates have agreed to waive certain claims held against the Company (including any and all management service fees that may be owed to them). |
| **ABL Credit Facility** | The ABL Credit Facility, which is not subject to the Scheme, will be paid in full in cash and terminated on the Restructuring Effective Date. |
| **OpCo Equity** | Cancelled; no recovery. |
| **Certain Additional Fees/Expenses** | Payment of certain additional fees, payments and expenses, including payments in the form of the remaining Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) to parties who are providing the new money backstop commitment and are funding additional liquidity and forbearing from exercising rights and remedies in the period running up to completion of the restructuring. |
| **Release**s | Pursuant to sections 6 and 7 of the Scheme Document and section 2 of that certain "Deed of Release," as of the Restructuring Effective Date, the Scheme Creditors will irrevocably and unconditionally waive, release, and discharge, fully and absolutely, to the fullest extent permitted by law, |

---

[18] Note that, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity or Warrants, on the Restructuring Effective Date, each holder of Unsecured Notes shall first receive, or be deemed to have received, an equivalent proportion of (i) NL15 Equity and (ii) warrants representing the right to acquire outstanding shares in the capital of the Dutch Borrower ("**NL15 Warrants**"), which such holder shall subsequently contribute, or be deemed to have contributed, to NewCo in exchange for its applicable share of Reorganized syncreon Equity and Warrants in accordance with the Restructuring Implementation Deed.

WEIL:\97137397\1\69894.0005

| Term | Description |
|---|---|
| | all Liabilities[19] of the Released Parties[20] in relation to or in connection with or in any way arising out of the Scheme Debt and related claims, the preparation, negotiation, sanction, or implementation of the Restructuring Support Agreement and/or the Restructuring and/or the Restructuring Documents, and the execution of the Restructuring Documents and/or the carrying out of any actions, steps, or transactions contemplated thereby.<br><br>Pursuant to section 3 of the Deed of Release, as of the Restructuring Effective Date, each of the Restructuring Parties, for itself and on behalf of its Connected Parties, will also irrevocably and unconditionally waive, release, and discharge fully and absolutely, to the fullest extent permitted by law, all Liabilities of any Released Party and each and every claim each Restructuring Party or its Connected Parties may have against any Released Party, in each case in relation to or in connection with or in any way arising out of, among other things, the Restructuring Support Agreement, the Scheme Debt and related claims, the preparation, negotiation, sanction, or implementation of the Schemes and/or the Restructuring and/or the Restructuring Documents, the execution of the Restructuring Documents and/or the carrying out of the actions, steps, and transactions contemplated thereby, and any event, act, or omission or other occurrence taking place on or prior to the Restructuring Effective Date based on or relating to the Company, or in any manner based on, relating to or arising from, the Restructuring, the Schemes, the recognition proceedings, or the Restructuring Documents. |

---

[19] Pursuant to the Deed of Release, "**Liability**" means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is known or unknown, whether or not it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises by contract, at common law, in equity, by statute or otherwise in England and Wales or any other jurisdiction, or in any manner whatsoever.

[20] Pursuant to the Deed of Release, "**Released Parties**" means the Adviser Released Parties, the Transaction Released Parties, the Company, syncreon Group, the Group Companies, the Participating Creditors, the New Money Providers and the Shareholder Parties and the direct and indirect holders of equity interests in the Shareholder Parties and each such person's Connected Parties (each, as defined in the Deed of Release). Pursuant to the Deed of Release, "**Connected Persons**" means with respect to a person, its current and former: (a) Affiliates (as defined in the Deed of Release); (b) Related Entities (as defined in the Deed of Release); (c) partners, directors, officers, employees, legal and other professional advisers (including auditors), agents, co-investors, managers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, potential or existing financing sources and representatives; and (d) its Affiliates' or its Related Entities' current and former partners, directors, officers, employees, legal and other professional advisers (including auditors), agents, co-investors, managers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, potential or existing financing sources and representatives.

WEIL:\97137397\1\69894.0005

Additional information about the Scheme and the Restructuring is set forth in the explanatory statement (the "**Explanatory Statement**"), which was filed with the English Court in conjunction with the Scheme on July 22, 2019.[21]

35.    Once sanctioned, the Scheme will authorize the Debtor and the Dutch Borrower to execute (i) the restructuring implementation deed, which contains all of the conditions to implementation of the restructuring (the "**Restructuring Implementation Deed**"), (ii) the Deed of Release, and (iii) any other documents necessary or desirable to give effect to the Scheme and the Restructuring on behalf of the Scheme Creditors.  The Restructuring will then take place pursuant to the Scheme, the Restructuring Implementation Deed, and the other documents governing the Restructuring.

36.    Completion of the Restructuring is conditioned upon, among other things: (i) approval of the Scheme by the Scheme Creditors, sanction of the Scheme by the English Court, and effectiveness of the Scheme in accordance with its terms; (ii) the recognition of the English Proceeding in the United States under chapter 15 of the Bankruptcy Code; and (iii) the recognition of the English Proceeding in Canada under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c, C-36 as amended, pursuant to parallel proceedings undertaken by the Debtor and the Dutch Borrower.

## VI.    The English Proceeding

37.    On July 10, 2019, the Debtor and the Dutch Borrower issued a practice statement letter (the "**Practice Statement Letter**")[22] to the Scheme Creditors.  Among other

---

[21]    As set forth in the Wilkinson Declaration, the Explanatory Statement may be broadly analogized to a disclosure statement in the chapter 11 context.  A copy of the Explanatory Statement that was distributed to Scheme Creditors is annexed to the Van Landschoot Declaration as **Exhibit C**.

[22]    A copy of the Practice Statement Letter is annexed to the Van Landschoot Declaration as **Exhibit I**.

WEIL:\97137397\1\69894.0005

things, the Practice Statement Letter notified the Scheme Creditors of the Debtor's intention to propose the Scheme and apply to the English Court for permission to convene the Scheme Meetings, the class composition of the Scheme Creditors under the Scheme, and the Debtor's intention to commence this Chapter 15 Case to obtain recognition of the Scheme (as a condition to the effectiveness of the Scheme).  The Practice Statement Letter was published (i) in respect of the Secured Lenders, by the Parent Credit Facility Agent's posting of the Practice Statement Letter to a data site maintained for the benefit of those parties; (ii) in respect of the Noteholders, through the Depository Trust Company's Legal Notice System; and (iii) by Lucid Issuer Services Limited (the "**Information Agent**") on the Scheme website at https://www.lucid-is.com/syncreon/, which can be accessed by all Scheme Creditors.

38.    On July 22, 2019, the Debtor commenced the English Proceeding by applying to the English Court for permission to convene the Scheme Meetings.[23]  The application to the English Court was accompanied by the Explanatory Statement containing information regarding the Company and the Scheme.  On July 25, 2019, the English Court held the Convening Hearing and issued the Convening Order,[24] which, among other things:  (i) ordered the convening of the Scheme Meetings on September 3, 2019; (ii) ordered that notice of the Scheme, together with the Explanatory Statement, be distributed to all Scheme Creditors; and (iii) authorized the appointment of the Foreign Representative in connection with this Chapter 15 Case.

39.    The Debtor anticipates the Sanction Hearing will be held on September 10, 2019.  If the English Court sanctions the Scheme at the Sanction Hearing and issues the Sanction

---

[23]    As noted above, on the same date, the Dutch Borrower commenced a parallel Scheme, which is inter-conditional with the Debtor's Scheme.

[24]    A certified copy of the Convening Order is annexed to the Van Landschoot Declaration as **Exhibit B**.

Order, the Scheme will become effective, and thereby binding as a matter of English law on all Scheme Creditors, upon delivery of the Sanction Order to the Registrar of Companies of England and Wales; Scheme implementation and, therefore, the Company's Restructuring, is further contingent upon this Court's recognition of the Scheme under chapter 15 of the Bankruptcy Code.

40.     Accordingly, the Foreign Representative has caused the Debtor to commence this Chapter 15 Case.  The Foreign Representative respectfully submits that recognition is necessary to facilitate the Restructuring and to achieve the more fundamental objectives of chapter 15 itself, including:

- protecting the interests of creditors (who overwhelmingly support the Scheme or whose debt is not otherwise compromised by the Scheme) by facilitating completion of the Debtor's proposed Restructuring;

- preserving the Company's operations as a going concern;

- preserving the jobs of more than 14,000 men and women across the globe;

- providing certainty for the creditors and third party capital providers who have agreed to support the Debtor's Restructuring through their own undertakings and commitments; and

- facilitating cooperation through established principles of comity recognizing the efficacy of English schemes of arrangement under U.S. law.

## BASIS FOR RELIEF REQUESTED

### I.    The Debtor Is Eligible for Chapter 15

#### A.    To the Extent Applicable, syncreon Automotive (UK) Ltd. Is a "Debtor" Under Section 109(a) of the Bankruptcy Code

41.     Certain courts in this district have held that the requirements of section 109(a) of the Bankruptcy Code do not apply to debtors seeking chapter 15 relief.  *See, e.g.*, Hr'g Tr. 8:19-9:10, *In re Bemarmara Consulting A.S.,* Case No. 13-13037 (Bankr. D. Del. Dec. 17, 2013), D.I. 38 (holding section 109(a) did not apply to chapter 15 proceeding); *In re Metinvest B.V.*, Case No. 17-10130 (LSS) (Bankr. D. Del. Feb. 8, 2017), D.I. 19 (same).  Admittedly, the United States Court of Appeals for the Second Circuit has taken a different approach.  *See*

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 251 (2d Cir. 2013) (holding that section 109(a) applies in the chapter 15 context).

42.     Regardless, to the extent section 109(a) of the Bankruptcy Code is applicable in chapter 15, the requirements set forth therein are satisfied here.  Under section 109(a) of the Bankruptcy Code, a corporate entity is eligible to be a "debtor" under the Bankruptcy Code where it has "property in the United States."  Section 109(a) does not require a specific quantum of property in the United States, nor does it impose a minimum on how long such property must have had situs in the United States.  *See*, *e.g.*, *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) ("Therefore, the Court concludes that . . . the language of § 109(a) is clear, and the Court does not have discretion to look behind the language and declare that the quantity of property in the United States will be decisive of eligibility to be a debtor under the Code.").

43.     As of the date hereof, the Debtor has property in the United States and, more specifically, in this district.  The Debtor has an interest in certain funds deposited with Pachulski Stang Ziehl & Jones LLP, as Delaware counsel to the Debtor in connection with this Chapter 15 Case, which funds are held in an account with M&T Bank in Wilmington, Delaware (the "**Retainer Account**").  The Retainer Account contains approximately $40,000.

44.     Professional retainers on deposit in bank accounts located in the United States are "property in the United States" under section 109(a) of the Bankruptcy Code.  *See e.g.*, *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 200 (Bankr. D. Del. 2015); *In re Glob. Ocean Carriers Ltd.*, 251 B.R. at 39; *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 293–96 (Bankr. S.D.N.Y. 2018).  Accordingly, the Debtor is an eligible debtor under section 109(a) of the Bankruptcy Code if such provision is, in fact, applicable here.

WEIL:\97137397\1\69894.0005

**B.      Section 1517(a) of the Bankruptcy Code Is Satisfied**

45.      Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . . within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517.  Each requirement is met here.

**1.      The English Proceeding Is a "Foreign Proceeding" Under Section 1502 of the Bankruptcy Code**

46.      The English Proceeding is a "foreign proceeding" under section 101(23) of the Bankruptcy Code and, as such, satisfies the first condition for entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.   Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."  11 U.S.C. § 101(23); *see In re ABC Learning Centres Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013) (delineating the elements of the definition of "foreign proceeding" per section 101(23)).  Section 1502(3) of the Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."

WEIL:\97137397\1\69894.0005

47.     Courts in this district have uniformly recognized English schemes of arrangement as "foreign proceedings" under chapter 15 of the Bankruptcy Code[25] and courts in other jurisdictions are in agreement.[26]

### i.     The English Proceeding Is a "Proceeding"

48.     The hallmark of a "proceeding" is a "statutory framework that contains [sic] a company's actions and that regulates the final distribution of a company's assets" and includes "acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." *Flynn v. Wallace (In re Irish Bank Resolution Corp.)*, 538 B.R. 692, 697 (D. Del. 2015) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009)).  The English Proceeding is governed by the statutory framework set forth in the Companies Act.  As detailed in the Wilkinson Declaration, the Companies Act specifies the acceptable procedures for implementing an English scheme of arrangement, including commencing the scheme, designating classes of creditors, holding meetings, and voting.  The Companies Act also sets forth the standards for approval of English schemes of arrangement by the English Court. Here, the Convening Order mandated that all creditors of the Debtor receive a copy of the Explanatory Statement that provides notice and disclosure regarding the procedures to take place in the Scheme.  The English Proceeding is therefore a "proceeding."  *See*, *e.g.*, *In re Irish Bank*

---

[25]     *See*, *e.g.*, *In re Metinvest B.V.*, Case No. 17-10130 (LSS) (Bankr. D. Del. Feb. 8, 2017), D.I. 19; *In re Metinvest B.V.*, Case No. 16-11424 (LSS) (Bankr. D. Del. June 30, 2016), D.I. 24; *In re Zodiac Pool Sols., SAS, et al.*, Case No. 14-11818 (KJC) (Bankr. D. Del. Aug. 29, 2014), D.I. 27–1; *In re Hellas Telecomms. (Luxembourg) V*, Case No. 10-13651 (Bankr. D. Del. Dec. 13, 2010), D.I. 38.

[26]     *See*, *e.g.*, *In re Avanti Commc'ns Grp. PLC*, Case No. 18-10458 (MG), 528 B.R. 603 (Bankr. S.D.N.Y. Apr. 9, 2018), D.I. 16; *In re Hibu Inc.*, Case No. 14-70323 (Bankr. E.D.N.Y. Feb. 27, 2014), D.I. 29; *In re Zlomrex Int'l Fin. S.A.*, Case No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014), D.I. 17; *In re Magyar Telecom B.V.*, Case No. 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013), D.I. 26; *In re Tokio Marine Eur. Ins. Ltd.*, Case No. 11-13420 (MG) (Bankr. S.D.N.Y. Sep. 8, 2011), D.I. 13.

*Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 9953792, at *12–13 (Bankr. D. Del. Apr.

30, 2014), *aff'd*, 538 B.R. 692 (D. Del. 2015).

### ii.    The English Proceeding Is Judicial in Character

49.    In assessing a comparable scheme mechanism in a sister law jurisdiction

(namely, Bermuda), a U.S. bankruptcy court reviewed the following elements to reach a

determination that such a proceeding was judicial in character:

> There are two mandatory court appearances, the first, on the *ex parte* summons to
> convene the class meetings and the second, on the sanctioning of the scheme. . . .
> Both hearings required the court to review the materials submitted and evaluate
> them. . . . With regard to the second hearing, . . . the court plays a significant role
> in that it must assure itself that the scheme is in the best interests of creditors and
> members.  Lastly, creditors and members had a plethora of opportunities to object
> to the scheme before it was sanctioned . . . .

*In re Petition of Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 52 (Bankr. S.D.N.Y. 1999),

*aff'd*, 275 B.R. 699 (S.D.N.Y. 2002).

50.    Similarly, here, the English Court, an English judicial body, has issued the

Convening Order, pursuant to which the English Court directed the convening of the Scheme

Meetings after determining that the Scheme complied with the applicable provisions of the

Companies Act, including that the proposed voting classes were acceptably defined.  Completing

the Scheme process requires the English Court to hold the Sanction Hearing, at which creditors

will have the opportunity to raise objections, to consider whether the standard for issuance of the

Sanction Order is met.

51.    To sanction the Scheme, the English Court must be satisfied, *inter alia*, that

an intelligent and honest person, being a member of the relevant class of scheme creditors

concerned and acting in respect of his interests, might reasonably approve it.  Absent the English

Court's sanction, the Company cannot implement the Scheme.  Indeed, the English Scheme may,

in fact, be considered more "creditor friendly" when compared to American bankruptcy

proceedings insofar as there is no cramdown mechanism comparable to American bankruptcy law; rather, each impaired class must accept its treatment under the Scheme: "Unlike chapter 11 of the Bankruptcy Code, UK law authorizing schemes of arrangement does not provide a mechanism for 'cramming down' dissenting classes of creditors.'" *In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 618–19 (Bankr. S.D.N.Y. 2018). Moreover, the class "acceptance" threshold is higher under an English scheme of arrangement than in chapter 11, with acceptance requiring at least 75% (and not two-thirds) in value of voting creditors in each class to accept the scheme. Accordingly, the English Proceeding is clearly judicial in character.

### iii.    The English Proceeding Is Collective in Nature

52.    A proceeding is "collective" if it considers the rights and obligations of all creditors. *See In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301, 308 (3d Cir. 2013) (finding an Australian liquidation proceeding collective in nature because the liquidator was required to "consider the rights of all the creditors in distributing assets" and "distribute assets according to priorities on a pro rata basis"); *see also In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638–39 (Bankr. S.D.N.Y. 2018) (finding a foreign proceeding "collective" in nature where the plain language of the applicable statute required findings that it was in the interest of the joint creditors).

53.    There is no serious debate in the caselaw or practice that English schemes of arrangement are "collective" in nature. This uniformly recognizes that English schemes of arrangement are intended to be precisely that. All Scheme Creditors have the opportunity to attend and vote at the Scheme Meetings, subject to compliance with the applicable procedures specified in the Convening Order. The English Court will then assess the extent to which Scheme Creditors may consult together in relation to the proposed compromise or arrangement with a view to their

29

common interest, as required by the Companies Act.  Finally, the Scheme (when sanctioned) will be binding on all affected creditors.  The Scheme is therefore collective in nature.

### iv.    The English Proceeding Is Located in a Foreign Country

54.    The Convening Hearing was held before the English Court in England, the Scheme Meetings will take place in England, and the Sanction Hearing will be held before the English Court in England.  Therefore, there can be no doubt that the English Proceeding is located in England, a foreign country.

### v.    The English Proceeding Relates to Adjustment of Debts

55.    A scheme of arrangement under the Companies Act is a flexible mechanism that can be used to encompass a large variety of compromises or arrangements between a company and its creditors.  Schemes of arrangement are routinely used to restructure all or part of a company's debt and have the effect of discharging or restructuring a company's liabilities.  Accordingly, an English scheme of arrangement is authorized or conducted under a law related to insolvency or the adjustment of debts.

### vi.    The English Proceeding Subjects the Debtor To Supervision of a Foreign Court

56.    "[T]he requirement that the debtor's assets be subject to the control and supervision of a foreign court does not require that the foreign proceedings play out entirely in a judicial context like cases under the Bankruptcy Code.  *The ability of a party to ask for court assistance concerning the proceeding is sufficient to satisfy this element*."  8 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1501.03(1) (16th ed. Rev. 2019) (emphasis added); *see ABC Learning Centres*, 445 B.R. at 332 (finding a "proceeding" to be subject to supervision of a foreign court where provisions allow interested parties to seek relief from the court).

WEIL:\97137397\1\69894.0005

57.     The English Proceeding clearly meets this minimal standard.  The English Court possesses the authority to sanction (or decline to sanction) the Scheme following the Sanction Hearing and, in turn, determine whether or not the Company will obtain the relief sought. Therefore, no contract or obligation of the Company may be modified pursuant to the Scheme without the English Court's approval.

58.     In addition, Scheme Creditors will have the opportunity to seek the assistance of the English Court by raising objections at the Sanction Hearing, and the English Court will have exclusive jurisdiction to hear and determine any suit, action, or proceeding and to settle any dispute which arises out of or in connection with the terms of the Scheme.  The Scheme is therefore subject to the "supervision" of a foreign court.

### vii.     The English Proceeding Is Intended to Facilitate a Reorganization

59.     The Scheme is an essential component of a global restructuring by which the Company (including the Debtor) will reduce its funded debt obligations by approximately $625 million, raise new third-party financing, preserve the jobs of more than 14,000 employees, and reorganize as a going concern with all debt other than the Scheme Debt (and certain claims held by the HoldCo Group and certain affiliates) paid in the ordinary course or otherwise consensually restructured or refinanced.  There can be no reasonable dispute that the Foreign Proceeding is a proceeding for the purposes of reorganization.

### C.     The English Proceeding Is a "Foreign Main Proceeding" or, Alternatively, a "Foreign Non-Main" Proceeding

### 1.     The English Proceeding Qualifies as a Foreign Main Proceeding

60.     Section 1502(4) defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests.  *See* 11 U.S.C. § 1502(4).  The Bankruptcy Code does not define the term "center of main interests"

31

or "**COMI**," but section 1516 establishes the presumption that COMI is the place of the debtor's registered office.  11 U.S.C. § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests.").  Where this statutory presumption does not apply, courts have generally considered a number of factors to determine COMI, including:

- the location of the debtor's headquarters;

- the location of those who actually manage the debtor (which, conceivably, could be the headquarters of a holding company);

- the location of the debtor's primary assets;

- the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and

- the jurisdiction whose law would apply to most disputes.

*See In re Irish Bank Resolution Corp. Ltd*., No. 13-12159 (CSS), 2014 WL 9953792, at *16 (Bankr. D. Del. Apr. 30, 2014); *ABC Learning Centres*, 445 B.R. at 333 (citing *In re Bear Stearns*, 389 B.R. 325 (S.D.N.Y. 2008)).

61.     The Debtor is incorporated in England, and its registered office is located in England—specifically, Unit 5 Logix Road, R D Park, Hinckley, Watling Street, Leicestershire, LE10 3BQ, United Kingdom.  The Court may therefore presume the Debtor's COMI is England. *See* 11 U.S.C. § 1516(c).

62.     Additional facts support this determination.  The Debtor's primary assets are located in England, including substantial operating facilities in Haydock, Minwork, Wolverhampton, and two separate locations in Coleshill, England (collectively, the "**English Facilities**").  The Debtor itself employs approximately 560 employees in England and serves the regional needs of one the Company's major automotive customers.  The English Facilities' leases, related employee contracts and obligations, and material customer contracts are

generally all governed by English law and any disputes related thereto would otherwise be subject to English law.  Other than the funds in the Retainer Account, substantially all of the Debtor's assets are located in England.  Accordingly, the English Proceeding qualifies as a foreign main proceeding and, thus, the first element of section 1517(a) of the Bankruptcy Code is satisfied.

### 2.    The English Proceeding Qualifies as a Foreign Non-Main Proceeding

63.    In the alternative, the English Proceeding is entitled to recognition as a "foreign nonmain proceeding."  A "foreign nonmain proceeding" is a "foreign proceeding" pending where the debtor has an "establishment."  Section 1502(2) of the Bankruptcy Code broadly defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2).  "Non-transitory" economic activity requires "a seat for local business activity" in the applicable country with a "local effect on the marketplace."  *See Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 806 (Bankr. W.D. Pa. 2019); *Mood Media*, 569 B.R. at 561–63 (Bankr. S.D.N.Y. 2017).  As described above, at a minimum, the Debtor has an "establishment" given the scope of its business connections to England, and the English Proceeding should, in the alternative, be recognized as a "foreign nonmain proceeding."

### D.    This Chapter 15 Case was Commenced by a Duly-Authorized "Foreign Representative"

64.    In order for a recognition motion to be granted, a foreign debtor's application for recognition must be made by a "foreign representative" who is a person or body.  *See* 11 U.S.C. §§ 1515(a), 1517(a)(2).  Section 101(24) then defines "foreign representative" as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

33

11 U.S.C. § 101(24).  Section 1516(a) of the Bankruptcy Code provides that "[i]f the decision [commencing the foreign proceeding] . . . indicates . . . that the person or body is a foreign representative, the court is entitle to so presume."

65.    Ms. Van Landschoot is a "foreign representative."  On July 9, 2019, the Debtor's board of directors appointed Ms. Van Landschoot[27] to serve as its "foreign representative" and to apply for this recognition here.  This duly delegated corporate authority satisfies section 101(24) of the Bankruptcy Code.  *See Ad Hoc Grp. of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro, S.A.B. de C. V.)*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd* 701 F.3d 1031 (5th Cir. 2012); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG), 2010 WL 10063842 (Bankr. S.D.N.Y. Nov. 8, 2010).  On July 25, 2019, the English Court expressly ratified the appointment of Ms. Van Landschoot as Foreign Representative pursuant to the Convening Order.[28]    Accordingly, Ms. Van Landschoot is a duly authorized foreign representative within the meaning of section 101(24) of the Bankruptcy Code.

### E.    The Verified Petition Satisfies Section 1515 and Bankruptcy Rule 1007(a)(4)

66.    The Foreign Representative properly commenced this case by filing the Chapter 15 Petition in accordance with section 1515(a) of the Bankruptcy Code, accompanied by all documents and information required by Bankruptcy Rule 1007(a)(4) and sections 1515(b) and

---

[27]    Here, the Foreign Representative is an individual and, thus, a "person" as defined under section 101(41) of the Bankruptcy Code.

[28]    A certified copy of the Convening Order is annexed to the Van Landschoot Declaration as **Exhibit B**.

(c) of the Bankruptcy Code, including this Motion.   Under sections 1515(b) and (c) of the Bankruptcy Code:

> (b) A petition for recognition shall be accompanied by—
>
>> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
>>
>> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
>>
>> (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.
>
> (c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515(b)–(c).  Bankruptcy Rule 1007(a)(4) requires that a chapter 15 petition include: (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 and (ii) a list containing (a) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, (b) all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.

67.    Per section 1515(b), the Foreign Representative annexed to the Chapter 15 Petition and the Van Landschoot Declaration (i) a certified copy of the resolution  of appointment by the Debtor's board of directors approving the commencement of the English Proceeding, this Chapter 15 Case, and the appointment of the Foreign Representative (the "**Resolution of**

**Appointment**")[29] and (ii) a certified copy of the Convening Order confirming the same.[30]   In addition, the Verified Petition includes all documents and information required by the Bankruptcy Code, Bankruptcy Rules, and Local Rules.  Accordingly, the Foreign Representative has satisfied the requirements of sections 1515(b) and (c) of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

## II.   The Releases Are Necessary, Appropriate, and Should Be Approved

68.   The Foreign Representative requests that the Court recognize, and give full force and effect to, the Releases contemplated by the Scheme.  Such recognition ensures that creditors supporting the Scheme (who, as noted above, include holders of approximately 97% of all Scheme Debt) will obtain the benefit of the English Court's ruling so that third parties cannot seek to thwart or circumvent the Scheme by pursuing remedies in the United States.  Similarly, the Debtor's more than 500 employees (to say nothing of the more than 14,000 men and women employed by the Company as a whole), customers, vendors, and trade counterparties all have a clear interest in assuring the integrity of the Scheme across all relevant jurisdictions.[31]

69.   Such relief is consistent with the Court's broad-based authority under each of sections 1507 and 1521 of the Bankruptcy Code, as well as the purpose and objective of chapter 15 itself.  These sections permit the Court to provide assistance to the Foreign Representative pursuant to section 1507, and "grant any appropriate" relief pursuant to section 1521, where such relief is necessary to protect the Debtor's assets <u>or</u> where such relief is in the "interests of the

---

[29]   An extract of a certified copy of the Resolution of Appointment is annexed to the Chapter 15 Petition and the Van Landschoot Declaration as **Exhibit 2** and **Exhibit A**, respectively.

[30]   A certified copy of the Convening Order is annexed to the Chapter 15 Petition and the Van Landschoot Declaration as **Exhibits 1** and **Exhibit B**, respectively.

[31]   To be clear, the Debtor is not aware of any party that may take such an adverse action at the present time.

creditors."  To this end, courts in this and other jurisdictions have consistently recognized that chapter 15 authorizes enforcement of non-debtor releases in recognition proceedings on facts comparable to those here.[32]

70.     Indeed, in *Avanti*, the Court specifically held that enforcing the release of guarantor liability with respect to an English scheme of arrangement is an appropriate exercise of such authority in chapter 15.  582 B.R. at 618.  The *Avanti* Court stated, in relevant part, that

> schemes of arrangements sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code . . . . The proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards . . . The failure of a U.S. bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring.  Principles of comity permit a US bankruptcy court to recognize and enforce the Scheme.

*Id*. at 618–19.  The relief requested herein is consistent with this precedent and should be approved.

**A.     Section 1507 of the Bankruptcy Code Authorizes the Court to Recognize and Enforce the Releases**

71.     The Court may provide "additional assistance" to the Foreign Representative pursuant to section 1507 of the Bankruptcy Code where such assistance is (i) "consistent with the principles of comity" and (ii) satisfies the specific considerations set forth

---

[32]   *See, e.g.*, *In re Zodiac Pool Solutions SAS*, Case No. 14-11818 (Bankr. D. Del. 2014), D.I. 27-1 (granting recognition of English scheme of arrangement and giving full force and effect to the scheme, which contemplated releases of certain non-debtor guarantors of the funded debt); *In re Mood Media*, 569 B.R. 556 (Bankr. S.D.N.Y. 2017) (enforcing third party releases with respect to non-debtor guarantors under CCAA proceeding); *In re Towergate Fin. PLC*, Case No. 15-10509-SMB (Bankr. S.D.N.Y. Mar. 27, 2015), D.I. 16 (recognizing an English scheme of arrangement and ordering that the scheme was entitled to "full force and effect, including the scheme releases set forth therein," which including releases with respect to certain non-debtor guarantors); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014), D.I. 20 (same); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL (Bankr. S.D.N.Y. Dec. 11, 2013) (same); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010); *In re Sino-Forest Corp.*, 501 B.R. 655, 665–66 (Bankr. S.D.N.Y. 2013) (enforcing non-debtor releases granted pursuant to CCAA plan of arrangement).

at section 1507(b).  11 U.S.C. § 1507; *see In re Elpida Memory, Inc.*, No. 12-10947 CSS, 2012 WL 6090194, at *4 (Bankr. D. Del. Nov. 20, 2012).

### 1.    The Releases Are Consistent With Principles of Comity

72.    "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987).  Comity does not require that a foreign proceeding trigger an identical or equivalent result to American law.  Rather, "[i]t is sufficient if the result is comparable." *Vitro*, 701 F.3d at 1044 (internal quotation marks omitted); *see In re Sino-Forest Corp.*, 501 B.R. at 662 ("[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States.").

73.    There is no real question that the substantive and procedural safeguards provided under the English Proceeding satisfy this broad standard.  As noted above, courts uniformly grant recognition to English proceedings with respect to schemes of arrangement.  This practice recognizes that the English Proceeding provides all affected creditors with a full and fair opportunity to object and be heard with respect to the Scheme—including with respect to the proposed Releases.  In the English Proceeding, the Scheme Creditors will have a full and fair opportunity to vote on and be heard in connection with the Scheme in a manner consistent with U.S. standards of due process.  For example, Scheme approval requires a greater than 50% majority in number representing not less than 75% in value of each class of Scheme Creditor present and voting at the relevant Scheme Meetings to vote in favor of the Scheme to be legally binding.

74.    Comity should thus extend as requested here.  On the one hand, failure to enforce the Releases would materially prejudice all creditors by thwarting a fundamental underpinning of the Scheme itself.  As the *Avanti* court has stated: "without releasing [the non-

38

debtor] guarantees, it would be difficult to restructure the debt because the collective assets and earnings of the group are needed to support the restructured debt without the risk of some creditors that hold the guarantees separately reaching the assets of the affiliates, endangering the ability of the group to meet its restructured debt obligations." 582 B.R. at 606

75.    On the other hand, the Releases contemplated by the Scheme are, as required for comity, entirely consistent with the laws and public policy of the United States.[33] Courts in this jurisdiction and others have recognized that third party releases can and should be enforced through the bankruptcy process where, as here, such releases are necessary to ensure the debtor's successful reorganization or may be necessary to "carry out the provisions" of the Bankruptcy Code. *See* 11 U.S.C. § 105(a); *see also In re Caesars Ent'mt Op. Co.*, 808 F.3d 1186, 1188–09 (7th Cir. 2015); *In re Cont'l Airlines*, 203 F.3d 203 (3d Cir. 2000).

### 2.    Section 1507(b) of the Bankruptcy Code Is Satisfied

76.    The English Proceeding provides for the just treatment of affected stakeholders, provides those parties with a developed path to protect their rights, and provides oversight and supervision of the proposed Restructuring by the English Court.  The English Court is, of course, an experienced, independent, and well-established tribunal that shares a deep legal tradition with the United States.  As *Avanti* recognized, "[t]he proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards." 582 B.R at 618.  Indeed, the interests of creditors will be harmed—not helped—should this Court decline to grant additional assistance by recognizing the Releases here:

---

[33]    Courts have in fact recognized that sections 1507 and 1521 authorize the enforcement of non-debtor releases arising under a foreign proceeding, via recognition, even where such releases would not be available in a comparable American proceeding. *See, e.g.*, *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 696 ("[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian orders, even if those provisions could not be entered in a plenary chapter 11 case.").

creditor recoveries will likely be materially impaired, trade claims may be compromised, the Company's going concern will be threatened, and thousands of jobs placed at risk.

**B.      Section 1521 Authorizes the Court to Recognize and Enforce the Releases**

77.      Section 1521(a) authorizes the Court, "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors," to "grant any appropriate relief" requested by the foreign representative, provided that the interests of creditors and other interested entities are sufficiently protected.  "In assessing requested relief under this section, the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *In re Energy Coal S.P.A.,* 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (internal quotation marks omitted).  The Court's authority in this regard is "exceedingly broad, since a court may grant any appropriate relief that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors."  *Avanti,* 582 B.R. at 612 (internal quotation marks omitted).  This discretionary relief has been applied to enforce non-debtor releases under similar circumstances by multiple courts.[34]

---

[34]      *See, e.g., In re Zodiac Pool Solutions SAS*, Case No. 14-11818 (Bankr. D. Del. Aug. 29, 2014), D.I. 27-1 (granting recognition of English scheme of arrangement and giving full force and effect to the scheme, which contemplated releases of certain non-debtor guarantors of the funded debt); *In re Mood Media*, 569 B.R. at 556 (enforcing third party releases with respect to non-debtor guarantors under CCAA proceeding); *In re Towergate Fin. PLC*, Case No. 15-10509-SMB (Bankr. S.D.N.Y. Mar. 27, 2015), D.I. 16 (recognizing an English scheme of arrangement and ordering that the scheme was entitled to "full force and effect, including the scheme releases set forth therein," including releases with respect to certain non-debtor guarantors); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014), D.I. 20 (same); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL (Bankr. S.D.N.Y. Dec. 11, 2013), D.I. 26 (same); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 700; *In re Sino-Forest Corp.*, 501 B.R. at 665–66 (enforcing non-debtor releases granted pursuant to CCAA plan of arrangement).

WEIL:\97137397\1\69894.0005

78.     To exercise such authority, the Court must determine that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).  "Sufficient protection" has been described as:

> embodying three basic principles: '[(i)] the just treatment of all holders of claims against the bankruptcy estate, [(ii)] the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and [(iii)] the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'

*In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 322 (Bankr. S.D.N.Y. 2019).  Each of these principles is satisfied here.

### 1.     Holders of Claims Against and Interests in Debtor's Property are Receiving Just Treatment under Scheme

79.     The "just treatment of all holders of claims against or interests in the debtor's property" is satisfied where the applicable foreign law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all of the estate's creditors in one proceeding.  *See, e.g.*, *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) ("The 'just treatment' factor is satisfied upon a showing that the applicable law 'provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors.'").

80.     The English Proceeding satisfies this principle.  As discussed above and as detailed in the Wilkinson Declaration, English schemes of arrangement are well-established and well-respected mechanisms to justly and fairly restructure obligations incurred by cross-border enterprises such as the Company.  The experience, integrity, and independence of the English Court is also beyond reproach.

**2.**     **Holders of Claims Against and Interests in Debtor's Property are Protected From Prejudice and Inconvenience**

81.     The Scheme treats only the Scheme Debt, and no Scheme Creditor (or any other creditor) is required to file a claim in the English Proceeding to receive the same treatment as other similarly situated creditors.  Claims held by Scheme Creditors are not disputed in the English Proceeding.  No creditor in the United States is required to process or file a claim in the English Proceeding, and no creditor in the United States will be inconvenienced thereby.  Further, all Scheme Creditors were given notice of the Scheme, and the process for participating in or objecting to the Scheme is the same for United States creditors as all other creditors.

**3.**     **The Scheme Provides for the Distribution of Proceeds Substantially in Accordance with the Bankruptcy Code**

82.     The third and final factor relevant here is whether distribution of the Debtor's property will substantially accord with the order of distribution available under the Bankruptcy Code.  This factor does not require that the Scheme to produce an identical result to the Bankruptcy Code.  Rather, "[t]his factor requires simply that the 'foreign distribution scheme be substantially in accordance with United States bankruptcy law; it does not have to mirror the United States distribution rules.'"  *In re Oi S.A.*, 587 B.R. 253, 268-69 (Bankr. S.D.N.Y. 2018) (quoting *In re Ionica PLC*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999)); *see In re ABC Learning Centres Ltd.*, 728 F.3d at 311 (approving Australian scheme where "Australian law established a different way to achieve similar goals[]" to the bankruptcy code).

83.     Part 26 of the Companies Act shares many fundamental principles with the Bankruptcy Code, including substantially similar distribution priorities.  Moreover, all Scheme Creditors will have a full and fair opportunity to vote on and be heard in connection with the Scheme, and the Scheme itself is subject to the approval of the English Court, which is substantially in accordance with United States bankruptcy law.

WEIL:\97137397\1\69894.0005

**III.    Discretionary Relief Should Also Be Granted With Respect to Section 1145 of the Bankruptcy Code**

84.    Section 1145(a)(1) of the Bankruptcy Code exempts certain securities from the registration requirements under section 5 of the Securities Act of 1933, as amended, and analogous state and local law (collectively, the "**Registration Requirements**").  Specifically, section 1145(a)(1) provides an exemption from the Registration Requirements for transactions involving securities that are:

> (1) offered or sold "under a plan;"
>
> (2) "of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan;" and
>
> (3) "in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate . . . "

*See* 11 U.S.C. § 1145(a)(1).  Section 1145(a)(2) further exempts the offer of "a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in [section 1145(a)(1)], or the sale of a security upon the exercise of such a warrant, option, right, or privilege" under a chapter 11 plan.  11 U.S.C. § 1145(a)(2).  Section 1145(c) of the Bankruptcy Code causes an offer or sale of securities of the kind and in the manner specified in section 1145(a)(1) to be deemed a public offering.  11 U.S.C. § 1145(c).

85.    In connection with the Restructuring, a Dutch *besloten vennootschap* (BV) ("**NewCo**") and a Dutch *stichting administratiekantoor* (the "**STAK**") were formed.  The STAK owns NewCo and NewCo will ultimately, through a series of transactions, become the new 100% shareholder of the Dutch Borrower.  The Scheme contemplates that the Dutch Borrower and

WEIL:\97137397\1\69894.0005

NewCo will issue securities to Scheme Creditors in exchange for their claims against the Scheme Debt Obligors, including the Debtor.[35]

86.     For the reasons set forth below, the Foreign Representative submits that the exemption provided for by section 1145 of the Bankruptcy Code should apply to certain of the securities issued in accordance with the Scheme, including: (i) the PCF Equity; (ii) the PCF Additional Equity; (iii) the Notes Equity; (iv) the Notes Additional Equity; (v) the NL15 Equity; (vi) the NL15 Additional Equity (each of (i)–(vi), as defined in the Scheme Document, and, collectively, the "**1145 Equity**"); (vii) the Warrants (including the Reorganized syncreon Equity issuable upon exercise of the Warrants); and (viii) the NL15 Warrants (each of (vii) and (viii) as defined in the Scheme Document and, collectively, the "**1145 Warrants**") (the 1145 Equity and the 1145 Warrants, collectively, the "**1145 Securities**").

87.     Section 1145 of the Bankruptcy Code is intended to prevent the holders of securities issued by a reorganizing company from being saddled involuntarily with restrictions, duties, or limitations imposed by the securities laws.  *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 236-38 (1977).  Section 1145 therefore "shield[s] from liability under the federal securities laws those individuals participating in the reorganization of an entity in bankruptcy" for the purpose of "encourag[ing] satisfaction of debts or other existing interests in the debtor."  *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 425 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).

---

[35]    Note that, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity or Warrants, on the Restructuring Effective Date, each holder of Secured Loans or Unsecured Notes shall first receive, or be deemed to have received, an equivalent proportion of (i) the NL15 Equity and (ii) NL15 Warrants, as applicable, which such holder shall subsequently contribute, or be deemed to have contributed, to NewCo in exchange for its applicable share of the Reorganized syncreon Equity and Warrants in accordance with the Restructuring Implementation Deed.  Capitalized terms used in this footnote but not otherwise defined in this Motion shall have the meaning ascribed to such terms in the Operative Scheme Documents.

### A.    Discretionary Relief Under Section 1145 Should Be Granted Under Sections 1521(a)(7) and 1507

88.    Section 1521(a)(7) of the Bankruptcy Code provides in pertinent part that:

> Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter . . . the court may . . . grant[ ] any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521. "Additional relief" therefore includes application of section 1145, and the rationale applicable to such relief in chapter 11 applies with equal force to this proceeding where "adequate disclosure exists and strict enforcement of the registration requirements of the U.S. securities laws would burden (or worse, preclude) the foreign reorganization process." Kurt A. Mayr, *Using Chapter 15 to Overcome U.S. Securities Law Impediments to Effective Ancillary Relief in Cross-Border Reorganizations*, 15 Norton J. Bankr. L. & Prac. 367, 374 (2006) (emphasis added).

89.    Courts in this and other districts have granted similar relief in recognition proceedings to exempt securities issued in a foreign proceeding from the Registration Requirements pursuant to sections 1507(a) and 1521(a)(7) of the Bankruptcy Code, including by explicit reference and application of section 1145 of the Bankruptcy Code.[36]

### B.    Section 1145 of the Bankruptcy Code is Satisfied Here

90.    *First*, section 1145 requires that the securities in question must be offered or sold "under a plan." This condition is, of course, satisfied here because the 1145 Securities are being offered or sold pursuant to the Scheme—the functional equivalent of a chapter 11 plan.

---

[36]    *See, e.g.*, *In re Abengoa, S.A.*, Case No. 16-10754 (KJC) (Bankr. D. Del., Dec. 8, 2016), D.I. 277; *In re Oi S.A.*, Case No 16-11791 (SHL) (Bankr. S.D.N.Y. June 15, 2018), D.I. 25; *In re CGG S.A.*, Case No. 17-11636 (MG) (Bankr. S.D.N.Y. Dec. 21, 2017), D.I. 169.

WEIL:\97137397\1\69894.0005

91.     *Second*, section 1145 requires the securities in question must be "of the debtor," an "affiliate participating in a joint plan" or a "successor."   Section 101(2) of the Bankruptcy Code defines the term "affiliate" as, among other things, "an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor."   11 U.S.C. § 101(2).   This condition is, again, satisfied here.   The 1145 Securities will be issued by an affiliate of the Debtor here—*i.e.*, an entity that indirectly owns or controls more than 20 percent of the voting securities of the Debtor.   Here, the 1145 Securities will be issued by the Dutch Borrower or NewCo (as a new parent entity of the Dutch Borrower), in each case, an entity that is an "affiliate" of the Debtor and participating in the transactions contemplated by the Scheme to effectuate the terms of the Scheme.   More specifically, each of the Dutch Borrower and NewCo is, or upon the effectiveness of the transactions contemplated by the Scheme, will be indirect parent companies of the Debtor, holding an indirect interest in 100% of the equity of the Debtor.   As such, each is an affiliate of the Debtor.

92.     *Third*, and finally, section 1145 of the Bankruptcy Code requires that the securities in question must be offered "in exchange for a claim against . . . the debtor or such affiliate."   Here, the 1145 Securities are being distributed in exchange for claims held by the Scheme Creditors against, among others, the Debtor and the Dutch Borrower.[37]

---

[37]   Section 1145(a)(2) specifically exempts the issuance of securities acquired through the exercise of warrants (as contemplated by the Scheme) where section 1145 is otherwise satisfied with respect to such warrants.   *See* 11 U.S.C. § 1145(a)(2).

WEIL:\97137397\1\69894.0005

IV.    **The Relief Requested By This Motion Achieves the Bankruptcy Code's Objectives and Policy**

93.    The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

(i) cooperation between (a) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors in possession; and (b) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (iv) protection and maximization of the value of the debtor's assets; and (v) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501.

94.    The relief requested achieves these objectives.  Recognizing the English Proceeding promotes the fair and efficient administration of a cross-border reorganization procedure that protects the interests of all affected parties.  Recognition will centralize the process of resolving any residual claims against the Debtor in England.  Claims would be treated in accordance with the Scheme, which comports with English law and is similar to comparable United States laws, and any disputes would be subject to the uniform jurisdiction of one tribunal—the English Court.

95.    In particular, recognition will further promote the "protection and maximization of the debtor's assets" and facilitate the "rescue of troubled businesses." *Cf.* 11 U.S.C. § 1501(a)(4)–(5).  The Foreign Representative believes the Scheme is the value-maximizing path forward for the Company's (and the Debtor's) stakeholders.  Recognition of the English Proceeding and, in turn, the English Orders, will also provide certainty for investment by certain third parties by facilitating the Company's incurrence of a new asset based lending facility

WEIL:\97137397\1\69894.0005

and the new money funding commitments contemplated by the Scheme. *Cf.* 11 U.S.C. § 1501(a)(2).

96.    More fundamentally, recognition will facilitate cooperation between courts in England and the United States—nations that share a longstanding common law tradition of cooperation and comity, as well as long standing precedent by which English schemes of arrangement are recognized as a matter of U.S. law. *See e.g.*, *In re Avanti Communications Group PLC*, 582 B.R. 603. Indeed, failure to recognize a duly-sanctioned English scheme of arrangement would be a perhaps unprecedented break from long-standing practice with respect to one common law jurisdiction extending comity (or not) to a fellow legal system.

## CONCLUSION

97.    For the reasons set forth herein, and on the record set forth in the Van Landschoot Declaration and in the Wilkinson Declaration, and as the Foreign Representative will be further prepared to establish at the Court's hearing to consider approval of the relief requested, the Foreign Representative respectfully requests that the Court enter the form of Proposed Order attached hereto as **Exhibit A**.

## NOTICE

98.    Notice of Verified Petition will be provided in accordance with the procedures set forth in the *Motion for Entry of Order (I) Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice and (II) Granting Related Relief* (the "**Scheduling Motion**") filed contemporaneously herewith. The Foreign Representative respectfully submits that no further notice is required.

WEIL:\97137397\1\69894.0005

## NO PRIOR REQUEST

99.     No previous request for the relief sought herein has been made by the Foreign Representative to this or any other court.

*[Remainder of page intentionally left blank]*

WEIL:\97137397\1\69894.0005

WHEREFORE the Foreign Representative respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: July 30, 2019
         Wilmington, Delaware

/s/ Laura Davis Jones
PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
          tcairns@pszjlaw.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
Andriana Georgallas (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for the Foreign Representative*

WEIL:\97137397\1\69894.0005