**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------- x
In re:                                                 :
                                                       :          **Chapter 15**
                                                       :
**SYNCREON AUTOMOTIVE (UK) LTD.**      :          **Case No. 19–11702 (    )**
                                                       :
            **Debtor in a foreign proceeding.**[1]  :
                                                       :
---------------------------------------------------------- x

**DECLARATION OF CARINE VAN LANDSCHOOT IN**
**SUPPORT OF MOTION FOR RECOGNITION OF FOREIGN MAIN**
**PROCEEDING AND REQUEST FOR CERTAIN RELATED RELIEF**

I, Carine Van Landschoot, pursuant to section 1746 of title 28 of the United States

Code, hereby declare under penalty of perjury under the laws of the United States that the

following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer ("**CFO**") and a member of the board of

directors (the "**Board**") of the above-captioned debtor, syncreon Automotive (UK) Ltd.

(the "**Debtor**" and, together with syncreon Group Holdings B.V. ("**OpCo**") and OpCo's

subsidiaries, including the Debtor, the "**Company**"), which is the subject of a proceeding

(the "**English Proceeding**") currently pending before the High Court of Justice of England and

Wales (the "**English Court**") concerning a scheme of arrangement (the "**Scheme**") commenced

pursuant to Part 26 of the Companies Act of 2006 (the "**Companies Act**").  The Debtor is a

company incorporated under the laws of England and Wales and is part of a corporate family, each

of which is owned, directly or indirectly, by OpCo.  Prior to assuming my role as CFO in

---

[1]    The identifying four digits of the Debtor's U.S. federal tax identification number are 1748.  The identifying four digits of the Debtor's local U.K. tax identification number are 2112. The Debtor's (UK) company registration number is 03012604.  The location of the Debtor's corporate headquarters and registered office is Unit 5 Logix Road, R D Park, Hinckley, Watling Street, Leicestershire, LE10 3BQ, United Kingdom.

September 2007, I held the position of Finance Director of Europe from October 2000 until September 2007.  Prior to joining the Company, I served as a Controller for one of the former automotive business units of Johnson Controls, a multinational manufacturing conglomerate specializing in electronics and HVAC equipment for buildings, from October 1998  until September 2000 and as a Controller for ECA, a Belgium-based auto supplier, from October 1992 until September 1998.  I have over 25 years of diversified experience as a financial professional. I received my Master of Business Economics and Business Engineering from the University of Leuven in Leuven, Belgium.

2.      I have been actively involved in the Company's proposed restructuring that will be effectuated pursuant to, among other things, the Scheme, if it is approved by the Scheme Creditors (as defined below) and sanctioned by the English Court in the English Proceeding.[2]

3.      On July 9, 2019, I was duly appointed as foreign representative (the "**Foreign Representative**") of the Debtor pursuant to a resolution (the "**Resolution of Appointment**") of the Board.[3]   On July 25, 2019, the English Court entered an order (the "**Convening Order**"),[4] which, among other things: (i) ordered the convening of a meeting (the "**Scheme Meeting**") of the Scheme Creditors for the purpose of voting on the Scheme on September 3, 2019; (ii) ordered that notice of the Scheme, together with a draft explanatory

---

[2]     Additional information regarding the English Proceeding may be found in paragraphs 38-40 below and in the *Declaration of Andrew J. Wilkinson as English Counsel to Debtor in Support of Motion for Recognition of Foreign Main Proceeding and Request for Certain Related Relief* (the "**Wilkinson Declaration**") filed contemporaneously herewith.

[3]     An extract of a certified copy of the Resolution of Appointment is annexed hereto as **Exhibit A**.

[4]     A certified copy of the Convening Order is annexed hereto as **Exhibit B**.

WEIL:\97137340\1\69894.0005

statement (the "**Explanatory Statement**"),[5] be distributed to all Scheme Creditors; and (iii) ratified my appointment as Foreign Representative and authorized me, in such capacity, to represent the Debtor in seeking any relief available to a foreign representative under chapter 15 of the Bankruptcy Code.

4.      Accordingly, I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtor in support of the (i) *Motion for Recognition of Foreign Main Proceeding and Request for Certain Related Relief* (the "**Recognition Motion**" and, together with the *Voluntary Chapter 15 Petition* (the "**Chapter 15 Petition**"), each filed contemporaneously herewith, the "**Verified Petition**")[6] and (ii) *Motion for Entry of Order (I) Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice and (II) Granting Related Relief* (the "**Scheduling Motion**") filed contemporaneously herewith.

5.      Except as otherwise disclosed herein, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Company, or my opinion based upon my experience, knowledge, and information concerning the Company's operations.  I am over the age of 18 and, if called upon to testify, I could testify competently to the facts set forth in this Declaration.

6.      In this Declaration, I provide a description of, among other things, the following: (i) the status of the Company and its proposed restructuring; (ii) the Company's business operations; (iii) the Company's corporate structure; (iv) the Company's capital structure;

---

[5]    A copy of the Explanatory Statement that was distributed to Scheme Creditors is annexed hereto as **Exhibit C**. Appendices to the Explanatory Statement not otherwise referenced in this Declaration or in the Verified Petition are voluminous and, thus, have been intentionally omitted from **Exhibit C**, however, the Debtor will provide copies of such appendices to the Court or the U.S. Trustee upon request.

[6]    Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Verified Petition.

3

(v) the events leading to the commencement of the English Proceeding and the above-referenced chapter 15 case (the "**Chapter 15 Case**"); (vi) the Scheme and the Restructuring; and (vii) the English Proceeding.  Thereafter, I summarize the relief that I am requesting from the Court and the basis for such relief.

## I.      Overview[7]

7.      The Company, including the Debtor, is a leading logistics services provider to technology and automotive manufacturers across the world.  The Company designs, implements, and executes integrated, customized, flexible, and mission critical logistics solutions for customers focused on reducing operating costs, improving efficiencies, and achieving competitive advantages through the increased outsourcing of their supply chain activities.  As of the date hereof (the "**Commencement Date**"), the Company employs more than 14,000 individuals across 100+ facilities in twenty (20) countries and six (6) continents.  In the year ended December 31, 2018 ("**Fiscal 2018**"), the Company's revenues were approximately $1.2 billion, with the Company reporting approximately $83 million of EBITDA over that same period.  As noted above, the Company's funded debt totaled approximately $1.1 billion as of the Commencement Date.

8.      I commenced this Chapter 15 Case to seek recognition and enforcement of the Scheme pending before the English Court, pursuant to which the Company will, among other things:

- reduce its funded debt load by approximately $625 million;

- repay, in full, obligations outstanding under its asset-based lending facility totaling approximately $80 million as of the Commencement Date;

---

[7]      Capitalized terms used but not otherwise defined in this Overview section shall have the meaning ascribed to such terms elsewhere in this Declaration or in the Verified Petition, as applicable.

WEIL:\97137340\1\69894.0005

- obtain a "new money" first-out term loan with up to $125.5 million of commitments backstopped by, among others, members of the Ad Hoc Group;

- incur a new $135 million asset-based lending facility; and

- not impair or otherwise affect general unsecured claims, which the Company will pay in the ordinary course of business and, in turn, ensure the uninterrupted operation of the Company's business.

The Scheme, its ancillary proceedings,[8] and the transactions contemplated thereby are supported by the overwhelming majority of the Debtor's capital structure and memorialized through a Restructuring Support Agreement. Parties to the Restructuring Support Agreement include holders of 100.0% of all Liquidity Loans (totaling approximately $75.5 million outstanding as of the Commencement Date), 96.5% of all obligations outstanding under the Parent Credit Facilities (totaling approximately $680 million outstanding as of the Commencement Date), and 97.6% of all Unsecured Notes (totaling approximately $221 million outstanding as of the Commencement Date).

9.    This consensus results from vigorous, arm's-length negotiations among the Company and its major stakeholders, including: (i) an ad hoc group of Secured Lenders and Noteholders (the "**Ad Hoc Group**"); (ii) syncreon Global Holdings Limited ("**HoldCo**" and, together with its subsidiaries (excluding the Company), the "**HoldCo Group**"),[9] the Company's indirect corporate parent and, through lateral affiliates, the Company's single-largest creditor; and (iii) various other Noteholders and creditors. During this process, the Company's efforts were

---

[8]    In addition to this chapter 15 proceeding, the Foreign Representative has commenced recognition proceedings on behalf of the Debtor and the Dutch Borrower (as defined below) in Canada under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c, C-36 as amended, seeking relief substantially similar to that sought by this proceeding with respect to the Scheme.

[9]    As it is used herein, the term "**HoldCo Group**" refers, collectively, to the following entities that own, directly or indirectly, OpCo: syncreon Global Holding Limited, syncreon Intermediate Global Holdings Limited, syncreon CayFinance Limited ("**CayCo**"), syncreon Netherlands A B.V., and syncreon Global S.à.r.l.  For the avoidance of doubt, the term "**Company**," as used herein, does not include any of the entities in the HoldCo Group.

WEIL:\97137340\1\69894.0005

supervised by an independent board of directors and experienced legal, business, and financial advisors, including PJT Partners LP, AlixPartners, LLP, and Weil, Gotshal & Manges LLP, as well as experienced Dutch and Canadian counsel, Loyens & Loeff N.V. and Blake, Cassels, & Graydon LLP, respectively.

10.     Following months of hard-fought negotiations, on May 21, 2019, the Company entered into a Restructuring Support Agreement (the "**Restructuring Support Agreement**" and the parties thereto, the "**RSA Parties**")[10] with the Ad Hoc Group, the HoldCo Group, and certain other creditors (collectively, the "**Consenting Creditors**"), pursuant to which the parties agreed to implement a comprehensive balance sheet restructuring of the Company (the "**Restructuring**").    Since that time, additional creditors have become party to the Restructuring Support Agreement and have agreed to support the Scheme and related transactions contemplated thereby.    As of the Commencement Date, parties to the Restructuring Support Agreement collectively hold approximately 97% in value of the Company's Secured Loans and Unsecured Notes—the only debt to be compromised by the Scheme (collectively, the "**Scheme Debt**").

11.     To effectuate the Scheme, on July 22, 2019, each of the Debtor and syncreon Group B.V. (the "**Dutch Borrower**"), the primary borrower and issuer with respect to the Scheme Debt, applied to the English Court for permission to convene a meeting of creditors for the purpose of considering and approving the Scheme.    The English Court considered that application at a hearing on July 25, 2019 (the "**Convening Hearing**") and issued an order (the "**Convening Order**"), which, among other things, ordered the convening of meetings (the "**Scheme Meetings**") of the holders of the Scheme Debt (collectively, the "**Scheme**

---

[10]    The Restructuring Support Agreement is annexed hereto as **Exhibit E**.

Creditors") on September 3, 2019.  If the Scheme is approved by the Scheme Creditors voting at the Scheme Meetings, the English Court is scheduled to hold a hearing on September 10, 2019 (the "**Sanction Hearing**") to consider whether to enter an order sanctioning the Scheme (the "**Sanction Order**" and, together with the Convening Order and any other order that may be entered by the English Court, the "**English Orders**").

12.     Implementation of the Scheme is conditioned upon, among other things, the recognition of the Scheme and the English Orders under chapter 15 of the Bankruptcy Code, including the Releases contemplated therein.  Indeed, I understand that the success of the Restructuring hinges, in large part, on the enforceability of the Releases and the preclusion of any actions by the Scheme Creditors that may frustrate the Restructuring effectuated by the English Proceeding.  Accordingly, I understand that it is critically important that Scheme Creditors be prohibited from taking action against the Scheme Debt Obligors.

13.     Accordingly, and consistent with the objectives of chapter 15 of the Bankruptcy Code, I commenced this Chapter 15 Case to obtain recognition of the English Proceeding and to give full recognition and enforcement to the English Orders and the Scheme, including the Releases contemplated therein.

## II.    Overview of the Company's Business

14.     The Company was founded by Mr. Michael Enright and his son, Mr. Brian Enright[11] in 1998 under the name Walsh Western International ("**WWI**").  WWI originally served as a regional provider of outsourced logistics services to the technology sector in Ireland, the United Kingdom, and the Netherlands.  In 2007, WWI acquired TDS Logistics Inc. ("**TDS**"), one

---

[11]    Mr. Brian Enright is the Chief Executive Officer of syncreon Group Holdings B.V. and a member of its Board of Directors.  Mr. Brian Enright also owns an approximate 2% equity interest in HoldCo.

WEIL:\97137340\1\69894.0005

of the world's leading global suppliers of value-added supply chain solutions to the automotive industry, and subsequently adopted "syncreon" as the name of the combined company. The combination of WWI and TDS, both market leaders in their respective industries, created a geographically diverse company with a broad service offering and exposure to industries with complex supply chain requirements.

15.     In December 2009, the Company further expanded its technology industry expertise through the acquisition of Illinois-based NAL Worldwide Holdings Inc. ("**NAL**"), a third-party logistics and supply chain services company providing solutions to the telecommunications, retail, hi-tech, and healthcare industries across North America. NAL increased the Company's North American footprint, broadened its service offering, and diversified the Company's customer base to include leading wireless network equipment manufacturers. In 2011, the Company acquired Barcelona-based Compuspar, a supply chain services company with capabilities in the reverse logistics and repair space, expanding the Company's service area to several new geographies. Through these acquisitions, the Company has become a leading global specialized contract logistics provider.

## III.     Company's Corporate Structure

16.     As of the Commencement Date, the Company employs more than 14,000 employees across 100+ facilities, through approximately sixty (60) entities, in twenty (20) countries, and on six (6) continents. As discussed above, OpCo is the Debtor's indirect corporate parent and OpCo's ultimate parent, in turn, is HoldCo, a privately held company. Through an indirect subsidiary, HoldCo is also the Company's single largest creditor. An abridged corporate

WEIL:\97137340\1\69894.0005

organizational chart detailing the relationship between the Company and the HoldCo Group is set

forth below.[12]



*[Remainder of page intentionally left blank]*

---

[12]    A more detailed abridged corporate organizational chart is annexed hereto as **Exhibit D**.

## IV.    Company's Capital Structure

17.    As of the Commencement Date, the Company's capital structure comprised approximately $1.1 billion in funded debt, summarized below:

| As of the Commencement Date<br>Debt Instrument | Principal Outstanding<br>($ millions) |
|---|---|
| **Debtor Obligations** | |
| Liquidity Loan Facilities[13] | 75.5 |
| | |
| **Debtor Obligations – Scheme Debt** | |
| Revolving Credit Facility | 109.5 |
| Primary Term Loan Facility | 497.4 |
| Incremental Term Loan Facility | 73.1 |
| **Total Secured Scheme Debt** | **680.0** |
| | |
| 8.625% Senior Unsecured Notes | 220.7 |
| **Total Scheme Debt** | **900.7** |
| | |
| **Non-Debtor Obligations** | |
| ABL Credit Facility[14] | 79.6 |
| | |
| **Total Company Funded Debt** | **1,055.8** |

18.    The Company's corporate capital structure is further characterized by significant jurisdictional complexity.  In its entirety, the Company includes over sixty (60) separate entities organized under the laws of twenty (20) different jurisdictions.  Thirty (30) of such entities are obligors on the Company's funded debt (collectively, the "**Obligors**"), including the various borrowers, issuers, and guarantors, as applicable, with respect to the Scheme Debt (collectively,

---

[13]    Obligations outstanding with respect to the Liquidity Loan Facilities are not subject to compromise pursuant the Scheme but will be restructured on a fully consensual basis.  Parties to the Restructuring Support Agreement include holders of 100.0% of obligations outstanding with respect to the Liquidity Loan Facilities.

[14]    Obligations outstanding with respect to the ABL Credit Facility are not subject to the Scheme and will repaid, in full, in cash, upon consummation of the transactions contemplated by the Scheme.

WEIL:\97137340\1\69894.0005

the "**Scheme Debt Obligors**").[15]   The Scheme Debt Obligors are organized under the laws of

Canada, Germany, Hungary, Ireland, Isle of Man, The Netherlands, Poland, the United Kingdom,

and the United States.   These funded debt obligations are described below.

      A.      **Debtor's Funded Debt Obligations**

      1.      **Liquidity Loan Facilities**

      19.    The Debtor, among others, is a guarantor of the Dutch Borrower's

obligations under that certain *Credit Agreement*, dated as of March 15, 2019 (as may be amended,

restated, amended and restated, supplemented, or otherwise modified from time to time,

the "**Liquidity Loan Agreement**"), between, among others, (i) the Dutch Borrower, as borrower;

(ii) the lenders party thereto (collectively, the "**Liquidity Lenders**"); and (iii) Cantor Fitzgerald

Securities, as administrative and collateral agent (the "**Liquidity Loan Agent**").   Pursuant to the

Liquidity Loan Agreement, the Liquidity Lenders agreed to provide the Dutch Borrower with term

loans in the aggregate principal amount of up to $125.5 million, consisting of (i) an initial term

loan in the principal amount of $15.5 million; (ii) an initial delayed draw term loan in the principal

amount of $9.5 million; and (iii) a subsequent delayed draw term loan facility in the amount of

$100.5 million (such facilities, the "**Liquidity Loan Facilities**" and the loans thereunder,

the "**Liquidity Loans**").   As of the Commencement Date, an aggregate principal amount of

approximately $75.5 million was outstanding under the Liquidity Loan Facilities.

      20.    The Dutch Borrower's obligations under the Liquidity Loan Facilities are

jointly and severally guaranteed, subject to certain limitations, by the Debtor and certain non-

Debtor affiliates (collectively, the "**Liquidity Loan Guarantors**").   All obligations under the

---

[15]   As used herein, the term "**Scheme Debt Obligors**" shall refer, collectively, to all of the entities identified on **<u>Exhibit B</u>** to the Recognition Motion.

Liquidity Loan Facilities, and the guarantees of such obligations, are secured, subject to certain limitations and exclusions, by substantially all of the assets of the Dutch Borrower and the Liquidity Loan Guarantors, and are senior in all respects to the obligations under the Parent Credit Facilities (as defined below).  The Liquidity Loan Facilities mature on the earliest to occur of (i) October 15, 2019; (ii) the RSA Termination Date (as defined in the Restructuring Support Agreement); and (iii) the date the Liquidity Loans are accelerated pursuant to Article 7 of the Liquidity Loan Agreement.  As detailed below, the Liquidity Loans are not being compromised under the Scheme.  Instead, all accrued but unpaid interest under the Liquidity Loan Facilities will be paid in cash in full and all outstanding Liquidity Loans will be converted, on a fully consensual basis, at par into the New First Out Term Loan (as defined below) issued by the Dutch Borrower.

### 2.    Parent Credit Facilities

21.    The Debtor, among others, is a guarantor of the Dutch Borrower's obligations under that certain *Credit Agreement*, dated as of October 28, 2013 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Parent Credit Agreement**"), among, among others, (i) the Dutch Borrower, as borrower; (ii) syncreon Global Finance (US) Inc. (the "**U.S. Borrower**"), as co-borrower under the Primary Term Loan Facility (as defined below); (iii) the various lenders party thereto (collectively, the "**Secured Lenders**"); and (iv) Wilmington Trust (London) Limited, as successor administrative and collateral agent (the "**Parent Credit Facility Agent**").  Pursuant to the Parent Credit Agreement, the Secured Lenders agreed to provide the Dutch Borrower with the Revolving Credit Facility, the Primary Term Loan Facility, and the Incremental Term Loan Facility (each, as defined below, and collectively, the "**Parent Credit Facilities**" and the loans thereunder, the "**Secured Loans**").  As of the Commencement Date, an aggregate principal amount of approximately $680 million was outstanding under the Parent Credit Facilities.

WEIL:\97137340\1\69894.0005

22.     The Dutch Borrower's obligations under the Parent Credit Facilities are jointly and severally guaranteed, subject to certain limitations, by the Debtor and certain non-Debtor affiliates (collectively, the "**Parent Credit Facility Guarantors**").  All obligations under the Parent Credit Facilities, and the guarantees of such obligations, are secured, subject to certain limitations and exclusions, by substantially all of the assets of the Dutch Borrower, the U.S. Borrower, and the Parent Credit Facility Guarantors.  Pursuant to the Intercreditor Agreement (as defined below), all liens securing the Parent Credit Facilities are subordinated to the liens securing the Liquidity Loan Facilities.  A description of each of the Parent Credit Facilities is set forth below.

### i.     Revolving Credit Facility

23.     Pursuant to the Parent Credit Agreement, certain of the Secured Lenders (such lenders, the "**Revolving Lenders**") agreed to provide the Dutch Borrower with revolving loans in an aggregate principal amount of up to $100 million (such facility, the "**Revolving Credit Facility**" and the loans thereunder, the "**Revolving Loans**").  As of the Commencement Date, an aggregate principal amount of approximately $109.5 million was outstanding under the Revolving Credit Facility, including paid-in-kind interest.

24.     In addition, the Revolving Loans are secured by creditor support from CayCo, the Dutch Borrower's lateral affiliate, consisting of: (i) cash collateral pledged by CayCo in favor of the Revolving Lenders in an amount not less than approximately $15,000,000 (the "**Revolving Lender Cash Collateral**")[16] and (ii) the Pledged Incremental Coupon Loans (as defined below).  The Revolving Credit Facility matures in October 2020.

---

[16]     Cortland Capital Market Services, LLC serves as the collateral agent with respect to the Revolving Lender Cash Collateral (in such capacity, the "**2020 Extended Revolving Lender Collateral Agent**").

### ii.      Primary Term Loan Facility

25.      Pursuant to the Parent Credit Agreement, certain of the Secured Lenders agreed to provide the Dutch Borrower and the U.S. Borrower with term loans in an aggregate principal amount of up to $525 million (such facility, the "**Primary Term Loan Facility**").[17]  As of the Commencement Date, an aggregate principal amount of approximately $497.4 million was outstanding under the Primary Term Loan Facility, which was borrowed by the Dutch Borrower on a several, not joint, basis with the U.S. Borrower.  The Primary Term Loan Facility matures in October 2020.

### iii.      Incremental Term Loan Facility

26.      Pursuant to the Parent Credit Agreement, the Dutch Borrower may incur incremental term loans in an aggregate principal amount of up to $95 million (such loans, the "**Main Incremental Term Loans**").  In addition, pursuant to that certain *Reinvestment Commitment Letter*, dated March 22, 2018, CayCo agreed to reinvest in the Dutch Borrower any cash interest it receives with respect to its holdings of the Unsecured Notes (as defined below) in the form of incremental term loans (the "**Pledged Incremental Coupon Loans**" and, together with the Main Incremental Term Loans, the "**Incremental Term Loans**" and such facility, the "**Incremental Term Loan Facility**").  The Pledged Incremental Coupon Loans have been pledged in favor of the Revolving Lenders.

27.      All Incremental Term Loans are *pari passu* with the Revolving Loans and the Primary Term Loans and are secured by the same collateral (although the Revolving Loans are

---

[17]      The relative contractual rights of the Liquidity Loan Lenders, on the one hand, and the Secured Lenders, on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of March 15, 2019 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**").  The Intercreditor Agreement provides that the Liquidity Loans rank senior in priority to the Secured Loans in relation to security and in right of payment from security enforcement proceeds and other distributions in the event of an insolvency or liquidation.

WEIL:\97137340\1\69894.0005

secured by additional collateral in the form of the Revolving Lender Cash Collateral and the Pledged Incremental Coupon Loans).  As of the Commencement Date, an aggregate principal amount of approximately $73 million was outstanding under the Incremental Term Loan Facility funded by CayCo, which includes an aggregate principal amount of approximately $13 million of Pledged Incremental Coupon Loans.  The Incremental Term Loan Facility matures in January 2021.

### 3.    Unsecured Notes

28.    The Dutch Borrower and the U.S. Borrower, as co-issuers, the Debtor and each of the other Parent Credit Facility Guarantors, as guarantors, and the Bank of New York Mellon, as trustee (the "**Indenture Trustee**"), are parties to that certain *Indenture*, dated as of October 28, 2013 (as may be amended, supplemented, or otherwise modified from time to time, the "**Indenture**") governing the 8.625% senior unsecured notes (the "**Unsecured Notes**" and the holders of the Unsecured Notes, the "**Noteholders**").  As of the Commencement Date, approximately **$**221 million in aggregate principal amount of Unsecured Notes was outstanding under the Indenture.  The Unsecured Notes are guaranteed on a senior unsecured basis, jointly and severally, by the Parent Credit Facility Guarantors.

### B.    Non-Debtor Funded Debt Obligations

29.    Non-Debtor affiliate syncreon Financing Ltd. (the "**ABL Borrower**") is party to that certain *Credit Agreement*, dated as of March 9, 2018 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), by and among (i) the ABL Borrower; (ii) Wells Fargo Bank, N.A., as administrative and collateral agent (the "**ABL Agent**"); and (iii) the lenders from time to time party thereto (the "**ABL Lenders**"), pursuant to which the ABL Lenders agreed to provide the ABL Borrower with revolving loans, subject to borrowing base availability, in an aggregate principal amount of up to $100 million

WEIL:\97137340\1\69894.0005

(the "**ABL Credit Facility**").  As of the Commencement Date, an aggregate principal amount of approximately $80 million was outstanding under the ABL Credit Facility.

30.    The ABL Borrower's obligations under the ABL Credit Facility are secured by substantially all assets of the ABL Borrower, consisting primarily of receivables contributed to the ABL Borrower through a series of intercompany transfers.  Although the Debtor does not guarantee the ABL Borrower's obligations under the ABL Credit Facility, the Debtor and other Company affiliates participate as "**Originators**"[18] (as defined in the ABL Credit Agreement) under the ABL Credit Facility.  As an Originator, the Debtor and other Originators transfer various receivables to certain Company subsidiaries, and receivables are ultimately transferred to the ABL Borrower and pledged as collateral to secure the ABL Borrower's obligations under the ABL Credit Facility.  The ABL Credit Facility matures in July 2020.

## V.    Events Leading to Restructuring

31.    A combination of factors has led to the Company's present restructuring. In recent years, the Company has experienced customer attrition, including the loss of a major tech customer in 2014, and decreased customer volumes from certain of its automotive customers. These challenges have been exacerbated by unfavorable currency fluctuations, as well as increasing labor costs and higher-than-expected launch costs for certain of the Company's new programs.  At the same time, the Company has successfully grown revenue by 6.8% and 17.3% in

---

[18]    In addition to the Debtor, the following entities participate in the ABL Credit Facility as "**Originators**:" syncreon Deutschland GmbH, syncreon Hungary kft, syncreon Technology (UK) Ltd., syncreon Technology Hungary kft, syncreon Ireland Unlimited Company, syncreon Technology (America) Inc., syncreon America Inc., syncreon Technology (USA) LLC, and syncreon Canada Inc.

2017 and 2018, respectively, but remains highly levered when compared to reported EBITDA of $83 million and debt service obligations of approximately $69.5 million in Fiscal 2018.

32.     Faced with these challenges and the prospect of debt maturities commencing in 2020, the Company undertook a broad-based approach to determine a value-maximizing path forward.  This process included a marketing process for a potential sale of the business, which process concluded in January 2019 without the Company receiving any formal bids and no indication that any formal bids would be forthcoming.

33.     Additionally, the Company began proactively engaging with certain of its key stakeholders, including the Ad Hoc Group and HoldCo, to build consensus around a de-leveraging transaction.  This process was conducted under the supervision of OpCo's board of directors, which board was supplemented with the appointment of two additional independent members holding substantial financial and restructuring expertise.  OpCo was also advised by experienced legal and financial advisors during this time.  This process of engagement further involved substantial amounts of business, financial, and legal diligence provided to the Ad Hoc Group.  This effort, in turn, led to near-constant, arm's-length negotiations, ultimately resulting in entry into the Restructuring Support Agreement on May 21, 2019.

34.     In accordance with the Restructuring Support Agreement, the Company and the relevant creditor parties subsequently (i) amended the Parent Credit Agreement to, *inter alia*, change the governing law of the Parent Credit Agreement to English law and to submit to the non-exclusive jurisdiction of the courts of England and Wales and (ii) amended the Indenture to, *inter alia*, change the governing law of the Indenture to English law and to submit to the exclusive jurisdiction of the courts of England and Wales and the United States.  Additionally, and in reliance on the transactions contemplated by the Restructuring Support Agreement, the Company obtained

17

third-party lending commitments for the $135.0 million exit ABL facility contemplated by the Scheme.

## VI.    Company's Restructuring and Scheme

35.    A summary of certain key terms and provisions of the transactions contemplated by the Scheme, including treatment of the Scheme Debt, is set forth below, which key terms and provisions shall be in accordance with and subject to the Operative Scheme Documents:[19]

| Term | Description |
| --- | --- |
| **Liquidity Loan Facility** | • All accrued but unpaid interest under the Liquidity Loan Facility will be paid in cash in full.<br>• Liquidity Loans outstanding will be converted at par into a new first-lien first-out term loan (the "**New First Out Term Loan**") issued by the Dutch Borrower.[20] |
| **New Money** | Commitments by the Ad Hoc Group (in such capacity, the "**New Money Backstop Parties**") to backstop up to $125.5 million in new financing, less outstanding and converted Liquidity Loans (excluding the Liquidity Loans, the "**New Money**"), which will be used to fund the balance of the New First Out Term Loan.<br><br>All Secured Lenders will be offered the opportunity to participate in the $100.5 million of the New First Out Term Loan (inclusive of the New Money). |
| **Secured Loans** | In exchange for all outstanding Secured Loans, holders will receive:<br><br>• $225 million of reinstated debt in the form of a first-lien second-out term loan (the "**Second Out Term Loan**"); |

---

[19]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the "**Operative Scheme Documents**."  The term "**Operative Scheme Documents**" refers collectively to the Scheme Document, the Deed of Release, and the Restructuring Implementation Deed, each of which are annexed hereto as **Exhibit F**, **Exhibit G**, and **Exhibit H**, respectively.  In the event of any inconsistency between the foregoing summary table and the Operative Scheme Documents, the Operative Scheme Documents shall control in all respects.  Capitalized terms used in this summary table and the corresponding footnotes but not otherwise defined in this Motion shall have the meaning ascribed to such terms in the Operative Scheme Documents.

[20]    All Liquidity Lenders are parties to the Restructuring Support Agreement and have agreed to consensually convert the Liquidity Loans to loans under the New First Out Term Loan as part of the Restructuring.

| Term | Description |
|------|-------------|
| | <ul><li>80.0% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP);[21]</li><li>an additional 5.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) for those Secured Lenders that became party to the Restructuring Support Agreement on or before three (3) business days prior to the Convening Hearing (the "**Lock-Up Deadline**"); and</li><li>solely for Revolving Lenders, (a) payment of the CayCo Cash Collateral and (b) distribution of any recovery on account of the Pledged Incremental Coupon Loans.</li></ul>On the date all conditions precedent to the Restructuring have been satisfied or waived as set forth in the Restructuring Implementation Deed (such date, the "**Restructuring Effective Date**"), the Parent Credit Facilities will be cancelled in their entirety and cease to exist, together with all obligations related thereto (subject to certain limitations). |
| **Unsecured Notes** | In exchange for all outstanding Unsecured Notes, holders will receive:<ul><li>4.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP);</li><li>warrants representing the right to purchase 10.0% of Reorganized syncreon Equity (subject to dilution by the MEIP) outstanding immediately after the Restructuring Effective Date (the "**Warrants**"); and</li><li>an additional 2.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) for those Noteholders that became party to the Restructuring Support Agreement on or before the Lock-Up Deadline.[22]</li></ul> |

---

[21] Note that, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity or Warrants, on the Restructuring Effective Date, each holder of Secured Loans shall first receive, or be deemed to have received, an equivalent proportion of beneficial ownership interests in and right to acquire legal ownership of shares in the capital of the Dutch Borrower ("**NL15 Equity**"), which such holder shall subsequently contribute, or be deemed to have contributed, to NewCo in exchange for its applicable share of Reorganized syncreon Equity in accordance with the Restructuring Implementation Deed.

[22] Note that, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity or Warrants, on the Restructuring Effective Date, each holder of Unsecured Notes shall first receive, or be deemed to have received, an equivalent proportion of (i) NL15 Equity and (ii) warrants representing the right to acquire outstanding shares in the capital of the Dutch Borrower ("**NL15 Warrants**"), which such holder shall subsequently contribute, or be deemed to have contributed, to NewCo in exchange for its applicable share of Reorganized syncreon Equity and Warrants in accordance with the Restructuring Implementation Deed.

WEIL:\97137340\1\69894.0005

| Term | Description |
|------|-------------|
| | On the Restructuring Effective Date, the Unsecured Notes will be cancelled in their entirety and cease to exist, together with all obligations related thereto (subject to certain limitations). |
| **Trade and Other Unsecured Claims** | Unimpaired and honored in the ordinary course. The HoldCo Group and certain affiliates have agreed to waive certain claims held against the Company (including any and all management service fees that may be owed to them). |
| **ABL Credit Facility** | The ABL Credit Facility, which is not subject to the Scheme, will be paid in full in cash and terminated on the Restructuring Effective Date. |
| **OpCo Equity** | Cancelled; no recovery. |
| **Certain Additional Fees/Expenses** | Payment of certain additional fees, payments and expenses, including payments in the form of the remaining Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) to parties who are providing the new money backstop commitment and are funding additional liquidity and forbearing from exercising rights and remedies in the period running up to completion of the restructuring. |
| **Releases** | Pursuant to sections 6 and 7 of the Scheme Document and section 2 of that certain "Deed of Release," as of the Restructuring Effective Date, the Scheme Creditors will irrevocably and unconditionally waive, release, and discharge, fully and absolutely, to the fullest extent permitted by law, |

WEIL:\97137340\1\69894.0005

| Term | Description |
|------|-------------|
|  | all Liabilities[23] of the Released Parties[24] in relation to or in connection with or in any way arising out of the Scheme Debt and related claims, the preparation, negotiation, sanction, or implementation of the Restructuring Support Agreement and/or the Restructuring and/or the Restructuring Documents, and the execution of the Restructuring Documents and/or the carrying out of any actions, steps, or transactions contemplated thereby.<br><br>Pursuant to section 3 of the Deed of Release, as of the Restructuring Effective Date, each of the Restructuring Parties, for itself and on behalf of its Connected Parties, will also irrevocably and unconditionally waive, release, and discharge fully and absolutely, to the fullest extent permitted by law, all Liabilities of any Released Party and each and every claim each Restructuring Party or its Connected Parties may have against any Released Party, in each case in relation to or in connection with or in any way arising out of, among other things, the Restructuring Support Agreement, the Scheme Debt and related claims, the preparation, negotiation, sanction, or implementation of the Schemes and/or the Restructuring and/or the Restructuring Documents, the execution of the Restructuring Documents and/or the carrying out of the actions, steps, and transactions contemplated thereby, and any event, act, or omission or other occurrence taking place on or prior to the Restructuring Effective Date based on or relating to the Company, or in any manner based on, relating to or arising from, the Restructuring, the Schemes, the recognition proceedings, or the Restructuring Documents. |

---

[23] Pursuant to the Deed of Release, "**Liability**" means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is known or unknown, whether or not it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises by contract, at common law, in equity, by statute or otherwise in England and Wales or any other jurisdiction, or in any manner whatsoever.

[24] Pursuant to the Deed of Release, "**Released Parties**" means the Adviser Released Parties, the Transaction Released Parties, the Company, syncreon Group, the Group Companies, the Participating Creditors, the New Money Providers and the Shareholder Parties and the direct and indirect holders of equity interests in the Shareholder Parties and each such person's Connected Parties (each, as defined in the Deed of Release). Pursuant to the Deed of Release, "**Connected Persons**" means with respect to a person, its current and former: (a) Affiliates (as defined in the Deed of Release); (b) Related Entities (as defined in the Deed of Release); (c) partners, directors, officers, employees, legal and other professional advisers (including auditors), agents, co-investors, managers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, potential or existing financing sources and representatives; and (d) its Affiliates' or its Related Entities' current and former partners, directors, officers, employees, legal and other professional advisers (including auditors), agents, co-investors, managers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, potential or existing financing sources and representatives.

WEIL:\97137340\1\69894.0005

Additional information about the Scheme and the Restructuring is set forth in the Explanatory Statement, which was filed with the English Court in conjunction with the Scheme on July 22, 2019.[25]

36.     I understand that, once sanctioned, the Scheme will authorize the Debtor and the Dutch Borrower to execute (i) the restructuring implementation deed, which contains all of the conditions to implementation of the restructuring (the "**Restructuring Implementation Deed**"), (ii) the Deed of Release, and (iii) any other documents necessary or desirable to give effect to the Scheme and the Restructuring on behalf of the Scheme Creditors.  The Restructuring will then take place pursuant to the Scheme, the Restructuring Implementation Deed, and the other documents governing the Restructuring.

37.     Completion of the Restructuring is conditioned upon, among other things: (i) approval of the Scheme by the Scheme Creditors, sanction of the Scheme by the English Court, and effectiveness of the Scheme in accordance with its terms; (ii) the recognition of the English Proceeding in the United States under chapter 15 of the Bankruptcy Code; and (iii) the recognition of the English Proceeding in Canada under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c, C-36 as amended, pursuant to a parallel proceedings undertaken by the Debtor and the Dutch Borrower.

---

[25]     As set forth in the Wilkinson Declaration, the Explanatory Statement may be broadly analogized to a disclosure statement in the chapter 11 context.  A copy of the Explanatory Statement that was distributed to Scheme Creditors is annexed hereto as **Exhibit C**.  Appendices to the Explanatory Statement not otherwise referenced in this Declaration or in the Verified Petition have been intentionally omitted from **Exhibit C**, however, the Debtor will provide copies of such appendices to the Court or the U.S. Trustee upon request.

WEIL:\97137340\1\69894.0005

## VII.    English Proceeding

38.    On July 10, 2019, the Debtor and the Dutch Borrower issued a practice statement letter (the "**Practice Statement Letter**")[26] to the Scheme Creditors.   Among other things, the Practice Statement Letter notified the Scheme Creditors of the Debtor's intention to propose the Scheme and apply to the English Court for permission to convene the Scheme Meetings, the class composition of the Scheme Creditors under the Scheme, and the Debtor's intention to commence this Chapter 15 Case to obtain recognition of the Scheme (as a condition to the effectiveness of the Scheme).   I understand that the Practice Statement Letter was published (i) in respect of the Secured Lenders, by the Parent Credit Facility Agent's posting of the Practice Statement Letter to a data site maintained for the benefit of those parties; (ii) in respect of the Noteholders, through the Depository Trust Company's Legal Notice System; and (iii) by Lucid Issuer Services Limited (the "**Information Agent**") on the Scheme website at https://www.lucid-is.com/syncreon/, which can be accessed by all Scheme Creditors.

39.    On July 22, 2019, the Debtor commenced the English Proceeding by applying to the English Court for permission to convene the Scheme Meetings.[27]   I understand that the application to the English Court was accompanied by the Explanatory Statement containing information regarding the Company and the Scheme.   On July 25, 2019, the English Court held the Convening Hearing and issued the Convening Order,[28] which, among other things: (i) ordered the convening of the Scheme Meetings on September 3, 2019; (ii) ordered that notice of the Scheme, together with the Explanatory Statement, be distributed to all Scheme Creditors; and

---

[26]    A copy of the Practice Statement Letter is annexed hereto as **Exhibit I**.

[27]    As noted above, on the same date, the Dutch Borrower commenced a parallel Scheme, which is inter-conditional with the Debtor's Scheme.

[28]    A certified copy of the Convening Order is annexed hereto as **Exhibit B**.

WEIL:\97137340\1\69894.0005

(iii) ratified my appointment as Foreign Representative and authorized me, in such capacity, to represent the Debtor in seeking any relief available to a foreign representative under chapter 15 of the Bankruptcy Code.

40.    The Debtor anticipates the Sanction Hearing will be held on September 10, 2019.  If the English Court sanctions the Scheme at the Sanction Hearing and issues the Sanction Order, I understand that the Scheme will become effective, and thereby binding as a matter of English law on all Scheme Creditors, upon delivery of the Sanction Order to the Registrar of Companies of England and Wales; Scheme implementation and, therefore, the Company's Restructuring, is further contingent upon this Court's recognition of the Scheme under chapter 15 of the Bankruptcy Code.

41.    Accordingly, I have commenced this Chapter 15 Case and respectfully request entry of the Proposed Order annexed to the Recognition Motion as **Exhibit A** to ensure that the Company may effectuate the Restructuring without delay.  I respectfully submit that recognition is necessary to facilitate the Restructuring and to achieve what I understand to be, based on guidance from counsel, the fundamental objectives of chapter 15, including by:

- protecting the interests of creditors (who overwhelmingly support the Scheme or whose debt is not otherwise compromised by the Scheme) by facilitating completion of the Debtor's proposed Restructuring;

- preserving the Company's operations as a going concern;

- preserving the jobs of more than 14,000 men and women across the globe;

- providing certainty for the creditors and third party capital providers who have agreed to support the Debtor's Restructuring through their own undertakings and commitments; and

- facilitating cooperation through established principles of comity recognizing the efficacy of English schemes of arrangement under U.S. law.

## VIII.    Request for Recognition and Relief

42.    In connection with the filing of this Chapter 15 Case, the Debtor submitted the Verified Petition.  In addition to the facts set forth above, I believe, after consultation with the Company's legal and financial advisors, that the relief requested in the Verified Petition is necessary to maximize value for all of the Debtor's creditors, as the Scheme is an integral element of the restructuring of the Company, and necessary to protect the Debtor, its creditors, and other stakeholders.

43.    As explained in the Verified Petition, the relief requested therein is necessary to: (i) ensure that all of the Scheme Creditors affected by the Scheme are treated consistently, regardless of where in the world they are located; (ii) protect the Debtor from any lawsuits in the United States from those who are bound by, and benefit from, the terms of the Scheme, and (iii) minimize the risk of other claims that might be alleged under the Company's Prepetition Indebtedness.

44.    Moreover, I believe, based on certain analyses[29] prepared by the Company's advisors (with input from the Company's management team), that the proposed Restructuring to be implemented through the Scheme is the value maximizing path forward for the Debtor's stakeholders, including the Scheme Creditors, and that the transactions contemplated by the Scheme present the highest and best value reasonably available to the Company's (and the Debtor's) stakeholders.  If this Court declines to recognize and enforce the Scheme (including the Releases contemplated therein) and the Scheme is, in turn, unsuccessful, I believe that creditor

---

[29]    These analyses are annexed to the Explanatory Statement as **Appendix 13** (Accelerated Sale Analysis) and **Appendix 14** (Wind Down Analysis).  The Explanatory Statement is annexed hereto as **Exhibit C**.

recoveries will likely be materially impaired, trade claims may be compromised, the Company's going concern will be threatened, and thousands of jobs will be placed at risk.

45.     The Debtor has property in the United States and, specifically, in this jurisdiction.  Indeed, the Debtor has an interest in certain funds deposited with Pachulski Stang Ziehl & Jones LLP, as Delaware counsel to the Debtor in connection with this Chapter 15 Case, which funds are held in an account with M&T Bank in Wilmington, Delaware (the "**Retainer Account**").  The Retainer Account contains approximately $40,000.

46.     To the best of my knowledge and belief, the English Proceeding constitutes a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code.  In addition to its registered office, the Debtor's primary assets are located in England, including substantial operating facilities in Haydock, Minwork, Wolverhampton, and two separate locations in Coleshill, England (collectively, the "**English Facilities**").   The Debtor itself employs approximately 560 employees in England and serves the regional needs of one the Company's major automotive customers.  The English Facilities' leases, related employee contracts and obligations, and material customer contracts are generally all governed by English law and any disputes related thereto would otherwise be subject to English law.  Other than the funds in the Retainer Account, substantially all of the Debtor's assets are located in England.

47.     Based on my understanding from counsel, I also believe the English Proceeding constitutes a judicial proceeding in the United Kingdom under English law relating to insolvency or the adjustment of debt in which the assets and affairs of the Debtor are subject to control and supervision of the English Court for the purpose of recapitalization or liquidation. Accordingly, I believe the English Proceeding constitutes a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

WEIL:\97137340\1\69894.0005

48.     Finally, as described in the Verified Petition and as discussed with counsel, I understand and believe that recognizing the English Proceeding as a "foreign main proceeding" and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and public policy of the United States.  Therefore, I believe that the relief requested in the Verified Petition is necessary and appropriate and in the best interests of the Debtor, its creditors, and other parties in interest.

## IX.     Statement Pursuant to Section 1515(c) of the Bankruptcy Code

49.     I am informed by counsel that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."  In addition to this Chapter 15 Case, the Debtor has sought recognition and enforcement of the Scheme in Canada pursuant to Part IV of the Companies' Creditors Arrangement Act (the "**Canadian Recognition Proceeding**").

50.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that, to my knowledge, the only foreign proceedings (as such term is defined in section 101(23) of the Bankruptcy Code) currently pending with respect to the Debtor are the English Proceeding and the Canadian Recognition Proceeding.

## X.     Disclosures Pursuant to Bankruptcy Rule 1007(a)(4)

51.     I am also informed by counsel that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that a foreign representative filing a petition for recognition under chapter 15 of the Bankruptcy Code shall file with such petition: (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 (the "**Corporate Ownership Statement**"); and (ii) unless the court orders otherwise, lists

27

containing (a) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, (b) all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.  In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

## XI.      Corporate Ownership Statement

52.     The Corporate Ownership Statement is annexed to the Chapter 15 Petition as **Exhibit 5** and is incorporated herein by reference.

## XII.     Persons or Bodies Authorized to Administer Foreign Proceedings

53.     On July 9, 2019, I was duly appointed as Foreign Representative of the Debtor pursuant to the Resolution of Appointment of the Debtor's Board.  On July 26, 2019, pursuant to the Convening Order, the English Court ratified my appointment as Foreign Representative and authorized me, in such capacity, to represent the Debtor in seeking any relief available to a foreign representative under chapter 15 of the Bankruptcy Code.  There are no other persons or bodies authorized to administer foreign proceedings for the Debtor.

## XIII.    Pending Litigation

54.     I am currently unaware of any litigation pending in the United States to which the Debtor is a party.

WEIL:\97137340\1\69894.0005

## XIV.   Provisional Relief

55.     I am not seeking provisional relief at this time, however, I reserve all rights to seek such relief in the event such relief becomes necessary to protect the Debtor or other Company assets, effectuate the Scheme, or otherwise.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury under the laws of the United States that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

July 30, 2019
Dated:  Maldegem, Belgium

_____
Carine Van Landschoot
Authorized Representative of the Debtor