**Exhibit C**

**Explanatory Statement**

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

THIS DOCUMENT COMPRISES AN EXPLANATORY STATEMENT IN COMPLIANCE WITH SECTION 897 OF THE COMPANIES ACT 2006 (the "**Explanatory Statement**"). It is being sent to persons who are believed to be Scheme Creditors and any other person with an interest in the PCF Debt or the Notes (as defined herein) at the date of this Explanatory Statement. If you have assigned, sold, or otherwise transferred, or assign, sell or otherwise transfer, your interests as a Scheme Creditor before the Record Time (as defined herein) you must forward this Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred, or assign, sell or otherwise transfer, your interests as a Scheme Creditor.

**If you are in any doubt as to the contents of this Explanatory Statement or the documents that accompany it or what action you should take, we recommend you seek your own independent financial, legal and tax advice immediately from your financial, legal and/or tax adviser who, if you are taking advice in the United Kingdom, is authorised pursuant to the Financial Services and Markets Act 2000 ("FSMA") or by an appropriate regulatory body, or from another appropriately authorised independent adviser if you are in a territory outside the United Kingdom.** Further copies of this Explanatory Statement and the Proxy Form and Notes Account Holder Letter attached hereto can be obtained by contacting the Information Agent (each as defined below).

**EXPLANATORY STATEMENT IN RELATION TO SCHEMES OF ARRANGEMENT**

**under part 26 of the Companies Act 2006 between**

**SYNCREON GROUP B.V. and SYNCREON AUTOMOTIVE (UK) LTD**

**and**

**THE SCHEME CREDITORS**

**(each as defined in this Explanatory Statement)**

**DATE: 26 July 2019**

The Record Time for determining the value of Scheme Claims (as defined herein) will be 10.00p.m. (London time) / 5.00p.m. (New York) time on Friday 23 August 2019. The Scheme Meetings for the Scheme Creditors to consider and vote on the Schemes will be held at 3.00p.m. (London time) on Tuesday 3 September 2019. The notice convening the Scheme Meetings is set out in Appendix 11 (*Notice of Scheme Meeting*).

Instructions about actions to be taken by Scheme Creditors and any other person with an interest in the PCF Debt or the Notes preceding the Scheme Meetings are set out in Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*) and are summarised in Part A (*Summary of actions to be taken by PCF Lenders*) and Part B (*Summary of actions to be taken by Noteholders*). **Whether or not you intend to attend and/or vote at the relevant Scheme Meetings, you are requested to ensure that you (or in the case of Noteholders, your Notes Account Holder (each as defined herein)) complete(s), execute(s) and return(s) a Proxy Form or Notes Account Holder Letter (as applicable) as soon as possible and in any event by the Voting Instruction Deadline, which will be 5.00p.m. (London time) / 12 Noon (New York time) on Thursday 29 August 2019, in accordance with the instructions printed thereon.**

**This Explanatory Statement concerns matters which may affect your legal rights and entitlements and you may therefore wish to take appropriate legal advice on its contents. This Explanatory Statement is not and shall not be deemed to be a solicitation for consents to the Schemes. The votes of the holders of the PCF Debt or the Notes (each as defined below) will not be solicited until such holders who are entitled to vote on the Schemes have received this Explanatory Statement and other required solicitation materials. This Explanatory Statement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.**

Further important information is set out under the Sections entitled "*Important Notice*" and "*Important Securities Law Notice*" on pages 1 to 8 (inclusive) of this Explanatory Statement.

# TABLE OF CONTENTS

**Page No.**

EXPECTED TIMETABLE OF PRINCIPAL EVENTS..............................................................12

ARE YOU A SCHEME CREDITOR OR ANY OTHER PERSON WITH AN INTEREST IN
THE PCF DEBT OR THE NOTES?...........................................................................14

PART 1  BACKGROUND AND RATIONALE TO THE RESTRUCTURING......................................22

   1  INTRODUCTION ..............................................................................................22

   2  SUMMARY INFORMATION ON THE GROUP AND THE SCHEME
COMPANIES ...................................................................................................22

   3  GROUP INDEBTEDNESS ...................................................................................23

   4  BACKGROUND TO AND REASONS FOR THE RESTRUCTURING............................26

   5  RESTRUCTURING OVERVIEW ..........................................................................32

   6  CREDITOR ENTITLEMENTS..............................................................................39

   7  ESTIMATED RECOVERIES FOR SCHEME CREDITORS IF THE
SCHEME IS SUCCESSFULLY IMPLEMENTED ............................................47

   8  CONSEQUENCES OF A FAILURE TO IMPLEMENT THE
RESTRUCTURING ....................................................................................49

PART 2 OVERVIEW OF THE SCHEMES............................................................................56

   9  SCHEME OF ARRANGEMENT OVERVIEW...........................................................56

  10  THE IDENTITY OF THE SCHEME CREDITORS .........................................................57

  11  EXERCISE OF THE COURT'S JURISDICTION IN RELATION TO THE
SCHEME COMPANIES ...............................................................................59

  12  SCHEME MEETINGS – CLASSES AND VOTING ...................................................59

  13  WHAT WILL THESE SCHEMES DO? ................................................................63

  14  WHEN THE SCHEMES WILL BE EFFECTIVE ....................................................65

  15  SCHEME RECOGNITION   ...............................................................................68

APPENDIX 1 THE SCHEME DOCUMENT .........................................................................70

APPENDIX 2 INSTRUCTIONS AND GUIDANCE FOR SCHEME CREDITORS AND ANY
PERSON WITH AN INTEREST IN THE PCF DEBT OR THE NOTES...............................127

APPENDIX 3 FORM OF PROXY FORM ...........................................................................147

APPENDIX 4 FORM OF NOTES ACCOUNT HOLDER LETTER ................................................171

APPENDIX 5 FURTHER INFORMATION ON THE SCHEME COMPANIES ...................................193

APPENDIX 6 KEY RISK FACTORS ................................................................................199

APPENDIX 7 FINANCIAL AND OTHER INFORMATION OF SYNCREON GROUP
HOLDINGS B.V. ....................................................................................221

APPENDIX 8 PRO FORMA FINANCIAL INFORMATION AND CAPITALISATION AND
INDEBTEDNESS....................................................................................481

APPENDIX 9 GROUP STRUCTURE ................................................................................485

APPENDIX 10 LIST OF GUARANTORS ...........................................................................487

APPENDIX 11 FORM OF NOTICES OF SCHEME MEETINGS ..................................................488

APPENDIX 12 TAXATION ............................................................................................500

APPENDIX 13 ACCELERATED SALE ANALYSIS ..........................................................514

APPENDIX 14 WIND DOWN ANALYSIS.......................................................................546

APPENDIX 15 GLOSSARY AND DEFINITIONS ..............................................................585

APPENDIX 16 SUMMARY OF KEY DOCUMENTS ..........................................................605

APPENDIX 17 FORM OF KEY DOCUMENTS .................................................................617

## IMPORTANT NOTICE

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in Appendix 15 (*Glossary and definitions*). The appendices form an integral part of this Explanatory Statement and, unless expressly stated otherwise, references to this Explanatory Statement shall be construed as references to this Explanatory Statement including the appendices to it.

**Information**

This Explanatory Statement has been prepared in connection with schemes of arrangement under part 26 of the Companies Act, namely schemes between each of syncreon Group and syncreon U.K. and their respective Scheme Creditors, and has been prepared solely for the purpose of providing information to Scheme Creditors and any other person with an interest in the PCF Debt or the Notes in relation to the Schemes.

Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than for Scheme Creditors and any other person with an interest the PCF Debt or the Notes to make a decision on the Schemes. The Scheme Creditors and any other person with an interest in the PCF Debt or the Notes may not reproduce or distribute this Explanatory Statement, in whole or in part, and may not disclose any of the contents of this Explanatory Statement or use any information herein for any purpose other than considering and/or making a decision in respect of the Schemes except as required by applicable law or regulation. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any interest in the PCF Debt, or any Notes, or any other financial instruments or assets of the Scheme Companies or any other member of the Group.

Nothing contained in this Explanatory Statement shall constitute a warranty, undertaking or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or liability on the part of the Scheme Companies or any other member of the Group with respect to any asset to which it or they may be entitled or any claim against any asset or them. Without prejudice to the generality of the foregoing, nothing in this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by the Scheme Companies or any other member of the Group, that a liability is owed by it to any person in respect of any claim (including without limitation any Scheme Claim) or that any person is or may be a Scheme Creditor or a person with an interest in the PCF Debt or the Notes. The failure to distribute this Explanatory Statement to any Scheme Creditor or any other person with an interest in the PCF Debt or the Notes shall not constitute an admission by the Scheme Companies that such person is not a Scheme Creditor or any other person with an interest in the PCF Debt or the Notes.

No independent auditor or accountant has reviewed or approved this Explanatory Statement or any of the financial projections or analysis contained in this Explanatory Statement.

No person has been authorised by the Scheme Companies or the Information Agent to give any information or make any representations concerning the Schemes (including concerning the Scheme Companies or any other member of the Group or the Scheme Consideration) which is inconsistent with this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised.

The information contained in this Explanatory Statement has been prepared based upon information available to the Scheme Companies prior to the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that, unless expressly stated otherwise, the information herein is correct as at any time subsequent to the date hereof. Save as otherwise agreed, or as required by applicable law, the Scheme Companies have no obligation to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent subsequent to the date hereof. To the best of the Scheme Companies' knowledge, information and belief, the information relating to each of the Scheme Companies contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the import of such information. The Scheme Companies have taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary to enable Scheme Creditors and

any other person with an interest in the PCF Debt or the Notes to make an informed decision about the effect of the Schemes on them.

In making a decision in respect of the Schemes, each Scheme Creditor or any other person with an interest in the PCF Debt or the Notes must rely on its own examination, analysis and enquiry of the Scheme Companies and the terms and, if approved, the consequences of the Schemes, including the merits and risks involved. The Scheme Companies' Advisers have not verified that the information contained in this Explanatory Statement is in accordance with facts and does not omit anything likely to affect the import of such information and each of those persons expressly disclaims responsibility for such information. Each Scheme Creditor or any other person with an interest in the PCF Debt or the Notes, by its participation in the Schemes and receipt of any acknowledges that:

(i)      it has not relied on Lucid Issuer Services Limited, as Information Agent or any person affiliated with the Information Agent in connection with any investigation of the accuracy of any information contained in this Explanatory Statement or their investment decision (including any decision in connection with the Schemes);

(ii)     it has not relied on The Bank of New York Mellon, as Notes Trustee in connection with any investigation of the accuracy of any information contained in this Explanatory Statement or their investment decision (including any decision in connection with the Schemes); and

(iii)    it has relied only on the information contained in this Explanatory Statement.

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority, including the U.S. Securities and Exchange Commission (the "**SEC**"). Further, no rating agency or regulatory authority has passed upon the accuracy or adequacy of the information contained in this Explanatory Statement or upon the merits being proposed by the Scheme Companies or any other member of the Group. Without prejudice to the representations and warranties given by the Scheme Companies or any other member of the Group or any directors or officers of the Scheme Companies or any member of the Group elsewhere, to the fullest extent permitted by law, neither the Scheme Companies nor any other member of the Group nor any directors or officers of the Scheme Companies or any other member of the Group will have any tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement and the Scheme Companies and all other members of the Group do not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if a Scheme Company or other member of the Group (as applicable) has been advised of the possibility of such damages.

The statements contained in the Explanatory Statement are made as of the date hereof unless otherwise specified. The terms of the Schemes govern in the event of any inconsistency with the summaries in this Explanatory Statement.

**Electronic form**

If this Explanatory Statement has been sent to you in an electronic form, you are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and consequently none of the Scheme Companies, the Information Agent or any person who controls, or is a director, officer, employee, agent or any affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between this Explanatory Statement distributed to you in electronic format and the hard-copy version available to you on request from the Information Agent.

You are reminded that this Explanatory Statement has been delivered to you on the basis that you are a person into whose possession it may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not nor are you authorised to deliver this Explanatory Statement or any part of it to any other person. If you are not the named addressee to which this Explanatory Statement has been delivered, please notify the sender immediately and destroy this Explanatory Statement.

**Restrictions**

The distribution of this Explanatory Statement may be restricted by law in certain jurisdictions. The Scheme Companies do not represent that this Explanatory Statement may be lawfully distributed in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assume any responsibility for facilitating such distribution.

Persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions.

Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

**Summary only**

The summary of the principal provisions of the Schemes contained in this Explanatory Statement is qualified in its entirety by reference to the Schemes themselves, the full text of which is set out in Appendix 1 (*The Scheme Document*). Each Scheme Creditor or any other person with an interest in the PCF Debt or the Notes is advised to read and consider carefully the text of the Schemes. This Explanatory Statement has been prepared solely to assist Scheme Creditors and any other person with an interest in the PCF Debt or the Notes in respect of voting on the Schemes.

**IN THE EVENT OF A CONFLICT BETWEEN THE INFORMATION AND TERMS DESCRIBED IN THIS EXPLANATORY STATEMENT AND THE SCHEMES, THE TERMS OF THE SCHEMES SHALL PREVAIL.**

**Prospectus**

This Explanatory Statement is not a prospectus within the meaning of Article 5.4 of the Prospectus Directive, or a prospectus equivalent document.

**Forward-looking statements**

Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Scheme Companies or any member of the Group except where otherwise specifically stated.

This Explanatory Statement includes statements that are, or may be deemed to be, "forward-looking statements". The words "believe", "estimate", "target", "anticipate", "expect", "could", "would", "intend", "aim", "plan", "predict", "continue", "assume", "positioned", "may", "will", "should", "shall", "risk", their negatives and other similar expressions that are predictions of or indicate future events and future trends identify forward-looking statements. These forward-looking statements include all matters that are not existing or historical facts. In particular, the statements in Part 1 (*Background and Rationale to the Restructuring*) and in Appendix 6 (*Key Risk Factors*) regarding the Scheme Companies' or the Group's strategy, plans, objectives, goals and other future events or prospects are forward-looking statements. A Scheme Creditor or any other person with an interest in the PCF Debt or the Notes should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors that are in many cases beyond the Scheme Companies' or the Group's control. By their nature, forward-looking statements involve risks, assumptions and uncertainties (many beyond the control of the Scheme Companies and their affiliates) because they relate to events and depend on circumstances that may or may not occur in the future. The Scheme Companies caution Scheme Creditors and any other person with an interest in the PCF Debt or the Notes that forward-looking statements are not guarantees of future performance and that their actual results of operations and financial condition, and the development of the industry in which they operate, may differ materially from those made in or suggested by the forward-looking statements contained in this Explanatory Statement and/or information incorporated by reference into this Explanatory Statement. In addition, if the Scheme Companies' or the Group's results of operations, financial position and growth, and the development of the markets and the industry in which the Group operates, are consistent with the forward-looking statements contained in this Explanatory Statement, those results or

developments may not be indicative of the results or developments in subsequent periods. The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Scheme Companies, or persons acting on their behalf, may issue. Factors that may cause the Scheme Companies' or the Group's actual results to differ materially from those expressed or implied by the forward-looking statements in this Explanatory Statement include but are not limited to the risks described in Appendix 6 (*Key Risk Factors*).

Each forward-looking statement speaks only as of the date of this Explanatory Statement and is not intended to give any assurances as to future results. Each forward-looking statement should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein. There can be no assurance that such statement will be reflective of actual outcomes. Furthermore, forward-looking statements contained in this Explanatory Statement that are based on past trends or activities should not be taken as a representation that such trends or activities will continue in the future. The Scheme Companies will comply with their obligations to publish updated information as required by applicable law and/or by any regulatory authority, but assume no further obligation to publish additional information. The delivery of this Explanatory Statement shall under no circumstances imply that there has been no change in the Scheme Companies' or the Group's affairs or that the information set forth in this Explanatory Statement is correct as of any date subsequent to the date hereof. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements.

## Risk factors

**THE ATTENTION OF THE SCHEME CREDITORS AND ANY OTHER PERSON WITH AN INTEREST IN THE PCF DEBT OR THE NOTES IS DRAWN TO CERTAIN RISKS ASSOCIATED WITH THE SCHEMES AND THE RESTRUCTURING THAT ARE SET OUT OR REFERRED TO IN APPENDIX 6 (*KEY RISK FACTORS*).**

### Legal, tax and financial advice

Scheme Creditors and any other person with an interest in the PCF Debt or the Notes should not construe the contents of this Explanatory Statement as legal, tax or financial advice.

This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs. Scheme Creditors and any other person with an interest in the PCF Debt or the Notes are recommended to consult their own professional advisers as to legal, tax, financial or other matters relevant to the action Scheme Creditors and any other person with an interest in the PCF Debt or the Notes should take in relation to the Schemes, or the implications/consequences of those actions.

This Explanatory Statement is issued by the Scheme Companies to Scheme Creditors and any other person with an interest in the PCF Debt or the Notes in the United Kingdom in reliance on Article 43 of the Financial Promotion Order. This Explanatory Statement is only addressed to Scheme Creditors and any other person with an interest in the PCF Debt or the Notes and no other person (whether in the United Kingdom or otherwise) should rely on it.

### Other jurisdictions

The implications of the Schemes for Scheme Creditors and any other person with an interest in the PCF Debt or the Notes who are residents or citizens of jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdictions. Such overseas Scheme Creditors and any other person with an interest in the PCF Debt or the Notes should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Schemes, including obtaining

any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

**SCHEME CREDITORS AND ANY OTHER PERSON WITH AN INTEREST IN THE PCF DEBT OR THE NOTES SHOULD CONSULT THEIR OWN PROFESSIONAL ADVISERS WITH RESPECT TO THE MATTERS DESCRIBED IN THIS DOCUMENT, INCLUDING THE LEGAL, FINANCIAL AND TAX CONSEQUENCES OF THE SCHEMES IN THEIR PARTICULAR CIRCUMSTANCES.**

## IMPORTANT SECURITIES LAW NOTICE

**NONE OF THE SECURITIES OR ANY RIGHT OR INTEREST THEREIN REFERRED TO IN THIS EXPLANATORY STATEMENT SHALL BE OFFERED, SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

If the Schemes are implemented in accordance with their terms and the other conditions precedent to the Restructuring (as set out in this Explanatory Statement) are satisfied, New Equity will be issued and the Notes and the applicable PCF Debt will be cancelled by the Group in accordance with the terms of the RID.

Neither this Explanatory Statement nor any part hereof constitutes an offer to distribute, issue or sell, or a solicitation of an offer to subscribe for or purchase, the Reorganized syncreon Equity, the Warrants, the NL15 Equity or the NL15 Warrants or any other securities or right or interest therein in any jurisdiction in which such distribution, issue, sale or solicitation is not permitted and neither this Explanatory Statement nor any part hereof may be used for or in connection with an offer to, or the solicitation by, any person in any jurisdiction or in any circumstances in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation. Accordingly, neither the New Equity nor any other securities may be offered or sold, directly or indirectly, and neither this Explanatory Statement nor any part hereof nor any prospectus, offering circular, form of application, advertisement, other offering or solicitation materials nor other information may be issued, distributed or published in any country or jurisdiction except in circumstances that will result in compliance with all applicable laws, orders, rules and regulations.

The New Equity issued pursuant to the Restructuring has not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (together with the rules and regulations promulgated thereunder, the "U.S. Securities Act"), or under any relevant securities laws of any state or other jurisdiction of the United States or under the applicable securities laws of Australia, New Zealand, South Africa, Canada, Japan or Switzerland or other relevant jurisdictions. No public offering of securities will be made in the United States, Australia, New Zealand, South Africa, Canada, Japan or Switzerland.

### U.S. Securities Laws

The Scheme Companies will, in tandem with the Chapter 15 recognition proceedings (described in more detail in paragraph 15.5), seek the entry of an order (an "**1145 Order**") from the U.S. Bankruptcy Court approving the application of the exemption from registration under the U.S. Securities Act provided by Section 1145 of Title 11 of the U.S. Code for the issuance of the Reorganized syncreon Equity comprising the PCF Equity, the PCF Additional Equity, the Notes Equity the Notes Additional Equity, and the Warrants (including the Reorganized syncreon Equity in the form of depositary receipts of the STAK issuable upon exercise of the Warrants), the NL15 Equity, the NL15 Additional Equity and the NL15 Warrants (the "**1145 Equity**"). If the 1145 Order is entered, the 1145 Equity will be issued in reliance upon the exemption from the registration requirements of the U.S. Securities Act and any other applicable U.S. state or local securities laws to the maximum extent permitted by Section 1145 of Title 11 of the U.S. Code. Section 1145 of Title 11 of the U.S. Code generally exempts from registration under the U.S. Securities Act the offer or sale pursuant to a plan of reorganization (in this case, the Schemes) of a security of the debtor (in this case, the Scheme Companies), of an affiliate participating in a joint plan of reorganization with the debtor, or of a successor to the debtor under a plan of reorganization, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of Title 11 of the U.S. Code also exempts from registration the offer of a security through any right to purchase a security issued in exchange for a claim or interest as described in the prior sentence and the sale of a security upon the exercise of such right.

Any 1145 Equity issued pursuant to the exemption from registration provided by Section 1145 of Title 11 of the U.S. Code may be resold without registration under the U.S. Securities Act or other U.S. federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of Title 11 of the U.S. Code. In addition, such Section 1145 exempt securities generally may be resold without registration under U.S. state securities laws pursuant to various exemptions provided by the respective laws of the several states. Section 1145(b) of Title 11 of the U.S. Code defines "underwriter" for purposes of the

U.S. Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan or (d) is an issuer, as used in Section 2(a)(11) of the U.S. Securities Act, with respect to such securities, which includes "control persons" of the issuer. Based on the legislative history of Section 1145 of Title 11 of the U.S. Code, any person who, in the aggregate, owns ten percent (10%) or more of the voting securities of any member of the Scheme Companies and its Affiliates may be presumed to be a control person and, therefore, an underwriter. Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the U.S. Securities Act, which permits the resale of securities received by such underwriters, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be underwriters as defined in Section 1145 of Title 11 of the U.S. Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

If the U.S Bankruptcy Court does not enter an 1145 Order, the New Equity will be issued in reliance upon the exemption from the registration requirements of the U.S. Securities Act provided by (i) in the case of the PCF Equity, the Notes Equity, the Warrants, the NL15 Equity and the NL15 Warrants (the "**Scheme Equity**"), Section 3(a)(10) of the U.S. Securities Act ("**Section 3(a)(10)**") and (ii) in the case of the PCF Additional Equity, the Notes Additional Equity, the NL15 Additional Equity and the Reorganized syncreon Equity in the form of depositary receipts of the STAK issuable upon exercise of the Warrants, Section 4(a)(2) and/or Regulation D of the U.S. Securities Act (together with the Private Placement Equity (as defined below), the "**4(a)(2) Equity**"). For the purpose of qualifying for the exemption from the registration requirements of the U.S. Securities Act provided by Section 3(a)(10) with respect to the Scheme Equity, the Court will be advised that, if the U.S. Bankruptcy Court does not enter an 1145 Order, the Court's sanctioning of the Schemes will be relied upon as an approval of the Schemes following a hearing on its fairness to security holders, which hearing all such security holders are entitled to attend in person, by proxy or through counsel to support or oppose the sanctioning of the Schemes and with respect to which hearing notification has been given to all such security holders. Any Scheme Equity issued pursuant to the exemption from registration provided by Section 3(a)(10) may be "restricted securities" and may not be resold in the United States without registration under the U.S. Securities Act, except pursuant to an available exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act. Recipients of such are advised to consult with their own legal advisers prior to any resale of such securities.

The issuance and sale of the Reorganized syncreon Equity on account of the New Money Backstop Payment, the Liquidity Loan Amendment Payment and the Liquidity Loan Forbearance (the "**Private Placement Equity**") are being made in reliance on the exemption from the registration requirements to the U.S. Securities Act pursuant to Section 4(a)(2) and/or Regulation D of the U.S. Securities Act. The 4(a)(2) Equity will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the U.S. Securities Act. Recipients of such securities are advised to consult with their own legal advisers as to the availability of any exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

The Restructuring, including the Schemes, and the offer, sale and/or issuances contemplated thereby, will not be approved or disapproved by the SEC, nor will the SEC or any U.S. state securities regulatory authority pass upon the merits or fairness of the transaction or upon the adequacy or accuracy of the information contained in this Explanatory Statement. Accordingly, the New Equity has not been recommended by any U.S. federal or state securities commission or regulatory authority. Any representation to the contrary is a criminal offence in the United States. The information disclosed in this Explanatory Statement is not necessarily the same as that which would have been disclosed if this Explanatory Statement had been prepared for the purpose of complying with the registration requirements of the U.S. Securities Act, or the exemptions therefrom, or in accordance with the laws and regulations of any state of the United States.

The New Equity will not be distributed pursuant to the Schemes to, or to the order, or for the account or benefit, of any person that constitutes an Ineligible Person or any other person where such distribution would

be prohibited by any applicable law or regulation, or so prohibited except after compliance with conditions or requirements that are unduly onerous. To the extent that such a prohibition applies, the New Equity that would otherwise have been distributed to any relevant person pursuant to the Schemes will be delivered to the Holding Period Trustee and, subject to the terms of the Schemes and certain limited exceptions, sold, and the net cash proceeds of such sale (after deduction of all applicable expenses and currency conversion costs) paid to that person in full satisfaction of his rights in respect of such securities under the Schemes. For further information see paragraph 6 (*Scheme Consideration and Total Restructuring Consideration*).

Scheme Creditors in the United States should note that the Schemes will relate to the securities of a Dutch private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) and a Dutch foundation (*stichting*), and the Schemes will be governed by English law. Moreover, the Schemes will be subject to the disclosure requirements and practices applicable in the United Kingdom to schemes of arrangement, which differ from the requirements of the U.S. securities laws.

No approved prospectus is required within the meaning of the E.U. Directive 2003/71/EC, as amended or superseded (including by Regulation (EU) 2017/1129, which entered into force on July 21, 2019), including any relevant implementing measure in the relevant member state, where applicable, since no securities will be offered pursuant to the Schemes to, or to the order, or for the account or benefit, of any person that constitutes an Ineligible Holder

Enforcement by investors under the U.S. securities laws may be affected adversely by the fact that the Scheme Companies are organised under the laws of a jurisdiction other than the United States, that some of their officers and directors are residents of countries other than the United States, and that all or a substantial portion of the assets of the Scheme Companies and such other persons may be located outside the United States. As a result, it may be difficult or impossible for PCF Lenders and/or Noteholders in the United States to effect service of process within the United States upon the Scheme Companies and their officers and directors, or to realise against them upon judgments of courts of the United States under the U.S. securities laws. In addition, PCF Lenders and/or Noteholders in the United States should not assume that the courts of England and Wales or The Netherlands: (a) would enforce judgments of U.S. courts obtained in actions against such persons under the U.S. securities laws; or (b) would enforce, in original actions, liabilities against such persons under the U.S. securities laws.

In order to obtain a judgment which is enforceable in the Netherlands, the claim must be re-litigated before a competent Dutch court. A Dutch court will, under current practice, generally grant the same judgment without relitigation on the merits if (a) that judgment results from proceedings compatible with the Dutch concept of due process, (b) that judgment does not contravene public policy (*openbare orde*) of the Netherlands, (c) the jurisdiction of the court has been based on an internationally acceptable ground and (d) the judgment by the court is not incompatible with a judgment rendered between the same parties by a Dutch court, or with an earlier judgment rendered between the same parties by a non-Dutch court in a dispute that concerns the same subject and is based on the same cause, provided that the earlier judgment qualifies for recognition in the Netherlands.

## EXPECTED TIMETABLE OF PRINCIPAL EVENTS[1]

**Each Scheme Creditor should be mindful of, and meet, any deadlines in this Explanatory Statement applicable to them. In particular, Noteholders and any other persons with an interest in the Notes should observe any deadlines set by any institution or settlement system through which they hold interests in the Notes (including DTC) to ensure that any voting instructions given by them are taken into account at the relevant Scheme Meeting. The Scheme Companies strongly urge each Noteholder to contact its relevant Notes Account Holder or Notes Intermediary as soon as possible to ensure they are aware of this Explanatory Statement and the process and timetable set out in it. Unless otherwise stated, all references to time in this Explanatory Statement are to London time.**

| Key Event | (Expected) Time and Date |
|---|---|
| **Lock-up Deadline** <br> Latest time and date for Scheme Creditors to accede to the RSA to receive their ratable portion of the Lock-up Payments (which may be amended pursuant to the RSA) | 5.00p.m. (London Time) / 12 Noon (New York time) on 22 July 2019 |
| **Scheme Convening Hearing** <br> Hearing at which the Scheme Companies apply to the Court for permission to convene the Scheme Meetings | 25 July 2019 |
| **U.S. Chapter 15 Filing Date** (Anticipated) <br> Commencement of a voluntary case under U.S. Chapter 15 and file related pleadings with the U.S. Bankruptcy Court, seeking recognition of the Syncreon U.K. Scheme under U.S. Chapter 15 | w/c 29 July 2019 |
| **Canadian Proceedings Filing Date** (Anticipated) <br> Filing of a notice for application for recognition of a foreign proceeding and related documents with the Canadian Court in support of their applications to seek recognition of the Schemes under Part IV of the CCAA. | w/c 29 July 2019 |
| **Canadian Proceedings – Initial Recognition Hearing Date** <br> Hearing at which the foreign representative applies to the Canadian Court for the recognition of the foreign proceeding and convening Order under part IV of the CCAA | 3.00p.m. (London time) / 10.00a.m. (Toronto time) on 8 August 2019 |
| **Record Time** <br> Time at which the entitlement of each Scheme Creditor to their applicable Total Restructuring Consideration will be calculated by reference to the claims of each Scheme Creditor[2] | 10.00p.m. (London time) / 5.00p.m. (New York time) on 23 August 2019 |
| **Voting Instruction Deadline** <br> Last time and date for receipt of Proxy Forms and Notes Account Holder Letters by the Information Agent in order for Scheme Creditors to vote at the relevant Scheme Meetings and for PCF Lenders to elect to participate in the First Out Term Loans | 5.00p.m. (London time) / 12 Noon (New York time) on 29 August 2019 |

---

[1] The dates in this timetable and mentioned throughout this Explanatory Statement assume that the Scheme Meeting is not adjourned. It is also possible that the drawing-up of the order of the Court sanctioning the Schemes may be delayed if any person appeals the order.

[2] All Scheme Creditors are determined as at the Record Time. The Scheme Companies will be entitled to exercise discretion as to whether they recognise any assignment or transfer of Scheme Claims after the Record Time.

| Key Event | (Expected) Time and Date |
|---|---|
| **Scheme Meetings**<br>Meetings at which Scheme Creditors will vote (in person or by proxy) on the Schemes | 3.00p.m. (London time) / 10.00a.m. (New York time) on 3 September 2019[3] |
| **Scheme Sanction Hearing**<br>Hearing at which the Court will be requested to sanction the Schemes by the Scheme Companies | 10 September 2019 |
| (Anticipated) **Scheme Effective Date**<br>Date upon which an office copy of the orders sanctioning each of the Schemes is filed at Companies House | 11 September 2019 |
| (Anticipated) **Chapter 15 Hearing Date**<br>Hearing before the U.S. Bankruptcy Court to consider recognition of the Guarantor Scheme under chapter 15 of Title 11 of the U.S. Code | w/c 23 September 2019[4] |
| (Anticipated) **Canadian Proceedings – Scheme Recognition Hearing Date**<br>Hearing before the Canadian Court to consider recognition of the Schemes under Part IV of the CCAA | By w/c 23 September 2019[5] |
| (Anticipated) **Restructuring Effective Date**<br>Date on which the Restructuring is completed in accordance with the RID | 30 September 2019 |

---

[3] The Scheme Meetings shall be held no earlier than the second Business Day after the Voting Instruction Deadline. The Scheme Meetings will commence at the time stated. Scheme Creditors that wish to attend the relevant Scheme Meeting in person should produce a duplicate copy of the valid Proxy Form or Notes Account Holder Letter (as applicable) submitted on their behalf through the Scheme Website, evidence of corporate authority (in the case of a corporation) (for example, a valid power of attorney and/or board minutes) and the passport or other form of government issued photographic identification matching the passport number or identification number provided in Part 1 (*Key Information*) of the Proxy Form or Notes Account Holder Letter (as applicable) at the registration desk by no later than one hour before the scheduled time of the relevant Scheme Meeting.

[4] Subject to court availability

[5] Subject to court availability

## ARE YOU A SCHEME CREDITOR OR ANY OTHER PERSON
## WITH AN INTEREST IN THE PCF DEBT OR THE NOTES?

You have been sent this Explanatory Statement because you are thought to be a Scheme Creditor or any other person with an interest in the PCF Debt or in the Notes.

Please determine whether you are a PCF Lender, a Noteholder, a Notes Account Holder, a DTC Participant or a Notes Intermediary in respect of an interest or interests in the PCF Debt, Notes or any other person with an interest in the PCF Debt or the Notes. You may fall within more than one of these capacities depending on the circumstances applying to you. An overview of each of these various capacities is set out on the following page to assist your understanding of the structure of the PCF Debt, the Notes and DTC.

This Section is split into two parts:

- Part A applies if you hold an interest in the PCF Debt; and

- Part B applies if you hold an interest in the Notes.

**THE FOLLOWING PERSONS HAVE INTERESTS IN THE PCF DEBT:**

**PCF Lenders:** You are a PCF Lender if you are listed in the Administrative Agent's records as having commitments and/or outstanding loans under the Parent Credit Facilities Agreement at the Record Time.

If you are a PCF Lender, please read this Explanatory Statement carefully and follow the instructions set out in Part A (*Summary of actions to be taken by PCF Lenders*) and Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).

**Administrative Agent**: Wilmington Trust (London) Limited, as administrative agent under the Parent Credit Facilities Agreement.

**THE FOLLOWING PERSONS HAVE INTERESTS IN THE NOTES:**

**Noteholders:** You are a Noteholder if you hold or, as the case may be, held an economic or beneficial interest as principal in Notes through DTC at the Record Time. Examples of Noteholders include:

- a person who holds such an interest for his own account;

- a trustee who is holding such an interest as part of the assets of the trust which he administers; and

- an executor or personal representative where the estate of the deceased contains such an interest which was held for the deceased's own account.

In determining whether a particular person is the ultimate beneficial owner of Notes, and therefore a Noteholder, entitled to a particular principal amount of Notes, each of the Scheme Companies and the Information Agent may rely on such evidence and/or information and/or certification as it shall, in its absolute discretion, think fit and, if it does so rely, such evidence and/or information and/or certification shall, in the absence of manifest error, be conclusive and binding on all concerned.

If you are a Noteholder, please read this Explanatory Statement carefully and follow the instructions set out in Part B (*Summary of actions to be taken by Noteholders*) and Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).

**Notes Account Holders:** You are a Notes Account Holder if you are recorded directly in the records of DTC as holding an interest in the Notes in an account with DTC or, as the context requires, are or were recorded as holding such an interest in such account at the Record Time. Notes Account Holders consist of those persons holding securities accounts with DTC.

If you are a Notes Account Holder, you should promptly forward a copy of this Explanatory Statement to all persons on whose behalf you hold an interest in the Notes.

**DTC Participants:** You are a DTC Participant if you hold a securities account with DTC. Notes Account Holders in DTC will also be DTC Participants.

If you are a DTC Participant, you should promptly forward a copy of this Explanatory Statement to all persons on whose behalf you hold an interest in the Notes.

**Notes Intermediary:** You are a Notes Intermediary if you hold an interest in the Notes on behalf of another person or, as the context requires, if you hold or held such an interest at the Record Time, and in either case you are not or (as appropriate) were not a Notes Account Holder in respect of that interest. Examples of Notes Intermediaries are stockbrokers, investment managers and nominee companies.

If you are a Notes Intermediary, you should promptly forward a copy of this Explanatory Statement to all persons on whose behalf you hold an interest in the Notes.

**The Notes Registered Holder**: DTC.

**The Notes Registered Holder Nominee**: Cede & Co., as nominee for DTC.

**The Notes Trustee**: The Bank of New York Mellon and any successor appointed pursuant the Notes Indenture.

**SCHEME CREDITORS ARE ENTITLED TO TAKE, OR DIRECT THE TAKING OF, CERTAIN ACTIONS IN RESPECT OF THE SCHEMES.**

For the purpose of the Schemes, the following persons are Scheme Creditors:

1.      the PCF Lenders, as creditors of the Scheme Companies;

2.      the Noteholders, the ultimate beneficial owners of an interest in the Notes and as contingent creditors of the Scheme Companies;

3.      the Administrative Agent under the Parent Credit Facilities Agreement;

4.      the Notes Trustee under the Notes Indenture;

5.      the Notes Registered Holder, as the registered holder of the Global Notes; and

6.      the Notes Registered Holder Nominee as the nominee for the Notes Registered Holder.

To avoid double counting in respect of the PCF and Notes Scheme Claims, each of the Administrative Agent, the Notes Trustee, the Notes Registered Holder and the Notes Registered Holder Nominee is intended not to exercise any voting rights to which it may be entitled as a Scheme Creditor at the Scheme Meetings (leaving the exercise of any such voting rights to the relevant PCF Lender/Noteholder, being the person with the underlying economic interest in the PCF Debt/Notes).

**Notes Account Holders, DTC Participants and Notes Intermediaries** are **not** entitled to vote on the Schemes on their own behalf unless and to the extent that they are Noteholders. However, their assistance will be required, in accordance with their custodial duties, to submit online versions of the completed Notes Account Holder Letters to the Information Agent through the Scheme Website in accordance with the instructions provided to them by Noteholders.

**Proxy Forms and Notes Account Holder Letters are required for the purposes of, among other things, (i) voting on the Schemes, (ii) confirming eligibility to receive the Total Restructuring Consideration and (iii) PCF Lenders electing to participate in, and become lenders under, the First Out Term Loans under the Amended and Restated Facilities Agreement.**

**If you are a Noteholder that is not a Notes Account Holder, you should contact your Notes Account Holder (through any Notes Intermediaries, if applicable) to ensure that your Notes Account Holder takes the appropriate action described in this Explanatory Statement.**

For further information on the action to be taken by Scheme Creditors and persons with an interest in the PCF Debt or the Notes, see Part A (*Summary of actions to be taken by PCF Lenders*, Part B (*Summary of actions to be taken by Noteholders*) and Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).

### INTERESTS IN NOTES IN GLOBAL FORM
### HELD THROUGH DTC

The following diagram illustrates the relationship between certain persons with interests in the Notes, which are held in global form through DTC:

| |
|---|
| **Registered Holder of Global Note** |
| ***Cede & Co. as nominee for DTC*** |
| The Global Notes representing interests in the Notes are registered in the name of Cede & Co. as nominee for DTC and have been deposited with the Notes Registered Holder (or its nominee) |
| **Clearing System** |
| *DTC* |
| Interests in the Notes are held in DTC as Book Entry Interests in the accounts of Notes Account Holders who are DTC Participants |
| **DTC Participant** |
| *(For example, a bank or brokerage house, with a securities account at DTC)* |
| The Book Entry Interests are held by a DTC Participant either for its own account (in which case, it is the beneficial owner of and/or the owner of the ultimate economic interest in the relevant Note) or as custodian for the Noteholder in which case, it is not the holder of the ultimate economic interest in the relevant Note |
| **Notes Account Holders** |
| *(For example, a bank or brokerage house, with a securities account at DTC)* |
| Each Notes Account Holder holds interests in the Notes either for its own account (in which case it is the beneficial owner of and/or the owner of the ultimate economic interest in the relevant Note) or as trustee or agent for the Noteholder (in which case it is not the beneficial owner of and/or the holder of the ultimate economic interest in the relevant Note) |
| **Notes Intermediary** |
| *(For example, a bank or brokerage house which does not have an account with DTC)* |
| There may be one or more Notes Intermediaries between a Notes Account Holder and a Noteholder |
| **Noteholder** |
| The beneficial owner of and/or the owner of the ultimate economic interest in the relevant Notes |
| **Voting** |
| Each Noteholder will be entitled to attend and vote (or to direct a duly authorised proxy to attend and vote on its behalf) at the relevant Scheme Meeting |

## PART A

## SUMMARY OF ACTIONS TO BE TAKEN BY PCF LENDERS

> **PCF Lenders are invited to vote at the relevant Scheme Meetings by completing and submitting to the Information Agent through the Scheme Website the Proxy Form set out in in Appendix 3 (*Form of Proxy Form*)**

Detailed instructions on the actions which PCF Lenders should take are set out in this Explanatory Statement and are summarised below.

**PCF Lenders should read the full instructions set out in Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).**

1.    You should read this Explanatory Statement as a whole, in conjunction with the documents that accompany it (including the Proxy Form) which contains, among other things, the voting form relating to the relevant Scheme Meeting.

**Actions to be taken by PCF Lenders in relation to the Schemes for the purposes of voting at the relevant Scheme Meeting**

2.    A separate Proxy Form must be completed in respect of each PCF Lender.

3.    Part 1 (*Key Information*) of the Proxy Form needs to be completed in full and executed on behalf of the PCF Lender for the Proxy form to be valid.

4.    Part 2 (*Voting*) of the Proxy Form must be completed in full in order to effect a vote in respect of the Schemes.

5.    Part 3 (*Restructuring Consideration*) of the Proxy Form must be fully completed in order to directly receive the PCF Total Restructuring Consideration on the Restructuring Effective Date, or to nominate an Affiliate to receive this as Designated Recipient.

6.    Part 4 (*Participation in First Out Term Loans*) of the Proxy Form must be fully completed in order to elect to participate in the First Out Term Loans.

> **Failure to deliver a valid Proxy Form on behalf of a PCF Lender by the Voting Instruction Deadline will mean that (a) the voting instructions contained in that Proxy Form will be disregarded for the purposes of voting at the relevant Scheme Meeting and the PCF Lender will not be entitled to vote at the relevant Scheme Meeting and (b) the elections (if any) contained in that Proxy Form will be disregarded for the purposes of electing to participate in the First Out Term Loans and the PCF Lender will not be entitled to participate in the First Out Term Loans.**

7.    Each of the Schemes requires the approval of a majority in number representing at least 75 per cent. in value of the applicable Scheme Creditors together present and voting in person or represented at each of the Scheme Meetings to be held at 3.00p.m. (London time) / 10.00a.m. (New York time) on 3 September 2019.

8.    It is important that as many votes as possible are cast at the Scheme Meetings so that the Court may be satisfied that there is a fair and reasonable representation of opinion of Scheme Creditors. You are strongly urged to complete and sign the relevant parts of your Proxy Form.

9.    To avoid double counting in respect of the PCF Scheme Claims, the Administrative Agent is intended not to exercise any voting rights to which it may be entitled as a Scheme Creditor at the

Scheme Meetings (leaving the exercise of any such voting rights to the PCF Lenders, being the persons with the underlying economic interests in the PCF Debt).

10. Completed Proxy Forms for the purposes of PCF Lenders voting at the relevant Scheme Meeting should be submitted to the Information Agent through the Scheme Website.

11. The amount of the PCF Scheme Claims of each PCF Lender which submits a valid Proxy Form in respect of the PCF Debt will be calculated as at the Record Time based on information confidentially provided to the Scheme Companies by each of the Administrative Agent and the Information Agent. This information will be used by the Chairperson to determine whether the Schemes are approved at the relevant Scheme Meeting. Accordingly, PCF Lenders do not need to take any action in respect of confirming the amount of their PCF Scheme Claims other than providing the details requested in the Proxy Form.

12. Proxy Forms should not in any circumstances be delivered to any of the Administrative Agent, the Scheme Companies, any Guarantor or any other person. None of the these parties nor any of their respective affiliates, officers, directors or employees or any other person will be under any duty to give notification of any defects, irregularities or delays in any Proxy Form, nor will any of such entities or persons incur any liability for failure to give such notification.

**Completed Proxy Forms for the purposes of voting should be submitted to, and received by, the Information Agent through the Scheme Website as soon as possible and in any event before the Voting Instruction Deadline (being 5.00p.m (London time) / 12 Noon (New York time) on 29 August 2019).**

## PART B

## SUMMARY OF ACTIONS TO BE TAKEN BY NOTEHOLDERS

> **Noteholders are invited to vote at the relevant Scheme Meeting by completing and submitting, or directing their Notes Account Holder to complete and submit, to the Information Agent through the Scheme Website the Notes Account Holder Letter set out in Appendix 4 (*Form of Notes Account Holder Letter*).**

Detailed instructions on the actions which Noteholders, Notes Intermediaries and Notes Account Holders should take are set out in this Explanatory Statement and are summarised below.

**Noteholders should read the full instructions set out in Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).**

1.   You should read this Explanatory Statement as a whole, in conjunction with the documents that accompany it (including the Notes Account Holder Letter) which contains, among other things, the voting form relating to the relevant Scheme Meeting.

2.   A Notes Account Holder may complete and submit a Notes Account Holder Letter on behalf of a Noteholder if the Notes Account Holder has the authority to do so and it discloses the identity of such Noteholder.

**Actions to be taken by Noteholders in relation to the Schemes for the purposes of voting at the relevant Scheme Meeting**

3.   A separate Notes Account Holder Letter must be completed in respect of each separate beneficial holding of the Notes.

4.   If you are a ***Noteholder that is not a Notes Account Holder*** and wish to vote at the relevant Scheme Meeting, you should:

   (a)   direct your Notes Account Holder to take the relevant steps to be taken in respect of interests in the Notes held through DTC set out in Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*); and

   (b)   direct your Notes Account Holder to complete the appropriate parts of the Notes Account Holder Letter and submit the completed Notes Account Holder Letter as soon as possible to the Information Agent through the Scheme Website and, in any event, so as to be received before the Voting Instruction Deadline, being 5.00p.m. (London time) / 12 Noon (New York time) on 29 August 2019.

5.   If you are a ***Noteholder that is a Notes Account Holder*** and wish to vote at the relevant Scheme Meeting in accordance with the terms of the Schemes, you should:

   (a)   take the relevant steps to be taken in respect of interests in the Notes held through DTC set out in Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*); and

   (b)   complete the appropriate parts of the Notes Account Holder Letter set out in Appendix 4 (*Form of Notes Account Holder Letter*) and submit the completed Notes Account Holder Letter as soon as possible to the Information Agent through the Scheme Website and, in any event, so as to be received before the Voting Instruction Deadline, being 5.00p.m. (London time) / 12 Noon (New York time) on 29 August 2019.

6.      Part 1 (*Key Information*) of the Notes Account Holder Letter needs to be completed in full and executed on behalf of the Noteholder for the Notes Account Holder Letter to be valid.

7.      Each Noteholder that wishes to vote at the relevant Scheme Meeting must also procure that the Notes Account Holder through whom it holds its Notes medallion guarantee stamps its Notes Account Holder Letter and confirms it holds a position in such Notes as at the Record Time. The procedure for doing this is described in Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).

8.      Part 2 (*Voting*) of the Notes Account Holder Letter must be completed in full in order to effect a vote in respect of the Schemes.

9.      Part 3 (*Restructuring Consideration*) of the Notes Account Holder Letter must be fully completed in order to directly receive the Notes Total Restructuring Consideration on the Restructuring Effective Date, or to nominate an Affiliate to receive this as Designated Recipient.

> **Failure to submit a valid Notes Account Holder Letter on behalf of a Noteholder to the Information Agent through the Scheme Website by the Voting Instruction Deadline will mean that the voting instructions contained in that Notes Account Holder Letter will be disregarded for the purposes of voting at the relevant Scheme Meeting and the Noteholder will not be entitled to vote at the relevant Scheme Meeting.**

10.     Each of the Schemes requires the approval of a majority in number representing at least 75 per cent. in value of the applicable Scheme Creditors together present and voting in person or represented at each of the Scheme Meetings to be held at 3.00p.m. (London time) on 3 September 2019.

11.     It is important that as many votes as possible are cast at the Scheme Meetings so that the Court may be satisfied that there is a fair and reasonable representation of opinion of Scheme Creditors. You are therefore strongly urged to complete and sign or direct your Notes Account Holder to complete and sign the relevant parts of your Notes Account Holder Letter.

12.     The amount of the Notes Scheme Claims of each Noteholder which submits a valid Notes Account Holder Letter in respect of the Notes will be calculated as at the Record Time based on information confidentially provided to the Scheme Companies by each of DTC and the Information Agent. This information will be used by the Chairperson to determine whether the Schemes are approved at the relevant Scheme Meeting. Accordingly, Noteholders do not need to take any action in respect of confirming the amount of their Notes Scheme Claims other than providing the details requested in the Notes Account Holder Letter.

13.     To avoid double counting in respect of the Notes Scheme Claims, the Notes Trustee, the Notes Registered Holder and the Notes Registered Holder Nominee is intended not to exercise any voting rights to which it may be entitled as a Scheme Creditor at the Scheme Meetings (leaving the exercise of any such voting rights to the relevant Noteholder, being the person with the underlying economic interest in the Notes).

14.     Completed Notes Account Holder Letters for the purposes of voting at the relevant Scheme Meeting should be submitted to the Information Agent through the Scheme Website.

15.     Notes Account Holder Letters should not in any circumstances be delivered to any of the Notes Registered Holder Nominee, the Notes Registered Holder, the Notes Trustee, the Scheme Companies or any Guarantor or any other person. None of the Notes Registered Holder Nominee, the Notes Registered Holder, the Notes Trustee, the Scheme Companies or any Guarantor and any of their respective affiliates, officers, directors or employees or any other person will be under any duty to give notification of any defects, irregularities or delays in any Notes Account Holder Letter, nor will any of such entities or persons incur any liability for failure to give such notification.

**Completed Notes Account Holder Letters for the purposes of voting should be submitted to, and received by, the Information Agent through the Scheme Website as soon as possible and in any event before the Voting Instruction Deadline (being 5.00p.m. (London time) / 12 Noon (New York time) on 29 August 2019).**

## PART 1

## BACKGROUND AND RATIONALE TO THE RESTRUCTURING

**1      INTRODUCTION**

1.1      On 21 May 2019, following an extensive period of engagement and negotiation with stakeholders, the Scheme Companies announced the intention to implement a wider Restructuring, as agreed between the Group and its key stakeholders, including the Schemes.

1.2      This Explanatory Statement is provided pursuant to section 897 of the Companies Act. It explains why the Scheme Companies believe the proposed Restructuring and the Schemes to be in the best interests of those with an economic interest in the Group, including the Scheme Creditors.

1.3      The Schemes will implement certain changes to the PCF Debt and the Notes which the Directors believe, together with the Restructuring, will ensure a stable and sustainable Group capital structure and significantly reduce the financial burden on the business, thereby mitigating the current adverse commercial stigma of the Group's highly leveraged position and putting the Group in a stronger position to continue to operate in the current market conditions (including, servicing its customers, paying its suppliers and employing its staff) and deliver growth for its stakeholders.

**2      SUMMARY INFORMATION ON THE GROUP AND THE SCHEME COMPANIES**

2.1      The Group is a global specialized contract logistics company supplying the automotive and technology industry with specialised logistics and supply chain solutions. It has over 14,000 employees across 100+ facilities located in 20 countries, through which it services its global client base, consisting of premier automotive and technology brands in 24 countries across Europe, the Americas, Africa, the Middle East and Australia.

**Group Structure**

2.2      The Scheme Companies are part of a corporate family of entities, which are currently held directly or indirectly by the Parent. syncreon Group is a direct subsidiary of the Parent and syncreon U.K. is an indirect subsidiary.

2.3      The Ultimate Parent of the Group is syncreon Global Holdings Limited, which indirectly owns 100% of the shares in the Parent (and thereby the Group). The Ultimate Parent also directly holds 100% of the shares in CayCo (which is an affiliate, but not part, of the Group) through which the Ultimate Parent has provided certain funding to the Group, as further specified below.

2.4      As of the date hereof, the Ultimate Parent's equity is held by the following parties: (i) Horizon Super Holdings L.P. (Cayman), an affiliate of Centerbridge Partners, L.P., (ii) GenNx360 Syncreon Investors, LLC, an affiliate of GenNx360 Capital Partners, (iii) The Wychwood Trust (an Enright family trust), and (iv) approximately 2% by the Chief Executive Officer, Brian Enright.

2.5      A simplified Group structure chart can be found at Part 1 (*Existing Group Structure*) of Appendix 9 (*Group Structure*). For more detailed information on the Group, see Appendix 5 (*Information about the Group*) which includes details pertaining to Group ownership, director/management interests in the Schemes and the Group and details of material litigation.

2.6      The Scheme Companies are:

(a)      syncreon Group, a direct subsidiary of the Parent and a borrower of the PCF Debt and issuer of the Notes; and

(b)      syncreon U.K., an indirect subsidiary of the Parent and a guarantor in respect of the PCF Debt and the Notes.

**History**

2.7    The Group was founded by Mr. Michael Enright and Mr. Brian Enright in 1998 under the name Walsh Western International ("**WWI**"). WWI originally served as a regional provider of outsourced logistics services to the technology sector in Ireland, the U.K. and the Netherlands.

2.8    In 2007, WWI acquired TDS Logistics Inc, one of the world's leading global suppliers of value-added supply chain solutions to the automotive industry, and subsequently adopted "syncreon" as the name of the combined company.

2.9    In December 2009, the company further expanded its technology industry expertise through the acquisition of Illinois-based NAL Worldwide Holdings Inc. ("**NAL**"), a third-party logistics and supply chain services company providing solutions to the telecommunications, retail, hi-tech, and healthcare industries across North America. NAL increased the Group's North American footprint, broadened its service offering, and diversified its customer base to include leading wireless network equipment manufacturers. In 2011, the Group acquired Barcelona-based Compuspar, a supply chain services company with capabilities in the reverse logistics and repair space, expanding the Group's service area to several new geographies.

**Present day operations**

2.10    The Group is a leading global asset-light provider of specialized logistics and supply chain solutions to a broad and diverse customer base comprised of multinational and Fortune 100 companies primarily in the technology and automotive industries. The Group designs, implements, and executes fully-integrated, customized, flexible and mission critical logistics solutions for customers focused on reducing operating costs, improving efficiencies, and achieving competitive advantages through the increased outsourcing of their supply chain activities.

2.11    As a leader in providing specialized and highly customized, value-added logistics services, and a reliable partner to its customers, the Group has developed deep, long-standing relationships with sophisticated "blue chip" customers across the technology and automotive industries who value its ability to meet their specialized needs in a cost-effective and high quality manner.

2.12    In 2018, the Group's annual revenue was approximately U.S.$1.166 billion and its adjusted EBITDA (on a consolidated 52-week basis) was approximately U.S.$83 million.

**3    GROUP INDEBTEDNESS**

**Overview**

3.1    As of 10 July 2019, the Group's capital structure includes approximately $1 billion in principal amount of funded debt as set out in the chart below.

| Debt Instrument | Principal Amount Outstanding |
|---|---|
| *Scheme Debt* | |
| **PCF Debt** | U.S.$ 680,040,332 |
| **Notes** | U.S.$225,000,000[6] |
| *Non-Scheme Debt* | |
| **Liquidity Facility Debt** | U.S.$75,500,000 |
| **Existing ABL Facility** | U.S.$80,000,000 |
| **Total** | **U.S.$ 1,060,540,332** |

---

[6] As noted in Part 1, paragraph 4.27, the Parent has agreed to purchase certain Notes with a par value of approximately U.S. $4.3 million form a Noteholder with a view to these Notes being cancelled in the near future pursuant to the provisions of the Notes Indenture.

**PCF Debt**

3.2     The PCF Debt is owed by syncreon Group as borrower under the Parent Credit Facilities Agreement and is comprised of:

(a)     Term Loans (other than the Incremental Term Loans) in an aggregate outstanding principal amount of U.S.$497,437,500 maturing on 28 October 2020 with an interest rate of LIBOR + 4.25%;

(b)     Revolving Loans in an aggregate outstanding principal amount of U.S.$109,544,645.21 maturing on 28 October 2020 with an interest rate of LIBOR + 11.00%; and

(c)     Incremental Term Loans provided by CayCo, an affiliate of the Ultimate Parent, pursuant to which there is currently an aggregate outstanding principal amount of U.S.$73,058,187 maturing in January 2021 bearing interest at the same rate as the Term Loans.

3.3     The PCF Debt is guaranteed by the Guarantors listed in Appendix 10 (*List of Guarantors*) under a separate PCF Guaranty Agreement dated 28 October 2013. The Guarantors are all members of the Group and together represent a significant majority of the Group's revenue. syncreon U.K. is one of the Guarantors. As further set out in paragraph 3.9 below, the Guarantors have also guaranteed the Notes, pursuant to the Notes Indenture.

3.4     The PCF Debt is secured by substantially all of the assets of the Guarantors (subject to certain limitations and exclusions), under various local law governed security documents entered into by the relevant Guarantors and the Administrative Agent.[7]

3.5     The Liquidity Intercreditor Agreement provides that (a) security interests created to secure the PCF Debt rank junior to the security interests created to secure the Liquidity Facility Debt and (b) the proceeds of security enforcement and/or any other distribution in insolvency or liquidation will be applied towards repayment of the PCF Debt after repayment of the Liquidity Facility Debt. The Liquidity Facility Debt also has the benefit of additional guarantees and security (as described below).

3.6     The Parent Credit Facilities Agreement and the PCF Guaranty Agreement are governed by the laws of England and Wales and the PCF Lenders and Administrative Agent have submitted to the non-exclusive jurisdiction of the courts of England and Wales (see paragraph 4.44 below).

**Notes**

3.7     The Notes were issued by syncreon Group and syncreon Global Finance (US) Inc. under the Notes Indenture originally dated as of 28 October 2013. The Bank of New York Mellon is the Notes Trustee.

3.8     The Notes bear interest at a rate of 8.625% and are payable semi-annually in arrears on 1 May and 1 November of each year prior to their maturity on 1 November 2021.

3.9     The Notes are guaranteed under the Notes Indenture by the same Guarantors that have guaranteed the PCF Debt (see paragraph 3.3 above).

3.10    The Notes are unsecured.

3.11    The Notes Indenture is governed by the laws of England and Wales and all parties thereto, and the Noteholders, have submitted to the courts of England and Wales and any U.S. Federal or state court sitting in the Borough of Manhattan, the City of New York, New York, United States of America and any appellate court from any thereof (see paragraph 4.44 below).

---

[7] The RCF Lenders, as a subset of the PCF Lenders, also have the benefit of certain additional security, described in footnote 8 below.

**Liquidity Facility Debt**

3.12    The Liquidity Facility Debt is owed by syncreon Group as borrower under the Liquidity Facility Agreement and is comprised of super senior loans in the following amounts and advanced on the following dates:

(a)    an initial term loan in an aggregate principal amount of U.S.$15,500,000 on 15 March 2019 ("**Initial Liquidity Facility Loan**"), with an interest rate of LIBOR + 8.00%;

(b)    an initial delayed draw term loan in an aggregate principal amount of U.S.$9,500,000 on 28 May 2019 ("**Initial Additional Liquidity Draw**"), with an interest rate of LIBOR + 8.00%; and

(c)    a subsequent delayed draw term loan in an aggregate principal amount of U.S.$50,500,000 on 21 June 2019 (the "**Liquidity Facility Upsize**"), with commitments to lend up to an additional U.S.$50,000,000 under a subsequent delayed draw (the "**Subsequent Liquidity Draw**"), with an interest rate of LIBOR +5.00%.

3.13    The loans under the Liquidity Facility Agreement mature on the earliest to occur of (i) 15 October 2019, (ii) the RSA Termination Date (as defined in the RSA) and (iii) the date that the loans are accelerated pursuant to Article 7 of the Liquidity Facility Agreement.

3.14    The Liquidity Facility Debt is guaranteed by the same Guarantors that have guaranteed the PCF Debt and the Notes (see paragraph 3.3 above) as well as certain additional guarantors that have not provided any guarantees or security in relation to the PCF Debt or the Notes (for a list of these additional guarantors see part 2, appendix 3 of the Deed of Release attached to Appendix 1 (*The Scheme Document*)).

3.15    The Liquidity Facility Debt is secured by the same security package as the PCF Debt (see paragraph 3.4 above) as well as certain additional security (from the entities listed in part 2, appendix 3 of the Deed of Release attached to Appendix 1 (*The Scheme Document*)) under various local law governed security documents entered into by the relevant Guarantors and the Liquidity Administrative Agent.

3.16    As noted in paragraph 3.5 above, the Liquidity Intercreditor Agreement provides that the Liquidity Facility Debt ranks senior in priority to the PCF Debt in relation to security and in right of payment from security enforcement proceeds and other distributions in insolvency or liquidation.

3.17    The Liquidity Facility Agreement contains customary events of default (with customary grace periods, as applicable). If an event of default occurs and is continuing, the interest rate on all outstanding obligations may be increased, payments of all outstanding loans may be accelerated and/or the Liquidity Facility Lenders' commitments may be terminated. In addition, upon the occurrence of certain insolvency or bankruptcy-related events of default, all amounts payable under the Liquidity Facility Agreement shall automatically become due and payable, and the Liquidity Facility Lenders' commitments will automatically terminate.

**Existing ABL Facility**

3.18    The Existing ABL Borrower is an indirect Canadian subsidiary of syncreon Group. The Existing ABL Facility comprises of a revolving credit loan facility in an amount of up to U.S.$100,000,000 (subject to borrowing base availability) and is documented under the Existing ABL Facility Agreement.

3.19    The loans under the Existing ABL Facility mature in July 2020 and have an interest rate of LIBOR + 7.75%. Certain Group companies (including syncreon U.K.) act as originators contributing certain of their receivables into the Existing ABL Facility structure.

3.20   The Existing ABL Borrower's obligations under the Existing ABL Facility are secured by substantially all assets of the Existing ABL Borrower.

3.21   The Existing ABL Borrower and its parent syncreon Intermediate Ltd are unrestricted subsidiaries under the Parent Credit Facilities Agreement and Notes Indenture and have not provided any guarantees or security in relation to the PCF Debt or the Notes.

# 4      BACKGROUND TO AND REASONS FOR THE RESTRUCTURING

**Financial difficulties and need to restructure**

4.1    In 2014, the Group lost its largest tech customer due to the customer's own decreased market share and subsequent attempt to right-size its business. This significant customer loss was compounded by sharp and unexpected adverse foreign currency movements.

4.2    As discussed above, the Group serves a global customer-base with operations in various jurisdictions. As a result, whilst interest payments on the Group's debt are made in U.S. dollars, approximately 65% of the Group's revenue in 2018 originated from outside the United States in currencies other than the U.S. dollar. The Group translates such functional currencies into U.S. dollars for reporting purposes based on either average exchange rates prevailing during a reporting period or the exchange rate at the end of that period. During times of a strengthening dollar, the Group's reported international revenues and earnings are reduced because the local currency is translated into fewer dollars.

4.3    In response to these headwinds, the Group engaged an independent consultant to evaluate the Group's competitive positioning, service offering and geographies. This resulted in a five-year strategic growth plan (the "**2021 Plan**"), the implementation of which started in 2016. The goal of the 2021 Plan was to optimize the Group's business, strengthen its foundation, and execute a higher level of customer growth in its core markets. The 2021 Plan included, among other things, significant investments in building-out the Group's salesforce and salesforce supporting functions to accelerate new business opportunities.

4.4    To support the 2021 Plan, the Group's shareholders contributed additional equity into the Group in 2016. Throughout 2017 and 2018, and as recently as January 2019, CayCo provided additional financing to the Group, including the Incremental Term Loans, to support the Group's liquidity needs whilst implementing the 2021 Plan.

4.5    In March 2018, the Group secured further liquidity by way of (i) the entry into the Existing ABL Facility Agreement with the loans thereunder maturing in 2020 and (ii) the RCF Lenders agreeing to extend the maturity of the Revolving Loans to match the 2020 Term Loans maturity. In exchange for the above, CayCo agreed, for the benefit of the Group, (A) to grant certain additional security to the RCF Lenders[8] from its own account and assets[9] and (B) to reinvest the amount of any interest it would receive in the future on account of the Notes it owned into Incremental Term Loans. CayCo's commitment facilitated the RCF Lenders' agreement to amend and extend the Revolving Loans, and, collectively, the accommodations provided by CayCo and the RCF Lenders provided a further runway to implement the 2021 Plan. However near term debt maturities continued to loom.

4.6    Since commencing implementation of the 2021 Plan, the Group's annual revenue increased by 6.8% and 17.3% in 2017 and 2018, respectively. The Group's adjusted EBITDA on a consolidated 52-week basis for the fiscal year ended 31 December 2018 was approximately U.S.$83,000,000, versus

---

[9] CayCo granted security in the form of: (i) a pledge over the CayCo Cash Collateral and (ii) a pledge over U.S.$13,000,000 of certain of its Incremental Term Loans (the "**Pledged Incremental Coupon Loans**"). "**CayCo Cash Collateral**" means the Initial Cash Collateral Amount (as defined in the RCF Pledge and Security Agreement), which, includes the U.S.$15,000,000 of cash collateral pledged by CayCo and/or syncreon Netherlands A B.V. in favor of the RCF Collateral Agent on behalf of the Revolving Lenders in accordance with the Reinvestment Letter (as defined in the RSA) and the RCF Pledge and Security Agreement, plus (ii) any Proceeds (as defined in the RCF Pledge and Security Agreement), including but not limited to any interest, thereof.

revenues of approximately U.S.$1,166,000,000 over that same time period. During this time, the Group has also earned significant contract wins with both existing and new customers.

4.7   Unfortunately, notwithstanding these improvements, the unanticipated launch costs for certain new businesses, contract expirations, reductions in certain customer volumes, and operating challenges have continued to strain the Group's liquidity. Moreover, the Group's highly leveraged position began to cause material customer and supplier concerns and deleveraging proved challenging due to high debt levels, rising interest rates (LIBOR) and the added balance sheet strain of the incremental debt from the Existing ABL Facility.

4.8   As a result, in the summer of 2018, the management team of the Group concluded that a longer term, structural solution was needed (i.e. a full balance sheet restructuring) to maintain the viability of the Group's business going forward.

4.9   During September and October 2018, the Group consulted with its key stakeholders, including its shareholders, and approached several professional advisers to obtain advice on its strategic options. The Group also put in place additional funding in 2018 from CayCo, which was ultimately converted into Incremental Term Loans in an aggregate principal amount of approximately U.S.$50 million under the Parent Credit Facilities Agreement in October 2018, to provide the necessary runway.

**2018 Sales Process**

4.10   In November 2018, the Group engaged both J.P. Morgan and Citibank as financial advisers to assist management in exploring options to strengthen the Group's liquidity position and to reduce the burden of the Group's debt service obligations on its businesses.

4.11   Together with these advisers, the Group initially explored the option of a preferred equity raise, but as this received little interest, they soon focused on preparing for a possible sale of the Group (the "**2018 Sales Process**").

4.12   The 2018 Sales Process was aimed at securing an offer for the purchase of the entire Group and providing a comprehensive solution for the Group and its existing debt obligations.

4.13   As part of this process, the Group and its advisers:

(a)   commenced full-fledged market-testing, approaching various potential investors with a view to engaging their interest;

(b)   conducted a comprehensive vendor due diligence exercise, identifying and summarizing the key contracts within the Group;

(c)   prepared a detailed confidential information memorandum (CIM), including all key historic financial figures and financial projections to assist potential bidders in assessing their interest in the Group;

(d)   uploaded key materials (including the CIM and outcome of the vendor due diligence exercise) to a dataroom for the benefit of potential bidders;

(e)   negotiated and executed non-disclosure agreements with 9 potential bidders, who were given access to the dataroom;

(f)   provided these potential bidders with access to key management by way of meetings; and

(g)   invited these potential bidders to submit their offers by a specified date in accordance with a detailed process letter, setting out the key requirements an offer needed to satisfy.

4.14    In spite of the Group's efforts, although certain parties had expressed an initial interest in a potential transaction, the Group did not receive any formal bids by the 22 January 2019 bid deadline and there were no indications that any subsequent bids would be forthcoming.

**Negotiations with creditors**

4.15    Upon it becoming clear that the above strategic efforts would not result in a viable solution for the Group, the Directors, with the assistance of the Group's restructuring advisors, and the encouragement and support of the Shareholder Parties and their advisors, engaged with the Group's key creditor groups and its shareholders in early 2019, with the goal of building a consensus around a potential deleveraging transaction. This process was conducted under the supervision of the Parent's independent board of directors, which board was supplemented with the appointment of two additional independent members having substantial financial and restructuring expertise.

4.16    The Group approached certain of its larger PCF Lenders with a view to forming an ad hoc group and encouraged the signing of non-disclosure agreements (to allow information sharing) and their engagement of financial and legal restructuring advisers, with a view to facilitating streamlined discussions on a potential restructuring.

4.17    The Group also engaged in discussions with certain of its larger Noteholders, with whom the Group entered into non-disclosure agreements as well (including CayCo, as holder of a large proportion of the Notes, the "**Key Noteholders**").

4.18    As highlighted above, the Group's liquidity position had continued to deteriorate and there was an immediate need for financing to permit the Group to continue its pursuit of either the sale transaction or the restructuring transaction. CayCo provided such additional emergency liquidity in the form of U.S.$10 million Incremental Term Loans in January 2019. Rather than demand a priming position on these additional Incremental Term Loans, to fulfil the Group's critical need of liquidity, CayCo agreed to extend such Incremental Term Loans on a pari passu basis with the PCF Debt. As a sister company to the sole equity owner of the Parent, the largest Noteholder and the largest PCF Lender, CayCo offered the Group a transaction that provided certainty of execution and a meaningful lifeline from a party that was already deeply committed to the Group's viability.

4.19    By February 2019, however, the Group's liquidity position had quickly further deteriorated and there was an urgent need to address liquidity in order to give time to negotiate the terms of a deal.

4.20    Whilst CayCo continued to express a willingness to support the Group in certain respects, CayCo expressed reservation to provide any further debt on a *pari passu* basis with the PCF Debt, funding on a super senior basis from CayCo or any other party would require the consent of the senior lenders to be primed, and further, no other PCF Lender was willing to extend *pari passu* financing. In light of this, a group of significant PCF Lenders, the Ad Hoc Group, formed and delivered a proposal whereby certain Ad Hoc Group members would fund up to U.S.$25 million on a super senior basis and a portion of which was on a delayed draw basis. No superior funding offers were received from the other stakeholders with whom the Group was in discussion at that time.

4.21    In contrast to the challenges and delay inherent in a syndicate-wide fundraising effort, the Ad Hoc Group presented a viable source of liquidity given that its members already had existing confidentiality arrangements in place with the Group and had undertaken substantial diligence, such that the participating members of the Ad Hoc Group were in a position to close on the additional financing swiftly to allow the Group to avoid further deterioration to the business and focus on completing its restructuring negotiations with key stakeholders.

4.22    On 15 March 2019, the Group entered into the Liquidity Facility Agreement and Liquidity Intercreditor Agreement and made an initial draw-down of the Initial Liquidity Facility Loan.

4.23    Following this, the Group continued its restructuring negotiations with the Ad Hoc Group, Key Noteholders and its shareholders, along with other key constituents. Various restructuring proposals

were put forward, including from one of the other Key Noteholders. However, following lengthy discussions with the Ad Hoc Group, this proposal did not prove acceptable to the majority senior lenders, pursuant to each of the Liquidity Facility Agreement and the Parent Credit Facilities Agreement and therefore was not capable of being implemented.

4.24    The Group continued negotiating and by the end of April 2019 the Group reached an in principle agreement with the Ad Hoc Group, CayCo and another Key Noteholder on the terms of a restructuring, and the relevant parties entered into the RSA to formalise this agreement on 21 May 2019.

4.25    On 21 May 2019 the Group announced in a press release (the "**RSA Release**") that it had entered into the RSA with holders of substantial majorities of its secured debt (the PCF Debt) and the Notes. The RSA Release also set out the brief terms of the Restructuring and stated that the recapitalization would be effected through schemes of arrangement.

4.26    On 31 May 2019, a copy of the RSA Release, along with a further notice to creditors (the "**RSA Notice**") which set out details of the RSA and the availability of certain lock-up payments was distributed to Scheme Creditors via the Information Agent. The RSA Notice extended an invitation to Scheme Creditors to accede to the RSA and noted that those parties who did and who complied with their obligations under the RSA would be entitled to their share of applicable Lock-Up Payment. The RSA Notice requested those seeking to become a party to the RSA to contact the Information Agent.

4.27    Following dissemination of the RSA to Scheme Creditors and as part of a dispute settlement in connection with a purported event of default and acceleration notice under the Notes Indenture, the Parent agreed to purchase certain Notes with a par value of approximately U.S.$4.3 million from a Noteholder with a view to cancelling these Notes pursuant to the provisions of the Notes Indenture. As part of the same arrangement, CayCo (an existing Key Noteholder) purchased certain additional Notes from the same Noteholder, increasing its existing position in the Notes.

**Relationship with customers**

4.28    Throughout the process described above, the Group has been routinely updating its major customers on the status of the negotiations. Notwithstanding the Group's progress on restructuring negotiations and the announcement of an in principle deal between the Group and its key stakeholders at the end of April 2019, the Group remained under pressure from its key customers and suppliers to demonstrate that it had the support of its major creditors, sufficient liquidity to close its restructuring and committed new money. Ahead of signing the RSA towards the end of May, a key customer of the Group provided notices to terminate certain logistics services agreements, effective from end of 2019 and mid 2020.

4.29    The situation as regards customers has significantly stabilised following the announcement of the RSA. Given that the Restructuring will result in a significant reduction of the Group's debt on balance sheet and cash interest burden and a significant improvement to the Group's liquidity position, the Directors are confident that the Restructuring will provide significant benefits for the Group's customers, suppliers and other key stakeholders and believe this should address and resolve the concerns they have raised during the period in which the Restructuring negotiations were taking place.

**Creditor Support for the Restructuring**

4.30    As set out above, the Group entered into the RSA with its key stakeholders on 21 May 2019. The RSA parties included, among others, the Scheme Companies, the Guarantors, the Ultimate Parent and its shareholders and subsidiaries (other than the Group) and the Ad Hoc Group and certain Key Noteholders (together representing a substantial majority in value of the PCF Lenders and Noteholders and all of the Liquidity Facility Lenders).

4.31    Among other things, the parties to the RSA have agreed to, subject to certain conditions:

(a)    take all steps and other actions reasonably necessary in order to support, facilitate, implement, consummate or otherwise give effect to the restructuring of the financial indebtedness and equity of the Group on the terms set out in the RSA; and

(b)    in the case of each of the Participating PCF Lenders and Participating Noteholders, attend the relevant Scheme Meetings in person or by proxy and vote in favour of the Schemes.

4.32    As at the date hereof, the RSA has been signed by creditors representing:

(a)    100% of the Liquidity Facility Debt;

(b)    over 90% of the PCF Debt (in value); and

(c)    over 75%[10] of the Notes (in value).

4.33    PCF Lenders and Noteholders that enter into or otherwise accede to the RSA by the Lock-up Deadline and comply with the terms of the RSA will be entitled to receive a portion of the applicable Lock-up Payment, as further set out in paragraph 6.8 below onwards.

**New Money Commitment**

4.34    Pursuant to the RSA, the Liquidity Facility Lenders (which includes certain Ad Hoc Group members) agreed to provide the Initial Additional Liquidity Draw and the Liquidity Facility Upsize, with commitments to lend the Subsequent Liquidity Draw, in order to provide the necessary liquidity runway for the Group to implement the Restructuring. In addition, certain members of the Ad Hoc Group agreed to backstop the funding of the New Money Commitment in respect of the First Out Term Loans (each as defined below) under the Backstop Agreement. It is understood that certain other Scheme Creditors that are not members of the Ad Hoc Group have subsequently become New Money Backstop Parties by acceding to the Backstop Agreement.

4.35    In looking to secure the funds necessary to continue operating, the Group's primary concern was the urgent underwriting and funding of additional liquidity in order to demonstrate as quickly as possible to the Group's customers that the Group had the backing of major lenders, access to liquidity and commitments for the new money needed to fund the Group after the closing of the Restructuring. This was achieved when the RSA execution was announced.

4.36    The significant time pressure placed on the Group by its key customers to demonstrate a firm commitment to meet the Group's liquidity needs before, during and after the Restructuring meant that it was not practical to offer all PCF Lenders the ability to backstop the New Money Commitment.

4.37    At the time the Group sought to engage with its key creditor groups, the Ad Hoc Group had (independently of the Group) already begun to form. At that time, the Ad Hoc Group was also in the process of engaging legal and financial advisors which, given the consolidation of PCF Debt holdings within the Ad Hoc Group, meant it was possible to negotiate in an efficient manner the key terms of the New Money Commitment and the Restructuring. The significant time pressure placed on the Group by its key customers, and its limited liquidity, meant that attempting to negotiate instead with all PCF Lenders (rather than the Ad Hoc Group) would have been impractical if not impossible.

4.38    Given that the Group's continued viability depended on quickly securing additional liquidity, the Group decided to negotiate additional funding with the Liquidity Facility Lenders, who were able to swiftly provide additional funding (including U.S.$75,500,000 in new money funding pursuant

---

[10] As noted in footnote 6 above, the Parent has agreed to purchase certain Notes for cancellation with the result that this figure will change upon cancellation.

to the Liquidity Facility Agreement before the commencement of the Schemes proceedings, see paragraphs 3.12 (*Liquidity Facility Debt*) above, 4.22 above, (*Negotiations with creditors*) and 4.34 (*New Money Commitment*) for further detail). This was only possible because members of the Ad Hoc Group had: (a) existing confidentiality agreements in place with the Group; and (b) already undertaken substantial due diligence.

4.39   When compared with a syndicate-wide fundraising effort (and the associated delays), the Group viewed the Ad Hoc Group as the only practical source of funding. The Directors considered it highly unlikely that any other party would be willing and able to provide such commitments within the given timeframes and ahead of implementation of the Restructuring, given that:

(a)   they would not have had the benefit of the Ad Hoc Group's knowledge of the Group's business and understanding of the proposed Restructuring and implementation process and risks (which, as set out below, are complex);

(b)   the strained liquidity position of the Group would have likely prevented the Group from securing the New Money Commitment in the markets save at exorbitant rates of interest; and

(c)   pursuant to the terms of the Parent Credit Facilities Agreement, the Group was not permitted to incur new debt without the prior consent of the PCF Lenders which in practice further limited the available funding options to the Group.

4.40   This approach was further supported by the Group's financial advisers PJT Partners, who advised the Directors that there were no practical alternatives to securing the urgent funding and new money commitments except for the members of the Ad Hoc Group that had indicated a willingness to fund and that the terms agreed were reasonable in the circumstances.

4.41   Each PCF Lender will, however, have the opportunity to elect to participate in a portion of the First Out Term Loans. More specifically, each PCF Lender that elects to participate in the First Out Term Loans (the "**Electing PCF Lenders**") by (a) submitting a validly completed Proxy Form, a form of which shall be appended to the Explanatory Statement as Appendix 3 (*Form of Proxy Form*), together with a validly completed commitment letter in respect of the relevant New Money Commitment, a form of which shall in turn be appended to the Proxy Form, to the Information Agent through the Scheme Website – (ii) delivering all necessary "know your customer" requirements to the Administrative Agent under the Amended and Restated Credit Facilities Agreements and (iii) delivering certain other administrative information, in each case, by the Voting Instruction Deadline, (b) acceding to the RSA as a Participating PCF Lender by the date falling two (2) Business Days after the date of the Scheme Sanction Hearing, and (c) satisfying certain eligibility requirements (as further set out herein and in the Proxy Form), will be required to fund its applicable share of the New Money Commitment and will receive its corresponding share of First Out Term Loans as set out in paragraph 5.10 below.

**Implementation by way of Schemes**

4.42   The RSA contemplates that the Restructuring will be implemented, among other things, by way of English schemes of arrangement in respect of the PCF Debt and the Notes.

4.43   The Directors explored various other implementation options with its restructuring advisers, including chapter 11 proceedings under Title 11 of the U.S. Code (as defined below). However, they concluded that there were no viable alternatives to the Schemes due to, among other things the high cost associated with such proceedings, the likely value-destructive effect on the business of the Group of formal insolvency proceedings (including potential termination of customer and supplier contracts) and potential issues around recognition of such alternative proceedings in the jurisdictions in which syncreon Group (as borrower of the PCF Debt and issuer of the Notes) and the Guarantors of the PCF Debt and the Notes are incorporated.

4.44    <u>Change of Governing Law:</u> In order to strengthen the connection to the English jurisdiction for the purposes of the Schemes, the parties to the RSA agreed to amend the governing law and jurisdiction clauses of the Parent Credit Facilities Agreement, the PCF Guaranty Agreement and the Notes Indenture as a preliminary step to launching the Schemes, as follows:

(a)     on 9 July 2019, Amendment No.7 to Credit Agreement was entered into between, among others, the Borrowers and the Required Lenders (each as defined therein), to, *inter alia*, change the governing law of the Parent Credit Facilities Agreement to English law and to submit to the non-exclusive jurisdiction of the courts of England and Wales and make such other changes as the Administrative Agent may require in connection with its powers, rights and responsibilities, in each case as part of establishing jurisdiction of the courts of England and Wales to sanction the Schemes with respect to the PCF Debt ("**PCF Governing Law Change**");

(b)     on 9 July 2019, Amendment No. 1 to the PCF Guaranty Agreement was entered into between, among others, the Borrowers (as defined therein), the Guarantors party thereto and the Administrative Agent to, *inter alia*, change the governing law of the PCF Guaranty Agreement to English law and to submit to the non-exclusive jurisdiction of the courts of England and Wales; and

(c)     on 8 July 2019, the issuers under the Notes Indenture, the Guarantors party thereto and the Notes Trustee entered into the Fifth Supplemental Indenture to the Notes Indenture with the consent of holders of at least a majority in aggregate principal amount of Notes then outstanding to, *inter alia*, change the governing law of the Notes Indenture, the Notes and related guarantees to English law and to submit to the exclusive jurisdiction of (i) the courts of England and Wales and (ii) any U.S. Federal or state court, including any such court sitting in The Borough of Manhattan, The City of New York, New York, United States of America and any appellate court from any thereof, and to make such other changes as the Notes Trustee may require in connection with its powers, rights and responsibilities, in each case as part of establishing jurisdiction of the courts of England and Wales to sanction the Schemes with respect to the Notes (the "**Notes Governing Law Change**").

4.45    It was expressly disclosed that the purpose of the PCF Governing Law Change and the Notes Governing Law Change was to strengthen the connection to the English jurisdiction with a view to implementing the Restructuring of the PCF Debt and the Notes by way of English schemes of arrangement.

**5       RESTRUCTURING OVERVIEW**

5.1     The Restructuring will involve the refinancing and/or exchange of the Group's existing debt for new instruments, including new term loans with extended maturities, equity and warrants issued by a new holding company of the Group and a new asset-based revolving facility.

5.2     The Restructuring will provide additional liquidity on improved terms, whilst reducing the Group's overall principal amount of debt by approximately U.S.$689,500,000 and its cash-pay interest obligations by approximately U.S.$51,100,000 per annum.

5.3     If the Restructuring is implemented, the Directors anticipate that it will significantly reduce the financial burden on the Group's business, thereby both mitigating the current adverse commercial stigma of the Group's highly leveraged position and enabling the Group to continue to operate (including, servicing its customers, paying its suppliers and employing its staff) and further implement its business strategy.

**New Group Debt and Capital Structure**

5.4     Upon implementation of the Restructuring, the Group's capital structure will be as set out in the table below.

| Debt Instrument | Principal Amount |
| --- | --- |
| **First Out Term Loans** | U.S.$125,500,000 outstanding |
| **Second Out Term Loans** | U.S.$225,000,000 outstanding |
| **New ABL Credit Facility** | U.S.$135,000,000 committed |
| **Total** | **U.S.$485,500,000** |

5.5    In addition, the shares that the Parent currently holds in syncreon Group will be cancelled and the PCF Lenders, Noteholders, Liquidity Facility Lenders and New Money Backstop Parties will receive equity instruments issued by Newco and/or IntermediateCo and/or the STAK (each as defined below) as new holding companies of the Group.

5.6    Please refer to Part 2 (*New Group Structure*) of Appendix 9 (*Group Structure*) for the proposed new Group structure and Part 2 (*Post Restructuring Financials*) of Appendix 7 (*Financial and other Information of syncreon Group Holdings B.V.*) for a capital structure table of the Group post-implementation of the Restructuring.

**Primary Objectives**

5.7    The primary objectives of the Restructuring, and therefore the Schemes, are to:

(a)    achieve extensive deleveraging of the Group, to seek to ensure a stable and sustainable capital structure which will result in a stronger balance sheet position and an appropriate debt service and maturity profile;

(b)    significantly reduce the Group's debt service obligations, so as to:

(i)    improve the ongoing liquidity position of the Group; and

(ii)    enable the Group to direct its cash resources towards servicing the Group's general corporate and working capital requirements and capital expenditures;

(c)    allow the Group to continue to service its customers, pay its suppliers and support its employees;

(d)    avoid the adverse consequences of any form of security enforcement by the Liquidity Facility Lenders and/or the PCF Lenders. Any such enforcement would be expensive and would very likely prove value destructive. In this scenario the recoveries for the PCF Lenders and the Noteholders are likely to be significantly less than if the Restructuring is successfully completed (see the Accelerated Sale Analysis at Appendix 13 (*Accelerated Sale Analysis*));

(e)    avoid the adverse consequences of any form of insolvency filing within the Group. Any such insolvency filing would prove value destructive to the operating businesses within the Group (see the Wind Down Analysis at Appendix 14 (*Wind Down Analysis*)); and

(f)    facilitate funding of the relevant portion of the First Out Term Loans to the extent applicable (the "**New Money Commitment**").

5.8    In addition to the wider advantages which the Restructuring and the Schemes seek to confer on the entities that form the Group (as set out above):

(a)    the Schemes will confer on syncreon Group the benefit of a release of its obligations as borrower under the PCF Debt and issuer of the Notes and a release of all related guarantees and rights of contribution from the Guarantors;

(b)      the Schemes will confer on syncreon U.K. the benefit of a release of its obligations as guarantor in respect of the PCF Debt and the Notes and a release of all related guarantees and rights of contribution from the Guarantors; and

(c)      the Schemes will confer broad releases for the benefit of the Released Parties in connection with the Restructuring.

**Key features of the Restructuring**

5.9      The key features of the proposed Restructuring are:

(a)      <u>Equity</u>: Implementation of an intragroup reorganisation, resulting in:

(i)      dissolution of the Parent;

(ii)      the incorporation of two Dutch private limited liability companies IntermediateCo and Newco and the STAK, a Dutch Foundation as new holding companies of syncreon Group and its direct and indirect subsidiaries; and

(iii)      the issuance to creditors (in the proportions set out below) of:

(A)      the Reorganized syncreon Equity, being depositary receipts of shares (*certificaten van aandelen*) in the capital of Newco, issued by the STAK, whereby each such depositary receipt corresponds to one share in the capital of Newco held by the STAK; and

(B)      the Warrants issued by NewCo representing the right to acquire 10.0% of the Reorganized syncreon Equity outstanding immediately after the Restructuring Effective Date (subject to dilution by the MEIP (as defined below) and adjustment in certain circumstances).

(b)      <u>PCF Debt</u>: as described more fully in paragraph 6.1 below, all outstanding PCF Debt will be deemed to have been paid or otherwise satisfied in full, all guarantees under the PCF Guaranty Agreement will be released in full, all security interests granted in respect of the PCF Debt will be released in full and the Parent Credit Facilities Agreement will be terminated and the following instruments will be issued to the PCF Lenders on a pro rata basis, by reference to their PCF Debt as at the Record Time as compared to all PCF Debt as at the Record Time:

(i)      Second Out Term Loans (being U.S.$225,000,000 of reinstated debt, in the form of term loans issued by syncreon Group);

(ii)      80.0% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**PCF Equity**"); and

(iii)      an additional 5.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**PCF Additional Equity**"), which is the PCF Lender Lock-up Payment, will be issued to Timely Participating PCF Lenders only on a pro rata basis, by reference to their PCF Debt as at the Record Time as compared to all PCF Debt held by Timely Participating PCF Lenders as at the Record Time (see paragraph 6.8 (*PCF Lender and Noteholder Lock-Up Payments)* below);

<u>provided that</u>, in each case, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity, on the Restructuring Effective Date, each PCF Lender shall first receive, or be deemed to have received, an equivalent proportion of the beneficial ownership interests (*economisch eigendom*) in and right to acquire legal ownership (*juridisch eigendom*) of shares in the capital of syncreon Group as (A) the PCF Equity (such

beneficial ownership interests, the "**NL15 PCF Equity**") and (B) if applicable, the PCF Additional Equity (such beneficial ownership interests, the "**NL15 PCF Additional Equity**"), which it shall immediately subsequently contribute, or be deemed to have contributed, to Newco in exchange for its applicable share of Reorganized syncreon Equity, in each case in accordance with the RID.

(c)     Notes: as described more fully in paragraph 6.1 below, all outstanding Notes will be cancelled and the following instruments will be issued to the Noteholders on a pro rata basis, by reference to their Notes as at the Record Time as compared to all Notes as at the Record Time:

    (i)     4.5% of Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**Notes Equity**"); and

    (ii)     the Warrants (being warrants representing the right to acquire 10.0% of the Reorganized syncreon Equity outstanding immediately after the Restructuring Effective Date (subject to dilution by the MEIP and adjustment in certain circumstances); and

    (iii)     an additional 2.5% of the Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**Notes Additional Equity**"), which is the Noteholder Lock-up Payment, will be issued to Timely Participating Noteholders only on a pro rata basis, by reference to their Notes as at the Record Time as compared to all Notes held by Timely Participating Noteholders as at the Record Time (see paragraph 6.8 (*PCF Lender and Noteholder Lock-Up Payments)* below),

provided that, in each case, as a prior interim step to receiving its applicable share of Reorganized syncreon Equity or Warrants, on the Restructuring Effective Date, each Noteholder shall first receive, or be deemed to have received, an equivalent proportion of (A) the beneficial ownership interests (*economisch eigendom*) in and right to acquire legal ownership (*juridisch eigendom*) (A) of shares in the capital of syncreon Group as (1) the Notes Equity (such beneficial ownership interests, the "**NL15 Notes Equity**" and together with the NL15 PCF Equity, the "**NL15 Equity**") and (2) if applicable, the Notes Additional Equity (such beneficial ownership interests, the "**NL15 Notes Additional Equity**" and together with the NL15 PCF Additional Equity, the "**NL15 Additional Equity**") and (B) warrants representing the right to acquire 10.0% of the outstanding shares in the capital of syncreon Group (the "**NL15 Warrants**", and together with the NL15 Equity and the NL15 Additional Equity, the "**Interim Equity**"), which it shall subsequently contribute, or be deemed to have contributed, to Newco in exchange for its applicable share of Reorganized syncreon Equity and Warrants, in each case in accordance with the RID.

(d)     Liquidity Facility Interest: prepayment in cash of all accrued but unpaid interest under the Liquidity Facility Agreement.

(e)     First Out Term Loans: issuance by syncreon Group of the First Out Term Loans in an aggregate principal amount of U.S.$125,500,000, of which:

    (i)     U.S.$75,500,000 will be issued in respect of a dollar-for-dollar conversion of the aggregate principal amounts outstanding under (a) the Initial Liquidity Facility Loan and the Initial Additional Liquidity Draw (collectively, the "**Converted Initial Loan**") and (b) the Liquidity Facility Upsize (the "**Converted Applicable Loan**"); and

    (ii)     up to U.S.$50,000,000 (the "**Applicable New Money Loan**" and, with the Converted Applicable Loan, the "**Applicable First Out Term Loans**") will be issued in respect of the New Money Backstop Parties and the Electing PCF Lenders (the "**New Money Providers**") making such amount (less 5% OID) available

(which amount shall be inclusive of any amount funded in respect of the Subsequent Liquidity Draw).[11]

(f)      Existing ABL Facility: Termination and repayment in full of the Existing ABL Facility.

(g)      New ABL Credit Facility: Implementation of the New ABL Facility (being a new asset-based revolving facility with aggregate principal commitments of not less than U.S.$135,000,000).

(h)      MEIP: up to 10.0% of the Reorganized syncreon Equity, on a fully diluted basis (including 4% to be allocated as an initial grant on or before sixty (60) days after the Restructuring Effective Date), shall be reserved for issuance as awards pursuant to a new Group management equity incentive plan (MEIP) with terms and conditions of the MEIP, the participants, and the terms and conditions of any awards granted pursuant thereto (including, without limitation, award amount and vesting) to be determined and implemented by the new board of directors of Newco.

(i)      Trade and unsecured claims: The general unsecured claims against the Group (excluding claims arising under or in connection with the PCF Debt, the Notes and the Liquidity Facility Debt and certain shareholder claims) will be unimpaired by the Schemes.[12]

(j)      The NL15 Equity, the NL15 Warrants, the PCF Equity, the Notes Equity and the Warrants issued on the Restructuring Effective Date pursuant to the Schemes will be issued in reliance on the exemption from the registration requirements of the U.S. Securities Act pursuant to: (i) if the U.S. Bankruptcy Court (as defined below) enters an order to such effect (which order may be the U.S. Chapter 15 Order (as defined below)), Section 1145 of Title 11 of the U.S. Code (as defined below); or (ii) Section 3(a)(10) of the U.S. Securities Act.

**Treatment of the Group's Existing Debt in the Restructuring and the Schemes**

5.10      The following table shows the impact of the Restructuring on the existing creditors and debt instruments that make up the Group's current capital structure.[13]

---

[11] Each Electing PCF Lender will be required to fund (and entitled to receive) its share of U.S. $100,500,000 in principal amount of First Out Term Loans (such share calculated by reference to the portion that each Electing PCF Lender's PCF Debt as of the Record Time bears to the total PCF Debt as of the Record Time).See paragraphs 5.10 and 6.2.

[12] Any claims of the Administrative Agent and the Notes Trustee for compensation and/or indemnity (in the case of the Administrative Agent, on a limited basis) pursuant to the Parent Credit Facilities Agreement or Notes Indenture (as applicable) shall survive the release of the PCF Debt and the termination of the Indenture and the Notes pursuant to the Schemes.

[13] This table is exclusive of Lock-up Payments and fees to which certain PCF Lenders and Noteholders may be entitled.

| Existing Instrument | Part of Scheme? | New Instrument(s)[14] |
|---|---|---|
| **PCF Debt** | Yes | (a)  Second Out Term Loans<br>(b)  80% of Reorganized syncreon Equity<br>(c)  Applicable First Out Term Loans (for New Money Providers if they elect to participate) |
| **Notes** | Yes | (a)  Warrants<br>(b)  4.5% of Reorganized syncreon Equity |
| **Liquidity Facility Debt** | No | (a)  Accrued interest paid in cash<br>(b)  First Out Term Loans |
| **Existing ABL Facility** | No | Repaid in cash and terminated |
| **Equity** | No | Cancelled |
| **Trade and unsecured claims** | No | Unaffected |

**Inter-conditionality and Implementation**

5.11   All of the elements of the Restructuring are inter-conditional and no components of the Restructuring will be implemented unless all other components are implemented (unless the relevant provisions are amended or waived in accordance with the terms of the RSA and the relevant Scheme Restructuring Documents).

5.12   The Schemes will deliver the restructuring in respect of the PCF Debt and the Notes only. The remainder of the Restructuring will be implemented consensually by the relevant parties entering into the required implementation documents, and in particular the RID.

5.13   The RID will govern the implementation of the Restructuring and it is intended to be the key controlling document to effect implementation. The RID will be binding on, *inter alia*, all PCF Lenders, all Noteholders, all Liquidity Facility Lenders, all New Money Providers, the Ad Hoc Group and the Shareholder Parties. The Schemes will authorise the Scheme Companies to enter into the RID on behalf of the PCF Lenders and the Noteholders, once the Schemes have become effective in accordance with their terms (see further Part 2 (*Overview of Schemes*).

5.14   The RID will control the timing of the implementation of each of the steps required to effect the Restructuring (the Implementation Steps). None of the Implementation Steps will occur unless, amongst other things (i) Weil, on behalf of the Parent and each Scheme Company; and (ii) the Ad Hoc Group and CayCo (or their respective Advisers on their behalf), has confirmed to the Information Agent that each of the conditions set out in schedule 3 (*Conditions Precedent*) to the RID have been satisfied or waived (other than those conditions that by their nature are to be satisfied on the Restructuring Effective Date).

5.15   Completion of the Restructuring is conditional upon, among other things:

(a)   the Schemes being approved by the relevant Scheme Creditors, sanctioned by the Court at the Scheme Sanction Hearing, an office copy of the Scheme Sanction Order being delivered to the Registrar of Companies and the Schemes becoming unconditionally effective in accordance with their terms;

---

[14] Reorganized syncreon Equity is subject to dilution by the MEIP and Warrants.

(b)      entry of the U.S. Chapter 15 Order (as defined below) and such order having become a final order not subject to appeal, or if an appeal has been filed, such order having not been stayed;

(c)      the Canadian Court having granted the Canadian Recognition Orders and such orders having not been vacated, stayed, amended, reversed or modified and (A) no appeal or application for leave to appeal therefrom having been filed and the time for filing such appeal or application for leave to appeal having expired, or (B) if any appeal(s) or application(s) for leave to appeal therefrom have been filed, any (and all) such appeal(s) or application(s) having been dismissed, quashed, determined, withdrawn or disposed of;

(d)      receipt of all necessary governmental and third-party authorisations and lapse of any relevant waiting periods in connection with the Restructuring;

(e)      payment of certain agreed and evidenced advisers' fees; and

(f)      such other conditions set forth in Schedule 3 (*Conditions Precedent*) of the RID,

provided that the Scheme Companies, Majority Participating Lenders (as defined in the RSA) and Majority Participating Noteholders (as defined in the RSA) can waive certain of these conditions in accordance with the Schemes and the relevant Scheme Restructuring Documents.

5.16    Upon the completion of all the Implementation Steps, the Parent shall issue a notice confirming that the Restructuring Effective Date has occurred by distributing such notice to, among others: (i) the Administrative Agent (for distribution to the PCF Scheme Creditors on the relevant lender site); (ii) DTC (for distribution to the Notes Scheme Creditors); and (iii) the Information Agent (for posting on the Scheme website).

5.17    Ahead of implementing the Restructuring, the Group will effect certain preliminary intragroup steps:

(a)      as soon as possible before the Restructuring Effective Date, Fuschia Limited establishes Irish tax residency;

(b)      the following steps (b) through (d) occur on the same day: Walsh Western Finance B.V. repays an intercompany liability of U.S.$86 million owed to Fuschia Limited by transferring U.S.$86 million of the loan receivable owed to it by syncreon Acquisition Corp;

(c)      Fuschia Limited distributes all of its assets to syncreon (IOM) Limited in complete liquidation;

(d)      Walsh Western Finance B.V. repays an intercompany liability of U.S.$109 million to syncreon (IOM) Limited by transferring U.S.$109 million of the loan receivable owed to it by syncreon Acquisition Corp; and

(e)      one day prior to the Restructuring Effective Date, syncreon Group B.V. transfers an intercompany loan of U.S.$450 million to the borrower, syncreon Global (Ireland) DAC for no consideration (i.e. as a gift), in complete extinguishment thereof,

(together, this paragraph 5.17, the "**Preliminary Restructuring Steps**").

**Terms of Key Documents**

5.18    The key implementation documents and the terms of the new debt and equity instruments are summarised in Appendix 16 (*Summary of Key Documents*).

5.19    The key implementation documents include: (i) the Scheme Document; (ii) the RID; (iii) the Deed of Release; and (iv) the Holding Period Trust Deed.

5.20    The key documents that will give effect to the terms of the new instruments include: (i) the Amended and Restated Facilities Agreement (which will document the First Out Term Loans and the Second Out Term Loans); (ii) the Participation Agreement; (iii) the Newco Articles; (iv) the Warrants Agreement; and (v) the New ABL Facility.

5.21    The long-form draft of the Scheme Document is attached as Appendix 1 (*The Scheme Document*) with the Deed of Release appended thereto.  Long form drafts of each of the (i) Amended and Restated Facilities Agreement, (ii) Participation Agreement, (iii) Newco Articles, (iv) Warrants Agreement, (v) Holding Period Trust Deed and (vi) RID are attached at Appendix 17 (*Form of Key Documents*.

## 6    CREDITOR ENTITLEMENTS

### Scheme Consideration and Total Restructuring Consideration

6.1    The Scheme Restructuring Documents, among other things, collectively provide for the following in relation to the PCF Debt and the Notes:

   (a)    PCF Debt:

      (i)    all outstanding PCF Debt will be deemed to have been paid or otherwise satisfied in full by virtue of the issuance of the PCF Total Restructuring Consideration (as defined below), all guarantees under the PCF Guaranty Agreement will be released in full, all security interests granted in respect of the PCF Debt will be released in full and the Parent Credit Facilities Agreement will be terminated[15];

      (ii)    each PCF Lender will be entitled to receive its pro rata share of (x) the Second Out Term Loans; and (y) the PCF Equity (such pro rata shares being determined as a proportion of the amount of PCF Debt it holds to the aggregate amount of PCF Debt held by all PCF Lenders, in each case, as at the Record Time) (the "**PCF Scheme Consideration**"); and

      (iii)    each Timely Participating PCF Lender will be entitled to receive its pro rata share of the PCF Additional Equity (such pro rata share being determined as a proportion of the amount of PCF Debt it holds to the aggregate amount of PCF Debt held by all Timely Participating PCF Lenders, in each case, as at the Record Time) (the "**PCF Lender Lock-up Payment**");

   (b)    Notes:

      (i)    all outstanding Notes will be deemed to have been paid or otherwise satisfied in full by virtue of the issuance of the Notes Total Restructuring Consideration (defined below), all guarantees under the Notes will be released in full, the Notes Indenture will be terminated[16] and the Notes will be cancelled;

      (ii)    each Noteholder will be entitled to receive its pro rata share of (i) the Notes Equity; and (ii) the Warrants (such pro rata share being determined as a proportion of the amount of Notes it holds to the aggregate amount of Notes held by all Noteholders, in each case, as at the Record Time) (the "**Notes Scheme Consideration**" and, together with the PCF Scheme Consideration, the "**Scheme Consideration**"); and

---

[15] Except that certain claims of the Administrative Agent for compensation and/or indemnity pursuant to the Parent Credit Facilities Agreement shall survive the termination of such Parent Credit Facilities Agreement pursuant to the Schemes.

[16] Except that certain claims of the Notes Trustee for compensation and/or indemnity pursuant to the Notes Indenture shall survive the termination of the Notes Indenture and the Notes pursuant to the Schemes.

(iii)    each Timely Participating Noteholder will be entitled to receive its pro rata share of the Notes Additional Equity (such pro rata share being determined as a proportion of the amount of Notes it holds to the aggregate amount of Notes held by all Timely Participating Noteholders, in each case, as at the Record Time) (the "**Noteholder Lock-up Payment**"),

(the aggregate amount of any Notes Scheme Consideration and Noteholder Lock-up Payment which a Noteholder is entitled to receive under paragraphs (ii) and (iii) above, together its "**Notes Total Restructuring Consideration**" and, together with the PCF Total Restructuring Consideration (as defined below), its "**Total Restructuring Consideration**").

**New Money Commitments**

6.2    In relation to the New Money Commitment, the Scheme Restructuring Documents also provide that:

(a)    each Electing PCF Lender will be required to make available in cash its share of the Applicable First Out Term Loans (totaling $100,500,000) calculated by reference to the proportion that each such Electing PCF Lender's PCF Debt (as at the Record Time) bears to the total PCF Debt (as at the Record Time);

(b)    with respect to any portion of Applicable First Out Term Loans that is not made available by the Electing PCF Lenders, such portion shall be made available by the New Money Backstop Parties by way of (i) a dollar-for-dollar conversion of the Converted Applicable Loan and/or the Applicable New Money Loan and/or (ii) in cash (as applicable) in accordance with the Backstop Agreement; and

(c)    each New Money Provider shall receive its applicable allocation of the Applicable First Out Term Loans, and each New Money Provider's definitive entitlement shall be set out in the Allocations Spreadsheet and Funds Flow (the amount of First Out Term Loans issued to an Electing PCF Lender, its "**PCF Lender New Money Allocation**"),

(the aggregate amount of any PCF Scheme Consideration, PCF Lender Lock-up Payment and PCF Lender New Money Allocation which a PCF Lender is entitled to receive, under paragraphs 6.1(a)(ii), 6.1(a)(iii) and 6.2(c) together its "**PCF Total Restructuring Consideration**"). Notwithstanding the fact that all PCF Lenders shall be given the opportunity to participate in the New Money Commitment, in relation to the allocation of the New Money Commitment and First Out Term Loans in respect of the Pledged Incremental Coupon Loans as noted in footnote 8 above (the "**Specified Allocations**"), CayCo has agreed with certain RCF Lenders that it shall turnover (or otherwise make available) to the RCF Lenders the rights to fund and/or receive (as applicable) the Specified Allocations on a pro rata basis.

6.3    The Scheme Restructuring Documents also include a deed of release that will confirm the releases effected under the Schemes and will include certain additional mutual releases between, inter alia, the Group, the Ultimate Parent and its affiliates (other than the Group), the Scheme Creditors, the Liquidity Facility Lenders and their respective advisers, certain additional customary releases granted to the Group, in each case for claims in connection with the Restructuring and with effect from the Restructuring Effective Date.

6.4    If a Scheme Creditor (a) submits a validly completed Proxy Form or Notes Account Holder Letter (as applicable) to the Information Agent through the Scheme Website by the Voting Instruction Deadline, (b) in the case of an Electing PCF Lender, delivers all necessary "know your customer" requirements to the Administrative Agent under the Amended and Restated Credit Facilities Agreement and satisfies the other requirements set forth above, and (c) in the case of a Timely Participating PCF Lender or Timely Participating Noteholder, accedes to the RSA as a Participating PCF Lender or Participating Noteholder (as applicable) on or prior to the Lock-up Deadline and complies with all of its obligations under the RSA as a Participating PCF Lender or Participating

Noteholder (as applicable), that Scheme Creditor (or its Designated Recipient, if applicable) will receive its Total Restructuring Consideration on the Restructuring Effective Date.

6.5     However, any Scheme Creditor that is a person:

(a)     who has failed to confirm that they are not an Ineligible Person or has confirmed that they are an Ineligible Person and has not appointed a Designated Recipient that is not an Ineligible Person; or

(b)     does not satisfy the requirements set forth in paragraph 6.4(a) above.

(a "**Compromised Creditor Beneficiary**") will have the Interim Equity, Reorganized syncreon Equity and/or Warrants (as applicable) to which it is entitled delivered to Lucid Issuer Services Limited (the "**Holding Period Trustee**") to hold on trust for, and for the benefit of, that Compromised Creditor Beneficiary in accordance with the terms of a deed to be entered into by (among others) syncreon Group and the Holding Period Trustee (the "**Holding Period Trust Deed**").

6.6     A PCF Lender, a Noteholder or a Designated Recipient (as applicable) is an "**Ineligible Person**" if:

(a)     such PCF Lender or Noteholder or Designated Recipient (as applicable) is entitled to receive Reorganized syncreon Equity or Warrants pursuant to the Schemes and:

(i)     is not a "qualified investor" within the meaning of the Prospectus Directive[17]; or

(ii)     is a citizen of, or domiciled or resident in, or subject to the laws of, any jurisdiction outside the United Kingdom, the Netherlands or any other member state of the European Economic Area and where the offer to issue to, or subscription by, such person of Interim Equity, Reorganized syncreon Equity or Warrants is prohibited by law or would, or would be likely to, result in the Scheme Companies being required to comply with any filing, registration, disclosure or other onerous (as may be decided by the Directors in their sole discretion) requirement in such jurisdiction;

(b)     solely with respect to the issuance of the Warrants and solely to the extent such Warrants will be issued in reliance on the exemption from registration set forth in Section 3(a)(10) of the U.S. Securities Act, such Noteholder or Designated Recipient (as applicable) (x) is entitled to receive Warrants pursuant to the Schemes, and (y) is neither:

(i)     a "qualified institutional buyer" (as such term is defined in Rule 144A under the U.S. Securities Act); nor

(ii)     an institutional "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3) or (7) under the U.S. Securities Act); or

(c)     solely with respect to the issuance of the PCF Additional Equity, NL15 Additional Equity, Notes Additional Equity and the Private Placement Equity and solely to the extent such equity will be issued in reliance on the exemption from registration set forth in Section 4(a)(2) and/or Regulation D of the U.S. Securities Act, such PCF Lender or Noteholder or Designated Recipient (as applicable) (x) is entitled to receive PCF Additional Equity, NL15 Additional Equity, Notes Additional Equity or Private Placement Equity, and (y) is not both:

(i)     a "qualified institutional buyer" (as such term is defined in Rule 144A under the U.S. Securities Act); and

---

[17] The E.U. Directive 2003/71/EC, as amended (including by Regulation (EU) 2017/1129, which entered into force on July 21, 2019) or superseded, including any relevant implementing measure in the relevant member state.

(ii)     an institutional "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3) or (7) under the U.S. Securities Act).

6.7     The Holding Period Trust Deed shall provide that the Interim Equity, Reorganized syncreon Equity and/or Warrants (as applicable) of the Compromised Creditor Beneficiaries shall be, absent any instruction in writing from the relevant Compromised Creditor Beneficiary to the contrary, held by the Holding Period Trustee on trust for, and on behalf of, such Compromised Creditor Beneficiary for a period of two (2) years in accordance with the Holding Period Trust Deed, following which:

(a)     such Compromised Creditor Beneficiary will have no entitlement to receive the relevant portion of Reorganized syncreon Equity and/or Warrants (as applicable) previously held on its behalf by the Holding Period Trustee; and

(b)     upon the expiration of the Holding Period, the Holding Period Trustee will sell the remaining portion of the Reorganized syncreon Equity and/or Warrants (as applicable) to a third party and the cash proceeds of such sale (after deduction of the reasonable costs and expenses of the Holding Period Trustee incurred in respect of such sale) shall be paid to the relevant Compromised Creditor Beneficiaries. To the extent the Holding Period Trustee is not able to sell any remaining portion of Reorganized syncreon Equity and/or Warrants (as applicable) held in the Holding Period Trust within three months following the end of the Holding Period, then each relevant Compromised Creditor Beneficiary's interests in the Holding Period Trust will be surrendered and cancelled, and the Holding Period Trustee will transfer such remaining portion first by way of gift on its behalf to the RSPCA or, failing such gift for any reason, to the STAK for cancellation at the Scheme Companies' or Newco's expense in accordance with the terms of the Holding Period Trust Deed.

**PCF Lender and Noteholder Lock-up Payments**

6.8     In order to maximise the support for the Restructuring and the Schemes, all PCF Lenders and Noteholders were given the opportunity to accede to the RSA as a Participating PCF Lender or Participating Noteholder (as applicable) and, subject to the terms of the RSA, obtain a portion of the applicable Lock-up Payment on the Restructuring Effective Date, as set out below. This opportunity is given to encourage timely sign-up to the RSA and participation in the Restructuring process generally, in order to provide certainty to the Group in relation to its ability to complete the Restructuring.

| Type of Payment | Amount (subject to dilution by the Warrants and the MEIP) | Beneficiaries (pro rata) |
|---|---|---|
| PCF Lender Lock-up Payment | 5.5% of Reorganized syncreon Equity | Timely Participating PCF Lenders |
| Noteholder Lock-up Payment | 2.5% Reorganized syncreon Equity | Timely Participating Noteholders |

6.9     The PCF Additional Equity and the Notes Additional Equity (and as a preceding interim step, the NL15 Additional Equity) issued on the Restructuring Effective Date in respect of the PCF Lender Lock-up Payment and the Noteholder Lock-up Payment (as applicable)will be issued in reliance on the exemption from the registration requirements of the U.S. Securities Act pursuant to: (i) if the U.S. Bankruptcy Court enters an order to such effect (which order may be the U.S. Chapter 15 Recognition Order), Section 1145 of Title 11 of the U.S. Code; or (ii) Section 4(a)(2) and/or Regulation D of the U.S. Securities Act.

6.10    Directors, having negotiated with the Ad Hoc Group, the Ultimate Parent and its shareholders and subsidiaries and certain other key Noteholders, agreed that it was appropriate for the Lock-up Payments to be paid as a proportion of Reorganized syncreon Equity rather than cash. Due to the ongoing liquidity needs of the Group, any cash payment would increase the amount of the New Money Commitment and the size of the First Out Term Loans post-Restructuring. This would be

more costly for the Group to service following the implementation of the Restructuring and was contrary to the overall aim of reducing the Group's debt burden and accordingly it was agreed that this amount should be paid by way of Reorganized syncreon Equity.

6.11    The following table sets out the value of the Lock-up Payments relative to (i) the outstanding principal amount of the PCF Debt or Notes (as applicable) and (ii) the Total Restructuring Consideration (including the applicable Lock-Up Payments) received by the PCF Lenders or the Noteholders (as applicable) as set out in the PJT Illustrative Valuation (described further in paragraph 7 below):

| Type of Payment | As a percentage (%) of the total **outstanding principal** amount of PCF Debt / Notes as at 30/6/2019 (as applicable) | As a percentage (%) of the **total estimated claim** in relation to the **PCF Debt / Notes** as at 30/6/2019 (as applicable) | As a percentage (%) of the **PCF/Notes Total Restructuring Consideration** (as applicable) [18] |
|---|---|---|---|
| Lender Lock-up Payment | **High**: 3% **Mid** 2% **Low**: 2% | **High**: 2% **Mid** 2% **Low**: 2% | **High**: 3% **Mid**: 3% **Low**: 3% |
| Noteholder Lock-up Payment | **High**: 3% **Mid**: 3% **Low**: 2% | **High**: 3% **Mid**: 3% **Low**: 2% | **High**: 36% **Mid**: 36% **Low**: 36% |

*Note: this table assumes a post-Restructuring total enterprise value ("TEV") range of U.S.$580 million in the low case, U.S.$630 million in the mid case and U.S.$680 million in the high case. This does not take into account the planned cancellation of Notes referred to in paragraph 4.27 above.*

6.12    The entitlement to a Lock-up Payment is subject to the following conditions:

(a)    those PCF Lenders that accede to the RSA as a Participating PCF Lender by delivering a valid Creditor Accession Deed to the Information Agent by the Lock-up Deadline (12 Noon (London time) on 22 July 2019) and which comply with all their obligations as a Participating PCF Lender under the RSA (each, a "**Timely Participating PCF Lender**"), will be entitled to receive a Lock-up Payment on the Restructuring Effective Date in an amount equal to its pro rata share of the Additional PCF Equity; and

(b)    those Noteholders that accede to the RSA as a Participating Noteholder by delivering a valid Creditor Accession Deed to the Information Agent by the Lock-up Deadline (12.00 Noon (London time) on 22 July 2019) and which comply with all their obligations as a Participating Noteholder under the RSA (each, a "**Timely Participating Noteholder**"), will be entitled to receive a Lock-up Payment on the Restructuring Effective Date in an amount equal to its pro rata share of the Additional Notes Equity.

6.13    Under the RSA, each Participating PCF Lender and Participating Noteholder must attend each relevant Scheme Meetings (or adjournment thereof) in person or by proxy and exercise and cast all of its votes in respect of its Locked-up Debt in favour of each Scheme and any amendment or modification to each such Scheme (and not change or withdraw such vote or cause or direct such vote to be changed or withdrawn), provided that they are proposed by the Parent or a Scheme

---

[18] Total Restructuring Consideration includes the applicable Lock-Up Payments.

Company and that the terms of the Schemes are and remain consistent in all material respects with the terms of the RSA, the Restructuring Term Sheet and the Steps Plan (each as defined in the RSA).

6.14    Each PCF Lender or Noteholder that accedes to the RSA by delivering a valid Creditor Accession Deed to the Information Agent prior to the Lock-up Deadline and wishes to receive its Lock-up Payment pursuant to the RSA on the Restructuring Effective Date must have submitted a valid Proxy Form or Notes Account Holder Letter (as applicable) to the Information Agent through the Scheme Website by the Voting Instruction Deadline and ensure that each of Part 1 (*Key Information*), Part 2 (*Voting*) and Part 3 (*Restructuring Consideration*) of the Proxy Form or Notes Account Holder Letter (as applicable) are validly completed (including the giving of the required confirmations, representations, warranties, waivers and undertakings set out therein) (the "**Election Procedures**").

6.15    For further detail on the obligations of Participating PCF Lenders and Participating Noteholders under the RSA, Scheme Creditors should review the RSA, a copy of which is available on the Scheme Website and through the Information Agent.

6.16    If a Scheme Creditor does not deliver a valid Creditor Accession Deed to the Information Agent by the Lock-up Deadline or does not comply with its obligations under the RSA (including without limitation the Election Procedures), such Scheme Creditor will not receive any portion of the Lock-up Payments.

6.17    Notwithstanding anything to the contrary in the RSA, any failure by a Scheme Creditor to timely deliver its Creditor Accession Deed to the RSA or to timely comply with its obligations under the RSA (including without limitation the Election Procedures) shall cause such Scheme Creditor to (x) irrevocably and unconditionally waive their right to receive its potential portion of the Lock-up Payment and (y) fully and absolutely release the Scheme Companies from any and all obligations to pay such Scheme Creditor's portion of the Lock-up Payments pursuant to the RSA or the RID; provided, however, that such Scheme Creditor will otherwise continue to be bound by its respective undertakings set forth in the RSA and its Creditor Accession Deed.

6.18    Scheme Creditors that deliver a valid Creditor Accession Deed to the Information Agent by the Lock-up Deadline and comply with their obligations under the RSA (including without limitation the Election Procedures) will receive more Total Restructuring Consideration than Scheme Creditors who are not entitled to a Lock-up Payment.

**Liquidity Facility Lender Payments**

6.19    Scheme Creditors should note that certain members of the Ad Hoc Group will receive the following additional payments:

(a)      certain members of the Ad Hoc Group shall receive, in their capacity as Liquidity Facility Lenders, having entered into the RSA and Amendment No. 3 to the Liquidity Facility Agreement, and having provided certain commitments and agreed to certain undertakings thereunder;

(i)      the Converted Initial Loan;

(ii)     1.5% of the Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**Liquidity Loan Amendment Payment**") in consideration for agreeing to amend the Liquidity Facility Agreement in order to provide the new money commitments thereunder (as further detailed at paragraph 6.2 (New Money Commitment) above); and

(iii)    1.0% of the Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**Liquidity Loan Forbearance Payment**") in consideration for their forbearance in respect of the Liquidity Facility Agreement for the duration of the Restructuring;

(b)    certain members of the Ad Hoc Group shall receive, in their capacity as New Money Backstop Parties, having entered into the RSA and the Backstop Agreement, and having provided certain commitments and agreed to certain undertakings thereunder:

    (i)    their applicable allocation of the Applicable First Out Term Loans (as determined in accordance with the Backstop Agreement); and

    (ii)    their applicable allocation (as set forth in the Backstop Agreement) of 5.0% of the Reorganized syncreon Equity (subject to dilution by the Warrants and the MEIP) (the "**New Money Backstop Payment**"), in consideration for, among other things, backstopping the New Money Commitment (as described at paragraphs 6.2 and 4.34 (*New Money Commitment*) above).

6.20    Further, the New Money Backstop Parties that are not members of the Ad Hoc Group, that have entered into the RSA and the Backstop Agreement, and have provided certain commitments and agreed to certain undertakings thereunder, will be entitled to receive:

(a)    their applicable allocation of the Applicable First Out Term Loans (as determined in accordance with the RSA and the Backstop Agreement); and

(b)    their applicable allocation (as set forth in the Backstop Agreement) of the New Money Backstop Payment, in consideration for, among other things, backstopping the New Money Commitment.

6.21    The Private Placement Equity issued in respect of the New Money Backstop Payment, the Liquidity Loan Amendment Payment and the Liquidity Loan Forbearance Payment will be issued in reliance on the exemption from the registration requirements to the U.S. Securities Act pursuant to Section 4(a)(2) and/or Regulation D of the U.S. Securities Act.

6.22    The payments to the Liquidity Facility Lenders and New Money Backstop Parties set out above reflect the consideration demanded by the Liquidity Facility Lenders and New Money Backstop Parties and are deemed by the Group to be fair, reasonable and commercially appropriate in the circumstances. As described in paragraph 4.36 above, significant time pressure was placed on the Group by its key customers to demonstrate a firm commitment to meet the Group's new money needs before, during and after the Restructuring. In particular, the Directors considered the Ad Hoc Group to be the only practical source of funding, as was also advised to them by the Group's financial advisers PJT Partners (as detailed further in paragraph 4.40).

6.23    Payment of the Liquidity Loan Amendment Payment and the Liquidity Loan Forbearance Payment to the Liquidity Facility Lenders is not conditional upon the approval of the Schemes or the completion of the Restructuring. In the event that the Restructuring is not consummated, syncreon Group will be required to make a cash payment to the Liquidity Facility Lenders in an amount equal to the Liquidity Loan Amendment Payment, the Liquidity Loan Forbearance Payment and certain fees.

**Adviser Fees**

6.24    Under the RSA, the Company has agreed to pay, or cause to be paid, all reasonable and documented fees and expenses incurred prior to the Restructuring Effective Date (including without limitation "success" or "transaction" fees of the applicable Advisers) by the Information Agent and the advisers to the Ad Hoc Group and the Ultimate Parent and its affiliates (other than the Group) in accordance with the RSA and, as applicable, with engagement or reimbursement agreements executed with the Parent. The Company has also agreed to pay all reasonable and documented fees and expenses incurred by the Administrative Agent, Notes Trustee and their advisers prior to the Restructuring Effective Date, pursuant to the RID.

**CayCo Cash Collateral**

6.25   Under the RSA, CayCo has agreed to transfer the CayCo Cash Collateral to the RCF Lenders as pledgees on the Restructuring Effective Date.

**Allocations and calculation of pro rata shares**

6.26   As more fully described in clause 4 of the RID, each Scheme Creditor's entitlement to the instruments issued pursuant to the Implementation Steps shall be set out in the Allocations Spreadsheet and Funds Flow and shall be calculated as follows:

(a)   each PCF Lender's applicable share of the PCF Scheme Consideration shall be calculated by reference to the proportion of the amount of PCF Debt that such PCF Lender holds (as at the Record Time) to the aggregate amount of PCF Debt held by all PCF Lenders (as at the Record Time);

(b)   each Timely Participating PCF Lender's applicable share of the PCF Lender Lock-up Payment shall be calculated by reference to the proportion of the amount of PCF Debt that each such Timely Participating PCF Lender holds (as at the Record Time) to the aggregate amount of PCF Debt held by all Timely Participating PCF Lenders (as at the Record Time);

(c)   each Noteholder's applicable share of the Notes Scheme Consideration shall be calculated by reference to the proportion of the amount of Notes that such Noteholder holds (as at the Record Time) to the aggregate amount of Notes held by all Noteholders (as at the Record Time);

(d)   each Timely Participating Noteholder's applicable share of the Noteholder Lock-up Payment shall be calculated by reference to the proportion of the amount of Notes that each such Timely Participating Noteholder holds (as at the Record Time) to the aggregate amount of Notes held by all Timely Participating Noteholders (as at the Record Time);

(e)   each Electing PCF Lender's applicable share of the commitment to fund the Applicable First Out Term Loans and the corresponding entitlement to be issued Applicable First Out Term Loans shall be calculated by reference to the proportion of the amount of PCF Debt that each such Electing PCF Lender holds (as at the Record Time) to the aggregate amount of PCF Debt held by all PCF Lenders (as at the Record Time), noting that, in relation to the allocation of the New Money Commitment and Applicable First Out Term Loans in respect of the Pledged Incremental Coupon Loans, CayCo has agreed with certain RCF Lenders that it shall turnover (or otherwise make available) to RCF Lenders the rights to fund and/or receive (as applicable) such allocations on a pro rata basis;

(f)   each Liquidity Facility Lender's applicable share of:

(i)   the Liquidity Loan Amendment Payment and the Liquidity Loan Forbearance Payment shall determined as set forth in Amendment No. 3 to the Liquidity Facility Agreement; and

(ii)   the First Out Term Loans in respect of the Converted Initial Loan shall be determined pro rata by reference to each Liquidity Facility Lender's holdings of the Initial Liquidity Facility Loan and the Initial Additional Liquidity Draw as of the Record Time; and

(g)   each RCF Lender's share of the CayCo Cash Collateral Payment shall be calculated by reference to the proportion of the amount of Revolving Loans that each such RCF Lender holds (as at the Record Time) to the aggregate amount of Revolving Loans held by all RCF Lenders (as at the Record Time),

provided that the Allocations Spreadsheet and Funds Flow shall be definitive in determining any creditor's applicable share, entitlement to any instrument or funding requirement.

## 7    ESTIMATED RECOVERIES FOR SCHEME CREDITORS IF THE SCHEME IS SUCCESSFULLY IMPLEMENTED

7.1    Upon a successful implementation of the Schemes and the Restructuring, the Directors estimate that Total Restructuring Consideration to be distributed to Scheme Creditors compared to the total outstanding principal amount of the PCF Debt (or subset thereof) or the Notes (as applicable) will be as set out below. Note that this table includes recoveries deriving from the PCF Additional Equity and the Notes Additional Equity.

| Total Restructuring Consideration | Recovery as a percentage (%) of the **total outstanding principal amount** of the **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 | | |
|---|---|---|---|
| | **Low Case** | **Mid Point** | **High Case** |
| PCF Lenders[19] | 59% | 66% | 72% |
| *Term Loan Lenders* | 59% | 66% | 72% |
| *Revolving Lenders[20]* | 80% | 87% | 94% |
| *ITL Lenders[21]* | 49% | 54% | 59% |
| Noteholders | 7% | 8% | 10% |

| Total Restructuring Consideration | Recovery as a percentage (%) of the **total estimated claim** in relation to the **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 | | |
|---|---|---|---|
| | **Low Case** | **Mid Point** | **High Case** |
| PCF Lenders[22] | 58% | 64% | 70% |
| *Term Loan Lenders* | 58% | 64% | 70% |
| *Revolving Lenders[23]* | 77% | 84% | 91% |
| *ITL Lenders[24]* | 47% | 52% | 57% |
| Noteholders | 6% | 8% | 9% |

***Note:*** *These tables assume a TEV of: U.S.$580 million in the low case, U.S.$630 million as the mid-point and U.S.$680million in the high case. These tables do not take into account the planned cancellation of Notes referred to in paragraph 4.27 above.*

---

[19] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans, the turnover of which are described in paragraph 7.2 and reflected in the lines "Revolving Lenders" and "ITL Lenders"
[20] Taking account of the turnover described in paragraph 7.2.
[21] Taking account of the turnover described in paragraph 7.2.
[22] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans, the turnover of which are described in paragraph 7.2 and reflected in the lines "Revolving Lenders" and "ITL Lenders"
[23] Taking account of the turnover described in paragraph 7.2.
[24] Taking account of the turnover described in paragraph 7.2.

The below tables illustrate recoveries for PCF Lenders and Noteholders who are not party to the RSA and as a result will not receive the PCF Additional Equity and/or the Notes Additional Equity:

| Total Restructuring Consideration | Recovery as a percentage (%) of the **total outstanding principal amount** of the **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 | | |
|---|---|---|---|
| | **Low Case** | **Mid Point** | **High Case** |
| PCF Lenders[25] | 58% | 64% | 69% |
| Noteholders | 4% | 5% | 6% |

| Total Restructuring Consideration | Recovery as a percentage (%) of the **total estimated claim** in relation to the **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 | | |
|---|---|---|---|
| | **Low Case** | **Mid Point** | **High Case** |
| PCF Lenders[26] | 56% | 62% | 67% |
| Noteholders | 4% | 5% | 6% |

*Note: These tables assume a TEV of: U.S.$580 million in the low case, U.S.$630 million as the mid-point and U.S.$680million in the high case. These tables do not take into account the planned cancellation of Notes referred to in paragraph 4.27 above.*

7.2    As noted in footnote 8, CayCo granted the CayCo Cash Collateral and pledged the Pledged Incremental Coupon Loans to the RCF Lenders in March 2018 in consideration for the RCF Lender agreeing to the Extension Amendment. It was agreed as a term of the Restructuring that these existing inter-creditor arrangements should be honoured in the Restructuring and accordingly, on the Restructuring Effective Date:

(a)    CayCo shall pay, pursuant to the RCF Pledge and Security Arrangement, the CayCo Cash Collateral to the RCF Collateral Agent on behalf of the RCF Lenders, which shall result in a partial discharge of an equivalent amount of the Revolving Loans; and

(b)    CayCo has instructed the Company to make any PCF Scheme Consideration or Applicable First Out Term Loans that would have been distributed to CayCo on account of the Pledged Incremental Coupon Loans available to the RCF Lenders in accordance with the terms of the RID.

Accordingly, although the PCF Scheme Creditors have the same rights against the Scheme Companies, the recovery to the RCF Lenders and the ITL Lenders set out in paragraph 7 are different as a result of the intercreditor arrangements agreed between CayCo and the RCF Lenders described above.

7.3    For the purpose of the estimating the recoveries set out in this paragraph, PJT Partners have prepared an illustrative valuation for the benefit of the Directors ("**PJT Illustrative Valuation**"). The key underlying assumptions of the PJT Illustrative Valuation are set out below:

(a)    In preparing the PJT Illustrative Valuation, PJT primarily relied on (i) public information and industry research, and (ii) private information provided by the Group and/or its advisors, including through discussions with the Group's management.

---

[25] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans
[26] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans

(b)     In determining a post-Restructuring TEV range, PJT evaluated a number of methodologies, including (i) the comparable companies analysis, (ii) the precedent transaction analysis, and (iii) the discounted cash flow analysis ("**DCF**").

(c)     In respect of the comparable companies analysis and the precedent transaction analysis, PJT calculated an LTM 3/31/19 Comparable Adjusted EBITDA metric based upon LTM financials prepared by the Group, adjusted (using publicly available information) to be comparable with the Group's peers and precedent transactions. This metric also normalized for what PJT and the Group's management considered to be "one-off" or extraordinary factors during the LTM period. PJT conducted a comprehensive review of applicable public, comparable trading companies and precedent transactions in order to derive appropriate EBITDA multiple ranges for each valuation methodology. These multiples were then applied to the Comparable Adjusted EBITDA to obtain valuation ranges for each valuation methodology.

(d)     In respect of the DCF analysis, PJT relied upon management's financial forecast(s) and business plan(s) prepared by the Group's management, which was finalized on 15 February 2019 (the "Feather Plan"). Unlevered free cash flows as detailed in the Feather Plan were then discounted at a range of estimated weighted average costs of capital, which was determined by reference to, among other things, the Group's cost of debt based on its post-restructuring capital structure and the estimated cost of equity based on the equity performance of the comparable companies. The DCF analysis also included an estimate of the value of the Group for the period beyond December 31, 2023, known as the terminal value. The terminal value was derived by applying a multiple to the Group's 2023 Comparable Adjusted EBITDA. The DCF analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

(e)     In determining the implied equity value, PJT subtracted net debt from TEV, using the Company's projected net debt balances as of 30/09/19; assuming $370.5 million of funded debt (excludes $10mm of contingencies related to certain contract discussions) and no balance sheet cash in excess of minimum cash (i.e., $35 million).

## 8     CONSEQUENCES OF A FAILURE TO IMPLEMENT THE RESTRUCTURING

8.1     The Directors believe that, in light of the considerable effort and time which it has taken for the Scheme Companies to agree the Restructuring with their key stakeholders, the prospect of such parties agreeing on an alternative transaction which would leave the Group with a viable capital structure before enforcement proceedings were commenced or it became necessary to place the Scheme Companies (and possibly other companies in the Group) into an insolvency procedure, is unlikely.

8.2     In particular, the Directors have given consideration to the existing defaults and potential defaults under the Parent Credit Facilities Agreement, the Notes Indenture, the Liquidity Facility Agreement and the Existing ABL Facility Agreement (certain of these existing and potential relevant defaults are set out in paragraphs 8.7 to 8.19 below). The Participating Lenders and the Participating Noteholders have agreed to forbear on a number of existing potential events of default pursuant to the terms of the RSA.

8.3     However, the Directors believe that if it becomes apparent that the Restructuring is not capable of being implemented (for example, if the requisite majorities of Scheme Creditors do not vote in favour of the Schemes or if the Court decides not to exercise its discretion to sanction the Schemes), shortly thereafter the Participating Lenders and/or the Participating Noteholders would terminate the RSA pursuant to clause 8.3 (*Participating Party Voluntary Termination*) of the RSA and would no longer be bound by, among other things, the forbearances granted in the RSA. In those circumstances, the Directors also consider that it is likely that syncreon Group and certain of its subsidiaries would be insolvent and that either:

(a) the Liquidity Facility Lenders and/or the PCF Lenders would seek to exercise their rights under the Liquidity Facility Agreement, the Parent Credit Facilities Agreement and/or the PCF Guaranty Agreement (respectively) to effect an accelerated sale of the Group through a security enforcement or insolvency process and effect a contractual release of the Noteholder guarantees in place across the Group ("**Accelerated Sale**").

(b) bankruptcy, insolvency or similar proceedings for the Parent, syncreon Group and/or their subsidiaries would commence as a result of filings under local law (certain of the Guarantors are incorporated in jurisdictions such as Germany where, in certain circumstances, directors may have an affirmative obligation to file) or formal demands and acceleration from the PCF Lenders (being more than 50% by value) and/or Noteholders (being 50% or more by value) or local creditors, which is likely to lead to the Parent, syncreon Group and their respective subsidiaries falling into separate local insolvency proceedings in various jurisdictions. Such fragmented proceedings would make it exceedingly difficult to sell the Group as a going concern and would therefore likely result in a piecemeal liquidation of the Group's global business on a jurisdiction-by-jurisdiction basis, with probable significant job losses for its over 14,000 employees world-wide ("**Wind Down Scenario**").

8.4 In order to assist the Directors' considerations of the likely consequences of a failure to implement the Restructuring:

(a) PJT Partners has prepared an analysis for the benefit of the Scheme Companies estimating the potential financial outcomes for Scheme Creditors in the event of an Accelerated Sale (the **"Accelerated Sale Analysis"**). A redacted version of the Accelerated Sale Analysis is attached at Appendix 13 (*Accelerated Sale Analysis*). Details of the assumptions, considerations, methodology, limitations and source data used in or applicable to the Accelerated Sale Analysis is set out in Appendix 13 (*Accelerated Sale Analysis*).

(b) AlixPartners has prepared an analysis for the benefit of the Scheme Companies estimating the potential financial outcomes for Scheme Creditors a Wind Down Scenario (the **"Wind Down Analysis"**). A redacted version of the Wind Down Analysis, is attached at Appendix 14 (*Wind Down Analysis*). Details of the assumptions, considerations, methodology, limitations and source data used in and applicable to the Wind Down Analysis is set out in paragraph 8.25 - 8.27 below and is more fully set out in Appendix 14 (*Wind Down Analysis*).

8.5 The Directors estimate that, based on the Accelerated Sale Analysis and the Wind Down Analysis, that the returns to Scheme Creditors in either an Accelerated Sale or Wind Down scenario would be significantly less than the returns estimated upon a successful implementation of the Schemes and the Restructuring.

8.6 The Accelerated Sale Analysis and the Wind Down Analysis were provided solely to determine a potential returns to Scheme Creditors if the Schemes are not sanctioned and the Restructuring is not successful. The Accelerated Sale Analysis and the Wind Down Analysis are not addressed to third parties and Scheme Creditors have no reliance upon them.

**Relevant defaults under the Parent Credit Facilities Agreement**

8.7 The existing defaults under the Parent Credit Facilities Agreement are as follows:

(a) the Group's failure to make interest payments due on and after 24 April, 2019, with respect to the outstanding Revolving Loans;

(b) the Group's failure to make interest payments due on and after 30 April, 2019 with respect to the outstanding Term Loans;

(c)     the Group's failure to pay installment of principal due on and after 1 May, 2019 with respect to outstanding Term Loans;

(d)     the Group's failure to timely deliver the Financial Plan (as defined in the Parent Credit Facilities Agreement) with respect to the fiscal year ending 31 December, 2019;

(e)     the Group's failure to timely deliver annual financial statements or related reports with respect to the fiscal year ended December 31, 2018;

(f)     the Group's failure to timely deliver quarterly financial statements or related reports until the RSA Termination Date including with respect to (i) the fiscal quarter ended 31 March, 2019 and (ii) the fiscal quarter ended 30 June, 2019; and

(g)     any other default or event of default arising under Section 7.01(g)(iii) of the Parent Credit Facilities Agreement.

**Relevant defaults under the Notes**

8.8     The existing defaults under the Notes are as follows:

(a)     the Group's failure to make the interest payment due May 1, 2019 with respect to the Notes Indenture;

(b)     if, as a result of the failure of the Restructuring and the termination of the RSA, syncreon Group or any of the Restricted Subsidiaries (as defined in the Notes Indenture) that is a subsidiary which accounts for 10% or more of total Group assets (or any group thereof that would constitute such) determined that it was necessary to file a voluntary or involuntary case under any Bankruptcy Law (as defined in the Notes Indenture) pursuant to Sections 6.01(f) and (g) of the Notes Indenture, the Notes would become immediately due and payable pursuant to Section 6.02 (no action to accelerate is required); and

(c)     if there is a termination of the RSA and the Liquidity Lenders accelerate pursuant to the terms of the Liquidity Facility Agreement or the PCF Lenders accelerate the PCF Debt pursuant to the terms of the Parent Credit Facilities Agreement, an event of default pursuant to 6.01(d) of the Notes will occur.

8.9     In addition and notwithstanding the above, the Group has not provided certain deliverables to the Notes Trustee which could constitute additional events of default under the Notes if such are not cured within 60 days of receipt of written notice given: (i) by the Notes Trustee or (ii) holders of not less than 50% (subject to certain exceptions) in aggregate principal amount of the Notes, in particular:

(a)     the Group's failure to deliver annual and quarterly financial statements for the year ended 31 December, 2018 and quarter ended 31 March 2019 pursuant to section 4.02 of the Notes Indenture; and

(b)     the Group's failure to deliver an annual compliance certificate required by section 4.09 of the Notes Indenture.

**Relevant potential events of default under the Liquidity Facility Agreement**

8.10    The Group's failure to make any payments of principal, interest or any other amount due and payable in respect of the PCF Debt or the Notes, in each case, beyond any applicable grace period provided therefor in the Parent Credit Facilities Agreement or the Notes Indentures, respectively.

8.11 The occurrence of any event or condition relating to the PCF Debt or the Notes, if the effect of such event of condition is to accelerate, or to permit the acceleration of, the maturity of the PCF Debt or the Notes, respectively.

8.12 The Group's failure to timely deliver annual financial statements or related reports with respect to the fiscal year ended December 31, 2018;

8.13 The Group's failure to timely deliver quarterly financial statements or related reports until the RSA Termination Date including: (i) the fiscal quarter ended 31 March, 2019 and (ii) the fiscal quarter ending 30 June, 2019;

8.14 The Group's failure to comply with the minimum cash covenant set forth in Section 6.13(b) of the Liquidity Facility Agreement; and

8.15 Any default or event of default arising under Section 7.01(g)(iii) of the Liquidity Facility Agreement.

**Relevant potential events of default under the Existing ABL Facility Agreement**

8.16 The Group's failure to make any payments of principal, interest or any other amount due and payable in respect of the PCF Debt or the Notes, in each case, beyond any applicable grace period provided therefor in the Parent Credit Facilities Agreement or the Notes Indentures, respectively.

8.17 The occurrence of any event or condition relating to the PCF Debt, the Notes, or the Liquidity Facility Debt, if the effect of such event of condition is to accelerate, or to permit the acceleration of, the maturity of the PCF Debt, the Notes, or the Liquidity Facility Debt, respectively;

8.18 If the Liquidity Lenders accelerate the Liquidity Facility Debt pursuant to the terms of the Liquidity Facility Agreement, the PCF Lenders accelerate the PCF Debt pursuant to the terms of the Parent Credit Facilities Agreement or the Noteholders accelerate the Notes in accordance with the terms of the Notes Indenture, this would trigger cross default under the Existing ABL;

8.19 The Group currently requires monthly waivers of the requirement to deliver the solvency certificates pursuant to the terms of the Existing ABL Facility Agreement as well as the requirement to make certain representations related to solvency in the structure that underlies the Existing ABL structure.

**Accelerated Sale Scenario**

8.20 If the Schemes and the Restructuring do not proceed and the Liquidity Facility Lenders and/or the PCF Lenders may seek to exercise their rights to effect an Accelerated Sale, the returns to PCF Lenders are likely to be less than the returns to PCF Lenders through the Scheme and there are likely to be no returns to Noteholders.

*Estimated outcomes for Scheme Creditors*

8.21 Based on the Accelerated Sale Analysis, the Directors estimate that in an Accelerated Sale (as more fully described in Appendix 13 (*Accelerated Sale Analysis*)) there is likely to be the following range of returns to Scheme Creditors compared to the total outstanding principal amount of PCF Debt or Notes (as applicable)

8.22 The Accelerated Sale Analysis sets out a range of returns reflecting the following two methodologies (as further described in Appendix 13 (*Accelerated Sale Analysis*))

(a) High case (*high risk contract termination*): this represents the estimated outcomes taking into account the impact on EBITDA in a scenario where all clients deemed to be "high" risk for termination, terminate the relevant contracts

(b)     Low case: (*risk weighted contract termination*): this represents the estimated outcomes taking into account the impact on EBITDA in a scenario where, in addition to the "high" risk termination contracts mentioned above, a certain proportion of clients deemed to be "low" or "medium" risk of termination also terminated the relevant contracts.

8.23    Accelerated Sale figures based on the **total outstanding principal amount** of PCF Debt or Notes (as applicable) as at 30 June 2019:

| PCF Lender or Noteholder | Estimated returns in an Accelerated Sale as a percentage (%) of the **total outstanding principal amount** of **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 | | Estimated recovery as a percentage (%) of the **total outstanding principal amount** of **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 **through the Scheme** (see paragraph 7.1 above) |
|---|---|---|---|
| | **Low Case** | **High Case** | |
| PCF Lenders[27] | 17% | 45% | High: 72% <br> Mid: 66% <br> Low: 59% |
| *Term Loan Lenders* | 17% | 45% | High: 72% <br> Mid: 66% <br> Low: 59% |
| *Revolving Lenders*[28] | 33% | 64% | High: 94% <br> Mid: 87% <br> Low: 80% |
| *ITL Lenders*[29] | 14% | 37% | High: 59% <br> Mid: 54% <br> Low: 49% |
| Noteholders | Nil | Nil | High: 10% <br> Mid: 8% <br> Low: 7% |

*Note*: This table does not take into account the planned cancellation of Notes referred to in paragraph 4.27 above.

---

[27] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans, the turnover of which are described in paragraph 7.2 and reflected in the lines "Revolving Lenders" and "ITL Lenders"
[28] Taking account of the turnover of the described in paragraph 7.2.
[29] Taking account of the turnover of the described in paragraph 7.2.

8.24    Accelerated Sale figures based on the **total estimated claim** in relation to the PCF Debt or Notes (as applicable) as at 30 June 2019:

| PCF Lender or Noteholder | Estimated returns in an Accelerated Sale as a percentage (%) of the **total estimated claim** in relation to the **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 | | Estimated recovery as a percentage (%) of the **total estimated claim** in relation to the **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 **through the Scheme** (see paragraph 7.1 above) |
|---|---|---|---|
| | **Low Case** | **High Case** | |
| PCF Lenders[30] | 15% | 42% | High: 70% <br> Mid: 64% <br> Low: 58% |
| *Term Loan Lenders* | 15% | 42% | High: 70% <br> Mid: 64% <br> Low: 58% |
| *Revolving Lenders[31]* | 30% | 60% | High: 91% <br> Mid: 84% <br> Low: 77% |
| *ITL Lenders[32]* | 13% | 35% | High: 57% <br> Mid: 52% <br> Low: 47% |
| Noteholders | Nil | Nil | High: 9% <br> Mid: 8% <br> Low: 6% |

*Note: This table does not take into account the planned cancellation of Notes referred to in paragraph 4.27 above.*

**Wind Down Scenario**

8.25    If the Schemes and the Restructuring do not proceed, the Liquidity Facility Lenders, PCF Lenders and/or Noteholders may seek to accelerate the Liquidity Facility, the PCF Facilities and/or the Notes against syncreon Group and each of the Guarantors which could result in a Wind Down Scenario. This paragraph and paragraphs 8.26 and 8.27 below should be read in conjunction with the "Important Notice" set out on page 2 of Appendix 14 (*Wind Down Analysis*).

*Estimated outcomes for Scheme Creditors*

8.26    Based on the Wind Down Analysis, the Directors estimate that in a Wind Down Scenario (described further below and more fully in Appendix 14 (*Wind Down Analysis*)) there is likely to be the following range of returns to Scheme Creditors compared to the total outstanding principal amount of PCF Debt or Notes (as applicable) as at 31 March 2019:

---

[30] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans, the turnover of which are described in paragraph 7.2 and is reflected in the lines "Revolving Lenders" and "ITL Lenders".
[31] Taking account of the turnover described in paragraph 7.2.
[32] Taking account of the turnover described in paragraph 7.2.

| PCF Lender / Noteholder | Estimated returns in an Wind Down Sale as a percentage (%) of the **total outstanding principal amount** of the PCF Debt or the Notes (as applicable) as at 31/3/2019 | | Estimated recovery as a percentage (%) of the **total outstanding principal amount** of **PCF Debt (or subset thereof) or Notes** (as applicable) as at 30/6/2019 **through the Scheme** (see paragraph 7.1 above) |
|---|---|---|---|
| | Scenario A[33] | Scenario B[34] | |
| PCF Lenders[35] | 15% | 11% | High: 72% Mid: 66% Low: 59% |
| *Term Loan Lenders* | 15% | 11% | High: 72% Mid: 66% Low: 59% |
| *Revolving Lenders[36]* | 30% | 26% | High: 94% Mid: 87% Low: 80% |
| *ITL Lenders[37]* | 12% | 9% | High: 59% Mid: 54% Low: 49% |
| Noteholders | 0.81% | 0.28% | High: 10% Mid: 8% Low: 7% |

*Note: This table does not take into account the planned cancellation of Notes referred to in paragraph 4.27 above.*

*Wind Down Analysis*

8.27    The Wind Down Analysis offers a range of returns reflecting the following two interpretations of the situation:

(a)    **Scenario A**: this represents the estimated outcome where there is a short period of continued trading with a view to facilitating a higher recovery for accounts receivable. At the end of that period it is assumed that operations would be closed down and remaining assets realised on a piecemeal basis.

(b)    **Scenario B**: this represents the estimated outcome where customers are not supportive of continued operations and/or there is insufficient funding to facilitate it. As a result, the assets would be realised on a piecemeal basis.

---

[33] Reflecting gross intercompany balances
[34] Reflecting net intercompany balances
[35] Excluding CayCo Cash Collateral and Pledged Incremental Coupon Loans, the turnover of which are described in paragraph 7.2 and reflected in the lines "Revolving Lenders" and "ITL Lenders"
[36] Taking account of the turnover Loans described in, paragraph 7.2.
[37] Taking account of the turnover Loans described in, paragraph 7.2.

## PART 2
## OVERVIEW OF THE SCHEMES

*This Part 2 contains a brief overview of the Schemes. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to, the more detailed information presented elsewhere in this Explanatory Statement and to the Schemes.*

## 9    SCHEME OF ARRANGEMENT OVERVIEW

9.1    The proposed Restructuring of the PCF Debt and Notes is to be effected by way of a scheme of arrangement of each of syncreon Group and syncreon U.K. as the Scheme Companies under the laws of England and Wales. Each of the Scheme Companies is a proposing a separate, but inter-conditional, scheme of arrangement, which collectively comprise the Schemes.

9.2    A scheme of arrangement is a formal procedure under part 26 of the Companies Act, which enables a company to agree a compromise or arrangement with its creditors or any class of its creditors in respect of its debts or obligations owed to those creditors. A scheme of arrangement requires the following to occur in order to become legally binding:

(a)    approval by a majority in number (the "**numerosity**" majority), representing at least 75 per cent in value (the "**value**" majority), of each class of scheme creditors present and voting either in person or by proxy at the relevant class meeting ordered to be summoned by the Court;

(b)    the approval of the Court by the making of an order sanctioning the scheme of arrangement; and

(c)    the delivery of the order sanctioning the scheme of arrangement to the Registrar of Companies.

9.3    If a scheme of arrangement is approved by the requisite majorities and sanctioned by the Court and the order sanctioning the scheme of arrangement is delivered to the Registrar of Companies, the scheme of arrangement will become effective in accordance with its terms and bind all the creditors subject to it, both those creditors who voted in favour of it and those creditors who voted against it or did not vote at all and in each case their successors and assigns.

9.4    A scheme of arrangement cannot be sanctioned by the Court unless the Court is satisfied, among other things, that the relevant provisions of part 26 of the Companies Act have been complied with and that an intelligent and honest person who is a member of the class concerned and acting in respect of his own interest, might reasonably approve the scheme of arrangement.

9.5    In connection with the Schemes, this Part 2 sets out a summary of:

(a)    the identity of the Scheme Creditors;

(b)    the exercise of the Court's jurisdiction in relation to the Scheme Companies;

(c)    the Scheme Meetings – classes and voting;

(d)    what the Schemes will do;

(e)    when the Schemes will be effective; and

(f)    recognition of the Schemes.

## 10    THE IDENTITY OF THE SCHEME CREDITORS

### General

10.1    The Scheme Creditors of each Scheme Company are identical and consist of:

    (a)    the PCF Scheme Creditors, as creditors of:

        (i)    syncreon Group as a borrower under the Parent Credit Facilities Agreement; and

        (ii)    syncreon U.K. as a guarantor under the PCF Guaranty Agreement,

      in respect of the PCF Debt; and

    (b)    the Notes Scheme Creditors, as creditors of:

        (i)    syncreon Group as an issuer of the Notes; and

        (ii)    syncreon U.K. as a guarantor under the Notes Indenture,

      in respect of the Notes.

10.2    The PCF Scheme Creditors comprise:

    (a)    the <u>PCF Lenders,</u> as lenders under the Parent Credit Facilities Agreement; and

    (b)    the <u>Administrative Agent</u>, who whilst having no economic interest in the PCF Debt, is nevertheless a creditor of the Scheme Companies by virtue of its right to enforce payments due in respect of the PCF Debt pursuant to various clauses in the Parent Credit Facilities Agreement and the PCF Guaranty Agreement.

10.3    As the Notes are securities which are held in a global form, the Notes Scheme Creditors comprise the following:

    (a)    the <u>Noteholders,</u> who are the persons with a direct or indirect beneficial interest as principal in the Notes and contingent creditors of the Scheme Companies as a result of their right (in certain circumstances), under the Notes Indenture, to request that the Scheme Companies issue a definitive note in respect of their interest in the Notes;

    (b)    the <u>Notes Trustee</u> who, whilst having no economic interest in the Notes, is nevertheless a creditor of the Scheme Companies by virtue of its right to enforce payments due in respect of the Notes pursuant to various clauses in the Notes Indenture;

    (c)    the <u>Notes Registered Holder</u>, as the registered holder of the Global Securities (as defined in the Notes Indenture), who, whilst also having no economic interest in the Notes, is nevertheless a creditor of the Scheme Companies by virtue of the fact that they are the legal owner of the Notes; and

    (d)    the <u>Notes Registered Holder Nominee</u> who, whilst also having no economic interest in the Notes, is nevertheless a creditor of the Scheme Companies by virtue of the fact that they have physical possession of the instrument and are the registered legal holder of the Notes in global form.

**Scheme Creditors for voting purposes**

10.4   For the purposes of *voting* on the Schemes at the Scheme Meetings, however, the Scheme Creditors will be:

(a)   the PCF Lenders; and

(b)   the Noteholders,

in each case, as at the Record Time.

10.5   The PCF Lenders 'of record' (based on the Administrative Agent's records), as lenders under the Term Loans, Revolving Loans and Incremental Term Loans, are the persons with the "real" interest in the PCF Scheme Claims and accordingly will be entitled to vote in respect of the Schemes. To avoid double counting, the Administrative Agent has confirmed to the Scheme Companies that it does not currently intend to exercise any voting rights to which it may be entitled as a PCF Scheme Creditor at the Scheme Meetings. This has been done to ensure an orderly voting procedure and is considered by the legal advisers to the Scheme Companies to represent current market practice in this type of situation. The voting procedure for the PCF Debt will be in accordance with the steps specified in this Explanatory Statement (including Appendix 3 (*Form of Proxy Form*)).

10.6   The Noteholders, as the beneficial owners of and/or the persons with the ultimate economic interest in the Notes, are the persons with the "real" interest in the Notes Scheme Claims and accordingly will be entitled to vote in respect of the Schemes. To avoid double counting in respect of the Notes Scheme Claims, each of the Notes Trustee, the Notes Registered Holder and the Notes Registered Holder Nominee intends not to exercise any voting rights to which it may be entitled as a Scheme Creditor at the Scheme Meetings. This has been done to ensure an orderly voting procedure and is considered by the legal advisers to the Scheme Companies to represent current market practice in this type of situation. The voting procedure for the Notes will be in accordance with the steps specified in this Explanatory Statement (including Appendix 4 (*Form of Notes Account Holder Letter*) hereto) and the customary procedures of DTC.

10.7   Notes Account Holders are not entitled to vote on the Schemes on their own behalf unless and to the extent that they are Noteholders. However, the assistance of Notes Account Holders, who are not also Noteholders, will be required, in accordance with their custodial duties, to deliver online, email, facsimile or hard-copy versions of the completed Notes Account Holder Letters in accordance with the instructions provided to them by Noteholders.

**Assessment of Scheme Claims for Voting Purposes**

10.8   For the purpose of voting at the Scheme Meetings, the value of Scheme Claims shall be determined by reference to the holdings of Scheme Creditors as at the Record Time as follows:

(a)   the value of the PCF Scheme Claims of each PCF Lender which submits a valid Proxy Form (or otherwise votes at the Scheme Meetings) will be calculated by reference to the outstanding principal amount of such PCF Lender's PCF Debt as against the aggregate outstanding principal amount of PCF Debt as at the Record Time based on information confidentially provided to the Information Agent; and

(b)   the value of the Notes Scheme Claims of each Noteholder which submits a valid Notes Account Holder Letter (or otherwise votes at the Scheme Meetings) will be calculated by reference to the outstanding principal amount of such Noteholder's Notes as against the aggregate outstanding principal Notes as at the Record Time based on information confidentially provided to the Information Agent.

## 11    EXERCISE OF THE COURT'S JURISDICTION IN RELATION TO THE SCHEME COMPANIES

11.1    The Court maintains a discretion as to whether to exercise its jurisdiction in relation to the Scheme Companies. As syncreon U.K. is a company incorporated in England & Wales, the court will exercise its jurisdiction in relation to the syncreon U.K. Scheme. In relation to syncreon Group, the court will consider whether it has a 'sufficient connection' to the jurisdiction before it decides to exercise its jurisdiction in relation to the syncreon Group Scheme.

11.2    The PCF Governing Law Change and the Notes Governing Law Change (described in Part 1 above) were entered into in order to further support the Scheme Companies' connection to the English jurisdiction for the purposes of the Schemes, as further described below. This purpose was expressly disclosed to all PCF Lenders and Noteholders during the required consent processes.

11.3    In addition to the PCF Governing Law Change and the Notes Governing Law Change, the Scheme Companies have the following connections to the jurisdiction:

(a)    syncreon U.K. is incorporated, and has its centre of main interests, in England and Wales;

(b)    in so far as Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 (the "**Judgments Regulation**") applies to this matter, Article 25 of the Judgments Regulation is invoked on the basis that:

(i)    the debt documents to which the Schemes apply, being the Parent Credit Facilities Agreement, the PCF Guaranty Agreement and the Notes Indenture are subject to the jurisdiction of the courts of England and Wales as set forth in paragraph 4.44 (*Change of Governing Law*) above such that the Scheme Creditors have contractually submitted to the jurisdiction of the courts of England and Wales; and

(ii)    Scheme Creditors representing over 90 per cent of the PCF Lenders (in value) and over 75 per cent[38] of the Noteholders (in value), having already submitted (in respect of disputes related to the Restructuring) to the jurisdiction of the courts of England and Wales by signing the RSA, which is governed by English law, and having consented to the PCF Governing Law Change and Notes Governing Law Change, are likely to further submit to the jurisdiction of the courts of England and Wales, by submitting a Proxy Form or Notes Account Holder Letter (as applicable) in accordance with the requirements of the RSA;

(c)    certain Scheme Creditors have significant connections to the U.K. (including being managed by entities located in the U.K.); and

(d)    syncreon Group is the holder of a bank account located with KBC, London in England and Wales.

## 12    SCHEME MEETINGS – CLASSES AND VOTING

### Two classes of Scheme Creditors

12.1    As noted above, under the provisions of part 26 of the Companies Act, in order for the Schemes to become legally binding on the Scheme Companies and the Scheme Creditors, the Schemes must be approved by a majority in number, representing at least 75 per cent in value of each class of Scheme Creditors present and voting either in person or by proxy at the relevant class meetings ordered to be summoned by the Court. The Schemes must be sanctioned by the Court at a subsequent hearing and a copy of the order delivered to Companies House before they can become effective.

---

[38] As noted in footnote 6 above, the Parent has agreed to purchase certain Notes for cancellation with the result that this figure will change upon cancellation.

12.2    If the rights of creditors affected by the Schemes are so different or would be affected so differently by the Schemes as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes, based on their rights and the treatment of such rights, for the purposes of voting on the Schemes and separate voting meetings must be held for each class of creditor.

12.3    It is the responsibility of the Scheme Companies to formulate the class or classes of creditors for the purpose of convening meetings to consider and, if thought fit, approve the Schemes. The final decision as to class composition will be a matter for the Courts at the Scheme Sanction Hearings after taking into account any objections from Scheme Creditors.

12.4    The Scheme Companies have considered the present rights of the Scheme Creditors against the Scheme Companies in the absence of the Schemes and the rights of the Scheme Creditors under the proposed Schemes. Having considered these rights, the Scheme Companies have concluded that it is appropriate that the Scheme Creditors vote in two classes at each of the Scheme Meetings:

(a)    PCF Lenders (in respect of the syncreon Group Scheme);

(b)    Noteholders (in respect of the syncreon Group Scheme);

(c)    PCF Lenders (in respect of the syncreon U.K. Scheme); and

(d)    Noteholders (in respect of the syncreon U.K. Scheme).

12.5    The Scheme Companies consider that the rights of the PCF Lenders against the Scheme Companies are not so dissimilar as to make it impossible for them to consult together with a view to their common interest because:

(a)    as secured creditors of the Scheme Companies, whose rights rank in priority to the Noteholders by virtue of, and to the extent of, their shared security, the PCF Lenders rank *pari passu* as between themselves in the Scheme Companies' capital structures. In addition, the PCF Lenders benefit from guarantees from the same Guarantors;

(b)    accordingly in the event that the Schemes fail, each of the PCF Lenders would secure similar levels of recovery in proportion to their existing interests in the PCF Debt in each of the comparator scenarios set out in paragraph 8 (*Consequences of a failure to implement the Restructuring*) above;

(c)    whilst the Scheme Companies have considered the fact that the Incremental Term Loans provided by CayCo and the Term Loans are subject to a different interest rate than the Revolving Loans under the Parent Credit Facilities Agreement, the Scheme Companies do not consider that this precludes CayCo and the remaining PCF Lenders from consulting together with a view to their common interests on the basis that:

(i)    the differential in interest rates is immaterial as against overall principal debt; and

(ii)    the other (more material) rights of CayCo under the Parent Credit Facilities Agreement (such as ranking, security, guarantees, enforcement rights, events of default, covenants, information rights and maturity) are identical to those of the other PCF Lenders under the Term Loans and Revolving Loans;

(d)    whilst the Scheme Companies have considered the fact that, as a result of the CayCo Cash Collateral and Pledged Incremental Coupon Loans, the RCF Lenders would secure higher recoveries in the event of an insolvency of the Scheme Companies and/or the Guarantors, these additional recoveries are the result of security that has been granted by CayCo in its capacity as PCF Lender and not by the Scheme Companies. As such, the Scheme Companies do not consider that this means all PCF Lenders cannot consult together with a

view to their common interests on the basis that this is primarily an intercreditor arrangement and not a difference in rights vis-à-vis the Scheme Companies;

(e)  if the Schemes are implemented, the PCF Lenders' pro rata entitlement to the PCF Scheme Consideration and their principal economic and legal rights under the Second Out Term Loans and in connection with the Reorganized syncreon Equity will be the same; and

(f)  whilst the Scheme Companies have considered the fact that certain PCF Lenders have entered into the RSA whilst others have not, the Scheme Companies do not consider that this means all PCF Lenders cannot consult together with a view to their common interests for the following reasons:

(i)  the opportunity to accede to the RSA and so qualify for the PCF Lender Lock-up Payment was available to all PCF Lenders up to the Lock-up Deadline, which right was notified to all PCF Lenders more than two (2) months in advance of that deadline;

(ii)  the undertakings provided by the Participating PCF Lenders to, among other things, attend the Scheme Meetings in person or by proxy and vote in favour of the Schemes, will benefit the Scheme Creditors as a whole as they will support the Group's ability to implement the Restructuring and have provided certainty to the Group in relation to its ability to complete the Restructuring before taking steps to launch the Schemes, which are both costly and subject to publicity; and

(iii)  whilst the RSA confers a pecuniary benefit on, representing an additional right for, Timely Participating PCF Lenders as they will be entitled to receive the PCF Lender Lock-up Payment on the Restructuring Effective Date, they do not consider this additional right to be material in the sense that the quantum of the PCF Lender Lock-up Payment as a percentage of the principal outstanding amount of PCF Debt has been estimated at between 1.6% and 2.4% such that, when considered against the right of the Timely Participating PCF Lenders to receive the Second Out Term Loans and the PCF Equity, the PCF Additional Equity issued in respect of the PCF Lender Lock-up Payment would not likely cause a Timely Participating PCF Lender to vote in favour of the Schemes in circumstances when it otherwise deemed the Second Out Term Loans and the PCF Equity to be insufficient consideration for doing so, particularly when all PCF Lenders are likely to be financially better-off as a result of the Restructuring being implemented than in the most probable alternative scenarios (see further at paragraph 8 (*Consequences of a failure to implement the Restructuring*)).

12.6  The Scheme Companies consider that the rights of the Noteholders against the Scheme Companies are not so dissimilar as to make it impossible for them to consult together with a view to their common interest because:

(a)  as unsecured creditors of the Scheme Companies, whose rights are junior to the PCF Lenders by virtue of, and to the extent of, PCF Lenders' security, the Noteholders rank *pari passu* as between themselves in the Scheme Companies' capital structures. In addition, the Noteholders benefit from guarantees from the same Guarantors;

(b)  accordingly in the event that the Schemes fail, each of the Noteholders would secure similar levels of recovery in proportion to their existing interests in the Notes in each of the comparator scenarios set out in paragraph 8 (*Consequences of a failure to implement the Restructuring*) above;

(c)  if the Schemes are implemented, the Noteholders' pro rata entitlement to the Notes Scheme Consideration and their principal economic and legal rights in connection with the Reorganized syncreon Equity and in relation to the Warrants will be the same; and

(d)     whilst the Scheme Companies have considered the fact that certain Noteholders have entered into the RSA whilst others have not, the Scheme Companies do not consider that this means all Noteholders cannot consult together with a view to their common interests for the following reasons:

     (i)     the opportunity to accede to the RSA and so qualify for the Noteholder Lock-up Payment was available to all Noteholders up to the Lock-up Deadline, which right was notified to all Noteholders more than two (2) months in advance of that deadline;

     (ii)     the undertakings provided by the Participating Noteholders to, among other things, attend the Scheme Meetings in person or by proxy and vote in favour of the Schemes will benefit the Scheme Creditors as a whole as they will support the Group's ability to implement the Restructuring and have provided certainty to the Group in relation to its ability to complete the Restructuring before taking steps to launch the Schemes, which are both costly and subject to publicity; and

     (iii)     whilst the RSA confers a pecuniary benefit on, representing an additional right for, Timely Participating Noteholders as they will be entitled to receive the Noteholder Lock-up Payment on the Restructuring Effective Date, they do not consider this additional right to be material in the sense that the quantum of the Noteholder Lock-up Payment as a percentage of the principal outstanding amount of Notes has been estimated at between 2.2% and 3.3% such that, when considered against the right of the Timely Participating Noteholders to receive the Notes Equity and the Warrants, the Notes Additional Equity would not likely cause a Timely Participating Noteholder to vote in favour of the Schemes in circumstances when it otherwise deemed the Notes Equity and the Warrants to be insufficient consideration for doing so, particularly when all Noteholders are likely to be financially better-off as a result of the Restructuring being implemented than in the most probable alternative scenarios (see further at paragraph 8 (*Consequences of a failure to implement the Restructuring*)).

12.7    The Scheme Companies have considered that certain Scheme Creditors (including CayCo and certain members of the Ad Hoc Group) hold an interest in both the PCF Debt and in the Notes and have determined that it is appropriate for these creditors to be included in both classes and for them to attend and vote at each of the Scheme Meetings in their capacity as PCF Lender and Noteholder (as applicable) because of the fact that they have the same rights as a PCF Lender as between other PCF Lenders and the same rights as a Noteholder as between other Noteholders and do not have any additional rights by virtue of them holding both PCF Debt and Notes.

12.8    The Scheme Companies have further considered the fact that if the Restructuring is not implemented, the most probable alternative scenarios (set out in paragraph 8 (*Consequences of a Failure to Implement the Restructuring*) above) would result in worse recoveries for all Scheme Creditors. Whether they hold an interest in (i) solely the PCF Debt, (ii) solely the Notes, or (iii) both the PCF Debt and the Notes, each Scheme Creditor is likely to be financially better-off as a result of the Restructuring being implemented.

12.9    Finally, whilst the Scheme Companies have considered the additional payments that the Liquidity Facility Lenders and New Money Backstop Parties (including certain members of the Ad Hoc Group) will receive (set out above), the Scheme Companies do not consider that the Liquidity Facility Lenders and New Money Backstop Parties, in their capacity as PCF Lenders or Noteholders should form a separate classes, among other things since these additional rights:

     (a)     are collateral to the Schemes and are not bestowed on such parties in their capacities as PCF Lenders or Noteholders;

(b)      were negotiated separately to the Schemes on arms' length terms and in difficult circumstances given the liquidity constraints of the Group;

(c)      are in consideration of certain key commitments necessary to strengthen the Group's liquidity position and reduce the burden of the Group's debt service obligations on its businesses for the benefit of all stakeholders and Scheme Creditors; and

(d)      certain of these rights are not conditional upon the approval of the Schemes or the completion of the Restructuring.

12.10    Accordingly, it is proposed that, for each Scheme Company, two meetings of the Scheme Creditors are convened for each Scheme Company for the purpose of considering and, if the Scheme Creditors think fit, approving each of the Schemes.

**Voting**

12.11    Scheme Creditors should refer to the detailed instructions in relation to voting at the relevant Scheme Meetings set out in Part A (*Summary of actions to be taken by PCF Lenders*), Part B (*Summary of actions to be taken by Noteholders*) and Appendix 2 (*Instructions and guidance for Scheme Creditors and any person with an interest in the PCF Debt or the Notes*).

12.12    Each PCF Lender and Noteholder must ensure that it has completed and submitted a valid Proxy Form or Notes Account Holder Letter (or, in the case of a Noteholder, it has procured that its Notes Account Holder has on its behalf) to the Information Agent so that it is received by the Information Agent before 5.00p.m. (London time) / 12 Noon (New York time) on the Voting Instruction Deadline, in order to vote at the relevant Scheme Meetings. PCF Lenders and Noteholders may vote at the relevant Scheme Meeting either in person or by proxy.

## 13      WHAT WILL THESE SCHEMES DO?

13.1    The Schemes are a compromise and arrangement between each of the Scheme Companies and their respective Scheme Creditors.

13.2    If approved, the Schemes will provide for:

(a)      A compromise and release of all PCF Debt, Notes and related guarantees under the PCF Guaranty Agreement and the Notes Indenture[39] (each on the Restructuring Effective Date) and a compromise and release of all related rights of recourse between members of the Group and a covenant not to sue;

(b)      the issuance of the Scheme Consideration to the Scheme Creditors on the Restructuring Effective Date; and

(c)      an authority for the Scheme Companies to enter into the required documentation to give effect to paragraphs (a) and (b) above and the Restructuring on behalf of the Scheme Creditors.

### Execution of Scheme Restructuring Documents

13.3    The authority of the Scheme Companies to execute documents on behalf of the Scheme Creditors will take effect on and from the Scheme Conditions Effective Date. From that time, the Scheme Companies (acting by their respective Directors, officers or other duly appointed representatives) will be irrevocably and unconditionally authorized, instructed and appointed to, on behalf of each Scheme Creditor (and any person to whom that Scheme Creditor has transferred its rights in respect

---

[39] Except that certain claims of the Administrative Agent and Notes Trustee for compensation and/or indemnity pursuant to the Parent Credit Facilities Agreement and Notes Indenture (as applicable) shall survive the termination of such Parent Credit Facilities Agreement, Notes Indenture and the Notes pursuant to the Schemes.

of its Scheme Claim after the Record Time where such transfer is recognised by the Scheme Companies in accordance with clause 9.3 (*Assignment and Transfers*) of the Schemes and each other party which it is expressed therein to act for and on behalf of), as its true and lawful agent and attorney, enter into, execute and (where applicable) deliver as a deed or otherwise each of the Scheme Restructuring Documents (including the RID) and certain other documents required to give effect to the Restructuring and the Scheme Restructuring Documents, in each case to which that Scheme Creditor is expressed to be a party, provided that such documents shall be executed in accordance with and shall only become effective in accordance with the RID and their respective terms on the Restructuring Effective Date.

13.4    On and from the Scheme Conditions Effective Date, the Undertaking Transaction Parties are irrevocably authorised and instructed to enter into, execute and (where applicable) deliver as a deed or otherwise each of the Scheme Restructuring Documents (including the RID) and certain other documents required to give effect to the Restructuring and the Scheme Restructuring Documents in each case to which that Undertaking Transaction Party is expressed to be a party, provided that such documents shall be executed in accordance with and shall only become effective in accordance with the RID and their respective terms on the Restructuring Effective Date.

**Releases**

13.5    The Schemes further authorize the Scheme Companies to, following the Scheme Effective Date, execute and deliver as a deed the Deed of Release in accordance with the terms of the RID of behalf of the Scheme Creditors, which will become effective on and from the Restructuring Effective Date. Under the terms of the Deed of Release, the Scheme Creditors will:

(a)    waive, release and discharge all of their rights, title and interest in their respective Scheme Claims;

(b)    waive, release and discharge all Liabilities of the Released Parties to the Scheme Creditors and their Connected Parties, and each and every claim which the Scheme Creditors may have against the Released Parties in relation to or in connection with or in any way arising out of:

(i)    their relevant Scheme Claims and the facts and matters giving rise to their Scheme Claims;

(ii)    the Parent Credit Facilities Agreement, the PCF Guaranty Agreement, any Loan Document (as defined in the Parent Credit Facilities Agreement), the Notes Indenture and the Notes (as applicable);

(iii)    the preparation, negotiation, sanction or implementation of the RSA and/or the Schemes and/or the Restructuring and/or the Scheme Restructuring Documents; and

(iv)    the execution of the Scheme Restructuring Documents and the carrying out of the actions, steps and transactions contemplated thereby in accordance with their terms.

13.6    The waivers, releases and discharges set out in paragraph 13.5 above, extend beyond the waiver, release and discharge of the Scheme Companies and the Guarantors to certain other parties connected to the Restructuring, including, but not limited to the following persons:

(a)    legal and other professional advisors to: (i) the Scheme Companies; (ii) certain Scheme Creditors (including the Ad Hoc Group); and (iii) other parties connected to the Restructuring;

(b)     the Administrative Agent, the Notes Trustee, the Notes Registered Holder, the Notes Registered Holder Nominee, the Liquidity Administrative Agent and the RCF Collateral Agent; and

(c)     the Participating Creditors, the New Money Providers and the Shareholder Parties.

13.7    The Scheme Companies consider that the above waivers, releases and discharges are necessary to ensure that Scheme Creditors can not undermine the aims of the Restructuring by bringing claims against other entities involved in the preparation, negotiation, sanction or implementation of the Restructuring.

13.8    Pursuant to the Deed of Release and the terms of the Schemes, the Scheme Creditors also covenant with the Scheme Creditors and Released Parties not to commence, take or continue or support any person commencing, taking or continuing or instruct any person to commence, take or continue any Proceedings, other than any Allowed Proceedings in accordance with clause 7.2 (*Covenant not to sue*) of the Schemes and the Deed of Release.

13.9    The waivers, releases and discharges referred to in paragraphs 13.5 are subject to the limitations set out in clause 4 (*Limitation*) of the Deed of Release.

**Scheme Consideration[40]**

13.10   The Schemes provide that, on the Restructuring Effective Date, in accordance with the RID and the other Scheme Restructuring Documents:

(a)     each PCF Lender shall receive its PCF Scheme Consideration; and

(b)     each Noteholder shall receive its Notes Scheme Consideration.

## 14      WHEN THE SCHEMES WILL BE EFFECTIVE

**Scheme Sanction Hearing**

14.1    As mentioned in paragraph 9.2 above, under part 26 of the Companies Act, a scheme of arrangement becomes effective in accordance with its terms and is binding on the company and creditors subject to it when the order of the Court sanctioning the scheme of arrangement is delivered to the Registrar of Companies. The Scheme Companies expect that the Scheme Sanction Hearing will take place on or about 10 September 2019.

14.2    Once the date of the Scheme Sanction Hearing is confirmed by the Court, the Information Agent will give notice to the Scheme Creditors:

(a)     on the data site maintained by the Administrative Agent with respect to the PCF Debt (for the PCF Lenders);

(b)     through DTC's Legal Notice System (for the Noteholders); and

(c)     on the Scheme Website (which can be accessed by all Scheme Creditors).

14.3    At the Scheme Sanction Hearing, the Scheme Companies (or either one of them) may, with the consent of the Majority Participating Lenders and Majority Participating Noteholders (to the extent such consent is required under clause 4.9 (*Restructuring Documents*) of the RSA) (such consent not to be unreasonably withheld or delayed), consent on behalf of itself and all Scheme Creditors and anyone else concerned to any modification of, or addition to, or waiver of, the Schemes and/or any

---

[40] The Schemes do not provide for the allocation of the PCF Lender New Money Allocation, the PCF Lender Lock-up Payments, or the Noteholder Lock-up Payments. The PCF Lender New Money Allocation will be governed by the RID and the PCF Lender Lock-up Payments and the Noteholder Lock-up Payments are governed by the terms of the RSA.

of the Scheme Restructuring Documents or any terms or conditions which, in each case, the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, provided that such modification, addition, term or condition or waiver does not materially adversely or disproportionally affect the economic treatment or any legal right or obligation or impose any additional material obligation on any Scheme Company or Scheme Creditor as compared to the treatment of the other Scheme Company or other Scheme Creditors under the Schemes or any other Scheme Restructuring Document (unless each such Scheme Company or Scheme Creditor consents); provided further that all such modifications, additions, terms or conditions and waivers shall be subject to clause 4.9(a)(iii) of the RSA; provided further that any modification, addition, term or condition or waiver of clause 8.1 (*Modification of the Schemes or waiver of the Scheme Conditions*) of the Scheme Document shall be in accordance with clause 13(e) (*Amendments*) of the RSA, as if a reference therein to *"Clause 13 (Amendments)"* were a reference to clause 8.1 (*Modification of the Schemes or waiver of the Scheme Conditions*) of the Scheme Document, save that the consent of the Information Agent shall not be required.

**Recognition and Filing**

14.4    On or as soon as reasonably practicable after the Court has made the Scheme Sanction Orders:

    (a)    each Scheme Company shall file its respective Scheme Sanction Order with the Registrar of Companies;

    (b)    the U.S. Chapter 15 Representative shall attend the U.S. Chapter 15 Hearing before the U.S. Bankruptcy Court to obtain the U.S. Chapter 15 Order on behalf of syncreon U.K.; and

    (c)    the foreign representative in the Canadian Proceedings shall attend the Canadian Court to obtain the Canadian Recognition Order on behalf of the Scheme Companies.

**The Scheme Effective Date**

14.5    Pursuant to the Schemes, following:

    (a)    approval by a majority in number representing at least 75 per cent in value of the Scheme Claims of the Scheme Creditors present and voting either in person or by proxy at the relevant Scheme Meeting;

    (b)    the granting by the Court of an order sanctioning the Schemes; and

    (c)    the delivery of the orders sanctioning the Schemes to the Registrar of Companies,

the Scheme Effective Date will occur and the Schemes will come into full force and effect in accordance with their terms.

14.6    Following the satisfaction (or waiver) of the following conditions, the Scheme Conditions Effective Date will occur:

    (a)    confirmation from HM Revenue & Customs that the Scheme Sanction Order will not be subject to a stamp duty charge;

    (b)    the grant of the U.S. Chapter 15 Order, providing such order has become a final order not subject to appeal or, if an appeal has been filed, such order has not been stayed; and

    (c)    the grant of the Canadian Recognition Order, providing such order has not been vacated, stayed, amended, reversed or modified and (A) no appeal or application for leave to appeal therefrom shall have been filed and the time for filing such appeal or application for leave to appeal having expired, or (B) if any appeal(s) or application(s) for leave to appeal

therefrom have been filed, any (and all) such appeal(s) or application(s) have been dismissed, quashed, determined, withdrawn or disposed of,

following which, additional clauses of the Schemes will become effective.

**Execution of the RID and other Scheme Restructuring Documents**

14.7    As soon as reasonably practicable after the Scheme Conditions Effective Date, one of the Scheme Companies will sign the RID on behalf of the Scheme Creditors pursuant to the authority referred to in paragraph 13.3 above, and each and every other party thereto will sign the RID.

14.8    On or as soon as reasonably practicable, but no later than three (3) Business Days following the Execution Effective Date, the Scheme Companies and/or the Undertaking Transaction Parties (as applicable) shall sign the other Scheme Restructuring Documents either on its own behalf or in accordance with the authority granted and instructions given by the Scheme Creditors pursuant to the terms of the Schemes, each of which shall become effective and unconditionally and irrevocably binding on all Scheme Creditors (and any person who acquires an interest in a Scheme Claim after the Record Time) on the Restructuring Effective Date in accordance with the terms of the RID.

**The Restructuring Effective Date**

14.9    The Schemes and the Restructuring will be implemented on the Restructuring Effective Date, being the date on which each of the conditions set out in schedule 3 (*Conditions Precedent*) to the RID have been satisfied or waived in accordance with their terms and all of the Scheme Restructuring Documents and the Restructuring have become effective in accordance with their respective terms following the occurrence of each of the Implementation Steps.

14.10    As soon as reasonably practicable after the Restructuring Effective Date has occurred, the Information Agent shall notify the Scheme Creditors:

(a)    by the Administrative Agent on the data site maintained by the Administrative Agent with respect to the PCF Debt (for the PCF Lenders);

(b)    by the Information Agent through DTC's Legal Notice System (for the Noteholders); and

(c)    by the Information Agent on the Scheme Website (which can be accessed by all Scheme Creditors).

14.11    Failure to satisfy the required conditions to the Restructuring Effective Date (unless waived) will mean that the following steps will not occur:

(a)    the PCF Debt and Notes will not be released, terminated and/or amended and restated;

(b)    the Interim Equity, Reorganized syncreon Equity and Warrants will not be issued;

(c)    the PCF Lenders will not be allocated their share of the Second Out Term Loan;

(d)    the PCF Lenders will lose their entitlement to participate in the First Out Term Loans (which shall not be issued); and

(e)    the Lock-up Payments will not be made.

**The Longstop Date**

14.12    Furthermore, if the Restructuring Effective Date does not occur on or before the Longstop Date, being 15 October 2019 (unless extended with the requisite consents of the parties to the RSA in accordance with the terms of that agreement), the terms of and the obligation on the parties under

or pursuant to the Schemes shall lapse and all the compromises and arrangements provided by the Schemes shall be of no effect.

## 15   SCHEME RECOGNITION

**General**

15.1   As noted in Part 3 (*Unaudited FY2018 Consolidated Financial Statements*) of Appendix 7 (*Financial and other Information of syncreon Group Holdings B.V.*) the United States and Canada represent two of the most significant jurisdictions in terms of the Group's assets and revenues and accordingly the Scheme Companies intend to make applications for recognition of the Schemes, (as set out further below), in order to ensure that the Schemes have utility.

15.2   The Netherlands is also an important jurisdiction for the Group in terms of the assets held and revenue generated there and the fact that syncreon Group as the borrower of the PCF Debt and the issuer of the Notes is incorporated in the Netherlands.

15.3   Having sought expert advice, the Directors consider it likely that the Schemes will be recognised in the Netherlands in accordance with Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast) (the "**Brussels I Regulation**").

15.4   The Brussels I Regulation would likely also form the basis for recognition of the Schemes in Ireland and Germany (where the Group has significant assets and generates significant revenues) and other EU jurisdictions, where certain of the Guarantors are incorporated.

**Recognition in the United States of America**

15.5   syncreon U.K. intends to file a petition for recognition of the syncreon U.K. Scheme in the U.S. Bankruptcy Court under U.S. Chapter 15 which provides for the recognition of foreign proceedings in the United States. The grant of the U.S. Chapter 15 Order is a condition to the implementation of the Restructuring and to the Schemes becoming fully effective.

15.6   The U.S. Chapter 15 Order is necessary to give effect in the United States to the Schemes. The Scheme Companies consider that recognition of the syncreon U.K. Scheme in the United States will amount to effective recognition of the syncreon Group Scheme, including the releases and compromises thereunder, in the United States on account, without limitation, of the following:

(a)   the provisions of the syncreon Group Scheme are identical to, and inter-conditional with, those of the syncreon U.K. Scheme;

(b)   syncreon Group, for the purposes of the U.S. Chapter 15 Proceedings, is a non-debtor whose rights are inter-connected with the rights of the debtor, syncreon U.K.;

(c)   courts in the United States regularly recognise and enforce non-debtor provisions in foreign proceedings under Sections 1521(a) and 1507 of the U.S. Code; and

(d)   the principles of comity lie significantly in favour of enforcement in the United States of any provision that the Court approves as part of the syncreon U.K. Scheme.

15.7   The U.S. Chapter 15 Order will, among other things:

(a)   ensure that all of the Scheme Creditors affected by the syncreon U.K. Scheme are treated consistently, whether in the U.K. or the United States;

(b)   protect the Scheme Companies and the Guarantors and their property from any lawsuits in the United States from those who are bound by the terms of the Schemes; and

(c)     minimize the risk of other claims that might be alleged under the Group's indebtedness.

15.8     In addition, the Scheme Companies will, in tandem with the U.S. Proceedings, seek the entry of an order (which order may be the U.S. Chapter 15 Recognition Order) from the U.S. Bankruptcy Court approving the application of the exemption from registration under the U.S. Securities Act provided by Section 1145 of the U.S. Code to the issuance of the Reorganized syncreon Equity comprising the PCF Equity, the PCF Additional Equity, the Notes Equity, the Notes Additional Equity, the Warrants (including the Reorganized syncreon Equity issuable upon exercise of the Warrants), the NL15 Equity, the NL15 Additional Equity and the NL15 Warrants. If the U.S Bankruptcy Court does not enter such an order, such equity and warrants will be issued in reliance upon the exemption from the registration requirements of the U.S. Securities Act provided by (i) in the case of the PCF Equity, the Notes Equity, the Warrants, the NL15 Equity and the NL15 Warrants, Section 3(a)(10) of the U.S. Securities Act and (ii) in the case of the PCF Additional Equity, the Notes Additional Equity, the NL15 Additional Equity and the Reorganized syncreon Equity issuable upon exercise of the Warrants, Section 4(a)(2) and/or Regulation D of the U.S. Securities Act.

**Canadian CCAA Recognition**

15.9     The Scheme Companies intend to make an application in Canada pursuant to Part IV of the CCAA, which provides for the recognition of foreign insolvency proceedings in Canada (including "foreign non-main proceedings" which do not require the relevant company to have its centre of main interests and/or an establishment in the jurisdiction where the local insolvency proceedings take place), for an order recognising the Scheme proceedings commenced by the Scheme Convening Hearing and a subsequent order recognizing the order granted at the Scheme Sanction Hearing sanctioning the Schemes (the "**Canadian Recognition Orders**"). Entry of the Canadian Recognition Orders by a Canadian court granting recognition of the Schemes is a condition to the implementation of the Restructuring and to the Schemes becoming effective.

15.10    The Canadian Recognition Orders are necessary to give effect in Canada to the Schemes and will, among other things:

(a)     ensure that all of the Scheme Creditors affected by the Schemes are treated consistently, regardless of whether they are located in the United Kingdom or Canada; and

(b)     may protect the Scheme Companies and their property from any proceedings in Canada from those who are bound by the terms of the Schemes.

## APPENDICES 1-12 AND 15-17

**[INTENTIONALLY OMITTED]**

**APPENDIX 13**

**ACCELERATED SALE ANALYSIS**

# Project Feather

## ACCELERATED SALE COMPARATOR ANALYSIS

July, 2019

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Disclaimer

This document contains highly confidential information and is solely for informational purposes and for the benefit of syncreon Group B.V., syncreon Automotive (UK) Ltd (together "the Scheme Companies"). You should not rely upon or use it to form the definitive basis for any decision or action whatsoever, with respect to any proposed transaction or otherwise. You and your affiliates and agents must hold this document and any oral information provided in connection with this document, as well as any information derived by you from the information contained herein, in strict confidence and may not communicate, reproduce or disclose it to any other person, or refer to it publicly, in whole or in part at any time except with our prior written consent. If you are not the intended recipient of this document, please delete and destroy all copies immediately.

This document is "as is" and is based, in part, on information obtained from other sources. Our use of such information does not imply that we have independently verified or necessarily agree with any of such information, and we have assumed and relied upon the accuracy and completeness of such information for purposes of this document. Neither we nor any of our affiliates or agents, make any representation or warranty, express or implied, in relation to the accuracy or completeness of the information contained in this document or any oral information provided in connection herewith, or any data it generates and expressly disclaim any and all liability (whether direct or indirect, in contract, tort or otherwise) in relation to any of such information or any errors or omissions therein. Any views or terms contained herein are preliminary, and are based on financial, economic, market and other conditions prevailing as of the date of this document and are subject to change. We undertake no obligations or responsibility to update any of the information contained in this document. Past performance does not guarantee or predict future performance.

This document does not constitute an offer to sell or the solicitation of an offer to buy any security, nor does it constitute an offer or commitment to lend, syndicate or arrange a financing, underwrite or purchase or act as an agent or advisor or in any other capacity with respect to any transaction, or commit capital, or to participate in any trading strategies, and does not constitute legal, regulatory, accounting or tax advice to the recipient. This document does not constitute and should not be considered as any form of financial opinion or recommendation by us or any of our affiliates. This document is not a research report nor should it be construed as such.

This document may include information from the S&P Capital IQ Platform Service. Such information is subject to the following: "Copyright © 2019, S&P Capital IQ (and its affiliates, as applicable). This may contain information obtained from third parties, including ratings from credit ratings agencies such as Standard & Poor's. Reproduction and distribution of third party content in any form is prohibited except with the prior written permission of the related third party. Third party content providers do not guarantee the accuracy, completeness, timeliness or availability of any information, including ratings, and are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, or for the results obtained from the use of such content. THIRD PARTY CONTENT PROVIDERS GIVE NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. THIRD PARTY CONTENT PROVIDERS SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, COMPENSATORY, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, COSTS, EXPENSES, LEGAL FEES, OR LOSSES (INCLUDING LOST INCOME OR PROFITS AND OPPORTUNITY COSTS OR LOSSES CAUSED BY NEGLIGENCE) IN CONNECTION WITH ANY USE OF THEIR CONTENT, INCLUDING RATINGS. Credit ratings are statements of opinions and are not statements of fact or recommendations to purchase, hold or sell securities. They do not address the suitability of securities or the suitability of securities for investment purposes, and should not be relied on as investment advice."

This document may include information from SNL Financial LC.  Such information is subject to the following: "CONTAINS COPYRIGHTED AND TRADE SECRET MATERIAL DISTRIBUTED UNDER LICENSE FROM SNL. FOR RECIPIENT'S INTERNAL USE ONLY."

Copyright © 2019, PJT Partners LP (and its affiliates, as applicable).

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Important Disclosures

> This report was prepared pursuant to the engagement of PJT Partners as restructuring advisor to the Company, syncreon Group Holdings B.V. (together with its subsidiaries, "syncreon"). The purpose of this report is to summarize PJT's observations, as of the date hereof, as to the total enterprise value of syncreon. PJT Partners has been retained as the Company's investment banker to provide the Company with general restructuring advice as more fully described in PJT Partners' engagement letter

> The information herein has been prepared by PJT based upon information both supplied by syncreon and publicly available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Company with respect to the anticipated future performance of the Company. PJT has relied upon the accuracy and completeness of the foregoing information. With respect to financial forecasts, PJT has assumed that they have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of management of the Company as to the future financial performance of the Company. PJT assumes no responsibility for such forecasts or the assumptions on which they are based. In preparing his analysis, PJT has made a number of assumptions (described in greater detail on subsequent pages). The information set forth herein is based upon economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof, unless indicated otherwise. PJT Partners expressly disclaims any and all liability (whether direct or indirect, in contract, tort or otherwise) in relation to any of such information, estimates and projections or any errors or omissions therein. Nothing contained herein is, or should be, relied upon as a promise or representation, whether as to the past or future. Actual results may vary materially from the estimates and projected results contained herein

> This report is not intended to furnish legal, regulatory, tax, accounting, investment or other advice, but it is acknowledged that PJT will provide a redacted version of this report which the Scheme Companies may (i) rely upon and (ii) refer and/or attach to the Practice Statement Letter, the Explanatory Statement and any witness testimony in connection with the Restructurings. PJT Partners owes no duty of care to any Scheme Creditor

> This report contemplates facts and conditions known and existing as of July 2019. Events and conditions subsequent to this date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the analyses contained herein. PJT Partners assumes no duty to supplement this report based on events occurring or information learned after the date hereof

> PJT Partners does not express any opinion as to the prices at which any securities of syncreon may trade at any time

> Accordingly, PJT Partners believes that selectively applying portions of its analyses and factors to other contexts could create a misleading or incomplete view of the processes underlying this presentation

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Index of Key Terms and Acronyms

> **Accelerated Sale**: Scheme Creditor enforcement and sale process following failure of the proposed Scheme. Scenario and assumptions are defined in significantly more detail on subsequent pages

> **AP/AR**: accounts payable / receivable, respectively

> **Business Plan or Feather Plan**: the Group's LV1 2019 model. Assumptions are defined in significantly more detail on subsequent pages

> **ITL**: Incremental Term Loan within the PCF Facilities

> **ICTL**: portion of ITLs originated by CayCo's lending of certain Notes coupons, pledged for the benefit of the RCF Lenders

> **KERP**: key employee retention plan

> **LL Facility or LL**: Liquidity Loans as provided for in the restructuring term sheet appended to the RSA

> – *Note: debt balances are shown as of 31 March 2019 ($25mm balance) to ensure comparability with "Comparative Analysis: Controlled Wind-Down Scenario" report, prepared by Alix Partners. Additional draws that have occurred in the interim would only worsen the recoveries to Scheme Creditors in the Accelerated Sale scenario*

> **Management**: key management personnel of the Scheme Companies

> **Noteholders**: the holders of the Notes

> **Notes**: the $225 million senior unsecured notes due 1 November 2021

> **PCF Facilities**: facilities made available under a credit agreement originally dated 28 October 2013 including: (i) the RCF facility, (ii) the term loan facility, and (iii) the incremental term loan facility/facilities

> **RCF Facility or RCF**: the revolving credit facility, within the PCF Facilities

> **RSA**: restructuring support agreement dates 21 May 2019

> **Scheme Companies:** NL Borrower and UK Guarantor

> **Scheme Creditors**: the PCF Lenders and the Noteholders

> **Scheme(s)**: the proposed schemes of arrangement between the Scheme Companies and the Scheme Creditors under Part 26 of the Companies Act in its present form or with or subject to any modification, addition or condition approved or imposed by the English Court, and agreed to by the Scheme Companies

> **Sound Point Facility / SP Facility / ABL**: the Group's asset based lending facility provided to CA12 by Sound Point Capital

> **Term Loan**: the term loan within the PCF Facilities

> **TRV**: total recoverable value

Note: Capitalized terms used but not defined herein shall have the meanings set forth in the Practice Statement Letter and/or Explanatory Statement.

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Executive Summary

> This presentation reviews one[1] of the key ways relevant Scheme Creditors could seek to realize value if it becomes apparent that the Restructuring cannot be implemented in order for the directors of the Scheme Companies to assess whether the proposed Restructuring delivers a better financial outcome than the most likely alternate scenarios.

> The Group is currently in the process of implementing a financial restructuring by way of English schemes of arrangement for each of the Scheme Companies, and anticipates filing the Schemes with the High Court of Justice in England and Wales in advance of the proposed hearing to convene the Scheme meetings, currently scheduled for 25 July 2019

> Following our appointment as advisors to syncreon Group BV ("syncreon Group"), PJT has prepared this report and the Analysis to assist the directors of the Scheme Companies in considering the potential outcome to the relevant Scheme Creditors in the event that the proposed Restructuring cannot be implemented

> As a comparator of alternative outcomes for relevant Scheme Creditors, PJT has considered the likely financial outcomes for relevant Scheme Creditors in a hypothetical "Accelerated Sale", defined further below

> In the event the Restructuring cannot be implemented, the Liquidity Facility Lenders and /or the PCF Lenders may seek to:

> Exercise their rights under the Liquidity Facility Agreement, the PCF Credit Agreement and the Loan Guaranty Agreement to accelerate the facilities and effect an Accelerated Sale of the Group through an enforcement or insolvency process. Select additional key assumptions are described in the following pages but this would be likely to take the form of:

1. An acceleration of the outstanding debt and enforcement of the share pledge granted over the shares in syncreon Ireland B.V. to effect a sale of syncreon Ireland B.V. or its subsidiaries, whilst providing necessary protection to the Group to avoid insolvency

2. A contractual release of the guarantees of the Notes throughout the Group

> While this presentation only seeks to assess the range of potential creditor recoveries in an Accelerated Sale, we understand that AlixPartners is separately providing the Scheme Companies with an alternative comparison analysis estimating the potential financial outcome(s) for the relevant Scheme Creditors in the event that there is controlled wind-down of the Group

(1) To be reviewed alongside "Scheme comparative analysis: controlled wind-down scenario" presentation, prepared by Alix Partners.
Note: Capitalized terms used but not defined herein shall have the meanings set forth in the Practice Statement Letter and/or Explanatory Statement.

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Executive Summary (Cont'd)

The table below illustrates the expected recoveries ($ and %) to relevant Scheme Creditors[1] in the event of a hypothetical Accelerated Sale. For illustrative purposes, recoveries[2] are presented at a $630mm TEV, which is considered to be the mid-point of Restructuring valuation range.

**RECOVERY SUMMARY**

| ($ in millions) | Accelerated Sale Recoveries | | | | Scheme Recoveries | |
|---|---|---|---|---|---|---|
| | High-Risk Contract Term. | | Risk-Weighted Contract Term. | | | |
| Recovery to RCF + ICTLs w/ Cash Collateral[3] | $69 | 60.3% | $35 | 30.4% | $96 | 84.3% |
| Recovery to SSTLs | 216 | 42.2% | 79 | 15.5% | 326 | 63.7% |
| Recovery to ITLs[4] | 26 | 34.7% | 10 | 12.7% | 39 | 52.4% |
| Recovery to Notes | – | – | – | – | 18 | 7.6% |

> Range of Accelerated Sale recoveries presented as (additional detail on following pages):

– High Risk Contract Termination: Loss of "High Risk" contracts only, based on Management's business judgement

– Risk-Weighted Contract Termination: Weighted average loss of contracts based on Management's perception of likelihood of termination (low/medium/high)

> The Accelerated Sale recovery estimates herein are only estimated by the impact on EBITDA from contract terminations in an Accelerated Sale and do not quantify a number of additional factors which in our view are inherently subjective with respect to anticipated financial outcome, although we believe these factors would likely be detrimental to Scheme Creditor recoveries. Refer to pages 13-17 for additional discussion of these factors

Note: Recoveries are shown net of senior secured debt which is not subject to the Scheme and assumed to recover par. Liquidity Loan debt balances as of 31 March 2019 ($25mm balance) to ensure comparability with "Comparative Analysis: Controlled Wind-Down Scenario" report, prepared by Alix Partners. Additional draws that have occurred in the interim would only worsen the recoveries to Scheme Creditors in the Accelerated Sale scenario.
(1)  All creditors assumed to be Timely Participating Creditors.
(2)  % of total outstanding claim amount as of 6/30/19.
(3)  Recoveries illustrated include pledged ICTL and Cash Collateral.
(4)  Illustrative for ICTL recovery turned over to RCF.

6

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Materials Considered

The presentation relies on (i) a number of public and private documents / models and (ii) Management's understanding of the state of the business and their recent interactions with customers.

### (I) THIRD PARTY DOCUMENTS

**In preparing this valuation analysis, PJT reviewed the following third-party materials**

> Corporate filings (including investor presentations, press releases, and earnings transcripts) for comparable public companies

– Specific companies described in further detail herein

> General industry research, including Wall Street research for comparable companies

> Public news sources regarding precedent transactions, including proxy statements associated with prior logistics transactions

> In addition, the analysis that follows makes conclusions based on the Company's legal advisor's[1] diligence of the Company's contracts and (in particular) the relevant termination provisions

### (II) PROVIDED BY SYNCREON

**PJT reviewed and relied upon the following documents provided by the Company**

> Relevant information gathered from the 2018 Sales Process

> Financial forecast (Management prepared business plan projections starting in February 2019 based on its best estimates of future industry trends and Company performance (the "Feather Plan"))

> "Business Risk Assessment (Combined)" excel file(s) (February 2019)

– Site by site contract review and assessment of probability of termination in the event of a prolonged sales process

– Analysis conducted with input from key corporate leaders and region/site-level management teams

– Data and corresponding conclusions later referred to as "Business Risk Assessment"

> Historical syncreon audited financials, internal presentations and management reporting

PJT also engaged in extensive discussions with syncreon management and employees in forming the opinions reflected in this report, and relied upon the representations they made about the Company's operations and business projections.

(1)  Weil, Gotshal & Manges LLP.

7

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Overview of Analysis

> A hypothetical Accelerated Sale is likely to lead to recoveries for relevant Scheme Creditors that are less than if the Restructuring is successfully consummated.

> Taking into account each of the matters set out in this report, it is likely that the value recovered by relevant Scheme Creditors through the Restructuring would be greater than the potential recoveries through an Accelerated Sale

> Nonetheless, PJT is of the view that:

  – The value to be delivered through an Accelerated Sale is likely to be significantly less than the outstanding amount of PCF Debt;

  – There is likely to be a material impairment to PCF Lenders' recovery relative to a Restructuring, and no recovery to Noteholders

> In summary, the analysis estimates that the recovery to the relevant Scheme Creditors in an Accelerated Sale would be:

  – PCF Lenders as a group: 13-47%, versus 58-70% via the Restructuring

  – RCF Lenders (inc. pledged ICTLs and Cash Collateral): 28-65%, versus 77-91% via the Restructuring

  – SSTL Lenders: 13-47%, versus 58-70% via the Restructuring

  – ITL Lenders[1]: 11-39%, versus 47-57% via the Restructuring

  – Noteholders: 0%, versus 6-9% via the Restructuring

> Importantly, the Accelerated Sale recovery estimates herein are only calculated using the impact on EBITDA from contract terminations in an Accelerated Sale and do not quantify a number of additional factors which, whilst inherently subjective, are likely to be detrimental to Scheme Creditor recoveries

  – This analysis and the Accelerated Sale recoveries listed above could yet be materially lower

> In addition, it is noted that the Accelerated Sale scenario would be extremely challenging to execute

  – Customers have been repeatedly assured that the Scheme will result in a stable, healthy syncreon post-emergence – failure of the Scheme could cause contract losses well in excess of those estimated herein, and lead to a mass key-employee exodus

  – The Company would be at risk of involuntary insolvency filings in various jurisdictions which would disrupt important royalty/IP relationships as well as cash management processes and systems

  – As a result, the ultimate outcome of a failed Scheme and attempted Accelerated Sale may be a disorderly wind-down of the Group

(1)  Illustrative ICTL recovery post amounts turned over to RCF.

8

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Overview of Analysis (Cont'd)

**PJT and Management considered various factors that would impact Restructuring recoveries under a hypothetical Accelerated Sale.**

**1** To quantify the potential impact on Restructuring recoveries via an Accelerated Sale, PJT worked with Management to develop 2 methodologies:

**A** High Risk Contract Termination

**B** Risk Weighted Contract Termination

– The Group has experienced business loss throughout the restructuring process

– Customers and associated contracts currently assumed in the Business Plan have expressed concerns and are internally developing contingency plans

**2** An Accelerated Sale would impact liquidity and would certainly require a liquidity solution to pursue a sales process, and may potentially impact value as a result

**3** In addition to the illustrative analytical assessment, a number of other factors were considered, each of which could negatively impact recoveries under an Accelerated Sale

**A** Nature of Business: Asset light model in a competitive industry with global complexity

**B** 2018 Sales Process: 2018 liquidity forced accelerated market check

**C** Jurisdictional Risk: Global multinational operations with local law considerations

**D** Labor: Key man and key labor risk

9

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# **1** **A** **B** Contract Termination Analysis

In an effort to quantify the potential contract losses that could occur following a failure of the proposed Restructuring, Management has prepared a comprehensive, contract-by-contract analysis assessing the risk status and ability to switch for each customer / contract.

**A** **High Risk Contract Termination:** Management provided a list of clients deemed "high" risk for termination due to multiple factors (e.g. renewal date, availability of other providers) in case the Restructuring cannot be completed. PJT used that list to calculate the 2019E Credit Agreement Adjusted EBITDA that would be lost from contract termination by these customers

– Assumes 100% of "high" risk contracts are terminated

**B** **Risk Weighted Contract Termination:** Additionally management specified whether other contracts were at a "low" or "medium" risk of termination if the Restructuring was not completed and weighted the chances of termination as 1/3 and 2/3, respectively. PJT used those weightings to calculate the likely impact of the loss of those contracts on 2019E Credit Agreement Adjusted EBITDA

> In both loss of customer scenarios, Selling, General, and Administrative costs ("SG&A") were reduced as a consistent percent of revenue to reflect Management's (or a buyer's) ability to 'right-size' the business following contract losses

– Simplifying assumption potentially represents additional downside risk to recoveries under an Accelerated Sale

| | Cases | Description | 2019E Gross EBITDA Lost | Estimated SG&A Reduction | 2019E Net EBITDA Lost |
|---|---|---|---|---|---|
| **A** | High Risk Contract Termination | > All contracts designated "high" risk terminated<br>> All contracts designated "medium" or "low" remain in force | $56.0mm | ($26.1)mm | **$29.9mm** |
| **B** | Risk Weighted Contract Termination | > All contracts assigned probability factor of termination associated with risk designation<br>> EBITDA reduced by probability factor | $100.2mm | ($45.6)mm | **$54.6mm** |

10

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

**1 A B** Contract Termination Analysis (Cont'd)

A hypothetical Accelerated Sale is likely to lead to recoveries for relevant Scheme Creditors that are less than if the Restructuring is successfully consummated.

| ($ in millions) | High-Risk Contract Term. | | | Risk-Weighted Contract Term. | | | Scheme Recoveries[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | **1 A** | | | **1 B** | | | | | |
| **Range of Illustrative TEV Before Contract Losses** | **$580** | **$630** | **$680** | **$580** | **$630** | **$680** | **$580** | **$630** | **$680** |
| Status Quo 2019E Comparable Adj. EBITDA[2] | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 |
| Implied Multiple | 7.0x | 7.6x | 8.2x | 7.0x | 7.6x | 8.2x | 7.0x | 7.6x | 8.2x |
| | | | | | | | | | |
| 2019E EBITDA at Risk | $30 | $30 | $30 | $55 | $55 | $55 | $– | $– | $– |
| TEV at Risk (2019E EBITDA at Risk x Implied Multiple) | 209 | 227 | 245 | 382 | 415 | 448 | – | – | – |
| | | | | | | | | | |
| **Range of Illustrative TEV After Contract Losses** | **$371** | **$403** | **$435** | **$198** | **$215** | **$232** | **$580** | **$630** | **$680** |
| (-) PF ABL Outstanding[3] | (82) | (82) | (82) | (82) | (82) | (82) | (20) | (20) | (20) |
| (-) Liquidity Loans / FLFO Recovery | (25) | (25) | (25) | (25) | (25) | (25) | (141) | (145) | (149) |
| **Net TRV** | **$264** | **$296** | **$328** | **$91** | **$109** | **$126** | **$419** | **$465** | **$511** |
| (-) PCF Debt Recovery | 264 | 296 | 328 | 91 | 109 | 126 | 404 | 447 | 490 |
| **Net Remaining Value** | **$–** | **$–** | **$–** | **$–** | **$–** | **$–** | **$15** | **$18** | **$22** |
| **Notes Recovery** | **$–** | **$–** | **$–** | **$–** | **$–** | **$–** | **$15** | **$18** | **$22** |
| | | | | | | | | | |
| **Recoveries** | | | | | | | | | |
| Recovery % to RCF + ICTLs w/ Cash Collateral | 55.2% | 60.3% | 65.4% | 27.7% | 30.4% | 33.1% | 77.4% | 84.3% | 91.1% |
| Recovery % to SSTLs | 37.7% | 42.2% | 46.8% | 13.0% | 15.5% | 17.9% | 57.6% | 63.7% | 69.8% |
| Recovery % to ITLs[4] | 31.0% | 34.7% | 38.5% | 10.7% | 12.7% | 14.7% | 47.4% | 52.4% | 57.4% |
| Recovery % to Notes | – | – | – | – | – | – | 6.2% | 7.6% | 9.1% |

Note: Recoveries based on debt balances as of 6/30/19. For the purposes of calculating Net TRV Liquidity Loan debt balances are shown as of 31 March 2019 ($25mm balance) to ensure comparability with "Comparative Analysis: Controlled Wind-Down Scenario" report, prepared by Alix Partners. Additional draws that have occurred in the interim would only worsen the recoveries to Scheme Creditors in the Accelerated Sale scenario.
(1) To be reviewed alongside *Illustrative Valuation* presentation, prepared by PJT Partners.
(2) 2019E Comparable Adj. EBITDA of $82.8mm. Comparable Adj. EBITDA adjusts syncreon's Credit Adj. EBITDA definition to match peers' Adj. EBITDA definition. See page 24 and *Illustrative Valuation* Presentation.
(3) ABL paydown not modelled in Risk Weighted Approach or High Risk Contract Losses – additional ~$82mm funding requirement if repayment required.
(4) Illustrative for ICTL recovery turned over to RCF.

11

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# 1 A High Risk Contract Termination

Key management from all regions participated in the Business Risk Assessment analysis, with the below contracts designated as High Risk. These customers would be expected to terminate their contracts in the case the Restructuring cannot be completed.

**TABLE REDACTED**

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# 1 B Risk Weighted Contract Termination

The table below illustrates the potential EBITDA impact of an Accelerated Sale based on risk weighting applied on a contract-by-contract basis as provided by Management.[1]



(1)  Risk weightings assume a 66.7% chance of losing medium risk contracts if the restructuring cannot be completed, and 33.3% chance of losing low risk contracts.

13

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

## ② Additional Considerations: Liquidity

The Group would require potentially significant additional capital to bridge through a nonconsensual Accelerated Sale process in light of the current liquidity position.

**COMMENTARY**

**ILLUSTRATIVE LIQUIDITY NEEDS ANALYSIS**



DETAIL REDACTED

14

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

**3** **A** Additional Factors: Nature of Business

> The nature of syncreon's business is not suited to an Accelerated Sale. Any buyer would have to conduct significant integration and valuation analyses, as well as diligence with a large number of customers.

**DETAIL REDACTED**

15

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# 3 B Additional Factors: 2018 Sales Process

The Group conducted a sales process in November 2018 (the "2018 Sales Process") that did not yield any formal bids. A number of factors impacted the ability to generate attractive bids for the Company, many of which would likely be exacerbated in an Accelerated Sale.

**DETAIL REDACTED**

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

**3** **C** Additional Process Factors: Jurisdictional Risk

In the event of a Restructuring cannot be completed, the Company would likely need to immediately seek protection from its Creditors via local bankruptcy filings (e.g. US Chapter 11). This process would be costly, heighten customer concerns, and reduce the flexibility of the Company to operate freely and maximize value.

**DETAIL REDACTED**

531

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# 3 D Additional Process Factors: Labor

In addition to customer contracts, the Company's valuation is impacted by (among other things) its employees and management. An Accelerated Sale could lead to the loss of key personnel and therefore impact value.

**DETAIL REDACTED**

18

# I.   Appendix

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Select Accelerated Sale Assumptions

> PJT and Weil have considered the potential structure of an Accelerated Sale, in order to assess its feasibility and the amount of business disruption that would likely be generated by the process.[1]

> An Accelerated Sale would be likely to take the form of an Irish share pledge enforcement by the Liquidity Facility Lenders and the PCF Lenders ("Accelerated Sale Lenders") or receivership sale of the shares in syncreon Ireland

> For the Accelerated Sale Lenders to implement such a share sale, they would also need to agree with syncreon Group to take certain steps to allow for the contractual release of the guarantors of the Notes in connection with the sale

  1. [Majority (50.1%)] PCF Lenders provide consent to amend the Parent Credit Facilities Agreement to allow syncreon Group to designate each of the Guarantors as Unrestricted Subsidiaries under and as defined in the Parent Credit Facilities Agreement and, as such, release the Relevant Guarantors from their obligations under their respective Loan Guaranty (as defined in the Parent Credit Facilities Agreement) to the extent permitted under the Parent Credit Facilities Agreement and syncreon Group so designating each of the Guarantors (the "PCF Guarantee Release"); and

  2. syncreon Group obtains an order from a court of competent jurisdiction finding that the PCF Guarantee Release has triggered an automatic release of the Relevant Guarantors from their obligations as Subsidiary Guarantors (under and as defined in the Notes Indenture) in accordance with the terms and conditions of the Notes Indenture, including section 10.03(i)(b) of the Notes Indenture (the "Indenture Release")

     • Intercompany claims at relevant entities are assumed to be released in order to facilitate a sale

> As it is likely that value would break in the PCF Debt in the context of an Accelerated Sale, upon the implementation of the Indenture Release there would be no recoveries available to Noteholders

> Bridge financing would likely need to be provided by the PCF Lenders to bridge to an Accelerated Sale (if not provided then it is likely that entities in the Group in certain jurisdictions would be forced to commence local insolvency proceedings prior to or during the M&A process, further impairing the ability to execute on any sale

  – Note, this presentation does not seek to size/structure this bridge financing from a financial/legal perspective

> Liquidity Loan debt balances are shown as of 31 March 2019 ($25mm balance) to ensure comparability with "Comparative Analysis: Controlled Wind-Down Scenario" report, prepared by Alix Partners. Additional draws that have occurred in the interim would only worsen the recoveries to Scheme Creditors in the Accelerated Sale scenario

(1) Assumed all residual intercompany claims arising on sale are released as a term of the sale and that there is no residual value in the Group left behind following enforcement (this has not been taken into account in analysis).

20

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Corporate Structure



**Key:**

- PCF/LF Facilities borrower/guarantor
- Specific LF Facility guarantor
- Scheme companies
- Third party ownership
- --- Legally Held Only
- --- Hook stock

Continues on next slide

21

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Corporate Structure (Cont'd)



536

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Corporate Structure (Cont'd)



Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Thirteen-Week Forecast (6/28/19)



24

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# syncreon Comparable EBITDA



Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Impact of Potential Preference Action from Noteholders

> We understand that certain creditors have raised concerns in relation to the pledging of security to $50mm of secured ITLs held by syncreon Cayfinance Ltd. The Company and its advisors have analyzed the potential impact on the return to the Noteholders in the event of a successful litigation regarding the issue. Regardless of the outcome of litigation, returns to the Notes remain lower than under the Restructuring.

**Scenario 1: $50.0mm of the amount owed to syncreon CayFinance Limited in respect of the ITLs is treated as unsecured**

> The return to the Noteholders remains 0% in this scenario

> The PCF debt is reduced by $50mm, while the unsecured claims balance increases by $50mm to $275mm

> All proceeds of an Accelerated Sale go to the secured equity pledge. The proceeds do not clear the PCF debt; no proceeds flow to the unsecured claims and Noteholders do not recover any value

**Scenario 2: $50.0mm of the amount owed to syncreon CayFinance Limited in respect of the ITLs is treated as equity**

> The return to the Noteholders remains 0% in this scenario

> The PCF debt is reduced by $50mm, while the Notes balance remains $225mm

> All proceeds of an Accelerated Sale go to the secured equity pledge. The proceeds do not clear the PCF debt; no proceeds flow to the unsecured claims and Noteholders do not recover any value

**Scenario 3: $50.0mm preference recoveries "turned-over" to all unsecured creditors – reflects chapter 11 style treatment for preference avoidance, given Accelerated Sale could be enacted through U.S. court process**

> The PCF Lenders recover between 13.0% and 46.8%, which, when applied to the $50mm portion of the ITLs subject to litigation, implies a recovery of between $6.5mm and $23.4mm

> The PCF deficiency claim ranges from $374mm to $611mm, making the total unsecured claim balance $649mm to $886mm

> The Noteholders will recover their proportionate share in this scenario, which equates to a range from 0.7% to 3.6%
  – These recoveries are lower than Noteholder recoveries under the Restructuring

26

# A. Scheme vs. Accelerated Sale

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

# Illustrative Recoveries (Proposed Restructuring)
# Liquidity Facility / PCF Lenders

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

|  |  | Midpoint |  |
|---|---|---|---|
| **Range of Illustrative TEV** (in $ millions) | $580 | $630 | $680 |
| (+) PF Excess Cash[1] | – | – | – |
| **Restructuring Available Value** | $580 | $630 | $680 |
| (-) PF ABL Outstanding[2] | (20) | (20) | (20) |
| (-) First Out Term Loan | (126) | (126) | (126) |
| (-) Second Out Term Loan | (225) | (225) | (225) |
| **Restructuring Equity Value** | $210 | $260 | $310 |
| *Illustrative TEV / LTM Comparable EBITDA* | *8.5x* | *9.2x* | *9.9x* |

**Restructuring Recoveries**

| **Liquidity Facility Lender Recoveries**[5] |  |  |  |
|---|---|---|---|
| First Out Term Loan | 126 | 126 | 126 |
| Common Equity | 16 | 19 | 23 |
| **Total Recovery** | **$141** | **$145** | **$149** |

| **PCF Lender Recoveries** |  |  |  |
|---|---|---|---|
| Debt | 225 | 225 | 225 |
| Common Equity[3] | 179 | 222 | 265 |
| **Total Recovery**[4] | **$404** | **$447** | **$490** |
| | | | |
| SSTL | 512 | 512 | 512 |
| RCF | 114 | 114 | 114 |
| 2018 + 2019 Incremental TLs | 62 | 62 | 62 |
| Incremental Coupon Loans | 13 | 13 | 13 |
| **Total PCF Claims** | **$702** | **$702** | **$702** |
| **Recovery (%)** | **57.6%** | **63.7%** | **69.8%** |

| **PCF Lenders who are not party to the RSA** |  |  |  |
|---|---|---|---|
| Equity Recovery | 168 | 208 | 248 |
| Second Out Term Loan | 225 | 225 | 225 |
| **Total Recovery** | **$393** | **$433** | **$473** |
| | | | |
| **Total PCF Claims** | **$702** | **$702** | **$702** |
| **Recovery (%)** | **56.0%** | **61.7%** | **67.4%** |

| **PCF Lenders who are party to the RSA** |  |  |  |
|---|---|---|---|
| Additional Equity Recovery | 12 | 14 | 17 |
| **Total PCF Claims** | **$702** | **$702** | **$702** |
| **PCF Lender Additional Recovery (%)** | **1.6%** | **2.0%** | **2.4%** |

| **Range of Illustrative TEV** (in $ millions) | $580 | $630 | $680 |
|---|---|---|---|
| **RCF Lenders** | | | |
| Second Out Term Loan | $37 | $37 | $37 |
| Common Equity | 29 | 36 | 43 |
| **RCF Recovery ex. CayCo Cash + ICTL** | **$66** | **$73** | **$80** |
| (+) CayCo Cash | 15 | 15 | 15 |
| (+) ICL Turnover Recovery | 8 | 9 | 9 |
| **Total Recovery** | **$89** | **$96** | **$104** |
| Total RCF Claim | 114 | 114 | 114 |
| **RCF Lender Recovery %** | **77.4%** | **84.3%** | **91.1%** |
| | | | |
| **Term Lenders** | | | |
| Second Out Term Loan | $164 | $164 | $164 |
| Common Equity | 131 | 162 | 193 |
| **Total Recovery** | **$295** | **$326** | **$357** |
| Total Claim | 512 | 512 | 512 |
| **Term Lender Recovery %** | **57.6%** | **63.7%** | **69.8%** |
| | | | |
| **Incremental Term Lenders (inc. Coupon Loans)** | | | |
| Second Out Term Loan | $24 | $24 | $24 |
| Common Equity | 19 | 24 | 28 |
| **Gross Recovery** | **$43** | **$48** | **$52** |
| (-) ICL Turnover Recovery | (8) | (9) | (9) |
| **Net Recovery**[6] | **$36** | **$39** | **$43** |
| Total Claim | 75 | 75 | 75 |
| **Incr. Term Lender Recovery %** | **47.4%** | **52.4%** | **57.4%** |

Note: Debt balances include accrued interest estimates as of 6/30/19.
(1) Cash on balance sheet in excess of minimum cash of $35mm.
(2) ABL draw is assumed as of 9/30/19 and excludes contingencies related to [Redacted] ($7mm) and [Redacted] ($3mm).
(3) Includes recoveries to Timely Participating PCF Lenders / Noteholders.
(4) Excludes $15mm cash pledged to RCF by syncreon CayFinance Ltd.
(5) Recoveries outside of the Restructuring.
(6) Illustrative for ICTL recovery turned over to RCF.

28

# Illustrative Recoveries (Proposed Restructuring) Noteholders

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

| | | Midpoint | |
|---|---|---|---|
| **Range of Illustrative TEV** (in $ millions) | $580 | $630 | $680 |
| (+) PF Excess Cash[1] | – | – | – |
| **Restructuring Available Value** | $580 | $630 | $680 |
| (-) PF ABL Outstanding[2] | (20) | (20) | (20) |
| (-) First Out Term Loan | (126) | (126) | (126) |
| (-) Second Out Term Loan | (225) | (225) | (225) |
| **Restructuring Equity Value** | **$210** | **$260** | **$310** |
| *Illustrative TEV / LTM Comparable EBITDA* | *8.5x* | *9.2x* | *9.9x* |

**Restructuring Recoveries**

| **Noteholder Recoveries** | | | |
|---|---|---|---|
| Common Equity | 15 | 18 | 22 |
| Warrant Value ($556mm TEV Strike) | – | – | – |
| **Net Recovery** | **$15** | **$18** | **$22** |
| | | | |
| Senior Unsecured Notes | 238 | 238 | 238 |
| **Total Noteholder Claims** | **$238** | **$238** | **$238** |
| **Recovery (%)** | **6.2%** | **7.6%** | **9.1%** |

| *Noteholders who are not party to the RSA* | | | |
|---|---|---|---|
| Equity Recovery | 9 | 12 | 14 |
| **Total Noteholder Claims** | **$238** | **$238** | **$238** |
| **Recovery (%)** | **4.0%** | **4.9%** | **5.9%** |

| *Noteholders who are party to the RSA* | | | |
|---|---|---|---|
| Additional Equity Recovery | 5 | 6 | 8 |
| **Total Noteholder Claims** | **$238** | **$238** | **$238** |
| **Notes Additional Recovery (%)** | **2.2%** | **2.7%** | **3.3%** |

Note: Debt balances include accrued interest estimates as of 6/30/19.
(1)   Cash on balance sheet in excess of minimum cash of $35mm.
(2)   ABL draw is assumed as of 9/30/19 and excludes contingencies related to [Redacted] ($7mm) and [Redacted] ($3mm).

29

# Illustrative Recoveries
## (Accelerated Sale w/ Risk Weighted Contract Losses)

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

|  |  | Midpoint |  |
|---|---|---|---|
| **Range of Illustrative TEV (Unadjusted)** (in $ millions) | $580 | $630 | $680 |
| 2019E Comparable Adj. EBITDA before Disruption | 83 | 83 | 83 |
| *Implied Multiple on 2019E Comparable Adj. EBITDA* | *7.0x* | *7.6x* | *8.2x* |
|  |  |  |  |
| Loss of EBITDA of Risk Adj. with SG&A addback | $55 | $55 | $55 |
| *(x) Multiple Applied to Lost EBITDA* | *7.0x* | *7.6x* | *8.2x* |
| **TEV Lost to Contract Losses** | **$382** | **$415** | **$448** |
|  |  |  |  |
| **TEV after Contract Losses** | **$198** | **$215** | **$232** |
| (+) PF Excess Cash[1] | – | – | – |
| **Restructuring Available Value** | **$198** | **$215** | **$232** |
| (-) PF ABL Outstanding[2] | (82) | (82) | (82) |
| **Net Distributable Value** | **$116** | **$134** | **$151** |

**Restructuring Recoveries**

| | $580 | $630 | $680 |
|---|---|---|---|
| Additional Recovery to Liquidity Lenders[3] | $25 | $25 | $25 |
|  |  |  |  |
| **PCF Lender Recoveries**[4] |  |  |  |
| **Total Recovery** | **$91** | **$109** | **$126** |
|  |  |  |  |
| SSTL | 512 | 512 | 512 |
| RCF | 114 | 114 | 114 |
| 2018 + 2019 Incremental TLs | 62 | 62 | 62 |
| Incremental Coupon Loans | 13 | 13 | 13 |
| **Total PCF Claims** | **$702** | **$702** | **$702** |
| **Recovery (%)** | **13.0%** | **15.5%** | **17.9%** |

**Noteholder Recoveries**

| | | | |
|---|---|---|---|
| **Total Recovery** | **$–** | **$–** | **$–** |
|  |  |  |  |
| Senior Unsecured Notes | 238 | 238 | 238 |
| **Total Noteholder Claims** | **$238** | **$238** | **$238** |
| **Recovery (%)** | **–** | **–** | **–** |

| **Range of Illustrative TEV** (in $ millions) | $580 | $630 | $680 |
|---|---|---|---|
| **RCF Lenders** |  |  |  |
| **RCF Recovery ex. CayCo Cash + ICTL** | **$15** | **$18** | **$20** |
| (+) CayCo Cash | 15 | 15 | 15 |
| (+) ICL Turnover Recovery | 2 | 2 | 2 |
| **Total Recovery** | **$32** | **$35** | **$38** |
| Total Claim | 114 | 114 | 114 |
| **RCF Lender Recovery %** | **27.7%** | **30.4%** | **33.1%** |
|  |  |  |  |
| **Term Lenders** |  |  |  |
| **Total Recovery** | **$67** | **$79** | **$92** |
| Total Claim | 512 | 512 | 512 |
| **Term Lender Recovery %** | **13.0%** | **15.5%** | **17.9%** |
|  |  |  |  |
| **Incremental Term Lenders (inc. Coupon Loans)** |  |  |  |
| **Gross Recovery** | **$10** | **$12** | **$13** |
| (-) ICL Turnover Recovery | (2) | (2) | (2) |
| **Net Recovery**[5] | **$8** | **$10** | **$11** |
| Total Claim | 75 | 75 | 75 |
| **Incr. Term Lender Recovery %** | **10.7%** | **12.7%** | **14.7%** |

Note: Debt balances include accrued interest estimates as of 6/30/19 apart from Liquidity Loan debt balances which are shown as of 31 March 2019 ($25mm balance) to ensure comparability with "Comparative Analysis: Controlled Wind-Down Scenario" report, prepared by Alix Partners. Additional draws that have occurred in the interim would only worsen the recoveries to Scheme Creditors in the Accelerated Sale scenario.
(1)   Cash on balance sheet in excess of minimum cash of $35mm.
(2)   ABL draw is assumed as of 9/30/19 and excludes contingencies related to [Redacted] ($7mm) and [Redacted] ($3mm).
(3)   Does not assume additional bridge funding to provide liquidity to run an Accelerated Sale Process, which would likely be required.
(4)   Excludes $15mm cash pledged to RCF by syncreon CayFinance Ltd.
(5)   Illustrative for ICTL recovery turned over to RCF.

30

# Illustrative Recoveries
## (Accelerated Sale w/ High Risk Contract Losses Only)

Privileged & Confidential
Attorney Work Product
Subject to Material Revision
Not For Distribution

| | | Midpoint | |
|---|---|---|---|
| Range of Illustrative TEV (Unadjusted) (in $ millions) | $580 | $630 | $680 |
| 2019E Comparable Adj. EBITDA before Disruption | 83 | 83 | 83 |
| *Implied Multiple on 2019E Comparable Adj. EBITDA* | *7.0x* | *7.6x* | *8.2x* |
| Loss of EBITDA of High Risk Customers | $30 | $30 | $30 |
| *(x) Multiple Applied to Lost EBITDA* | *7.0x* | *7.6x* | *8.2x* |
| TEV Lost to Contract Losses | $209 | $227 | $245 |
| TEV after Contract Losses | $371 | $403 | $435 |
| (+) PF Excess Cash[1] | – | – | – |
| Restructuring Available Value | $371 | $403 | $435 |
| (-) PF ABL Outstanding[2] | (82) | (82) | (82) |
| Net Distributable Value | $289 | $321 | $353 |

### Restructuring Recoveries

| | | | |
|---|---|---|---|
| Additional Recovery to Liquidity Lenders[3] | $25 | $25 | $25 |
| **PCF Lender Recoveries[4]** | | | |
| Total Recovery | $264 | $296 | $328 |
| SSTL | 512 | 512 | 512 |
| RCF | 114 | 114 | 114 |
| 2018 + 2019 Incremental TLs | 62 | 62 | 62 |
| Incremental Coupon Loans | 13 | 13 | 13 |
| Total PCF Claims | $702 | $702 | $702 |
| Recovery (%) | 37.7% | 42.2% | 46.8% |

### Noteholder Recoveries

| | | | |
|---|---|---|---|
| Total Recovery | $– | $– | $– |
| Senior Unsecured Notes | 238 | 238 | 238 |
| Total Noteholder Claims | $238 | $238 | $238 |
| Recovery (%) | – | – | – |

| Range of Illustrative TEV (in $ millions) | $580 | $630 | $680 |
|---|---|---|---|
| **RCF Lenders** | | | |
| RCF Recovery ex. CayCo Cash + ICTL | $43 | $48 | $53 |
| (+) CayCo Cash | 15 | 15 | 15 |
| (+) ICL Turnover Recovery | 5 | 6 | 6 |
| Total Recovery | $63 | $69 | $75 |
| Total Claim | 114 | 114 | 114 |
| RCF Lender Recovery % | 55.2% | 60.3% | 65.4% |
| **Term Lenders** | | | |
| Total Recovery | $193 | $216 | $240 |
| Total Claim | 512 | 512 | 512 |
| Term Lender Recovery % | 37.7% | 42.2% | 46.8% |
| **Incremental Term Lenders (inc. Coupon Loans)** | | | |
| Gross Recovery | $28 | $32 | $35 |
| (-) ICL Turnover Recovery | (5) | (6) | (6) |
| Net Recovery[5] | $23 | $26 | $29 |
| Total Claim | 75 | 75 | 75 |
| Incr. Term Lender Recovery % | 31.0% | 34.7% | 38.5% |

Note: Debt balances include accrued interest estimates as of 6/30/19 apart from Liquidity Loan debt balances which are shown as of 31 March 2019 ($25mm balance) to ensure comparability with "Comparative Analysis: Controlled Wind-Down Scenario" report, prepared by Alix Partners. Additional draws that have occurred in the interim would only worsen the recoveries to Scheme Creditors in the Accelerated Sale scenario.
(1)  Cash on balance sheet in excess of minimum cash of $35mm.
(2)  ABL draw is assumed as of 9/30/19 and excludes contingencies related to [Redacted] ($7mm) and [Redacted] ($3mm).
(3)  This line does not assume additional bridge funding to provide liquidity to run an Accelerated Sale Process, which would likely be required.
(4)  Excludes $15mm cash pledged to RCF by syncreon CayFinance Ltd.
(5)  Illustrative for ICTL recovery turned over to RCF.

31

**APPENDIX 14**

**WIND DOWN ANALYSIS**

WEIL:\96938514\38\69894.0005

**Alix**Partners

# Scheme comparative analysis

Controlled wind-down scenario

**12 July 2019**

# Important notice

This report (**Report**) was prepared by AlixPartners, LLP (**AlixPartners**) at the request, and on the instructions, of syncreon America Inc. (the **Company**) exclusively for the benefit and use of the Company, and syncreon Group BV and syncreon Automotive (UK) Limited (the **Scheme Companies**) pursuant to a client relationship as recorded in an engagement letter dated 12 December 2018, as supplemented, incorporating AlixPartners' General Terms and Conditions of business (the **Engagement Letter**). AlixPartners is acting as an adviser to the Company and the Scheme Companies for this work. AlixPartners' sole duty of care is to the Company and the Scheme Companies. AlixPartners is not responsible to and does not owe any duty to any other person in respect of the Report, and is not responsible for providing advice to and is not purporting to advise any other person in connection with such matters.

The Report remains subject to the scope and exclusions as agreed with the Company as set out in the Engagement Letter in connection with the proposed restructuring of the debt owed to the PCF Lenders and the Noteholders (together the **Scheme Creditors**). The restructuring is to be implemented by way of linked and inter-conditional English schemes of arrangement proposed by the Scheme Companies pursuant to section 897 of the Companies Act 2006 (the **Schemes**). The Report has been prepared with only the Scheme Companies' interests, requirements and objectives in mind (in their role as proposers of the Schemes) and should not be used for any other purpose, by any other parties or in any other context.

In accordance with the Engagement Letter, AlixPartners has prepared a high level analysis of the potential return to the Scheme Creditors in the event that the proposed debt restructuring is not completed (the **Analysis**). The Analysis is based on the Company's instructions and with only the interests of the Company and the Scheme Companies in mind. By accepting the Analysis, the Company's creditors, the Scheme Companies' creditors, the Group and any other party who gains access to the Analysis (**Third Parties**) will be taken to have represented, warranted and undertaken that they have read, be subject to and agree to comply with the contents of this Disclaimer.

No reliance may be placed for any purpose whatsoever on this Report or the Analysis and any reliance creditors and/or Third Parties choose to place on such information is a matter for their judgment exclusively and at their own risk. To the fullest extent permitted by law, no liability or responsibility whatsoever is accepted by AlixPartners for any loss of whatever nature, howsoever arising, from any use of or reliance on this Report or the Analysis or in connection therewith.

This Report does not constitute or form any part of, and should not be construed as:

• An offer or invitation or other solicitation or recommendation in respect of the proposed restructuring.

• An offer to sell or issue, or the solicitation of an offer to purchase, subscribe to or acquire, securities of any Group company.

• An inducement to enter into investment activity in the United States or in any other jurisdiction in which such offer, solicitation, inducement or sale would be unlawful prior to registration, exemption from registration or qualification under the securities laws of such jurisdiction.

AlixPartners does not provide any legal, tax, valuation or accounting advice in connection with any aspect of this Report. It may be that a full legal or taxation review would highlight matters of which AlixPartners is not aware and could change the results of the Analysis. Accordingly, expert local legal and/or taxation advice should be sought independently by any Third Party on any matters which are of interest. AlixPartners' comments pertaining to insolvency processes do not constitute any form of legal advice, opinion or guarantee, and expert local legal advice should be sought when managing any insolvency process in each country where such processes are planned.

**Alix**Partners    2

548

# Contents

Glossary of terms

1.  Summary

2.  Approach and methodology

3.  Key observations and assumptions

4.  Overview of the Analysis

Appendices

A. EPM methodology

B. Key sources of information

C. Key assumptions

D. Disclaimer

**Alix**Partners    3

# Glossary of terms

| | |
|---|---|
| **Advisors** | Weil and PJT |
| **AlixPartners/AP/us /our/we** | AlixPartners LLP |
| **Analysis** | a high level analysis of the potential return to the Scheme Creditors in the event that the proposed debt restructuring is not completed based on the unaudited financial position of the Group's entities as at 31 March 2019 |
| **AR** | accounts receivable |
| **BB Forecast** | the Borrowing Base forecast dated 1 May 2019 |
| **Cash Pledge** | a pledge over $15m of cash held by syncreon CayFinance Limited for the benefit of the RCF Lenders |
| **COMI** | centre of main interests |
| **the Company** | syncreon America Inc |
| **Debt Facilities** | the LF Facility, the PCF Facilities, the Existing ABL Facility and the Notes |
| **Engagement Letter** | AlixPartners' engagement letter with the Company dated 12 December 2018, as amended and supplemented |
| **EPM** | entity priority model |
| **ERV** | estimated realisable value |
| **Explanatory Statement** | the explanatory statement provided by the Scheme Companies to the Scheme Creditors |
| **Existing ABL Facility** | the Group's existing asset based lending facility provided to syncreon Financing Limited by Sound Point |
| **Existing ABL Lender** | the lender under the Existing ABL Facility |
| **FX** | foreign exchange |
| **GAAP** | generally accepted accounting principles |

| | |
|---|---|
| **the Group** | the Parent and its subsidiaries |
| **Guarantor** | the Group companies that have guaranteed the PCF Facilities and the Notes |
| **Incremental Term Loan or ITL** | the incremental term loan, within the PCF Facilities |
| **ITL Coupon Pledge** | a pledge over the coupon loans of the ITL for the benefit of the RCF Lenders |
| **LC** | letter of credit |
| **Lenders** | LF Lenders, PCF Lenders and Noteholders |
| **LF Facility** | the senior secured loan facility agreement originally dated 15 March 2019 |
| **LF Lenders** | the lenders under the LF Facility |
| **Management** | the senior management team of the Group |
| **NBV** | net book value |
| **NL Borrower** | syncreon Group B.V |
| **Noteholders** | the holders of the Notes |
| **Notes** | the $225 million senior unsecured notes due 1 November 2021 |
| **Obligor Entities** | any Group entity which is a borrower or Guarantor under the LF Facility, PCF Facilities and/or the Notes |
| **OE** | Originating Entity under the Existing ABL Facility |
| **Office Holder** | any person appointed to take control of an insolvency proceeding |
| **the Parent** | syncreon Global Holdings Limited |
| **Pari Passu** | side by side; on an equal footing |
| **PCF Facilities** | facilities made available under a credit agreement originally dated 28 October 2013 including i. the RCF facility ii. the term loan facility and iii. the incremental term loan facility |

**Alix**Partners    4

# Glossary of terms

| | |
|---|---|
| **PCF Lenders** | the Lenders under the PCF Facilities |
| **PIK** | payment in kind |
| **PJT** | PJT Partners, Inc, advisors to the Company |
| **RCF Facility or RCF** | the revolving credit facility, within the PCF Facilities |
| **RCF Lenders** | the Lenders under the RCF Facility |
| **RSA** | restructuring support agreement dated 21 May 2019 |
| **Scheme Companies** | NL Borrower and UK Guarantor |
| **Scheme Creditors** | the PCF Lenders and the Noteholders |
| **Schemes** | the proposed schemes of arrangement between the Scheme Companies and the Scheme Creditors under Part 26 of the Companies Act (in England and Wales) in its present form or with or subject to any modification, addition or condition approved or imposed by the English Court, and agreed to by the Scheme Companies |
| **Sound Point** | Sound Point Capital |
| **Specified Allocations** | the Cash Pledge and the ITL Coupon Pledge |
| **TB** | trial balances for all Group entities as at 31 March 2019 |
| **Term Loan** | the term loan within the PCF Facilities |
| **UK Guarantor** | syncreon Automotive (UK) Limited |
| **US** | United States of America |
| **USD or $** | United States of America dollar currency |
| **VAT** | value added tax, and/or its equivalent |
| **Weil** | Weil, Gotshal & Manges LLP, legal advisors to the Company |
| **WHT** | withholding tax |

# 1. Summary

## Introduction

Following our appointment as advisors to the Company AlixPartners prepared this report and the underlying Analysis to assist the directors of the Scheme Companies in considering the potential outcome to the Scheme Creditors in the event that the proposed restructuring that is currently being implemented by the Scheme Companies is unsuccessful and there is a controlled wind-down of the Group.

The Explanatory Statement to which this report is appended includes a description of the context in which a wind-down of some or all of the Group's entities may arise. In those circumstances, the likely result is that NL Borrower and the Guarantor entities in the Group would need to file for formal insolvency protection, with further entity filings likely where i) there is insufficient liquidity to continue to trade; and/or ii) demands for repayment were made in relation to settlement of intercompany balances that could not be settled from available resources.

Our view is that insolvency filings across the Group would be unplanned and broadly uncoordinated, with each entity looking to the procedures available to it under local law. In our work we have considered the following scenarios, resulting in a range of estimated outcomes for the Scheme Creditors:

- **Scenario A:** this represents the estimated outcome where there is a short period of continued trading with a view to facilitating a higher recovery for AR. At the end of that period it is assumed that operations would be closed down rather than sold, with assets sold on a piecemeal basis.

- **Scenario B:** this represents the estimated outcome where customers are not supportive of continued operations and/or there is insufficient funding to do so. As a result, operations would be closed immediately on appointment of an Office Holder and the assets realised on a piecemeal basis.

In order to assess the potential return to the Scheme Creditors for the purposes of the Schemes, the Analysis has included the preparation of an EPM to assess the recoverable value from asset realisations, and their distribution amongst creditors on an entity by entity basis. The EPM has been prepared using the approach outlined in Appendix A based on unaudited US GAAP trial balances for each Group entity as at 31 March 2019. In each Scenario, consideration has been given to the effect of considering inter-company balances on gross and net bases.

Our findings should be read in the context of the notice and disclaimers provided at the beginning and conclusion of this report respectively.

# 1. Summary

## Estimated return to Scheme Creditors

Based on the work completed in preparing the Analysis, it is estimated that the return to the Scheme Creditors from the relevant Obligor Entities in the event that the proposed restructuring is unsuccessful and a controlled wind-down scenario results may range between:

- 11% and 15% for the PCF Lenders; and

- 0.28% and 0.81% for the Noteholders

If the above estimated return is adjusted to include consideration of obligations and rights under the Specified Allocations, the estimated return to the Scheme Creditors is between:

- 9% and 30% for the PCF Lenders; and

- 0.28% and 0.81% for the Noteholders.

Fuller information on the estimated returns is included on page 18.

These estimated returns are before consideration of certain items which would likely dilute the return to the Scheme Creditors including additional unsecured claims such as employee severance claims, landlords' claims for breach of contract, customer claims for damages, contingent liabilities associated with litigation and parent company guarantees, as well as priority or preference claims under applicable local law.

Scenarios A and B do not necessarily represent the 'best' and 'worst' case of recoveries for the Scheme Creditors. There are a number of risks associated with recovering value from the Group which we have sought to quantify in a meaningful manner for the purposes of this Analysis. There is also a possibility that the primary assets could be realised for more.

### Estimated returns to Scheme Creditors

| $m | NBV / claim as at 31 March 2019 | Obligor Entities | | Adjusted for Specified Allocations | |
|---|---|---|---|---|---|
| **Scenario A with gross intercompany balances** | | | | | |
| PCF - Term Loan | 497.4 | 75.4 | 15% | 75.4 | 15% |
| PCF - RCF | 107.8 | 16.3 | 15% | 32.6 | 30% |
| PCF - ITL | 73.1 | 11.1 | 15% | 9.1 | 12% |
| | 678.3 | | | | |
| Notes | 225 | 1.8 | 0.81% | 1.8 | 0.81% |
| **Scenario B with net intercompany balances** | | | | | |
| PCF - Term Loan | 497.4 | 54.9 | 11% | 54.9 | 11% |
| PCF - RCF | 107.8 | 11.9 | 11% | 27.6 | 26% |
| PCF - ITL | 73.1 | 8.1 | 11% | 6.6 | 9% |
| | 678.3 | | | | |
| Notes | 225 | 0.6 | 0.28% | 0.6 | 0.28% |

Sources: AP working papers; PJT report dated 8 July 2019.

**Alix**Partners

# 2. Approach and methodology

## Approach

The explanatory statement to which this report is appended includes a description of the context in which a wind-down of some or all of the Group's entities may arise. In those circumstances, the likely result is that NL Borrower and the Guarantor entities in the Group would need to file for formal insolvency protection, with further entity filings likely where i) there is insufficient liquidity to continue to trade; and/or ii) demands for repayment were made in relation to settlement of intercompany balances that could not be settled from available resources.

Our view is that insolvency filings across the Group would be unplanned and broadly uncoordinated, with each entity looking to the procedures available to it under local law. This is because:

- There is no known contingency planning underway by either the Group or its key creditors that is specifically aimed at preparing to implement a coordinated and controlled wind-down across the Group in the event that the Schemes are not sanctioned. In the absence of any new money to fund the Group during a period of subsequent planning, the expected applications for insolvency proceedings would, by necessity, be unplanned, reducing the opportunity for coordination.

- The Group has entities incorporated in 24 different countries. There are operating entities in 19 different countries, each with no operations outside of their country of incorporation. The baseline assumption is that entities would file for insolvency proceedings in their country of incorporation, rather than look for an opportunity to migrate their COMI (where applicable) to allow them to take advantage of potentially 'more favourable' insolvency procedures available in other jurisdictions and to facilitate a more coordinated approach (such as seen in the Collins and Aikman case). This is because:

  - There is unlikely to be funding available to support the Group during the minimum three month period for which evidence of COMI outside of the country of incorporation is required to be provided to the relevant court; the necessary funding period may be longer where additional time is required to implement a COMI shift.

  - Even if funding were available, it is often challenging to successfully move the COMI of operating entities compared to holding companies.

**Alix**Partners    8

# 2. Approach and methodology

Approach (cont'd)

In practice, the consequences of the above include:

- Some entities would be under the control of an appointed Office Holder with broad power to trade and sell assets by private treaty (such as in the UK), whilst other entities could be under the control of a court appointed Office Holder with a requirement to sell assets at auction (such as in Hungary). The nature of the available local insolvency procedures would therefore impact the commercial activity that could subsequently follow.

- There would not be a Group-wide coordinated filing and decisions would be made at an entity level e.g. no sharing of available cash, no multi-entity sale agreements, no sharing of general corporate overhead costs. However, it may be possible for there to be an element of coordination between a small number of specific entities where there is clear mutual benefit.

Each Office Holder (or continuing director) would consider his/her strategy in the context of the entity for which he/she is responsible, in particular his/her duty to maximise realisations for the benefit of an individual entity's creditors, rather than considering any potential benefit for the Group as a whole.

The baseline option, and the one that usually offers the least risk, is for an Office Holder to cease ongoing operations and realise assets on a piecemeal, break-up basis. However, he/she would also need to give consideration to the options available to enhance recoveries. For the Group, these value enhancement opportunities, at an individual entity level, appear to be:

- **Continued trading:** this envisages the continued trading of the business (in whole or in part) for a short period (say two to four months) to service customers in order to: i) maximise recoveries for AR; ii) mitigate unsecured claims from customers for damages; and/or iii) preserve value in a business pending a sale.

- **Sale of the business**: this envisages a sale of some or all of the business and assets as a going concern in order to generate improved value compared to that achieved on a break-up basis.

# 2. Approach and methodology

Approach (cont'd)

Based on information shared with us, both of the above opportunities to enhance recoverable value appear to be challenging to achieve. Nonetheless, in order to ensure that proper consideration is given to the ability to recover value over and above a pure forced-sale liquidation, the controlled wind-down context for our work assumes that:

- Continued trading at an individual entity level may be possible. On the assumption that either trading would be self-funded or funded by a marginal lender, this offers an opportunity to demonstrate to the Scheme Creditors what their potential return might be in the event that a strategy could be adopted to secure enhanced returns for AR.

- Based on an assessment of the commercial position between the Group and its customers, including discussion with the Group's Advisors, it is unlikely to be possible to achieve sales of businesses and assets of individual entities. Even if sales could be achieved, the relatively short remaining customer contract term means that the most likely upside for the Group would be enhanced AR recoveries.

In this report, this has been recognised by estimating the return to Scheme Creditors in two scenarios:

- **Scenario A:** this represents the estimated outcome where there is a short period of continued trading with a view to facilitating a higher recovery for AR. At the end of that period it is assumed that operations would be closed down rather than sold, with assets sold on a piecemeal basis.

- **Scenario B:** this represents the estimated outcome where customers are not supportive of continued operations and/or there is insufficient funding to do so. As a result, operations would be closed immediately on appointment of an Office Holder and the assets realised on a piecemeal basis.

# 2. Approach and methodology

## Methodology

In order to assess the potential return to the Scheme Creditors for the purposes of the Schemes, the Analysis has included the preparation of an EPM to assess the recoverable value from asset realisations, and their distribution amongst creditors on an entity by entity basis. The EPM has been prepared using the approach outlined in Appendix A based on unaudited US GAAP trial balances for each Group entity as at 31 March 2019.

An EPM approach is required because it is necessary to consider value flows at an entity level, rather than at a consolidated group level, due to there being differing waterfalls within the Group e.g. only certain entities are Guarantors for the PCF/LF Facilities and the Notes.

The output of this work should not be interpreted as providing a forecast return to creditors in a controlled wind-down. This is because the Analysis does not capture all potential detriments to return which could further dilute the return to the Scheme Creditors. Specific areas which have not been included in the Analysis are:

• Additional unsecured claims such as employee severance claims, landlords claims for breach of contract, customer claims for damages, contingent liabilities associated with litigation, parent company guarantees and contractual RSA related claims in the event the Schemes are not implemented. In each case, if included these would have the effect of diluting the return to the PCF Lenders and the Noteholders.

• Priority or preference claims as applicable to each jurisdiction. If included, these would likely have the effect of diluting the return to the PCF Lenders and the Noteholders.

In order to provide context to the outcomes derived from the Analysis, the Appendices include information relating to assumptions made and limitations associated with our work. These are outlined in Section 3 with further detail included in Appendix C.

# 3. Key observations and assumptions

| Area | Observation or assumption |
|------|---------------------------|
| **Nature of insolvency proceedings** | The Group operates in 24 countries. In undertaking our work we have not had the benefit of local law advice on the nature of insolvency proceedings available and the particular rights and restrictions applicable to an Office Holder in each. The nature of local insolvency proceedings can differ across these countries from traditional liquidation proceedings focused on selling assets and distributing value, to more rescue orientated proceedings where continued trading and business sales are readily facilitated. It is therefore likely that a consistent route for recovering value may not be available in all jurisdictions. |
| **Management** | It is assumed that appointed directors across the Group would be cooperative and work with appointed Office Holders to support implementation of an Office Holder's preferred strategy. |
| **Jurisdiction of proceedings** | It is assumed that Group companies would open proceedings in their country of incorporation, rather than look for an opportunity to migrate their COMI (where applicable) to allow them to take advantage of potentially 'more favourable' insolvency procedures available in other jurisdictions and to facilitate a more coordinated approach. This is because:<br><br>• There is unlikely to be funding available to support the Group during the minimum three month period for which evidence of COMI outside of the country of incorporation is typically required to be provided to the relevant court. The necessary funding period may be longer where additional time is required to implement a COMI shift.<br><br>• Even if funding were available, it is often challenging to successfully move the COMI of operating entities compared to holding companies. |
| **Extent and validity of security** | Appendix C includes a summary of the security that we understand has been provided to the Scheme Creditors and other Lenders. This is based on information provided to us by Weil. We have assumed that where security has been granted to a lender, or is expected to be granted before the end of June 2019, it is valid and perfected in all relevant jurisdictions. In the event that security requiring perfection is not perfected in advance of any formal insolvency proceedings, the amount of the Scheme Creditors debt that is considered to be secured could be restricted.<br><br>As a consideration of priority or preferential claims has not been included, there is no demarcation between security which allows only the direct costs of realisation to be deducted from the proceeds, or security which also allows the costs of the formal insolvency proceeding to be deducted as well as priority claims.<br><br>The Analysis assumes that the security provided by syncreon Canada Inc. for the benefit of the PCF/LF Lenders does not encompass its investments in subsidiaries. Canadian counsel has indicated that it is arguable that these investments would be pledged to the PCF/LF Lenders but as it is unclear, the Analysis assumes that the any value from this asset is for the general benefit of unsecured creditors (including the Noteholders and the PCF Lenders as applicable). |

# 3. Key observations and assumptions

| Area | Observation or assumption |
|---|---|
| **Extent and validity of security (cont'd)** | The TB data indicates that the ITL asset is owned by syncreon Intermediate Global Holdings Limited whereas it is understood that the ITL Coupon Pledge has been granted by syncreon CayFinance Limited. Pending further review by the Group, the Analysis assumes that the ITL Coupon Pledge correctly attaches to the Incremental Term Loan assets. |
| **Local priority claims** | Our work does not include consideration of potential local priority or preference claims which may rank above certain security granted by Group companies to the PCF Lenders and/or LF Lenders. If included, such claims would likely have the impact of reducing the return available to the PCF Lenders and the Noteholders. |
| **Guarantee restrictions and subrogation** | The guarantees provided by some Group entities are subject to certain restrictions. Based on information provided to us by Weil, these restrictions only impact the Analysis for Obligor Entities in Poland and Germany. To recognise the potential impact, distributions in respect of the PCF Facilities and/or Notes have been restricted to ensure that guarantee payments do not reduce net assets to below ordinary share capital as per local GAAP as at 31 March 2019.<br><br>As neither the PCF Facilities nor the Notes are repaid in full, subrogated claims have not been recognised in respect of payments made by Guarantors. |
| **Asset realisation assumptions** | The Analysis includes estimates of the potential realisable value of assets based on our experience in being appointed as Office Holders in the UK as well as discussions with Management and the Group's advisors. Discounts have been applied to book values to reflect the general risks associated with recovering value. We have not had access to formal valuations and it is possible that recoveries may be higher or lower than estimated here with variations expected across the applicable jurisdictions. Further comments on the assumptions used are included in Appendix C. |
| **Costs of realisation** | The Analysis includes a high level assessment of the potential costs associated with preserving and recovering value within, or outside of, a formal insolvency processes. The costs are estimated at 5% of gross asset realisations, subject to a minimum of $25k per entity. Such costs can be material, and may well be higher than the estimate included. This would have the effect of reducing the amount to be returned to the Scheme Creditors. In practice, an Office Holder may seek not only reassurance that the Scheme Creditors and other Lenders with security would agree to their fees and costs being paid from realisations, but in some circumstances would request interim payments to be funded directly by Lenders pending the realisation of assets. |

# 3. Key observations and assumptions

| Area | Observation or assumption |
|---|---|
| **Intercompany balances** | Jurisdictions across the Group require differing treatment as to the realisation of intercompany balances in an insolvency process (such as subordination and/or netting). The Group's intercompany agreements provide for certain amounts to be netted but is silent on others. Our Analysis has included estimated outcomes based on both net and gross treatment of intercompany balances to provide an assessment on both bases. A consideration of local law subordination has not been included. |
| **Trading and funding in Scenario A** | Scenario A assumes that higher recoveries from AR may be possible where a customer requires continuity of supply and the relevant operating entity is able to continue to trade for a short period. |
| | A provision of $2.2 million is included in Scenario A to recognise the costs associated with securing the services of certain central corporate personnel to assist with the collection of AR for a period of three months. |
| | It does not include an estimate of the potential associated profits or losses from continuing to trade as the actual trading result would likely be determined by the terms agreed with the relevant customer(s). These could be markedly different from those currently existing. Therefore the approach assumes that the cost of continued trading would be met by the customer, or at least covered by an increase in the recovery of pre-filing AR. |
| | To continue to trade, the Office Holder may require access to funding to cover any losses, costs and/or associated working capital requirements. The Existing ABL Lender and/or the PCF Lenders should have an economic interest in securing enhanced value for their applicable AR where possible. As a result such lenders may be interested in providing funding to support continued trading where it would enhance recoveries from customers. |
| | For AR pledged to the Existing ABL Lender, the financing structure introduces the additional challenge that the AR is owned by a different entity (syncreon Financing Limited) to the OE. An Office Holder of an OE would only be likely to continue to trade to enhance the recoverable value of AR pledged to the Existing ABL Lender where the OE's estate is held harmless for the associated costs/risks. This reassurance is unlikely to be given by the Canadian Office Holder, as representative of the AR's owner, and so the obvious source would be the Existing ABL Lender itself. |
| | Whether the marginal creditor is the Existing ABL Lender or the PCF Lenders, there would be a need for the lender(s) to coordinate with a number of different Office Holders of individual entities across different jurisdictions to put in place acceptable funding arrangements. Without the benefit of planning in advance of insolvency filings, this would be challenging to achieve in accelerated timescales, not least for the PCF Lenders who would also need to reach agreement amongst themselves as to how to proceed. |

# 3. Key observations and assumptions

| Area | Observation or assumption |
|------|---------------------------|
| **Timing of asset realisations and distributions to creditors** | In the Analysis, estimated asset realisations are assumed to flow around the Group (via intercompany balances and/or equity) and to third party creditors simultaneously. In reality, the realisation of distributions to creditors in individual estates would take place over an extended period of time (months, if not years depending on the issues to be addressed in winding down each individual entity), rather than simultaneously. There is an inherent risk as to the timing of when assets are realised and when those realisations achieved are distributed to creditors, including the Lenders. The Analysis does not apply any discount to adjust for the time value of money. |
| **Potential additional claims** | This report does not include consideration of potential additional unsecured claims. If included, their impact would likely be to dilute the return to the PCF Lenders and the Noteholders. Potential additional unsecured claims include: |

- Claims arising from **current litigation** against certain Group entities. It is understood that there are a small number of contested litigation actions in hand which may result in crystallised claims against certain Group companies. These have not been included in order to avoid the need to disclose values in a public forum.

- Claims arising from **customers for damages** as a result of failure to perform under existing contracts. Some provision for this is inherent within the recovery assumptions for AR but there may be claims which are not capable of set-off either due to local law or due to there being insufficient AR to set-off against. These have not been included as the Group does not have an existing assessment of the potential for such claims to arise.

- Claims arising from a **defined benefit pension scheme** operated by syncreon Canada Inc. Our work includes the estimated deficit on a 'going concern' basis which is included in the trial balance as at March 2019. This amount may increase when considered on a 'buy-out' or similar basis.

- Claims arising from the **termination of employment contracts.** These include redundancy pay, pay in lieu of notice and accrued holiday pay and any awards for unfair or wrongful dismissal. The claims that can be made by former employees vary across the relevant jurisdictions and local law advice has not been available to us to allow inclusion of a reasonable estimate. However, a provision is included to recognise unsecured claims for one week arrears of pay for waged and salaried employees, where it is assumed that the liability would accrue to the entity in which their salary cost is recognised.

- Claims **from landlords in relation to a breach of rental agreements.** The substantial majority of the Group's premises are rented and, whilst certain of the landlords have LCs to cover a portion of such claims, these could be material given an annual rental cost of approximately $70 million.

- Claims arising under **guarantees or indemnities** provided by Group entities other than those under the Debt Facilities. These are not included here as a summary of these was not readily available.

- **RSA** related claims in the event the Schemes do not occur.

**Alix**Partners    15

561

# 3. Key observations and assumptions

| Area | Observation or assumption |
|---|---|
| Taxation | We have not reviewed the Group's taxation affairs other than to understand the Group's views on the ability to recover certain taxation assets. Where distributions are made to the Scheme Creditors, it may be necessary in some circumstances for an Office Holder to deduct WHT for which no provision has been included in the Analysis. In preparing the Analysis, we have not obtained advice on the risk of tax liabilities arising from the realisation of assets in an insolvency scenario. Tax risk in relation to asset realisations and/or distributions to creditors would be dependent upon the tax attributes of each individual entity, the extent of realisations achieved and the eventual quantum of distributions made to each class of creditor. |
| Loss of business | As customers become aware of financial challenges within any business, the risk of contract suspension, termination or non-renewal increases. The Analysis assumes that there would be no material changes to the business before any filing. Any material customer loss before a filing would likely reduce the ability to recover value for the associated AR. |
| Materiality | In preparing the Analysis, we have applied a materiality level of $100k. That is, we have not specifically investigated potential assets or liabilities where the book value is below this threshold (unless specific reasons have been identified to warrant a different assumption). |
| Applicable GAAP | The base financial information used to prepare our work was prepared in US GAAP being the Group's shared reporting GAAP. In a high level comparison to local reporting GAAP, there were no material differences in the balances for key assets between US and local GAAP. |
| Currency | The Analysis models estimated asset realisations and distributions to creditors in a common currency, USD (the Group's reporting currency), and does not reflect the potential impact of foreign exchange fluctuations. The balance sheets as at 31 March 2019 that form the basis of our work assumed various FX rates as used by the Group. Given the breadth of the currencies in which the Group operates, there is potential exposure to currency exchange losses or gains on the realisation of assets in non-USD reporting entities and on the distribution of funds to individual creditors. |
| Restrictions | Our work assumes that there would be no local law restrictions which would hinder the movement of value around the Group and to its creditors. |
| Unlimited companies | The Group includes a small number of unlimited companies. Based on advice from Weil, to the extent that there is a deficit to creditors in one of these entities it is assumed that the unlimited company would have an unsecured claim against its parent(s). |
| Make-whole provisions | The amount that is shown as owed to each Lender is the outstanding principal amount plus any PIK interest. Based on advice from Weil, no provision has been included in relation to the make-whole provision applicable to the Notes as it is not considered to be applicable in the event of an enforcement. |

AlixPartners

# 3. Key observations and assumptions

| Area | Observation or assumption |
|---|---|
| Litigation | Litigation may represent material upside or downside risk in any formal insolvency. We assume that there is no material litigation arising from the wind-down of individual entities in the Group which may delay the completion of asset realisations and/or distributions to creditors and potentially result in significant additional liquidation costs being incurred. It should be noted that the Group's customers are 'blue chip' groups and they, and the Group's financial creditors, are well resourced and proactive in maximising their positions and as a result there is a risk that recoverable values may reduce and the costs of realisation increase.<br><br>The Analysis excludes any consideration of potential net recoveries from an Office Holder pursuing any claims associated with antecedent or challengeable transactions. |
| Limitations | It should be noted that, by its nature, the Analysis is illustrative of the potential outcomes for the Scheme Creditors in the specified scenarios and should not be interpreted as providing a forecast return to creditors in a controlled wind-down. This is because the Analysis does not capture all potential detriments to return which would further dilute the return to the Scheme Creditors. To the extent that the assumptions used as set out herein do not hold true, or require further refinement, this may have an impact on the conclusions reached and the possible outcome to the Scheme Creditors. |
| Specific reference date | The Analysis has been completed as at a specific point in time. It is based on the unaudited financial position of the Group as at 31 March 2019 and the individual unaudited TBs for each entity in the Group as at this date. As the Group's financial position continues to change over time (and indeed is likely to continue to deteriorate in the absence of a binding restructuring being completed), the possible outcomes for the Scheme Creditors and others derived from the Analysis are also likely to change. |

# 4. Overview of the Analysis

## Summary

| $m | NBV / claim as at 31 March 2019 | Scenario A Net intercompany | | Scenario A Gross intercompany | | Scenario B Net intercompany | | Scenario B Gross intercompany | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total ERV | % | Total ERV | % | Total ERV | % | Total ERV | % |
| **Realisations** | | | | | | | | | |
| Cash | 55.2 | 55.2 | 100% | 55.2 | 100% | 55.2 | 100% | 55.2 | 100% |
| Restricted cash | 35.6 | 19.9 | 56% | 19.9 | 56% | 19.9 | 56% | 19.9 | 56% |
| Receivables | 231.1 | 181.7 | 79% | 181.7 | 79% | 135.5 | 59% | 135.5 | 59% |
| Inventory | 13.8 | 2.8 | 20% | 2.8 | 20% | 1.4 | 10% | 1.4 | 10% |
| Tangible fixed assets | 54.6 | 8.7 | 16% | 8.7 | 16% | 4.6 | 8% | 4.6 | 8% |
| Intangible assets | 121.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Other assets | 89.1 | 5.8 | 6% | 5.8 | 6% | 3.0 | 3% | 3.0 | 3% |
| Tax related assets | 18.6 | 9.1 | 49% | 9.1 | 49% | 9.1 | 49% | 9.1 | 49% |
| Finance assets | 230.9 | 10.1 | 4% | 10.3 | 4% | 7.1 | 3% | 7.3 | 3% |
| | | 293.4 | 35% | 293.6 | 35% | 235.9 | 28% | 236.1 | 28% |
| less: cost of realisations | | (21.7) | | (22.3) | | (15.7) | | (16.2) | |
| **Total** | **850.0** | **271.7** | | **271.3** | | **220.3** | | **219.9** | |
| Liquidity Facility | 15.5 | 15.5 | 100% | 15.5 | 100% | 15.5 | 100% | 15.5 | 100% |
| PCF - Term Loan | 497.4 | 73.8 | 15% | 75.4 | 15% | 54.9 | 11% | 56.4 | 11% |
| PCF - RCF | 107.8 | 32.2 | 30% | 32.6 | 30% | 27.6 | 26% | 28.0 | 26% |
| PCF - ITL | 73.1 | 8.9 | 12% | 9.1 | 12% | 6.6 | 9% | 6.8 | 9% |
| **Total PCF Facilities** | **678.3** | **114.9** | **17%** | **117.0** | **17%** | **89.2** | **13%** | **91.1** | **13%** |
| Notes | 225.0 | 1.8 | 0.80% | 1.8 | 0.81% | 0.6 | 0.28% | 0.7 | 0.29% |
| Other unsecured 3rd party creditors | 305.1 | 43.7 | 14% | 41.2 | 14% | 35.9 | 12% | 33.6 | 11% |
| External shareholders | | 11.3 | | 11.3 | | 8.2 | | 8.2 | |
| **Total** | **1,308.4** | **271.7** | | **271.3** | | **220.3** | | **219.9** | |

Sources: TB; AP working papers

**Alix**Partners    18

564

# 4. Overview of the Analysis

## Sources and uses of value

The table opposite summarises the sources of value and its uses as regards distributions to stakeholders in Scenario A, with gross intercompany balances, as this yields the highest estimated return to the Scheme Creditors.

**Sources of value**

The key sources of value are AR and cash.

Accounts receivable are assumed to be recovered at 80% (60% in Scenario B) of net book value, with lower recoverable values attributed to sales accruals. In our view these are optimistic recoveries and only likely to be achieved where local operations are capable of continuing to operate for a short period, with the support of customers, to mitigate set-off claims for damages or the general challenges of collecting outstanding invoices in a formal insolvency.

The same principles are applied to the AR in syncreon Financing Limited which are pledged to the Existing ABL Lender. In our view it would be challenging for a lender to quickly coordinate funding across relevant OEs to support continued trading, nonetheless the higher recoveries indicate the potential to achieve improved returns.

Given the minimal other creditors in syncreon Financing Limited and syncreon Intermediate Limited, any surplus arising on the AR pledged to the Existing ABL Lender would pass to syncreon Canada Inc. by way of an equity dividend or distribution. The Analysis assumes that the security provided by syncreon Canada Inc. for the benefit of the PCF/LF Lenders does not encompass its investments in subsidiaries although local Canadian counsel has indicated that it is arguable that such assets would be pledged to the PCF/LF Lenders. As a result, it is possible that the estimated returns to the Noteholders are overstated.

Scenario A, with gross intercompany balances

| $m | NBV / claim as at 31 March 2019 | Total ERV | Blended recovery rate |
|---|---|---|---|
| **Realisations** | | | |
| Cash | 55.2 | 55.2 | 100% |
| Restricted cash | 35.6 | 19.9 | 56% |
| Receivables | 231.1 | 181.7 | 79% |
| Inventory | 13.8 | 2.8 | 20% |
| Tangible fixed assets | 54.6 | 8.7 | 16% |
| Intangible assets | 121.1 | - | 0% |
| Other assets | 89.1 | 5.8 | 6% |
| Tax related assets | 18.6 | 9.1 | 49% |
| Finance assets | 230.9 | 10.3 | 4% |
| | | 293.6 | |
| less: cost of realisations | | (22.3) | |
| **Total** | **850.0** | **271.3** | |
| | | | |
| **Distributions:** | | | |
| Sound Point Facility | 84.4 | 84.4 | 100% |
| Liquidity Facility | 15.5 | 15.5 | 100% |
| PCF - Term Loan | 497.4 | 75.4 | 15% |
| PCF - RCF | 107.8 | 32.6 | 30% |
| PCF - ITL | 73.1 | 9.1 | 12% |
| **Total PCF Facilities** | **678.3** | **117.0** | **17%** |
| Notes | 225.0 | 1.8 | 0.81% |
| Other unsecured 3rd party creditors | 305.1 | 41.2 | 14% |
| External shareholders | | 11.3 | |
| **Total** | **1,308.4** | **271.3** | |

Sources: TB; AP working papers

AlixPartners    19

# 4. Overview of the Analysis

## Sources and uses of value (cont'd)

Cash is assumed to be recovered in full where the funds are not restricted. In practice, collection can be compromised such as where funds are capable of being attached by local creditors and it may be that certain Office Holders would decide to use cash to fund continued trading where to do so would be for the benefit of the estate as a whole.

Potential recoveries from $35.6 million of restricted cash has been assessed as follows:

- $15.0 million relates to cash held by syncreon CayFinance Limited and pledged for the benefit of the RCF Facility. This is assumed to be recovered in full.

- There is $1.0 million held in reserve in respect of potential litigation which it is assumed would be recoverable in full.

- A cash backed LC in relation to insurance cover from which we understand there might be an eventual release of approximately $3.9 million.

Other sources of value are less material including:

- Finance assets: the bond and incremental loan assets held by syncreon Intermediate Global Holdings Limited and syncreon CayFinance Limited are valued according to the results of the Analysis as regards estimated returns to those creditors.

- Tangible fixed assets: some recoverable value has been attributed to tangible fixed assets such as equipment, vehicles and racking (see Appendix C for further information).

Scenario A, with gross intercompany balances

| $m | NBV / claim as at 31 March 2019 | Total ERV | Blended recovery rate |
|---|---|---|---|
| **Realisations** | | | |
| Cash | 55.2 | 55.2 | 100% |
| Restricted cash | 35.6 | 19.9 | 56% |
| Receivables | 231.1 | 181.7 | 79% |
| Inventory | 13.8 | 2.8 | 20% |
| Tangible fixed assets | 54.6 | 8.7 | 16% |
| Intangible assets | 121.1 | - | 0% |
| Other assets | 89.1 | 5.8 | 6% |
| Tax related assets | 18.6 | 9.1 | 49% |
| Finance assets | 230.9 | 10.3 | 4% |
| | | 293.6 | |
| less: cost of realisations | | (22.3) | |
| **Total** | **850.0** | **271.3** | |
| | | | |
| **Distributions:** | | | |
| Sound Point Facility | 84.4 | 84.4 | 100% |
| Liquidity Facility | 15.5 | 15.5 | 100% |
| PCF - Term Loan | 497.4 | 75.4 | 15% |
| PCF - RCF | 107.8 | 32.6 | 30% |
| PCF - ITL | 73.1 | 9.1 | 12% |
| **Total PCF Facilities** | **678.3** | **117.0** | **17%** |
| Notes | 225.0 | 1.8 | 0.81% |
| Other unsecured 3rd party creditors | 305.1 | 41.2 | 14% |
| External shareholders | | 11.3 | |
| **Total** | **1,308.4** | **271.3** | |

Sources: TB; AP working papers

# 4. Overview of the Analysis

## Sources and uses of value (cont'd)

### Costs of realisations

A provision is included for the costs of delivering the formal insolvencies or continuing to operate under the control of existing directors as applicable. This is estimated to be 5% of gross realisations which is a conservative estimate in comparison to costs typically seen in the formal insolvencies of complex groups.

Scenario A also includes an estimate of $2.2 million to reflect the potential cost of retaining selected employees for a three month period to assist with monetising the Group's assets, particularly AR.

The model does not include an assessment of the estimated net costs (or profits) from continued trading in Scenario A. The net costs of trading would be heavily influenced by the results of commercial negotiation with the relevant customer whose willingness to continue to trade, to potentially pay more or to amend onerous conditions may be limited. It would be for the local Office Holder and funding creditor to consider whether there would be merit in continuing to trade in light of those customer discussions. To the extent that there are losses from continued trading, these would reduce the return to the Scheme Creditors.

Scenario A, with gross intercompany balances

| $m | NBV / claim as at 31 March 2019 | Total ERV | Blended recovery rate |
|---|---|---|---|
| **Realisations** | | | |
| Cash | 55.2 | 55.2 | 100% |
| Restricted cash | 35.6 | 19.9 | 56% |
| Receivables | 231.1 | 181.7 | 79% |
| Inventory | 13.8 | 2.8 | 20% |
| Tangible fixed assets | 54.6 | 8.7 | 16% |
| Intangible assets | 121.1 | - | 0% |
| Other assets | 89.1 | 5.8 | 6% |
| Tax related assets | 18.6 | 9.1 | 49% |
| Finance assets | 230.9 | 10.3 | 4% |
| | | 293.6 | |
| less: cost of realisations | | (22.3) | |
| **Total** | **850.0** | **271.3** | |
| **Distributions:** | | | |
| Sound Point Facility | 84.4 | 84.4 | 100% |
| Liquidity Facility | 15.5 | 15.5 | 100% |
| PCF - Term Loan | 497.4 | 75.4 | 15% |
| PCF - RCF | 107.8 | 32.6 | 30% |
| PCF - ITL | 73.1 | 9.1 | 12% |
| **Total PCF Facilities** | **678.3** | **117.0** | **17%** |
| Notes | 225.0 | 1.8 | 0.81% |
| Other unsecured 3rd party creditors | 305.1 | 41.2 | 14% |
| External shareholders | | 11.3 | |
| **Total** | **1,308.4** | **271.3** | |

Sources: TB; AP working papers

AlixPartners

# 4. Overview of the Analysis

Sources and uses of value (cont'd)

**Distributions of value**

The assets pledged to the Existing ABL Lender are cash and AR held in syncreon Financing Limited. Any surplus from this is assumed to be passed by way of equity distribution to syncreon Intermediate Limited and then to syncreon Canada Inc where it is expected to be available to creditors generally.

The LF Facility is expected to be repaid in full. The LF Lenders recover a de minimis amount from collateral pledged specifically to them. Substantially all of their recovery is from one Polish subsidiary where the LF Lenders are a material unsecured creditor or from assets pledged to the PCF/LF Lenders where the LF Lenders have super-priority.

Recoveries for the PCF Lenders arise primarily from assets pledged directly to the PCF/LF Lenders with a small amount of value also recovered from relevant unpledged assets where the PCF Lenders are able to rank as an unsecured creditor for any deficit. The PCF Lenders rank Pari Passu amongst themselves in relation to returns from the relevant Obligor Entities. When potential returns from the Specified Allocations are also considered there is variation in the returns amongst the PCF Lenders as the RCF Facility also benefits from the Cash Pledge and the ITL Coupon Pledge.

The limited return to the Noteholders reflects the fact that there are a few assets in the relevant Obligor Entities which have not been pledged for the benefit of the PCF/LF and are therefore available to all unsecured creditors including the Noteholders.

Scenario A, with gross intercompany balances

| $m | NBV / claim as at 31 March 2019 | Total ERV | Blended recovery rate |
|---|---|---|---|
| **Realisations** | | | |
| Cash | 55.2 | 55.2 | 100% |
| Restricted cash | 35.6 | 19.9 | 56% |
| Receivables | 231.1 | 181.7 | 79% |
| Inventory | 13.8 | 2.8 | 20% |
| Tangible fixed assets | 54.6 | 8.7 | 16% |
| Intangible assets | 121.1 | - | 0% |
| Other assets | 89.1 | 5.8 | 6% |
| Tax related assets | 18.6 | 9.1 | 49% |
| Finance assets | 230.9 | 10.3 | 4% |
| | | 293.6 | |
| less: cost of realisations | | (22.3) | |
| **Total** | **850.0** | **271.3** | |
| **Distributions:** | | | |
| Sound Point Facility | 84.4 | 84.4 | 100% |
| Liquidity Facility | 15.5 | 15.5 | 100% |
| PCF - Term Loan | 497.4 | 75.4 | 15% |
| PCF - RCF | 107.8 | 32.6 | 30% |
| PCF - ITL | 73.1 | 9.1 | 12% |
| **Total PCF Facilities** | **678.3** | **117.0** | **17%** |
| Notes | 225.0 | 1.8 | 0.81% |
| Other unsecured 3rd party creditors | 305.1 | 41.2 | 14% |
| External shareholders | | 11.3 | |
| **Total** | **1,308.4** | **271.3** | |

Sources: TB; AP working papers; Note: external shareholders are syncreon Global Holdings Limited; JV partner in Liaoning LIF & TDS Warehousing Co., Limited

AlixPartners    22

568

# 4. Overview of the Analysis

## Estimated returns to the PCF Lenders

The Analysis estimates returns to the Scheme Creditors from the relevant Obligor Entities compared to their par debt of between 11% and 15%.

The PCF Lenders benefit from full asset security in respect of all of the relevant Obligor Entities except for:

- Those entities in Germany, Hungary and Poland where certain assets are not pledged; and

- Certain investments which are not pledged including those in syncreon Intermediate Limited, syncreon Ireland A Limited, syncreon Technology Hungary KFT, Liaoning LIF & TDS Warehousing Co Limited, syncreon A LLC and syncreon US Holdings Inc.

Whilst the majority of the PCF Lenders recovery is from pledged assets in the Obligor Entities, they also recover value from:

- The Cash Pledge;

- The ITL Coupon Pledge; and

- A share of assets available to unsecured creditors in the relevant Obligor Entities where as a general guide the PCF/LF Lenders comprise approximately 65% to 70% of the unsecured creditors.

Scenario A, with gross intercompany balances: PCF/LF Lenders

| Facility $m | LF | PCF Term Loan | RCF | ITL | Total |
|---|---|---|---|---|---|
| Total amount owed to the LF/PCF Lenders | (15.5) | (497.4) | (107.8) | (73.1) | (693.8) |
| **Total estimated amount available to the LF/PCF Lenders** | | | | | **132.5** |
| Allocated as follows: | | | | | |
| 1  Repayment of LF Debt given super-priority status | 15.5 | - | - | - | 15.5 |
| 2  Allocation of the remainder pari passu to the original debt | - | 75.4 | 16.3 | 11.1 | 102.8 |
| **Estimated distributions from the Obligor Entities** | **15.5** | **75.4** | **16.3** | **11.1** | **118.3** |
| *Return to the LF/PCF Lenders* | *100%* | *15%* | *15%* | *15%* | |
| 3  Specifically pledged collateral being $15m cash held by KY12 (less 5% costs) available to the RCF Lenders | - | - | 14.3 | - | 14.3 |
| 4  Specifically pledged collateral being return on the coupon loans of c$13m held by KY11/12 available to the RCF Lenders | - | - | 2.0 | (2.0) | - |
| **Total estimated distributions to the LF/PCF Lenders** | **15.5** | **75.4** | **32.6** | **9.1** | **132.5** |
| *Total return to the LF/PCF Lenders* | *100%* | *15%* | *30%* | *12%* | |

Sources: TB; AP working papers

# 4. Overview of the Analysis

Estimated returns to the PCF Lenders (cont'd)

Actual recoveries for the PCF Lenders in the event of a controlled wind-down could be diluted due to the Analysis for the following reasons:

- Not including additional unsecured claims such as employee severance claims, landlords claims for breach of contract, customer claims for damages, contingent liabilities associated with litigation and parent company guarantees. These would dilute the share of the available assets that would pass to the PCF Lenders.

- Not including priority or preference claims as applicable to each jurisdiction. If included, these could reduce the amount available to all unsecured creditors generally including the PCF Lenders where applicable.

Recoveries could be enhanced due to the following, although these are unlikely to be sufficient to increase the return to the PCF Lenders to match the estimated returns offered under the Schemes:

- Distributions or dividends from syncreon Intermediate Limited to syncreon Canada Inc (arising from a surplus after repayment of the Existing ABL Lender) may be subject to the PCF/LF Lenders' security as local counsel has indicated that are good arguments for this.

- Further security being granted to the LF Lenders which, to the extent it has value, will increase the share available to the PCF Lenders from their shared security arrangements.

**Alix**Partners    24

# 4. Overview of the Analysis

Estimated returns to the Noteholders

The Analysis estimates that the return to the Noteholders would be de minimis and likely to be less than 1%. The return arises due to there being some assets within the relevant Obligor Entities which are not pledged for the benefit of the PCF/LF Lenders and so are available to unsecured creditors generally. These unsecured creditors include the Noteholders and the PCF/LF Lenders for any deficit after consideration of recoveries from assets pledged to them.

As a general guide, in the Analysis the Noteholders recover approximately 18% to 27% of the value of the assets available to general unsecured creditors in the relevant Obligor Entities. However, these recoveries could be diluted in the event of an actual controlled wind-down due to the Analysis:

- Not including additional unsecured claims such as employee severance claims, landlords claims for breach of contract, customer claims for damages, contingent liabilities associated with litigation and parent company guarantees. These would dilute the share of the available assets that would pass to the Noteholders.

- Not including priority or preference claims as applicable to each jurisdiction. If included, these could reduce the amount available to all unsecured creditors generally including the Noteholders.

- Assuming that distributions or dividends from syncreon Intermediate Limited to syncreon Canada Inc. (arising from a surplus after repayment of the Existing ABL Lender) would not be subject to the PCF/LF Lenders' security and therefore available to unsecured creditors. Canadian counsel has indicated that there are arguments that the value could be pledged to the PCF/LF Lenders and, if that is the case, the amount estimated to be recoverable by the Noteholders would be significantly reduced.

- Not including the further security which it is planned to be granted for the benefit of the LF Lenders.

As a result, the actual return to the Noteholders could be materially less than the already low return as represented in the Analysis.

# Appendix A

## EPM methodology

The diagram opposite summarises the approach to preparing the EPM which supports the Analysis. An EPM is an integrated financial model which provides an analysis of assets and liabilities on an entity by entity basis, to facilitate an assessment of return to a group's creditors.

**Entity balance sheets:** the Group provided unaudited trial balances for each of the entities that are either wholly owned, or in which the Group has a controlling interest. These trial balances were provided in US GAAP as at 31 March 2019 in local reporting currency. Due to multiple reporting currencies used within the trial balance data, balances held in currencies other than the Group's reporting currency, USD, were revalued at FX rates used by the Group at March 2019.

**Scenario establishment:** We formed a view as to the likely opportunities to enhance value in a controlled wind-down scenario in conjunction with the Group's advisors. A summary of the considerations was shared with Management.



# Appendix A

EPM methodology (cont'd)

**Recovery assumptions**: an assessment of the potential recoverability of the Group's assets in two scenarios was developed, supported by additional management information, with Scenario A recognising the opportunity to enhance recoveries through certain entities continuing to trade in the short term. The assumptions used in preparing the Analysis are discussed in Sections 3 and 4 and are outlined in further detail in Appendix C.

**Insolvency priorities applied:** Weil provided a summary of the security granted to the Lenders by the Group. The estimated asset realisations were applied in the general order of repayment when a company enters into an insolvency process. The Analysis did not take account of the relevant insolvency priorities in the jurisdiction of each entity's incorporation nor of certain contingent liabilities.

**Scenario analysis:** the outcome of this work allowed an assessment of the range of potential recoveries to the PCF Lenders and Noteholders from the hypothetical scenarios posed above. The results should be read in conjunction with this report.



# Appendix B

Key sources of information

In preparing the Analysis, we have utilised the following key sources of information:

- the unaudited trial balances for each entity in the Group as at 31 March 2019
- the Group's intercompany matrix as at 31 March 2019
- a summary of restricted cash balances as at 31 March 2019, incorporating details of open LCs
- discussions with Management, including Robert Adams, and the Group's Advisors
- access to certain waterfall analysis prepared by PJT and their views on the potential to sell the business in parts
- details of security granted by each Group entity, as well as views on inter-creditors priorities, from Weil
- Group structure charts as at 23 February 2019 and 8 March 2019, including ownership data
- cash management documentation including sample cash pooling agreements
- a summary of outstanding litigation with Group entities as plaintiff and defence
- a detailed schedule of accounts receivable due to each entity in the Group as at 31 March 2019
- TWCF forecast dated 30 May 2019, and actual results for the period from w/e 29 March 2019, together with supporting data
- the BB Forecast dated 1 May 2019
- the Group's Business Plan

Additional information and documentation provided by Management on various other matters was accessed through the data room and/or provided during calls with Management.

**AlixPartners**    28

574

# Appendix C

Key assumptions: assets

The comments set out below relate to the estimated realisable value of assets applied in each of Scenarios A and B.

| Description | NBV ($m) | Recovery estimate: Scenario A | Recovery estimate: Scenario B | Comments |
|---|---|---|---|---|
| **Cash** | 55 | 100% | 100% | It is assumed that cash held in bank accounts is liquid, easily accessible and fully recoverable where unrestricted subject to any cash pool/intercompany agreements. In practice, this can be compromised such as where funds are capable of being attached by local creditors. |
| **Restricted cash** | 36 | var | var | Restricted cash is assumed to be unrecoverable in all instances except for:<br><br>• restricted cash of $1 million in syncreon Financing Limited which relates to funds being held in the event of any potential litigation, as required by the Existing ABL Facility agreement.<br><br>• $15 million of cash held by syncreon CayFinance Limited and pledged for the benefit of the RCF.<br><br>• A cash-backed LC in relation to insurance cover from which we understand there might be an eventual release of approximately $3.9 million.<br><br>A significant amount of the remaining restricted cash is used to support LCs provided to landlords. On the assumption that it might reasonably take at least one year for the premises to be re-let for value, then effectively substantially all of these LCs would likely be called in full and the cash collateral utilised. |
| **Accounts receivable** | 231 | Billed AR 80%<br><br>Cut-off accrual 30% | Billed AR 60%<br><br>Cut-off accrual 10% | Accounts receivable (including any cut-off accruals) are assumed to be recovered at 80% (60% in Scenario B) of net book value with lower values of 30% and 10% attributed to non cut-off sales accruals. In our view these are optimistic recoveries and only likely to be achieved where local operations are capable of continuing to operate for a short period, with the support of customers, to mitigate set-off claims for damages or the general challenge of outstanding invoices.<br><br>The same principles are applied to the accounts receivable in syncreon Financing Limited which are pledged to the Existing ABL Facility. In our view it would be challenging for a lender to coordinate funding across relevant OEs to support continued trading. Nonetheless, the higher recoveries indicate the potential to achieve improved returns. Any surplus following the repayment of amounts owed to the Existing ABL Lender is recognised as an asset available to other creditors. |

**AlixPartners**    29

575

# Appendix C

Key assumptions: assets (cont'd)

| Description | NBV ($m) | Recovery estimate: Scenario A | Recovery estimate: Scenario B | Comments |
|---|---|---|---|---|
| **Inventory** | 14 | 20% | 10% | Inventory comprises work in progress and finished goods. In both scenarios we assume that all customers would be lost as the business winds down. Each entity holding inventory may be left with excess undesirable stock, some of which may be sold at a discounted rate. We have therefore attributed minimal recovery percentages in both scenarios. |
| **Tangible fixed assets** | 55 | var | var | Tangible fixed assets include:<br><br>• Buildings (100% in both Scenarios) – relates to one building with minimal value ($0.2 million) held by syncreon Automotive (UK) Limited. It is assumed the building's full value is recovered in each scenario.<br><br>• Leasehold improvements (0% in both Scenarios) – relates to the capitalised costs of improvement works to leasehold properties which could never be recovered, regardless of the scenario. There is no legal obligation for any of the landlords to repay the relevant company for any of these works.<br><br>• Construction in progress (30% Scenario A, 30% Scenario B) – relates to capitalised fixed IT infrastructure costs not yet used. We have therefore assumed the condition of these assets may be good and so have attributed some recovery value to each scenario.<br><br>• Plant machinery, equipment and vehicles – (20% Scenario A, 10% Scenario B) – Relates to warehouse equipment and vehicles. We have attributed a low recovery percentage to PM&E which includes vehicles, as it is assumed the condition of these assets are used but may have some recovery value in each scenario.<br><br>• Racks (10% Scenario A, 5% Scenario B) – in our experience minimal value is recoverable from racking and in some instances can create a liability for its removal. Therefore, we have assumed a low recovery percentage in each scenario.<br><br>• Office equipment and furniture (20% Scenario A, 10% Scenario B) – we do not anticipate that used office equipment and furniture would realise significant value in either scenario and so a low recovery percentage is reflected in each case. |

**AlixPartners**

# Appendix C

Key assumptions: assets (cont'd)

| Description | NBV ($m) | Recovery estimate: Scenario A | Recovery estimate: Scenario B | Comments |
|---|---|---|---|---|
| Intangible assets | 121 | 0% | 0% | Intangible assets comprise of goodwill and IT software. We have assumed that in each there is no goodwill in any of the group entities and a nil recovery has been attributed in both scenarios. As we understand, there could be minimal value in bespoke IT software where it has been developed for a particular customer, but no value has been included here. |
| Other assets | 89 | var | var | Includes prepayments and deposits, sales accruals (non-cutoff) and other current and long term assets. No recoverable value is assumed for prepayments and deposits as we expect any potential value would be offset by creditor balances and counter claims against each entity. We have attributed minimal value in each scenario to other assets (10% Scenario A, 5% Scenario B) as we understand they include a portion of costs to be recovered in relation to AR. <br><br> A higher recovery assumption of 30% (Scenario A) and 10% (Scenario B) has been included for non cut-off sales accruals as it is considered possible that a portion of these accruals could be converted into AR. |
| Tax related assets | 18 | var | var | Tax related assets include deferred tax, net VAT receivable and recoverable tax. It is assumed there is zero recoverability of deferred tax in each scenario as each entity is no longer a going concern. <br><br> Net VAT receivable and other recoverable taxes are assumed to be fully recovered in each scenario. |
| Finance assets | 231 | per analysis | per analysis | Finance assets relate to the Group's holding of the Notes as well as the Incremental Term Loans. The recovery in each scenario is driven by the expected return to unsecured creditors as a result of all other assumptions in the model. |
| Total | 850 | | | |

The estimated recoverable value of intercompany receivables and investments in subsidiaries are each calculated within the EPM based on the ERV of the relevant entities assets and their respective creditors' claims.

AlixPartners

# Appendix C

Key assumptions: the Lenders and their security

The table below shows the direct borrower of each facility. Guarantors to the facilities are included on the following page. Assets pledged as security to the Lenders are assumed to be valid. It is assumed that the Lenders would ensure their security is perfected in advance of any enforcement or insolvency filing.

| Facility | Borrower(s) | Comments |
|---|---|---|
| LF Facility | syncreon Group B.V.<br>syncreon Global Finance (US) Inc. | The LF Facility is understood to benefit from super priority in respect of returns from assets pledged to both the LF Lenders and the PCF Lenders. In addition, there are a small number of Group entities which have pledged assets specifically to the LF Facility (see following pages). |
| PCF Facilities | **RCF:**<br>syncreon Group B.V.<br>syncreon Canada Inc [1]<br>syncreon Treasury Services Limited[1]<br>**Term Loan:**<br>syncreon Group B.V.<br>syncreon Global Finance (US) Inc<br>**Incremental Term Loan:**<br>syncreon Group B.V. | The PCF Facilities are understood to benefit from assets pledged to both the LF Lenders and the PCF Lenders. The various tranches of the PCF Facilities are assumed to rank Pari Passu. It is understood that there is no intercreditor agreement between the PCF Lenders and the Noteholders. |
| Existing ABL Facility | syncreon Financing Limited | The Existing ABL Facility is provided to syncreon Financing Limited which then distributes funding to the OEs through intercompany loans. |
| Notes | syncreon Group B.V. | syncreon Group B.V is the Note issuer with certain of the Notes held by syncreon CayFinance Limited. It is understood that the make-whole provisions would not be applicable in either Scenarios modelled. |

**AlixPartners**

# Appendix C

## Key assumptions: the Lenders and their security (cont'd)

The table below summarise the entities which have pledged all asset security to the PCF Lenders and/or LF Lenders.

| Entity | Exclusions | PCF/LF Facility borrower/ Guarantor | LF Facility only borrower/ Guarantor | Notes borrower /Guarantor |
|---|---|:---:|:---:|:---:|
| **PCF/LF Lenders only** | | | | |
| syncreon Canada Inc. | Investment in subsidiary syncreon Intermediate Limited. | ✓ | | ✓ |
| syncreon Ireland Unlimited Company | Investment in subsidiary syncreon Ireland A Limited. | ✓ | | ✓ |
| syncreon Holdings Limited | | ✓ | | ✓ |
| syncreon Global (Ireland) Designated Activity Co | | ✓ | | ✓ |
| syncreon European Holdings Unlimited Company | | ✓ | | ✓ |
| syncreon EMEA Unlimited Company | | ✓ | | ✓ |
| syncreon Treasury Services Limited | | ✓ | | ✓ |
| syncreon International Group | Investment in subsidiary syncreon Technology Hungary KFT | ✓ | | ✓ |
| syncreon Ireland Holdings Limited | | ✓ | | ✓ |
| Walsh Western Finance B.V. | | ✓ | | ✓ |
| syncreon Netherlands B.V. | Investment in all subsidiaries | ✓ | | ✓ |
| syncreon Ireland B.V. | | ✓ | | ✓ |
| syncreon Group B.V | | ✓ | | ✓ |
| syncreon (IOM) Limited | | ✓ | | ✓ |
| syncreon America Inc. | Investment in subsidiary syncreon A LLC | ✓ | | ✓ |
| syncreon Acquisition Corp. | Investment in subsidiaries Liaoning LIF & TDS Warehousing Co., Limited and syncreon.US Holdings Inc. | ✓ | | ✓ |
| syncreon South America Holdings Inc. | | ✓ | | ✓ |
| syncreon Technology (USA) LLC | Investment in subsidiary syncreon A LLC | ✓ | | ✓ |
| syncreon Technology (America) Inc. | Investment in subsidiary syncreon A LLC | ✓ | | ✓ |
| syncreon Technology (UK) Limited. | | ✓ | | ✓ |
| syncreon Automotive (UK) Limited. | | ✓ | | ✓ |
| syncreon UK Holdings Limited | | ✓ | | ✓ |
| syncreon Group Holdings B.V | Share pledge | ✓ | | ✓ |
| syncreon Ireland Acquisition Designated Activity Company | | ✓ | | ✓ |
| syncreon Global Finance (US) Inc. | | ✓ | | ✓ |
| **LF Lenders only** | | | | |
| syncreon Asia Holdings (UK) Limited | NB Share pledge is for benefit of the PCF/LF Lenders | | ✓ | |

**Alix**Partners    33

579

# Appendix C

Key assumptions: the Lenders and their security (cont'd)

The table below summarises the entities which have pledged specific asset security to certain of the Lenders:

| Entity | Cash | Accounts receivable | Intercompany receivable | Investment in subsidiaries | Share pledge | PCF/LF Guarantor | LF only Guarantor | Notes Guarantor |
|---|---|---|---|---|---|---|---|---|
| **Existing ABL Lender** | | | | | | | | |
| syncreon Financing Limited. | ✓ | ✓ | | | | | | |
| **LF Lenders only** | | | | | | | | |
| syncreon Technology Hungary KFT | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | |
| syncreon (IOM) Holdings Unlimited | ✓ | ✓ | ✓ | ✓ | ✓ (PCF/LF) | | ✓ | |
| syncreon Logistics Polska Sp. Z.o.o. | | | | | ✓ | | ✓ | |
| syncreon South Africa (Pty) Limited. | | | | | ✓ | | | |
| syncreon Rus Holding B.V. | | | | | ✓ | | | |

**Alix**Partners    34

580

# Appendix C

Key assumptions: the Lenders and their security (cont'd)

The table below summarises the entities which have pledged specific asset security to certain of the Lenders:

| Entity | Cash | Accounts receivable | Intercompany receivable | Investment in subsidiaries | Share pledge | PCF/LF Guarantor | LF only Guarantor | Notes Guarantor |
|---|---|---|---|---|---|---|---|---|
| **PCF/LF lenders** | | | | | | | | |
| syncreon Deutschland GmbH | ✓ | ✓ | | | ✓ | ✓ | | ✓ |
| Total Distribution Systems Deutschland GmbH | ✓ | ✓ | | ✓ | ✓ | ✓ | | ✓ |
| syncreon Hungary kft | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| syncreon Polska Sp z.o.o. | ✓ | | | | ✓ | ✓ | | ✓ |
| syncreon Australia pty Limited. | | | | | ✓ | | | |
| syncreon International Trading (Shanghai) Co., Limited. | | | | | ✓ | | | |
| Logit Services GmBH | | | | | ✓ | | | |
| syncreon Spain S.A. | | | | | ✓ | | | |
| syncreon Mexico S de RL de CV | | | | | ✓ | | | |
| syncreon Slovakia s.r.o | | | | | ✓ | | | |
| syncreon Logistica S.A. | | | | | ✓ | | | |
| Fuschia Limited | | | | ✓ (to LF only) | ✓ | | | |
| syncreon Luxembourg Holdings SARL | | | | | ✓ | | | |

# Appendix C

Key assumptions: the Lenders and their security (cont'd)

The table below summarises the entities which have not pledged any assets as security to any of the Lenders.

| Entity |
|---|
| Compuspar Argentina S.A. |
| Arcesesyncreon S.P.A. |
| syncreon Services Mexico S.C. |
| syncreon Middle East DWC-LLC |
| syncreon ATM S.L. |
| syncreon Logistics S.L. |
| Liaoning LIF & TDS Warehousing Co., Limited |
| Compuspar Mexico SA de CV |
| syncreon Borderland S. de R.L. de C.V. |
| syncreon Rus OOO |
| syncreon (Yangshan) Co., Limited |
| syncreon Global Holdings Limited |
| syncreon Ireland A Limited. |
| syncreon Ireland B Limited. |
| syncreon Intermediate Limited. |
| syncreonSolucoes Logisticas Limitada |
| syncreon Servicos de Armazenamento do Brasil Limiteda. |
| syncreon.US Holdings Inc. |
| syncreon A LLC |
| syncreon B LLC |
| syncreon Genk BVBA |
| syncreon.US Inc |

| Entity |
|---|
| syncreon Intermediate Limited. |
| syncreonSolucoes Logisticas Limitada |
| syncreon Servicos de Armazenamento do Brasil Limiteda. |
| syncreon.US Holdings Inc. |
| syncreon A LLC |
| syncreon B LLC |
| syncreon Genk BVBA |
| syncreon.US Inc |
| syncreon Intermediate Global Holdings Limited |
| syncreon Global S.a.r.l. |
| syncreon CayFinance Limited |
| syncreon Netherlands A B.V. |

**AlixPartners** 36

582

# Appendix D

## Disclaimer

The Analysis makes assumptions regarding the extent and validity of security provided to the Scheme Creditors and other lenders to the Group. It also includes assumptions as to the ranking of creditors' claims in jurisdictions outside of the UK. These assumptions are based on information provided to AlixPartners by the Company's legal advisors.

This Report and the Analysis is based on information and explanations provided to AlixPartners by the Group's management and their advisors which have not been subject to independent verification, audit or checking, and to the extent that information or explanations are incomplete, our conclusions may change. Accordingly, AlixPartners assumes no liability whatsoever and makes no representations or warranties, express or implied, in relation to the contents of this Report or the Analysis, including their accuracy, completeness or verification or for any other statement made or purported to be made by or on behalf of the Company, the Scheme Companies or AlixPartners.

The Analysis has been completed as at a specific point in time, in this case, based on the unaudited financial position of the Group as at 31 March 2019 and information and explanations provided to AlixPartners as at 10 June 2019. The Analysis does not incorporate the effects, if any, of events and circumstances which may have occurred or information which may have come to light subsequent to these dates unless specifically stated. AlixPartners make no representation as to whether, had AlixPartners carried out such work or made such inquiries, there would have been a material effect on the Analysis.

The work AlixPartners has been engaged to carry out does not constitute an audit of the Company's or the Scheme Companies' financial position and AlixPartners is not in a position to provide an opinion as to the veracity of information it has received nor should any opinions of AlixPartners be regarded as a substitute for an audit opinion which can only be provided by the Group's auditors.

The Group's financial forecasts and projections are, by their nature, speculative and include estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro or macro economic developments, business or industry events, or the inability of the Group to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions involve elements of subjective judgment, are beyond the control of the Group and are inherently subject to substantial uncertainty. Consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The numbers presented in this report may contain minor rounding errors.

**Alix**Partners

**WHEN IT REALLY MATTERS.**

©2019 AlixPartners, LLP.