**Exhibit E**

**Restructuring Support Agreement**

**Weil, Gotshal & Manges (London) LLP**
110 Fetter Lane
London EC4A 1AY
+44 20 7903 1000 main tel
+44 20 7903 0990 main fax
weil.com



*EXECUTION VERSION*

**21 May 2019**

**RESTRUCTURING SUPPORT AGREEMENT**

**between**

**SYNCREON GROUP HOLDINGS B.V.**
**as the Company**

**SYNCREON GROUP B.V.**
**as the Borrower/Issuer**

**THE ORIGINAL GROUP COMPANIES**
**as Company Parties**

**THE ORIGINAL PARTICIPATING CREDITORS**
**as Participating Creditors**

**CERTAIN ENTITIES**
**as Shareholder Parties**

**and**

**LUCID ISSUER SERVICES LIMITED**
**as Information Agent**

## TABLE OF CONTENTS

**Page No.**

1    INTERPRETATION ................................................................................................................1

2    EFFECTIVENESS................................................................................................................17

3    PARTIES' RIGHTS AND OBLIGATIONS...........................................................................19

4    GENERAL UNDERTAKINGS .............................................................................................20

5    PARTICIPATING CREDITOR PERMITTED TRANSFERS ....................................................33

6    LIMITATIONS....................................................................................................................35

7    THE INFORMATION AGENT .............................................................................................37

8    TERMINATION...................................................................................................................37

9    REPRESENTATIONS AND WARRANTIES .........................................................................44

10   SPECIFIC PERFORMANCE ................................................................................................45

11   CONFIDENTIALITY ...........................................................................................................46

12   PUBLICITY.........................................................................................................................47

13   AMENDMENTS ..................................................................................................................47

14   TAX ...................................................................................................................................48

15   REMEDIES AND WAIVERS................................................................................................49

16   RESERVATION OF RIGHTS ...............................................................................................49

17   MISCELLANEOUS .............................................................................................................49

18   NOTICES............................................................................................................................50

19   GOVERNING LAW AND JURISDICTION ...........................................................................50

20   AGENT FOR SERVICE OF PROCESS .................................................................................50

SCHEDULE 1 ORIGINAL GROUP COMPANIES ......................................................................52

SCHEDULE 2 CREDITOR ACCESSION DEED ..........................................................................53

SCHEDULE 3 SUB-PARTICIPANT ACCESSION DEED .............................................................54

SCHEDULE 4 GROUP COMPANY ACCESSION DEED..............................................................56

SCHEDULE 5 RESTRUCTURING TERM SHEET........................................................................57

**THIS RESTRUCTURING SUPPORT AGREEMENT** (including the Schedules annexed hereto, this "**Agreement**") is made as of 21 May 2019 among the following parties:

(1)    **SYNCREON GROUP HOLDINGS B.V.**, a private limited company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, with its official seat in Amsterdam, the Netherlands, registered with the Dutch commercial register under number 58621008 and with its official address at Athenastraat 6, 5047RK Tilburg (the "**Company**");

(2)    **SYNCREON GROUP B.V.**, a private limited company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, with its official seat in Amsterdam, the Netherlands, registered with the Dutch commercial register under number 58623701 and with its official address at Athenastraat 6, 5047RK Tilburg (the "**Borrower/Issuer**");

(3)    **THE COMPANIES LISTED IN SCHEDULE 1 (ORIGINAL GROUP COMPANIES)** (the "**Original Group Companies**");

(4)    **THE CREDITORS** that have signed this Agreement as of the date hereof, in their respective capacities as Participating Liquidity Facility Lenders, Participating PCF Lenders and/or Participating Noteholders (as each is defined herein), as applicable, as set forth in the applicable signature pages hereto (the "**Original Participating Creditors**");

(5)    (A) **SYNCREON GLOBAL HOLDINGS LIMITED, SYNCREON INTERMEDIATE GLOBAL HOLDINGS LIMITED, SYNCREON CAYFINANCE LIMITED, SYNCREON NETHERLANDS A B.V. AND SYNCREON GLOBAL S.À R.L.**, in their capacity as direct or indirect holders of equity interests in, or sister companies of, the Company; and (B) **HORIZON SUPER HOLDINGS L.P. (CAYMAN), GENNX360 SYNCREON INVESTORS, LLC, BRIAN J.P. ENRIGHT AND THE WYCHWOOD TRUST**, in their capacity as direct or indirect holders of equity interests in syncreon Global Holdings Limited (collectively, (A) and (B), the "**Shareholder Parties**"); and

(6)    **LUCID ISSUER SERVICES LIMITED** (the "**Information Agent**").

**WHEREAS**

(A)    In light of the current financial position of the Group, the Company and a substantial number of its stakeholders, including the Original Participating Creditors and the Shareholder Parties, have been engaged in negotiations with the objective of reaching an agreement for the financial restructuring of the Group.

(B)    The Parties have agreed in principle to the terms of a financial restructuring of the Group on the terms set out in this Agreement.

**THE PARTIES, in consideration for the mutual undertakings provided by each of the other Parties hereto, AGREE AS FOLLOWS:**

**1      INTERPRETATION**

**1.1    Definitions**

In this Agreement the following words and expressions and abbreviations have the following meanings, unless the context otherwise requires (provided that capitalized terms used but not defined in this Clause 1.1 (*Definitions*) shall have the meaning given to them in the Restructuring Term Sheet):

"**ABL Commitment Letter**" means a commitment letter and related term sheet in respect of the provision of the New ABL Credit Facility;

"**ABL Credit Agreement**" means that certain credit agreement originally dated as of 9 March 2018 among syncreon Financing Ltd., as borrower, the ABL Lenders and Wells Fargo Bank, N.A., as administrative and collateral agent, relating to a secured receivables facility;

"**ABL Lender**" means each "Lender" under and as defined in the ABL Credit Agreement;

"**Acceded Voting Sub-Participant**" means any sub-participant of any Locked-up Bank Debt that is the subject of a Voting Sub-Participation which has acceded to this Agreement as a Participating Lender by executing a Sub-Participant Accession Deed in accordance with Clause 2.3 (*Sub-Participant Accession*);

"**Accession Deed**" means a Creditor Accession Deed, a Sub-Participant Accession Deed or a Group Company Accession Deed;

"**Ad Hoc Group**" means collectively, the ad hoc group of Liquidity Facility Lenders and PCF Lenders represented by the Ad Hoc Group Advisers, from time to time;

"**Ad Hoc Group Advisers**" means Evercore Group L.L.C. and Jones Day, as financial advisers and legal advisers, respectively, to the Ad Hoc Group, and such other professional advisers as the Ad Hoc Group has retained or may reasonably retain in connection with the Restructuring from time to time;

"**Additional Group Company**" means each Affiliate of the Company that becomes a Party as a Group Company after the date of this Agreement in accordance with Clause 2.4 (*Group Company Accession*);

"**Additional Participating Creditor**" means any Creditor (or any fund or other entity advising or managing a Creditor that is acting on behalf of that Creditor) that becomes a Party as a Participating Creditor after the date of this Agreement in accordance with Clause 2.2 (*Creditor Accession)*;

"**Additional Participating Lender**" means any Participating Lender (or any fund or other entity advising or managing a Participating Lender that is acting on behalf of that Participating Lender) that becomes a Party as a Participating Lender after the date of this Agreement in accordance with Clause 2.2 (*Creditor Accession)* or Clause 2.3 (*Sub-Participant Accession)*;

"**Adviser**" means each of the Ad Hoc Group Advisers and the HoldCo Advisers;

"**Affiliate**" means with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person and for the purposes of this definition, "**control**" shall mean the power, direct or indirect, to (a) vote on more than 50 percent of the securities having ordinary voting power for the election of directors of such person, or (b) direct or cause the direction of the management and policies of such person whether by contract or otherwise; *provided that* for purposes of this Agreement, none of the Group, including the Borrower/Issuer, shall be or be deemed to be an Affiliate of the HoldCo Group Parties, the other Shareholder Parties or other affiliates of the Shareholder Parties;

"**Aggregate Locked-up Debt**" means the Aggregate Locked-up Notes or the Aggregate Locked-up PCF Debt, as applicable;

"**Aggregate Locked-up Liquidity Facility Debt**" means, as of any date of calculation, the aggregate outstanding principal amount of Locked-up Liquidity Facility Debt as of such date;

"**Aggregate Locked-up Notes**" means, as of any date of calculation, the aggregate outstanding principal amount of Locked-up Notes as of such date;

"**Aggregate Locked-up PCF Debt**" means, as of any date of calculation, the aggregate outstanding principal amount of Locked-up PCF Debt as of such date;

"**Agreement**" has the meaning given to it in the preamble to this Agreement;

"**Allocations Spreadsheet and Funds Flow**" means the allocations spreadsheet and funds flow documenting, among other distributions and payments, the distribution of the new debt and equity instruments to the Liquidity Facility Lenders, PCF Lenders and Noteholders, the payment of the Evidenced Restructuring Effective Date Adviser Fees and the funding and application of the New Money Commitment in accordance with the Restructuring Term Sheet;

"**Alternative Restructuring**" has the meaning given to it in Clause 4.2(c)(iii);

"**Amendment Agreement to the Liquidity Facility Agreement**" means an amendment agreement in respect of the Additional Liquidity Facility Amount in form and substance consistent in all material respects with the Restructuring Term Sheet;

"**Amendment Agreement to the Parent Credit Facility Agreement**" means an amendment agreement to the Parent Credit Facility Agreement in form and substance consistent in all material respects with the Restructuring Term Sheet and as required to effectuate the Amendment Agreement to the Liquidity Facility Agreement;

"**Authorization**" means any authorization, consent, approval, resolution, license, exemption, filing, notification, notarization or registration;

"**Backstop Agreement**" means a backstop agreement in respect of, among other things, the commitment of certain members of the Ad Hoc Group, as backstop parties, to backstop 100% of the New Money Commitment;

"**Bank Debt**" means any Liquidity Facility Debt or any PCF Debt;

"**Bank Debt Beneficial Owner**" means, with respect to any Locked-up Bank Debt or other Bank Debt:

**(a)**      the lender of record in respect of such Locked-Up Bank Debt or other Bank Debt; or

**(b)**      to the extent that the relevant lender of record has granted a Voting Sub-Participation in respect of such Locked-Up Bank Debt and the relevant sub-participant has become an Acceded Voting Sub-Participant, the relevant Acceded Voting Sub-Participant;

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time;

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware;

"**Beneficial Owner**" means a Bank Debt Beneficial Owner or a Notes Beneficial Owner, as applicable;

"**Borrower/Issuer**" has the meaning given to it in the preamble to this Agreement;

"**Borrower/Issuer Scheme**" means any scheme of arrangement under part 26 of the Companies Act to be proposed by the Borrower/Issuer as a means of implementing all or part of the Restructuring;

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Amsterdam and New York;

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

"**Canadian Proceedings**" means any recognition proceedings pursuant to part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c, C-36 as amended to be commenced by the

Scheme Companies, each in its capacity as foreign representative, as a means of seeking recognition of the Schemes;

"**Canadian Proceedings Documentation**" means all documents to be filed with the Canadian Court in the Canadian Proceedings in connection with the recognition of the Schemes;

"**Canadian Recognition Order**" means, in respect of the Schemes, a recognition order from the Canadian Court entered in the Canadian Proceedings;

"**CayCo**" means syncreon CayFinance Limited;

"**Chapter 15 Order**" means, in respect of the UK Guarantor Scheme, a recognition order from the Bankruptcy Court entered in the U.S. Proceedings;

"**Cleansing Material**" shall have the meaning ascribed to such term in the Confidentiality Agreements;

"**Companies Act**" means the Companies Act 2006;

"**Company**" has the meaning given to it in the preamble to this Agreement;

"**Company Party**" means each of the Company, the Borrower/Issuer and the Group Companies;

"**Conditions Precedent**" means the Company has paid (or caused to be paid) in full in cash all Evidenced Effective Time Adviser Fees in respect of which the Company has received applicable invoices at least three (3) Business Days prior to the Effective Time;

"**Confidential Information**" means the contents of this Agreement, the identity of any Participating Creditor and the amount of Debt held by any Participating Creditor, except to the extent such information is or becomes public information other than as a direct or indirect result of any breach of Clause 11 (*Confidentiality*);

"**Confidentiality Agreements**" means the confidentiality agreements entered into by and between any Company Party and any Participating Creditor;

"**Connected Persons**" means with respect to a person, its current and former (a) Affiliates; (b) Related Entities; (c) partners, directors, officers, employees, legal and other professional advisers (including auditors), agents, co-investors, potential or existing financing sources and representatives; and (d) its Affiliates' or its Related Entities' current and former partners, directors, officers, employees, legal and other professional advisers (including auditors), agents, co-investors, potential or existing financing sources and representatives;

"**Contractual Guarantee Release Steps**" means, collectively, the Required Release Amendments, the PCF Guarantee Release and the Indenture Release;

"**Court**" means the High Court of Justice of England and Wales;

"**Creditor**" means any Liquidity Facility Lender, any PCF Lender or any Noteholder;

"**Creditor Accession Deed**" means a deed substantially in the form set out in Schedule 2 (*Creditor Accession Deed*);

"**Debt**" means any Bank Debt or any Notes;

"**Default**" means a default under and as defined in the Liquidity Facility Agreement, the Parent Credit Facility Agreement and/or the Notes Indenture, as applicable;

"**Depository**" means the Depository Trust Company Corporation and Cede & Co. as its nominee as the Notes Registered Holder (as defined in the Notes Indenture);

"**Effective Time**" has the meaning given to that term in Clause 2.1(a) (*Effective Time*);

"**Enforcement Action**" means:

**(a)**     any step towards the acceleration of any payment of any Bank Debt or any Notes or any other indebtedness of the Company or any other member of the Group, including the making of any declaration that any Bank Debt or any Notes or any such other indebtedness is immediately due and payable or due and payable on demand;

**(b)**     the exercise of any right of set-off, account combination or payment netting against the Company or any other member of the Group;

**(c)**     any action of any kind to recover or demand cash cover in respect of all or any part of indebtedness owed by any member of the Group;

**(d)**     the taking of any steps to enforce or require the enforcement of any guarantee, mortgage, charge, pledge, lien or other security interest or any other agreement or arrangement having a similar effect granted by the Company or any other member of the Group or granted by any other person as security or credit support for an obligation of the Company, the Borrower/Issuer or any other Company Party;

**(e)**     any action of any kind to sue, claim or institute or continue legal process (including legal proceedings, execution, distress and diligence) against any member of the Group;

**(f)**     any action of any kind to designate an early termination date under any document evidencing a derivative transaction or terminate, or close out any transaction under any document evidencing a derivative transaction, prior to its stated maturity, or demand payment of any amount which would become payable on or following an early termination date or any such termination or close-out; and

**(g)**     the petitioning, applying for, voting for or taking of any step towards or in connection with any Insolvency Proceeding in respect of the Company or any other member of the Group;

"**English Law and Jurisdiction Amendments**" has the meaning given to it in Clause 4.3(a)(i) (*Additional Company Party Undertakings*);

"**Event of Default**" means an Event of Default under and as defined in the Liquidity Facility Agreement, the Parent Credit Facility Agreement and/or the Notes Indenture, as applicable;

"**Evidenced Adviser Fees**" means, collectively, the Evidenced Effective Time Adviser Fees and the Evidenced Restructuring Effective Date Adviser Fees;

"**Evidenced Effective Time Adviser Fees**" means:

**(a)**     all reasonable and documented fees and expenses incurred by the Advisers in accordance with the engagement or reimbursement agreements executed among the Company and the Advisers prior to the Effective Time or as otherwise provided in the Restructuring Term Sheet (excluding "success" or "transaction" fees), as evidenced by invoices delivered to the Company and addressed to the Ad Hoc Group or the HoldCo Group Parties, as applicable, which shall contain time entries corresponding to the incurred fees thereunder (it being understood and agreed that such time entries may be redacted or modified to delete any information that may be subject to attorney-client-privilege, attorney-work product, joint defence or any other applicable doctrine of privilege or confidentiality); and

**(b)** reasonable estimates of fees and expenses to be incurred by such Advisers on or after the date of delivery of such invoices through and including the Effective Time;

"**Evidenced Restructuring Effective Date Adviser Fees**" means:

**(a)** all reasonable and documented fees and expenses (including without limitation "success" or "transaction" fees of the applicable Advisers) incurred by the Advisers and the Information Agent in accordance with the engagement or reimbursement agreements executed among the Company and the Advisers or the Information Agent, as applicable, prior to the Restructuring Effective Date or as otherwise provided in the Restructuring Term Sheet, as evidenced by invoices delivered to the Company and addressed to the Ad Hoc Group or the HoldCo Group Parties, as applicable, which shall contain time entries corresponding to the incurred fees thereunder (it being understood and agreed that such time entries may be redacted or modified to delete any information that may be subject to attorney-client-privilege, attorney-work product, joint defence or any other applicable doctrine of privilege or confidentiality); and

**(b)** reasonable estimates of fees and expenses to be incurred by such Advisers and the Information Agent on or after the date of delivery of such invoice until the Restructuring Effective Date;

"**Existing Finance Documents**" means each of the Liquidity Facility Agreement and the Loan Documents (as defined in the Liquidity Facility Agreement), the Parent Credit Facility Agreement and the Loan Documents (as defined in the Parent Credit Facility Agreement) and the Notes Indenture, the Notes issued in connection therewith and the guarantees and credit support documents therefor;

"**Explanatory Statement**" means the explanatory statement required to be provided to the Scheme Creditors, together with the Scheme Document, pursuant to section 897 of the Companies Act;

"**Global Note**" means a global note representing any of the Notes;

"**Group**" means the Company and each of its subsidiaries from time to time;

"**Group Company**" means each Original Group Company and each Additional Group Company;

"**Group Company Accession Deed**" means a deed substantially in the form set out in Schedule 4 (*Group Company Accession Deed*);

"**HoldCo Advisers**" means Houlihan Lokey Capital, Inc., Simpson Thacher & Bartlett LLP, Akin Gump LLP (being the London office partnership only), solely with respect to English law issues in connection with the Schemes, and one local counsel in each of the Cayman Islands, Delaware (United States) and Canada, as financial advisers and legal advisers, as applicable, to the HoldCo Group Parties in respect of the Restructuring;

"**HoldCo Group Parties**" mean together syncreon Global Holdings Limited, syncreon Intermediate Holdings Limited, CayCo, syncreon Netherlands A B.V., syncreon Global S.À R.L.;

"**Holding Period Trust Deed**" means the agreement to be entered into by the Company and/or the Borrower/Issuer and a party to be engaged by or on behalf of the Company as the holding period trustee in respect of, among other things, any Reorganized syncreon Equity or Warrants, in accordance with the terms of the Restructuring Implementation Deed;

"**Indenture Release**" has the meaning given to it in Clause 4.3(a)(iii)(C);

"**Individual Participating Party Termination Date**" means, with respect to an individual Participating Creditor whose obligations under this Agreement are terminated in accordance with

Clauses 8.5 (*Individual Participating Party Automatic Termination*) or 8.6 (*Effect of Termination*) the date on which this Agreement is terminated with respect to that Participating Creditor;

"**Information Agent**" has the meaning given to it in the preamble to this Agreement;

"**Insolvency Proceedings**" means the appointment of an administrator, liquidator, provisional liquidator, bankruptcy or proposal trustee, receiver, administrative receiver or similar officer in respect of the Company, the Borrower/Issuer, or any Group Company or the winding up, liquidation, provisional liquidation, dissolution, administration, reorganization, composition, compromise, or arrangement of or with the Company, the Borrower/Issuer, or any Group Company or any equivalent or analogous appointment or proceedings under the law of any other jurisdiction;

"**Key Consultation Restructuring Document**s" means each of:

**(a)**      the New ABL Credit Facility Documents;

**(b)**      the New Term Loan Facility Agreement and the other definitive documents related thereto;

**(c)**      the New Organizational Documents; and

**(d)**      the New Shareholders' Agreement;

"**Key Other Restructuring Documents**" means each of:

**(a)**      the Backstop Agreement; and

**(b)**      any other Restructuring Document designated as such by the Company, the Majority Participating Lenders and the Majority Participating Noteholders (each acting reasonably);

"**Key Restructuring Documents**" means each of:

**(a)**      the ABL Commitment Letter;

**(b)**      the Warrants Agreement;

**(c)**      the Holding Period Trust Deed;

**(d)**      the Practice Statement Letter, Explanatory Statement, Scheme Document, Scheme Sanction Order and all other material documentation relating to the Schemes, including the documents implementing the release and exculpation provisions contemplated under the Restructuring Term Sheet;

**(e)**      the Chapter 15 Order and all other material U.S. Proceedings Documentation;

**(f)**      the Canadian Recognition Order and all other material Canadian Proceedings Documentation;

**(g)**      the Steps Plan and the Restructuring Implementation Deed;

**(h)**      the documents required to give effect to the Contractual Guarantee Release Steps; and

**(i)**      any other Restructuring Document designated as such by the Company, the Majority Participating Lenders and the Majority Participating Noteholders (each acting reasonably);

"**Liquidity Facility Agreement**" means the senior secured term loan facility agreement originally dated 15 March 2019 between, among others, the Company, the Borrower/Issuer, the lenders party thereto, and the Administrative Agent (as defined therein);

"**Liquidity Facility Debt**" means all present and future monies, debts and liabilities due, owing or incurred from time to time, including any accrued but unpaid interest, by any Loan Party (as defined in the Liquidity Facility Agreement) to any Liquidity Facility Lender under or in connection with any Loan Document (as defined in the Liquidity Facility Agreement) (in each case, whether alone or jointly, jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Liquidity Facility Lender**" means each "Lender" under and as defined in the Liquidity Facility Agreement;

"**Loan Documents**" has, unless otherwise indicated, the meaning given to that term in the Parent Credit Facility Agreement, the Liquidity Facility Agreement and/or the ABL Credit Agreement, as applicable;

"**Lock-up Deadline**" means three (3) Business Days prior to the hearing for leave to convene the Scheme Meetings or such earlier or later date as determined by the Company with the consent of the Majority Participating Lenders and the Majority Participating Noteholders (such consent not to be unreasonably withheld, conditioned or delayed);

"**Locked-up Bank Debt**" means any Locked-up Liquidity Facility Debt or any Locked-up PCF Debt;

"**Locked-up Debt**" means any Locked-up Bank Debt or any Locked-up Notes;

"**Locked-up Liquidity Facility Debt**" means, as of any date of calculation, in relation to a Participating Liquidity Facility Lender, the aggregate amount of:

**(a)**   Liquidity Facility Debt held by that Participating Liquidity Facility Lender as at the date on which it became a Participating Liquidity Facility Lender; and

**(b)**   any additional Liquidity Facility Debt purchased or otherwise acquired by that Participating Liquidity Facility Lender after the date on which it became a Participating Liquidity Facility Lender;

but excluding, in each case:

**(i)**   any Liquidity Facility Debt sold, transferred, assigned or otherwise disposed of (other than by way of sub-participation) by that Participating Liquidity Facility Lender in accordance with this Agreement after the date on which it became a Participating Liquidity Facility Lender; and

**(ii)**   any Liquidity Facility Debt held by a Participating Liquidity Facility Lender as lender of record which is the subject of a Voting Sub-Participation, provided the relevant sub-participant is an Acceded Voting Sub-Participant;

"**Locked-up Notes**" means, as of any date of calculation, in relation to a Participating Noteholder, the aggregate amount of:

**(a)**   all Notes held by that Participating Noteholder as at the date on which it became a Participating Noteholder; and

**(b)**   any additional Notes purchased or otherwise acquired by that Participating Noteholder after the date on which it became a Participating Noteholder;

but excluding, in each case,

(i)     any Notes held either at the date of this Agreement or the date of the relevant Creditor Accession Deed (if applicable) or at any time thereafter by a Non-Participating Team;

(ii)    any Notes sold, transferred, assigned or otherwise disposed of by that Participating Noteholder in accordance with this Agreement after the date on which it became a Participating Noteholder;

"**Locked-up PCF Debt**" means, as of any date of calculation, in relation to a Participating PCF Lender, the aggregate amount of:

(a)    PCF Debt held by that Participating PCF Lender as at the date on which it became a Participating PCF Lender; and

(b)    any additional PCF Debt purchased or otherwise acquired by that Participating PCF Lender after the date on which it became a Participating PCF Lender;

but excluding, in each case,

(i)     any PCF Debt held either at the date of this Agreement or the date of the relevant Creditor Accession Deed (if applicable) or at any time thereafter by a Non-Participating Team;

(ii)    any PCF Debt sold, transferred, assigned or otherwise disposed of (other than by way of sub-participation) by that Participating PCF Lender in accordance with this Agreement after the date on which it became a Participating PCF Lender; and

(iii)   any PCF Debt held by a Participating PCF Lender as lender of record which is the subject of a Voting Sub-Participation, provided the relevant sub-participant is an Acceded Voting Sub-Participant;

"**Longstop Date**" means October 15 2019 (or such later date as may be agreed pursuant to Clause 13 (Amendments));

"**Majority Participating Lenders**" means, collectively, the Majority Participating Liquidity Facility Lenders and the Majority Participating PCF Lenders;

"**Majority Participating Liquidity Facility Lenders**" means at the relevant time, Participating Liquidity Facility Lenders whose Locked-up Liquidity Facility Debt (limited to principal only) represents more than 50 percent in amount of the Aggregate Locked-up Liquidity Facility Debt;

"**Majority Participating PCF Lenders**" means at the relevant time, Participating PCF Lenders whose Locked-up PCF Debt represents more than 50 percent in amount of the Aggregate Locked-up PCF Debt (limited to principal only); <u>provided</u> that any Locked-up PCF Debt held by (a) a HoldCo Group Party, (b) any equity holder of a HoldCo Group Party, or (c) any affiliate of any such equity holder, in each case, will be discounted for the purposes of this calculation (both for determining the numerator and the denominator);

"**Majority Participating Noteholders**" means at the relevant time, Participating Noteholders whose Locked-up Notes (limited to principal only) represent more than 50 percent in amount of the Aggregate Locked-up Notes;

"**New ABL Credit Facility Documents**" means, collectively, the New ABL Credit Facility Agreement with the other definitive documents evidencing the New ABL Credit Facility, including the intercreditor agreement related thereto;

"**Non-Consenting Party**" has the meaning given to it in Clause 8.5(b) (*Individual Participating Party Automatic Termination*);

"**Non-Participating Team**" means, where a division, department or business unit is expressly specified in the signature page to this Agreement (or in any Lender Accession Deed as the case may be) pertaining to a Participating Creditor, any <u>other</u> division, department or business unit of that Participating Creditor;

"**Noteholder**" means a holder of Notes from time to time;

"**Notes**" means all present and future monies, debts and liabilities due, owing or incurred from time to time, including any accrued but unpaid interest, by any Obligor (as defined in the Notes Indenture) to any Noteholder under or in connection with the US$225,000,000 8.625 percent senior notes due 1 November 2021 issued by the Borrower/Issuer, with the following identification numbers:

(a)     in respect of the Rule 144A: Global Notes: ISIN: US87169JAA97, CUSIP: 87160JAA9; and

(b)     in respect of the Regulation S Global Notes: ISIN: USN84345AA04, CUSIP N84345AA0;

"**Notes Beneficial Owner**" means, with respect to any Locked-up Notes or other Notes, the beneficial owner of and/or the owner of the ultimate economic interest in those Locked-up Notes or other Notes;

"**Notes Indenture**" means the indenture dated 28 October 2013 between, among others, the Borrower/Issuer as issuer and The Bank of New York Mellon as notes trustee, governing the Notes;

"**Original Group Companies**" has the meaning given to it in the preamble to this Agreement;

"**Original Participating Creditors**" has the meaning given to it in the preamble to this Agreement;

"**Parent Credit Facility Agreement**" means that certain credit agreement originally dated 28 October 2013 between, among others, the Borrower/Issuer as the Dutch Term Borrower and as an RCF Borrower (each as defined therein), the lenders party thereto, and Wilmington Trust, National Association as the administrative agent;

"**Participating Creditor**" means each Original Participating Creditor and each Additional Participating Creditor, in each case which has not ceased to be a Participating Creditor in accordance with the provisions of this Agreement;

"**Participating Lender**" means each Participating Liquidity Facility Lender and each Participating PCF Lender;

"**Participating Liquidity Facility Lender**" means each Participating Creditor that is:

(a)     a Liquidity Facility Lender; or

(b)     an Acceded Voting Sub-Participant of a Liquidity Facility Lender,

in each case, in that capacity;

"**Participating Noteholder**" means each Participating Creditor that is a Noteholder, in that capacity;

"**Participating Party Termination Date**" means, with respect to the Participating Liquidity Facility Lenders, the Participating PCF Lenders, the Participating Noteholders or the Shareholder Parties whose obligations are terminated in accordance with Clauses 8.3 (*Participating Party*

*Voluntary Termination*) or 8.6 (*Effect of Termination*), the date on which this Agreement is terminated with respect to the Participating Liquidity Facility Lenders, the Participating PCF Lenders, the Participating Noteholders or the Shareholder Parties (as applicable);

"**Participating PCF Lender**" means each Participating Creditor that is:

**(a)**      a PCF Lender; or

**(b)**      an Acceded Voting Sub-Participant of a PCF Lender,

in each case, in that capacity;

"**Parties**" means the parties to this Agreement from time to time, including a party who accedes to this Agreement pursuant to Clauses 2.2 (*Creditor Accession*), 2.3 (*Sub-Participant Accession)* or 2.4 (*Group Company Accession*);

"**PCF Debt**" means all present and future monies, debts and liabilities due, owing or incurred from time to time, including any accrued but unpaid interest, by any Loan Party (as defined in the Parent Credit Facility Agreement) to any PCF Lender under or in connection with any Loan Document (as defined in the Parent Credit Facility Agreement) (in each case, whether alone or jointly, jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**PCF Lender**" means each "Lender" under and as defined in the Parent Credit Facility Agreement;

"**Practice Statement Letter**" means the letter prepared in accordance with the Chancery Division High Court Practice Statement issued 15 April 2002 to be sent to all Scheme Creditors informing them of the proposed Schemes, the proposed Court hearing for leave to convene the Scheme Meetings and the proposed Scheme Meetings;

"**Qualified Market Maker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Group (or enter with customers into long and short positions in claims against the Group), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt);

"**RCF Exclusive Collateral**" means the "Collateral" as defined in the RCF Pledge and Security Agreement;

"**RCF Pledge and Security Agreement**" means the 2020 Extended Revolving Lender Pledge and Security Agreement, dated as of March 22, 2018, among CayCo, syncreon Netherlands A B.V., and Cortland Capital Market Services LLC, as collateral agent;

"**Related Entity**" means in relation to an entity (the "**First Entity**"), an entity which is managed or advised by the same investment manager or investment adviser as the First Entity (or its Affiliates) or, if it is managed by a different investment manager or investment adviser, an entity whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the First Entity (or its Affiliates);

"**Relevant Guarantors**" has the meaning given to it in Clause 4.3(a)(iii)(B);

"**Relevant Jurisdiction**" means, in relation to a Party, its jurisdiction of incorporation and any jurisdiction in which it conducts business;

"**Required Release Amendments**" has the meaning given to it in Clause 4.3(a)(iii)(A);

"**Reservations**" means

**(a)**    the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganization and other laws generally affecting the rights of creditors;

**(b)**    the time barring of claims under the Limitation Act 1980 and the Foreign Limitation Periods Act 1984; and

**(c)**    similar principles, rights and defenses under the laws of any Relevant Jurisdiction;

"**Restructuring**" means the proposed restructuring of the existing indebtedness and equity of the Group, the principal terms of which are set out in the Restructuring Term Sheet, as further supplemented by the Steps Plan;

"**Restructuring Conditions**" means:

**(a)**    by July 15, 2019:

  **(i)**    the Information Agent has given the notice under Clause 2.1(d);

  **(ii)**    the English Law and Jurisdiction Amendments have become effective (subject to the Restructuring Effective Date occurring);

  **(iii)**    the Company has entered into the Backstop Agreement;

  **(iv)**    the Company has entered into the ABL Commitment Letter; and

  **(v)**    the Company has entered into the Amendment Agreement to the Liquidity Facility Agreement and the Amendment Agreement to the Parent Credit Facility Agreement;

**(b)**    by July 15, 2019, the Scheme Companies have launched the Schemes by issuing the Practice Statement Letter to all Scheme Creditors;

**(c)**    by August 2, 2019, receipt by the Scheme Companies of permission from the Court to convene the Scheme Meetings;

**(d)**    as soon as reasonably practicable, but in no event later than five (5) Business Days after the Court has granted leave to convene the Scheme Meetings:

  **(i)**    the UK Guarantor has filed with the Bankruptcy Court a voluntary petition for relief under chapter 15 of the Bankruptcy Code and such other documents necessary to commence the U.S. Proceedings; and

  **(ii)**    the Scheme Companies have filed with the Canadian Court a notice of application in respect of an application to commence the Canadian Proceedings;

**(e)**    by September 13, 2019, approval of each of the Schemes at the requisite Scheme Meetings by the requisite majorities of Scheme Creditors specified in section 899(1) of the Companies Act;

**(f)**    by September 30, 2019, receipt by the Scheme Companies of the Scheme Sanction Order;

**(g)**    by September 30, 2019, the Scheme Companies have filed the sealed Scheme Sanction Order with the Registrar of Companies and Companies House; and

(h)     by the earlier of the Longstop Date and the Restructuring Effective Date:

(i)     the Schemes have become unconditionally effective in accordance with their terms (save as to the other Restructuring Conditions in this sub-paragraph (h), which the Parties acknowledge are inter-conditional with this Restructuring Condition);

(ii)    the Bankruptcy Court has entered the Chapter 15 Order and such order has become a final order not subject to appeal or, if an appeal has been filed, such order shall not have been stayed;

(iii)   the Canadian Court has granted the Canadian Recognition Order and such order shall not have been vacated, stayed, amended, reversed or modified and (A) no appeal or application for leave to appeal therefrom shall have been filed, or (B) if any appeal(s) or application(s) for leave to appeal therefrom have been filed, any (and all) such appeal(s) or application(s) have been dismissed, quashed, determined, withdrawn or disposed of;

(iv)    satisfaction on the Restructuring Effective Date of the Contractual Guarantee Release Steps;

(v)     the receipt of all necessary authorizations in connection with the Restructuring, including receipt of all governmental and material third party approvals and consents, that are necessary to implement the Restructuring, and such authorizations and approvals and consents shall not be subject to unfulfilled conditions, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such the Restructuring;

(vi)    all Restructuring Documents shall (x) have satisfied the applicable Parties' consent rights in accordance with Clause 4.9 (*Restructuring Documents*), (y)(A) have been executed by all parties thereto with their signatures held in escrow or (B) (where signing in advance is not possible) the relevant parties thereto shall have confirmed in writing they shall promptly execute such documents on the Restructuring Effective Date (or any other date specified in this Agreement, the Restructuring Term Sheet, the Steps Plan or the Restructuring Implementation Deed), and (z) shall otherwise come into full force and effect in accordance with their terms on the Restructuring Effective Date;

(vii)   each of the Allocations Spreadsheet and Funds Flow is agreed in accordance with Clause 4.9 (*Restructuring Documents*);

(viii)  provided that the Company has received the applicable invoices at least three (3) Business Days prior to the Restructuring Effective Date, the Evidenced Restructuring Effective Date Adviser Fees have been paid in full in cash in accordance with the Allocations Spreadsheet and the Funds Flow;

(ix)    the ABL Borrowings have been repaid in full (or will be repaid in full on the Restructuring Effective Date in accordance with the Allocations Spreadsheet and the Funds Flow); and

(x)     this Agreement shall not have terminated (other than as a result of the Restructuring Effective Date occurring) as to all parties hereto and shall be in full force and effect, and any event that would otherwise give rise to a right to terminate this Agreement under Clauses 8.2 (*Company Voluntary Termination)* or 8.3 (*Participating Party Voluntary Termination*) as a result of the passage of time has been cured or waived;

"**Restructuring Documents**" means each of:

(a)     this Agreement (including its Schedules);

(b)     the Key Restructuring Documents and any ancillary documentation that may be necessary or desirable to support, facilitate, implement or otherwise give effect thereto;

(c)     the Key Other Restructuring Documents and any ancillary documentation that may be necessary or desirable to support, facilitate, implement or otherwise give effect thereto;

(d)     the Key Consultation Restructuring Documents and any ancillary documentation that may be necessary or desirable to support, facilitate, implement or otherwise give effect thereto; and

(e)     any other documents that the Company (acting by its directors, officers or other duly appointed representatives) and/or the Ad Hoc Group and/or CayCo reasonably determine may be necessary or desirable to support, facilitate, implement or otherwise give effect to the Restructuring;

"**Restructuring Effective Date**" means the date on which the Restructuring Conditions have been fulfilled or waived in accordance with their terms and all of the Restructuring Documents referred to in paragraphs (b) to (e) of such definition are effective in accordance with their respective terms and the Restructuring is implemented;

"**Restructuring Implementation Agreement**" means the implementation agreement effecting all or part of the Restructuring;

"**Restructuring Implementation Deed**" means the document which will implement the Restructuring;

"**Restructuring Term Sheet**" means the summary term sheet for the Restructuring set out in Schedule 5 (*Restructuring Term Sheet*);

"**RSA Termination Date**" means the date on which this Agreement is terminated with regard to all Parties in accordance with Clauses 8.1 *(Mutual Voluntary Termination)*, 8.2 (*Company Voluntary Termination*) or 8.4 (*Automatic Termination*);

"**Scheme Company**" means each of the Borrower/Issuer and the UK Guarantor;

"**Scheme Creditors**" means, in respect of each of the Schemes, the PCF Lenders and the Noteholders;

"**Scheme Document**" means the document setting out the terms and conditions of either or both of the Schemes, as applicable, to be approved by the requisite majorities of Scheme Creditors specified in section 899(1) of the Companies Act and to be sanctioned by the Court;

"**Scheme Meeting**" means any meeting of Scheme Creditors to vote on any of the Schemes, convened pursuant to an order of the Court (and any adjournment of such meeting);

"**Scheme Sanction Order**" means an order of the Court sanctioning the Schemes;

"**Scheme Threshold**" means the Scheme Threshold (Notes) or the Scheme Threshold (PCF), as applicable;

"**Scheme Threshold (Notes)**" means, as at the relevant time, the Aggregate Locked-up Notes represent at least 75 percent of the outstanding principal amount of the Notes;

"**Scheme Threshold (PCF)**" means, as at the relevant time, the Participating PCF Lenders represent a majority in number of all PCF Lenders and the Aggregate Locked-up PCF Debt represents at least 75 percent of the outstanding principal amount of the PCF Debt;

"**Schemes**" means each of the Borrower/Issuer Scheme and the UK Guarantor Scheme;

"**Shareholder Parties**" has the meaning given to it in the preamble to this Agreement;

"**Specified Defaults**" has the meaning given to that term in Clause 4.11(a) (*Restrictions on Enforcement / Forbearance*);

"**Steps Plan**" means the plan for implementing the Restructuring;

"**Sub-Participant Accession Deed**" means a deed substantially in the form set out in Schedule 3 (*Sub-Participant Accession Deed*);

"**Timely Participating PCF Lender**" has the meaning given to it in Clause 2.5(a) (*Lock-up Payment)*;

"**Timely Participating Noteholder**" has the meaning given to it in Clause 2.5(b) (*Lock-up Payment*);

"**UK Guarantor**" means syncreon Automotive (UK) Limited;

"**UK Guarantor Scheme**" means the scheme of arrangement under part 26 of the Companies Act to be proposed by the UK Guarantor as a means of implementing all or part of the Restructuring;

"**U.S. Proceedings**" means a case commenced by the UK Guarantor in the Bankruptcy Court under chapter 15 of the Bankruptcy Code for the recognition of the UK Guarantor Scheme and/or any other U.S. process or proceedings that the Company, the Majority Participating Lenders and the Majority Participating Noteholders consider reasonably necessary to implement all or part of the Restructuring;

"**U.S. Proceedings Documentation**" means all documents relating to the U.S. Proceedings, including the Chapter 15 Order;

"**Voting Sub-Participation**" has the meaning given to it in Clause 4.5 (*Participating Lender Undertakings*); and

"**Weil**" means Weil, Gotshal & Manges LLP, in its capacity as legal advisers to the Company.

**1.2    Construction**

In this Agreement, save as otherwise provided:

(a)    the singular shall include the plural and vice versa (unless the context otherwise requires);

(b)    a reference to a Clause, sub-Clause or schedule is a reference to a Clause, sub-Clause or schedule to this Agreement;

(c)    the Clause, sub-Clause and schedule headings in this Agreement are for ease of reference only and shall not affect the interpretation of this Agreement;

(d)    a reference to a provision of law is a reference to that provision as extended, applied, amended or re-enacted from time to time and includes any subordinate legislation;

**(e)**     a reference to a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

**(f)**     a reference to any document or instrument is a reference to that document or instrument as, or may be, amended, supplemented, novated, extended, restated or otherwise modified from time to time;

**(g)**     a reference to a Restructuring Document means such document in the form agreed by the requisite Parties (as applicable) in accordance with Clause 4.9 (*Restructuring Documents*);

**(h)**     a reference to "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

**(i)**     a reference to "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

**(j)**     a reference to a "**person**" includes any individual, firm, company, corporation, limited liability company, general or limited partnerships, unincorporated association, government, state or agency of a state or any association, trust, joint venture, consortium or other partnership (whether or not having separate legal personality);

**(k)**     a reference to any "**Participating Creditor**", the "**Company**", any "**Shareholder Party**" or any other "**Party**" shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the relevant documents;

**(l)**     a reference to:

    **(i)**     a "**holder**" when used in connection with a Participating Noteholder or other Noteholder is a reference to the Participating Noteholder or other Noteholder as the Notes Beneficial Owner of the relevant Locked-up Notes or Notes or a person who has the full legal right and authority to act on behalf of that Notes Beneficial Owner;

    **(ii)**     "**Locked-up Notes**" or "**Notes**" when used in connection with a Participating Noteholder or other Noteholder is a reference to the Participating Noteholder's or other Noteholder's interests as a holder in the relevant Global Note(s) held by the relevant Depository or Depositories; and

    **(iii)**     the terms "**held by**", "**holdings**", its "**Notes**", its **"Debt"**, its "**Locked-up Notes**" or its "**Locked-up Debt**", when used in connection with a Participating Noteholder or other Noteholder shall be construed accordingly;

**(m)**     a reference to:

    **(i)**     a "**holder**" when used in connection with a Participating Lender is a reference to the Participating Lender as the Bank Debt Beneficial Owner of the relevant Locked-up Bank Debt or a person who has the full legal right and authority to act on behalf of that Bank Debt Beneficial Owner; and

     **(ii)**    the terms "**held by**", "**holdings**", its **Bank Debt**", its **"Debt"**, its "**Locked-up Bank Debt**" or its "**Locked-up Debt**", when used in connection with a Participating Lender shall be construed accordingly;

**(n)**    the words "**include**" and "**including**" mean include and including without limitation; and

**(o)**    a reference to any time of day is a reference to London time.

## 1.3   Third Party Rights

Save as expressly set out herein, a person who is not a Party has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to rely on, enforce or to enjoy the benefit of any term of this Agreement.

## 1.4   Execution by Participating Creditors

Each Participating Creditor is entering into this Agreement in its capacity as a Participating Creditor and only in respect of the Debt which it holds (or, where such Participating Creditor is an investment manager or adviser, the Debt for which it acts as investment manager or adviser) and not in any other capacity or in respect of any other debt or other instrument.

## 1.5   Relationship with Other Documents

**(a)**    Subject to the amendment, restatement and/or cancellation thereof, and/or the waiver of, or forbearance from, any provisions therein, including as expressly set out in this Agreement and/or pursuant to the Restructuring, each of the Parent Credit Facility Agreement, the other Loan Documents and the Notes Indenture shall continue to have full force and effect. In the event of any inconsistency between this Agreement and the Parent Credit Facility Agreement, the other Loan Documents and/or the Notes Indenture, this Agreement shall prevail.

**(b)**    This Agreement and the Restructuring Documents now or hereafter entered into set out the Parties' entire understanding of the Restructuring and supersede any previous agreement between any of the Parties with respect to the Restructuring (save for any confidentiality agreement entered into with the Company prior to the Effective Time in connection with the Restructuring, which shall each continue to be binding on the parties thereto) except that the "Disclosure Time" under each confidentiality agreement between the Company and any Participating Liquidity Facility Lender or Participating PCF Lender shall be deemed to have occurred coextensively with the Effective Time (and the Company shall accordingly be required to disclose the "Cleansing Material" under and in accordance with each such confidentiality agreement).

**(c)**    In the event of any inconsistency between the Restructuring Term Sheet and the body of this Agreement, the body of this Agreement shall prevail.

**(d)**    In the event of any inconsistency between this Agreement and any of the Restructuring Documents, the relevant Restructuring Document shall prevail.

## 2   EFFECTIVENESS

## 2.1   Effective Time

**(a)**    This Agreement in its entirety will become effective and legally binding among the Parties, including the Original Participating Creditors, on and from the date on which the Agreement has been executed and delivered by each of the original parties to this Agreement and the Conditions Precedent have been satisfied (or are otherwise waived

(email being sufficient) by the Company, the Majority Participating Lenders and the Majority Participating Noteholders) (such time being the "**Effective Time**").

**(b)**    This Agreement will become effective and legally binding upon any Creditor who is not an Original Participating Creditor and becomes a Party as a Participating Creditor after the date of this Agreement, on the later of the Effective Time and the date on which such Creditor delivers a duly executed and completed Creditor Accession Deed to the Information Agent and Weil in accordance with Clause 2.2 (*Creditor Accession*).

**(c)**    This Agreement will become effective and legally binding upon any person who is not an Original Participating Creditor and becomes a direct or indirect sub-participant of a Participating Creditor after the date of this Agreement, on the later of the Effective Time and the date on which such person delivers a duly executed and completed Sub-Participant Accession Deed to the Information Agent and Weil in accordance with Clause 2.3 (*Sub-Participant Accession*).

**(d)**    The Information Agent shall promptly notify the Company, Weil, the Advisers and the Participating Creditors by e-mail when the Scheme Thresholds have been met.

**2.2**    **Creditor Accession**

**(a)**    A Creditor who is not an Original Participating Creditor will become a Party as an Additional Participating Creditor on the later of the Effective Time and the date on which it delivers a duly executed and completed Creditor Accession Deed to the Information Agent and Weil.

**(b)**    By delivering a Creditor Accession Deed in accordance with sub-clause (a) above, such Additional Participating Creditor shall be bound by and shall comply with all of the terms of this Agreement which are expressed to be binding on a Participating Creditor (and a Participating Liquidity Facility Lender, Participating PCF Lender and/or Participating Noteholder, as applicable) as if it had been a Party in such capacity on and from the date of this Agreement.

**(c)**    To the extent there is activity to report, the Information Agent shall update the Company, its advisers and the Advisers of any Additional Participating Creditors and/or transfers of (portions of) debt between Participating Creditors.

**2.3**    **Sub-Participant Accession**

**(a)**    A direct or indirect sub-participant of a Participating Lender will become a Party as an Additional Participating Lender on the later of the Effective Time and the date on which it delivers a duly executed and completed Sub-Participant Accession Deed to the Information Agent and Weil.

**(b)**    By delivering a Sub-Participant Accession Deed in accordance with sub-clause (a) above, such Additional Participating Lender shall be bound by and shall comply with all of the terms of this Agreement which are expressed to be binding on a Participating Lender (and a Participating Liquidity Facility Lender and/or Participating PCF Lender, as applicable) as if it had been a Party in such capacity on and from the date of this Agreement.

**(c)**    To the extent there is activity to report, the Information Agent shall update the Company, its advisers and the Advisers of any Additional Participating Lenders and/or transfers of (portions of) debt between Participating Lenders.

**2.4**    **Group Company Accession**

(a)    An Affiliate of the Company (other than the Borrower/Issuer or an Original Group Company) will become a Party as an Additional Group Company on the later of the Effective Time and the date on which it delivers a duly executed and completed Group Company Accession Deed to the Information Agent and Weil.

(b)    By delivering a Group Company Accession Deed in accordance with sub-clause (a) above, such Additional Group Company shall be bound by and shall comply with all of the terms of this Agreement which are expressed to be binding on a Group Company as if it had been a Party in such capacity on and from the date of this Agreement.

(c)    To the extent there is such activity to report, the Information Agent shall update the Advisers of any Additional Group Companies.

**2.5    Lock-up Payment**

(a)    Each PCF Lender that becomes a Participating PCF Lender by the Lock-up Deadline and complies with all its obligations as a Participating PCF Lender under this Agreement, including under Clause 4.6 (*Scheme Creditor Undertakings*) (each a **"Timely Participating PCF Lender"**) will, on the Restructuring Effective Date, receive a pro rata share of the PCF Lender Lock-up Payment based on the Locked-up PCF Debt held by such Participating PCF Lender as of the Lock-up Deadline in addition to the other consideration it is entitled to under the Restructuring Term Sheet.

(b)    Each Noteholder that becomes a Participating Noteholder by the Lock-up Deadline and complies with all its obligations as a Participating Noteholder under this Agreement, including under Clause 4.6 (*Scheme Creditor Undertakings*) (each a "**Timely Participating Noteholder**") will, on the Restructuring Effective Date, receive a pro rata share of the Noteholder Lock-up Payment based on the Locked-up Notes held by such Participating Noteholder as of the Lock-up Deadline in addition to the other consideration it is entitled to under the Restructuring Term Sheet.

(c)    For the avoidance of doubt, if a Participating Creditor holds Locked-up PCF Debt and Locked-up Notes, as of the Lock-up Deadline, such Participating Creditor shall be entitled to its pro rata share of both the PCF Lender Lock-up Payment and the Noteholder Lock-up Payment to which it is entitled in accordance with Clauses (a) and (b) of this Clause 2.5 (*Lock-up Payment).*

**3    PARTIES' RIGHTS AND OBLIGATIONS**

**3.1**    Subject to Clause 6 (*Limitations*), the Company, the Borrower/Issuer and the Group Companies shall be jointly and severally liable for their obligations under this Agreement.

**3.2**    Except for the Company, the Borrower/Issuer and the Group Companies:

(a)    the obligations of each Party under this Agreement are several;

(b)    failure by a Party to perform its obligations under this Agreement shall not affect the obligations of any other Party under this Agreement; and

(c)    no Party is responsible for the obligations, actions or failure to act of any other Party under this Agreement.

**3.3**    The rights of each Party under or in connection with this Agreement are separate and independent rights. Each Party may separately and independently enforce its rights under this Agreement.

**4**      **GENERAL UNDERTAKINGS**

**4.1**    **Effectiveness**

The undertakings in this Clause 4 (*General Undertakings*) shall be at all times subject to Clause 6 (*Limitations*) and shall apply on and from the Effective Time until the earlier to occur of:

(a)      the RSA Termination Date; and

(b)      in relation to any Party whose rights and obligations under this Agreement have been terminated in accordance with Clauses 8.2 (*Company Voluntary Termination*), 8.3 (Participating Party Voluntary Termination), 8.5 (*Individual Participating Party Automatic Termination*) or 8.6 (*Effect of Termination*), the Participating Party Termination Date or the Individual Participating Party Termination Date (as applicable).

**4.2**    **All Parties Undertakings**

(a)      Each Party shall (and, in the case of the Company and the Borrower/Issuer, shall procure that each member of the Group, to the extent applicable, shall) act in good faith and promptly take actions reasonably necessary in order to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Conditions and the Restructuring in accordance with this Agreement, the Restructuring Term Sheet and the Steps Plan, including:

(i)      in respect of the Restructuring Documents to which it is proposed to be a party, once in agreed form in accordance with Clause 4.9 (*Restructuring Documents*), executing, delivering, making, issuing, filing and/or announcing (as applicable) such Restructuring Documents and all ancillary documents, notices, confirmations and consents relating thereto (it being understood that the Restructuring Term Sheet and Steps Plan set out or will set out the key terms of the Restructuring and the Parties agree that the precise terms of the Restructuring Documents will be subject to Clause 4.9 (*Restructuring Documents*));

(ii)     executing and delivering any other document and giving any other notice, confirmation, consent, order, instruction or direction or making any application or announcement necessary or desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring, provided in each case, it is in a form which is consistent in all material respects with the Restructuring Term Sheet and the Steps Plan;

(iii)    to the extent applicable, preparing and filing for any legal process or proceedings, and supporting petitions or applications to any court, to support, facilitate, implement, consummate or otherwise give effect to the Restructuring, including the Schemes, the U.S. Proceedings and the Canadian Proceedings; and

(iv)     to the extent applicable, attending in person or by proxy and timely voting, or instructing its proxy or other relevant person to timely vote, and exercising any powers or rights available to it, irrevocably and unconditionally in favor of:

(A)      in the case of the Company Parties, each relevant member of the Group and, to the extent applicable, each Shareholder Party, any matter requiring shareholder or board approval, as applicable, including holding all relevant shareholder meetings and board meetings and passing all relevant shareholder and board resolutions;

(B)      in the case of the Participating Liquidity Facility Lenders, in respect of their Locked-up Liquidity Facility Debt, any matter or proposal requiring

a resolution, instruction, waiver, consent, amendment, discretion or approval under the Liquidity Facility Agreement, any other Loan Document (as defined in the Liquidity Facility Agreement) and/or any other documentation, in each case, required in relation to the Restructuring;

**(C)**     in the case of the Participating PCF Lenders, in respect of their Locked-up PCF Debt, any matter or proposal requiring a resolution, instruction, waiver, consent, amendment, discretion or approval under the Parent Credit Facility Agreement, any other Loan Document (as defined in the Parent Credit Facility Agreement) and/or any other documentation, in each case, required in relation to the Restructuring; and

**(D)**     in the case of the Participating Noteholders, in respect of their Locked-up Notes, any matter or proposal requiring a resolution, instruction, waiver, consent, amendment, discretion or approval under the Notes Indenture and/or any other documentation, in each case, required in relation to the Restructuring;

**(v)**     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions, to address such impediment provided that the economic outcome for the Participating Creditors and the Shareholder Parties and the anticipated timing of the Restructuring must be substantially preserved in such alternate provisions,

in each case as necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring in accordance with the Restructuring Term Sheet and the Steps Plan.

**(b)**     Each Party shall (and, in the case of the Company and the Borrower/Issuer, shall procure that each member of the Group shall, to the extent applicable) use all reasonable efforts to obtain, comply with and do all that is necessary to maintain in full force and effect any necessary Authorization required under any applicable law or regulation of a Relevant Jurisdiction (or in respect of a Participating Creditor, any applicable law or regulation in its jurisdiction of incorporation) to:

**(i)**     enable it to perform its obligations under the Restructuring Documents; and

**(ii)**     ensure the legality, validity, enforceability or admissibility in evidence in the Relevant Jurisdictions (or in respect of a Participating Creditor, its jurisdiction of incorporation) of any Restructuring Document to which it is or will be a party subject to any applicable Reservations.

**(c)**     Each Party shall not (and, in the case of the Company and the Borrower/Issuer, shall procure that no member of the Group shall to the extent applicable):

**(i)**     vote, or allow its proxy to vote or instruct any Affiliate, Related Entity , or other relevant person to vote, in favor of any matter requiring a resolution, instruction, waiver, consent, amendment, discretion or approval, which would, or would reasonably be expected to, breach or be materially inconsistent with this Agreement, the Restructuring Term Sheet or the Steps Plan, including an Alternative Restructuring;

**(ii)**     take, encourage, assist or support (or procure that any other person takes, encourages, assists or supports) any other action which would, or would reasonably be expected to, breach or be materially inconsistent with this Agreement, the

Restructuring Term Sheet or the Steps Plan, including an Alternative Restructuring;

**(iii)** support, directly or indirectly, any alternative restructuring, refinancing or recapitalization that is inconsistent with the Restructuring Term Sheet (including any plan, plan proposal, restructuring proposal, scheme, scheme proposal, offer of dissolution, assignment for the benefit of creditors, winding up, liquidation, sale or disposition, reorganization, merger, business combination, joint venture, debt or equity financing or re-financing, or other restructuring of the Company or any member of the Group) (collectively, an "**Alternative Restructuring**"); and

**(iv)** oppose, delay, impede or prevent the implementation or consummation of the Restructuring.

**4.3    Additional Company Party Undertakings**

**(a)    Schemes and Contractual Guarantee Release Steps**

**(i)** The Company Parties shall:

**(A)** seek the necessary consents from the PCF Lenders to amend the Parent Credit Facility Agreement and each Loan Guaranty (as defined in the Parent Credit Facility Agreement) so that such documents are governed by English law and the English courts have non-exclusive jurisdiction;

**(B)** if determined by the Company in its sole discretion, seek the necessary consents from the Noteholders to amend the Notes Indenture so that it is governed by English law and the English courts have non-exclusive jurisdiction; and

**(C)** execute all such documents necessary or reasonably desirable to support, facilitate, implement, consummate or otherwise give effect to the amendments referred to in paragraphs (A) and, if applicable, (B) above (Clauses (A)-(C) collectively, the "**English Law and Jurisdiction Amendments**").

**(ii)** The Scheme Companies shall seek the approval of the Scheme Creditors, the sanction of the Schemes by the Court and the recognition of the Restructuring and the Schemes under the U.S. Proceedings and the Canadian Proceedings, in each case as described in the relevant Restructuring Conditions.

**(iii)** The Borrower/Issuer shall, on or prior to the Restructuring Effective Date but subject to the satisfaction of the Restructuring Conditions on the Restructuring Effective Date:

**(A)** obtain the necessary consents from the PCF Lenders to amend the Parent Credit Facility Agreement (1) to waive the requirement that the Borrower/Issuer must be in compliance with the financial covenant in Section 6.13 of the Parent Credit Facility Agreement in order to designate a Restricted Subsidiary as an Unrestricted Subsidiary (each term as defined in the Parent Credit Facility Agreement), (2) to waive the requirement that any subsidiary designated as an Unrestricted Subsidiary under the Parent Credit Facility Agreement may not be a "Restricted Subsidiary" under the Notes Indenture or any other material indebtedness, (3) to waive the requirement that any designation of a subsidiary as an Unrestricted Subsidiary constitute an investment in an amount equal to the fair market of the net assets of such subsidiary attributable to the Borrower/Issuer's

equity interest therein, and (4) to waive the requirement that no Default or Event of Default (each term as defined in the Parent Credit Facility Agreement) shall have occurred and be continuing immediately before or after the designation (the "**Required Release Amendments**") (which consents may, but do not necessarily need to, be obtained by way of the Schemes);

**(B)**    once the amendment referred to in paragraph 4.3(a)(iii)(A) above has become effective, designate each of the Group Companies other than the Company, the Borrower/Issuer, and syncreon Global Finance (US) Inc. (the "**Relevant Guarantors**") as Unrestricted Subsidiaries under and as defined in the Parent Credit Facility Agreement and, as such, release the Relevant Guarantors from their obligations under their respective Loan Guaranty (as defined in the Parent Credit Facility Agreement) (the "**PCF Guarantee Release**") (which designation and releases may, but do not necessarily need to, be effected by way of the Schemes); provided that the foregoing PCF Guarantee Release shall be with respect to syncreon Treasury Services Limited and syncreon Canada, Inc. only to the maximum extent permitted under the terms of the Parent Credit Facility Agreement; and

**(C)**    shall have obtained an order from a court of competent jurisdiction finding that the PCF Guarantee Release has triggered an automatic release of the Relevant Guarantors from their obligations as Subsidiary Guarantors (under and as defined in the Notes Indenture) in accordance with the terms and conditions of the Notes Indenture, including section 10.03(i)(b) of the Notes Indenture (the "**Indenture Release**").

**(b)    Adversary Proceedings**

**(i)**    The Company Parties shall timely file a formal objection in form and substance reasonably acceptable to the Majority Participating Lenders and the Majority Participating Noteholders (each of whose consents shall not be unreasonably withheld, conditioned or delayed), to any motion, application or adversary proceeding filed with the Court, the Bankruptcy Court or the Canadian Court or any other court of competent jurisdiction by any party seeking to:

**(A)**    dismiss or challenge at any stage and on any basis the Scheme, the U.S. Proceedings or the Canadian Proceedings;

**(B)**    challenge the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, as applicable any portion of the Bank Debt or Notes;

**(C)**    assert any other cause of action against and/or with respect or relating to the Bank Debt or the Notes or the liens securing the Bank Debt; or

**(D)**    commence any involuntary proceeding under any applicable insolvency law, or directing the appointment of a trustee or examiner, in respect of any of the Company Parties.

**(ii)**    Each Party shall not (and, in the case of the Company and the Borrower/Issuer, shall procure that no member of the Group shall, to the extent applicable) file a motion, application or adversary proceeding or support any motion, application or adversary proceeding filed or commenced by any third party:

**(A)**   challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Bank Debt or asserting any other cause of action against the Participating Creditors or with respect to or relating to such Bank Debt or the prepetition liens securing the Bank Debt; or

**(B)**   challenging the validity, enforceability or priority of, or seeking avoidance or subordination of, any portion of the Notes or asserting any other cause of action against the Participating Noteholders or with respect of or relating to such Notes.

**(iii)**   To the extent that such action would not be inconsistent with the relevant Party's obligations under this Agreement, each Party's right to file or otherwise submit any type of pleading or evidence in support of the Schemes, or in response to or in respect of the types of motions, applications and/or adversary proceedings described in Clause 4.3(b)(i) (*Adversary Proceedings*) are expressly reserved.

**(c)**   **Insolvency Filings**

Each of the Company Parties:

**(i)**   shall not petition, apply, vote for or commence any proceedings or take any step (including encouraging a third party to commence any proceedings or to take any step) towards or in connection with any Insolvency Proceedings in respect of the Company Parties, other than to implement or consummate the Restructuring in accordance with the Restructuring Term Sheet and the Steps Plan, unless such Company Party has received advice from an independent Queen's Counsel of at least 10 years call that such action is in the best interests of the relevant Company Party; and

**(ii)**   undertakes, where possible and lawful (i.e. permitted by law and applicable regulation) and not in violation of any fiduciary duty of the members of its management board or its directors (reasonably taking into account the best interests of the relevant Company Party), to give to the Participating Creditors at least ten days' notice of any intention of the relevant directors to file for any Insolvency Proceedings of a Company Party not contemplated under the Restructuring, the Restructuring Term Sheet, or the Steps Plan.

**(d)**   **Information Undertakings**

**(i)**   Subject to: (x) the existing limitations in Clauses 4.13 (*Limitations on Undertakings*) and 6 (*Limitations*); and (y) to the extent that the Company is not obliged to provide such information pursuant to the Existing Finance Documents in accordance with and subject to the confidentiality provisions therein, to the relevant Party being subject to a confidentiality agreement with the Company, the Company and each Scheme Company undertakes to notify the Participating Creditors and Shareholder Parties promptly (and in any event within two (2) Business Days of such actual knowledge) following it:

**(A)**   becoming aware of any other party intending to petition, move or apply for, vote, file or take any steps towards or in connection with any Enforcement Action in respect of any Company Party;

**(B)**   receiving any notice from any regulator, which may have (in the reasonable opinion of the Company) a material adverse effect on the business of the Company or the Group (taken as a whole);

**(C)** receiving any notice from any counterparty to a contract, license or other Authorization that is material to the operation of the business of the Company or the Group (taken as a whole), which has (in the reasonable opinion of the Company) a material adverse effect on the business of the Company or the Group (taken as a whole);

**(D)** becoming aware of the ABL Lender or any other creditor taking any steps towards or in connection with any Enforcement Action in respect of any Company Party; or

**(E)** becoming aware of the details of any new material litigation, arbitration or administrative proceedings threatened in writing or commenced against any Company Party after the date of this Agreement.

**(ii)** If the Group knows of a material breach by any Party of such Party's obligations, representations, warranties or covenants set forth in this Agreement, it undertakes to promptly provide written notice (and in any event within five (5) Business Days of such actual knowledge) to the Advisers.

**(iii)** The Company shall use commercially reasonable efforts to continue the business of the Group in the ordinary course (other than any steps reasonably required to implement the Restructuring and the transactions contemplated thereby).

**(iv)** Subject to: (x) the existing limitations in Clauses 4.13 (*Limitations on Undertakings*) and 6 (*Limitations*); and (y) to the extent that the Company is not obliged to provide such information pursuant to the Existing Finance Documents in accordance with and subject to the confidentiality provisions therein, to the relevant Party being subject to a confidentiality agreement with the Company in form and substance reasonably acceptable to the Company, the Company shall, until the RSA Termination Date:

**(A)** use commercially reasonable efforts to keep the Participating Creditors, Shareholder Parties and the Advisers reasonably informed about the operations of the Company and each Group Company;

**(B)** provide reasonable access during normal business hours to the Group's books and records as reasonably requested by the Advisers;

**(C)** provide the Participating Creditors and the Advisers reasonable access to senior management and the advisors of the Group during normal business hours in the relevant jurisdiction, by e-mail or by telephone; and

**(D)** provide reasonable responses to all reasonable diligence requests within a reasonable timeframe,

in each case, for the purposes of evaluating the Group's assets, liabilities, operations, businesses, finances, strategies, prospects and affairs for the purposes of the Restructuring.

**(e)** **Group Company Accessions**

If any Affiliate of the Company that is not an Original Group Company becomes a party to the Liquidity Facility Agreement, the Company undertakes in favor of the other Parties to procure that such Affiliate shall promptly execute and deliver to the Information Agent and Weil a Group Company Accession Deed in accordance with Clause 2.4 (*Group Company Accession*).

**(f)**     **Further Undertakings**

**(i)**     The Company:

**(A)**     undertakes to disclose all Cleansing Material on the data sites maintained for the PCF Debt and Notes in accordance with each Confidentiality Agreement as soon as reasonably practicable following the Effective Time and in any event, not later than the following: (a) if the Effective Time occurs on a Business Day before 5 p.m. (prevailing Eastern Time), then the Company shall make such disclosure or instruct the applicable agent to do so, as applicable, on the same day no later than 5 p.m. (prevailing Eastern Time), and (b) if the Effective Time occurs either (x) on a non-Business Day or (y) on a Business Day after 5 p.m. (prevailing Eastern Time), then the Company shall make such disclosure or instruct the applicable agent to do so, as applicable, on the following Business Day no later than 8:30 a.m. (prevailing Eastern Time);

**(B)**     undertakes to promptly pay, or cause to be paid, any Evidenced Adviser Fees as set forth in the applicable Adviser's engagement agreement from time to time or as otherwise set forth in the Restructuring Term Sheet, but in any event within seven (7) days of delivery to the Company of any applicable invoice;

**(C)**     shall not terminate, and shall remain in compliance with and not breach, the fee and reimbursement obligations owed to the Ad Hoc Group Advisers and the HoldCo Advisers; and

**(D)**     shall procure that the New Organizational Documents are in full force and effect on the Restructuring Effective Date and, to the extent required under applicable local law, have been duly filed with the applicable authorities in the relevant jurisdiction.

**(ii)**     The Company undertakes that, other than as contemplated under paragraph (i) above, neither it nor any Group Company shall:

**(A)**     make or declare any dividends, distributions or other payments on account of its equity (other than as set forth in the Restructuring Term Sheet);

**(B)**     directly or indirectly make or procure any payments to the Shareholder Parties or any of its respective Affiliates or reimburse any professional fees incurred by any of the Shareholder Parties or the Participating Noteholders (other than as set forth in the Restructuring Term Sheet); or

**(C)**     make any transfers (whether by dividend, distribution or otherwise) to any direct or indirect parent entity or shareholder of the Company (other than as set forth in the Restructuring Term Sheet).

**(iii)**     Each Company Party undertakes to not sell, or file any motion or application seeking to sell, any material assets other than in the ordinary course of business.

**(iv)**     Each Company Party shall maintain its good standing under the laws of the jurisdiction in which it is incorporated or organized.

**(v)**     Each Company Party undertakes to, by no later than the Restructuring Effective Date, deliver (or cause to be delivered) the annual financial statements and related reports with respect to the fiscal year ended December 31, 2018 as required by the

Liquidity Facility Agreement, the Parent Credit Facility Agreement and the Notes Indenture.

(vi)   Each Company Party undertakes to, within two weeks of the date of this Agreement, deliver (or cause to be delivered) the Financial Plan (as defined in the Parent Credit Facility Agreement) with respect to the fiscal year ending December 31, 2019 as required by the Liquidity Facility Agreement and the Parent Credit Facility Agreement.

**4.4   Participating Creditor Undertakings**

Each Participating Creditor undertakes in favor of the other Parties that:

(a)   it shall not direct, whether directly or indirectly, any administrative agent, collateral agent, or indenture trustee (as applicable) to take, or support any other party in taking, any action inconsistent with such Participating Creditor's obligations under this Agreement and, if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with such Participating Creditor's obligations under this Agreement, shall use its commercially reasonable efforts to direct or cause such administrative agent, collateral agent, or indenture trustee to cease and refrain from taking any such action, provided that no Participating Creditor shall, in connection with any such direction, be required to incur any out of pocket costs, expenses or liabilities or to provide any indemnity to any party, as the case may be; and

(b)   it shall not opt-out of the releases contemplated by the Restructuring Term Sheet in conjunction with consummation of the Restructuring.

**4.5   Participating Lender Undertakings**

Subject to Clause 5.1 (*Participating Creditor Permitted Transfers)*, if a Participating Lender elects to sub-participate to any person any of its Locked-up Bank Debt after the date of this Agreement and grants voting rights to the sub-participant in respect of such Locked-up Bank Debt (a "**Voting Sub-Participation**"), such Participating Lender undertakes in favor of the other Parties to procure that such person shall at the same time as entering into the sub-participation arrangement execute and deliver to the Information Agent and Weil a Sub-Participation Accession Deed in accordance with Clause 2.3 (*Sub-Participant Accession*) in order that the relevant Locked-up Bank Debt shall constitute Locked-up Bank Debt of that person, and not Locked-up Bank Debt of the Participating Lender under this Agreement.

**4.6   Scheme Creditor Undertakings**

Each Participating Creditor that is a Scheme Creditor undertakes that it shall:

(a)   promptly and timely vote, or instruct its proxy or other relevant person to timely vote (and not change or withdraw such vote or cause or direct such vote to be changed or withdrawn), and exercise any powers or rights available to it, irrevocably and unconditionally in favor of, and execute and deliver any document and give any other notice, confirmation, consent, order, instruction or direction or make any application or announcement necessary or desirable to support, facilitate, implement, consummate or otherwise give effect to, as applicable:

(i)   an amendment of the Parent Credit Facility Agreement and each Loan Guaranty (as defined in the Parent Credit Facility Agreement) to ensure that such documents are governed by English law and the English courts have non-exclusive jurisdiction;

**(ii)**      if requested by the Company (in its sole discretion) an amendment of the Notes Indenture to ensure that such document is governed by English law and the English courts have non-exclusive jurisdiction;

**(iii)**      the Required Release Amendments and the PCF Guarantee Release;

**(iv)**      the Amendment Agreement to the Liquidity Facility Agreement; and

**(v)**      the Amendment Agreement to the Parent Credit Facility Agreement.

**(b)**      attend each relevant Scheme Meeting (or adjournment thereof) in person or by proxy and exercise and cast all of its votes in respect of its Locked-up Debt in favor of each Scheme and any amendment or modification to each such Scheme (and not change or withdraw such vote or cause or direct such vote to be changed or withdrawn), provided that they are proposed by the Company or a Scheme Company and that the terms of the Schemes are and remain consistent in all material respects with the terms of this Agreement, the Restructuring Term Sheet and the Steps Plan.

**4.7**      **Participating Liquidity Facility Lender Undertakings**

Each Liquidity Facility Lender undertakes (a) to promptly enter into good faith negotiations with the Company regarding the provision of the Additional Liquidity Facility Amount and an extension of the maturity date of the Liquidity Facility Agreement and (b) to the extent agreement is reached, as soon as reasonably practicable, to agree to the precise terms of any amendment or other documentation, including the Amendment Agreement to the Parent Credit Facility Agreement and the Amendment Agreement to the Liquidity Facility Agreement, reasonably necessary to give effect to the provision of the Additional Liquidity Facility Amount, which documentation shall be in form and substance reasonably satisfactory to the Company (whose consent shall not be unreasonably withheld, conditioned or delayed) and acceptable to the Liquidity Facility Lenders.

**4.8**      **Shareholder Party Undertakings**

Each Shareholder Party undertakes in favor of the other Parties that it shall:

**(a)**      (i) promptly execute, deliver, make, issue, file and/or announce (as applicable) any and all authorizations, documents, notices, confirmations, consents, orders or instructions or directions necessary or desirable to cancel and/or transfer its equity ownership interests in the Group and effect the Restructuring in accordance with the Restructuring Term Sheet and the Steps Plan, (ii) not take, or direct any other party in taking, any action inconsistent with the Restructuring Term Sheet in respect of the distributions to the Revolving Lenders on account of or in connection with the CayCo Cash Collateral and the Pledged Incremental Coupon Loans and (iii) pursuant to and subject to this Agreement, take such actions as are reasonably necessary or appropriate to cause the RCF Exclusive Collateral to be distributed to or otherwise received by the Revolving Lenders on the Restructuring Effective Date in accordance with and as contemplated by the Restructuring Term Sheet;

**(b)**      upon consummation of the Restructuring pursuant to the Restructuring Documents, waive, release, set-off, discharge, or otherwise settle any and all of its unsecured claims of any kind or nature against the Company, except any PCF Debt or Notes held by such Shareholder Party (subject to the terms of the Restructuring Term Sheet); and

**(c)**      not (i) pledge or encumber (other than as in effect as of the date hereof) or assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other equity interests in the Group; or (ii) other than as held as of the date hereof, acquire any outstanding indebtedness of the Group, in each case, to the extent such pledge,

encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event will impair or adversely affect any of the Group's tax attributes (including under section 108 or 382 of the Internal Revenue Code of 1986 (as amended));

**(d)** except to the extent expressly provided hereunder or under the Restructuring Documents:

    **(i)** not enter into any transactions or agreements with the Group or receive any management or transaction fees or expense reimbursements from the Group; or

    **(ii)** without prejudice to the terms of the Restructuring, until after both the PCF Debt and Liquidity Facility Debt are paid in full in cash or as otherwise agreed to by the Majority Participating Lenders, in their sole discretion, not assert any claims of any kind or any priority against the Group, rights to indemnification and contribution under the Group's constituent documents or applicable state law; and

**(e)** not (i) pledge or encumber (other than as in effect as of the date hereof pursuant to the RCF Pledge and Security Agreement) or assign, sell, convey, dispose of, or otherwise transfer all or any of the RCF Exclusive Collateral or the right to receive any recovery, value or other distribution on account of any of the RCF Exclusive Collateral owned by it that are pledged under the RCF Pledge and Security Agreement, (ii) release any of the RCF Exclusive Collateral (or waive any right to RCF Exclusive Collateral) except as expressly contemplated pursuant to this Agreement, or (iii) other than as in effect as of the date hereof pursuant to the Existing Finance Documents, subordinate in right of payment or lien priority the RCF Exclusive Collateral.

**4.9**    **Restructuring Documents**

**(a)** The Company, the Participating Lenders and the Participating Noteholders undertake to promptly enter into good faith negotiations to agree upon:

    **(i)** a Steps Plan (which, once agreed, shall be annexed to this Agreement as a new Schedule);

    **(ii)** the Allocations Spreadsheet and Funds Flow;

    **(iii)** the precise terms of the Restructuring Documents as soon as reasonably practicable, provided that:

        **(A)** the Restructuring Documents shall be consistent in all material respects with the Restructuring Term Sheet and, if applicable, the Steps Plan;

        **(B)** in addition to Clause 4.9(a)(iii)(A) (*Restructuring Documents*), the Key Restructuring Documents shall be in form and substance reasonably satisfactory to the Company, the Majority Participating Lenders and the Majority Participating Noteholders (each of whose consents shall not be unreasonably withheld, conditioned or delayed);

        **(C)** in addition to Clause 4.9(a)(iii)(A) (*Restructuring Documents*), the Key Consultation Restructuring Documents shall be in form and substance reasonably satisfactory to the Company and the Majority Participating Lenders; provided that the HoldCo Group Parties shall have a consultation right with respect to the Key Consultation Restructuring Documents and the terms of the Key Consultation Restructuring Documents shall:

            **(1)** not impair the economic treatment or legal rights of the PCF Debt or Notes held by CayCo or any of its Affiliates as set forth in the Restructuring Term Sheet; or

**(2)** other than as expressly set forth in the Restructuring Term Sheet, not materially adversely or disproportionately affect the treatment of the PCF Debt or Notes held by CayCo or any of its Affiliates (as compared to the treatment of the other Participating PCF Lenders and other Participating Noteholders); and

**(D)** in addition to Clause 4.9(a)(iii)(A) (*Restructuring Documents*), the Key Other Restructuring Documents shall be in form and substance reasonably satisfactory to the Company and the Majority Participating Lenders provided that the HoldCo Group Parties shall have a consultation right with respect to the Key Other Restructuring Documents;

**(b)** The Scheme Companies and each of the other Parties, as applicable, shall use reasonable endeavors to procure that their respective legal advisers, to the extent practicable:

**(i)** provide the legal Advisers with drafts of:

**(A)** the Practice Statement Letter, prior to the date on which the applicable Scheme Company intends to issue the Practice Statement Letter, but in any event no less than ten (10) days in advance of the date set out in paragraph (b) of the Restructuring Conditions; and

**(B)** the Explanatory Statement, Scheme Document and all other pleadings to be filed with the Court in the proceedings seeking sanction of the Schemes prior to the date on which the applicable Scheme Company intends to file the relevant document or pleading, but in any event no less than ten (10) days in advance of the date on which the relevant Scheme Company intends to file the relevant document or pleading;

**(ii)** consult in good faith with the legal Advisers regarding the form and substance of any such documents or pleadings the applicable Scheme Company intends to file prior to submitting them in any proceedings before the Court, the Bankruptcy Court or the Canadian Court; and

**(iii)** reasonably in advance of the final date for launching the Schemes pursuant to paragraph (b) of the Restructuring Conditions:

**(A)** coordinate to have the Ad Hoc Group Advisers provide drafts of the following documents to the other Advisers: (1) the New Organizational Documents; (2) the New Shareholders Agreement; and (3) the Backstop Agreement;

**(B)** coordinate to have the HoldCo Advisers provide a draft of the Warrants Agreement to the other Advisers; and

**(C)** provide the legal Advisers with drafts of the New Term Loan Facility Agreement and any related intercreditor agreement.

**4.10    Potential Impediments**

Each Party shall promptly notify the Company (and the Company shall promptly notify each other Party upon receiving such notification) of any matter or circumstance which it knows, or suspects would reasonably be expected, to be a material impediment to the implementation or consummation of the Restructuring, unless it reasonably believes that any other person has already notified the Company of any such matter or circumstance (save where such notification would breach any applicable law, regulation or rules of any relevant stock exchange or governmental or other regulatory authority).

**4.11**    **Restrictions on Enforcement / Forbearance**

(a)    Until the RSA Termination Date or, if applicable to such Participating Creditor, the Participating Party Termination Date, each Participating Creditor agrees to forbear from taking any Enforcement Action or exercising any other remedies (including taking or instructing or encouraging another party to take, any Enforcement Action) in respect of any Default or Event of Default arising from or related to:

(i)    the Group's failure to make any interest payment due on and after April 24, 2019 until the RSA Termination Date, with respect to the revolving facility under the Parent Credit Facility Agreement;

(ii)    the Group's failure to make any interest payment due on and after April 30, 2019 until the RSA Termination Date with respect to the term loan facility under the Parent Credit Facility Agreement;

(iii)    the Group's failure to make any installment of principal due on and after May 1, 2019 until the RSA Termination Date with respect to any facility under the Parent Credit Facility Agreement;

(iv)    the Group's failure to make the interest payment due on and after May 1, 2019 until the RSA Termination Date with respect to the Notes Indenture;

(v)    the Group's failure to timely deliver an annual compliance certificate due on April 30, 2019 under the Notes Indenture;

(vi)    the Group's failure to timely deliver annual financial statements or related reports with respect to the fiscal year ended December 31, 2018 under the Liquidity Facility Agreement, the Parent Credit Facility Agreement or the Notes Indenture;

(vii)    the Group's failure to timely deliver quarterly financial statements or related reports until the RSA Termination Date including: (i) the fiscal quarter ended March 31, 2019 and (ii) the fiscal quarter ending June 30, 2019 under the Liquidity Facility Agreement, the Parent Credit Facility Agreement or the Notes Indenture;

(viii)    the Group's failure to timely deliver the Financial Plan (as defined in the Parent Credit Facility Agreement) with respect to the fiscal year ending December 31, 2019;

(ix)    the Group's failure to comply with milestones set forth in section 5.13 of the Liquidity Facility Agreement;

(x)    the Group's failure to comply with the minimum cash covenant set forth in Section 6.13(b) of the Liquidity Facility Agreement;

(xi)    the entry into this Agreement or any Restructuring Document or any step envisaged by the Steps Plan or otherwise in connection with the launch and/or implementation of the Restructuring (including, for the avoidance of doubt, the launch and/or sanction of the Schemes and/or the application for and/or approval of the recognition of the Schemes under any U.S. Proceedings or the Canadian Proceedings in accordance with this Agreement);

(xii)    any defaults or events of default arising from or related to the foregoing under the ABL Credit Agreement;

(xiii)    any default or event of default arising under Section 7.01(g)(iii) of the Parent Credit Facility Agreement; and/or

     **(xiv)**    any default or event of default arising under Section 7.01(g)(iii) of the Liquidity Facility Agreement;

    (the Defaults or Events of Default listed in paragraphs (i) to (xiv) above, the "**Specified Defaults**") provided that (1) on and after the RSA Termination Date or, if applicable to such Participating Creditor, the Participating Party Termination Date or the Individual Participating Party Termination Date, the agreements and forbearances set forth in this Clause 4.11(a) (*Restrictions on Enforcement / Forbearance*) as to such Party shall have no further force and effect, and such Party shall be permitted to exercise or take any Enforcement Action, including any remedies (including instructing or encouraging another party to take any Enforcement Action), in respect of any Default or Event of Default arising from the foregoing and (2) if a Participating Party Termination Date or an Individual Participating Party Termination Date occurs as to CayCo or any other HoldCo Group Party, then nothing in this Agreement shall restrict, limit or otherwise impair any Party that holds Revolving Loans, or any agent or representative thereof, from exercising any rights or remedies against, or taking any other Enforcement Action with respect to, the RCF Exclusive Collateral that may be available to such Party notwithstanding this Agreement.

**(b)**    Subject to the amendment, restatement and/or cancellation thereof, and/or the waiver or forbearance in respect of any provisions therein (including as expressly set out in this Agreement (including under this Clause 4.11 (*Restrictions on Enforcement / Forbearance*) and/or pursuant to the Restructuring), each of the Existing Finance Documents shall continue to have full force and effect and, following the occurrence of the RSA Termination Date or the Participating Party Termination Date (as applicable), the applicable Participating Creditors shall be free to pursue all their rights under the Existing Finance Documents.

**(c)**    For the avoidance of doubt, the forbearance in this Clause 4.11 (*Restrictions on Enforcement / Forbearance*) shall:

    **(i)**    not constitute a waiver with respect to any Defaults or Events of Default; and

    **(ii)**    not bar any Participating Creditor from filing a proof of claim in the Schemes, the U.S. Proceedings or the Canadian Proceedings, or taking action to establish the amount of such claim.

**(d)**    If the Restructuring is not consummated by the RSA Termination Date, the Parties fully reserve any and all of their rights, remedies, claims and defenses. Except as expressly provided in this Agreement and any applicable intercreditor agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Participating Creditor to protect and preserve any right, remedy, condition or approval requirement under this Agreement or the Restructuring Documents.

**(e)**    Subject to this Clause 4.11 (*Restrictions on Enforcement / Forbearance*), nothing in this Agreement shall limit, condition or restrict the Participating Liquidity Facility Lenders from:

    **(i)**    exercising any rights and remedies under the Liquidity Facility Agreement (and any related Loan Documents);

    **(ii)**    waiving or forbearing with respect to any "Default" or "Event of Default" under and as defined in the Liquidity Facility Agreement (and all related credit documents) other than the Specified Defaults;

    **(iii)**    amending, modifying or supplementing the Liquidity Facility Agreement (and any related credit documents); or

**(iv)**    refusing to make additional advances under the Liquidity Facility Agreement (and any related credit documents),

in each case in Clauses (i) through (iv) above, in accordance with the terms of the Liquidity Facility Agreement (and any related Loan Documents in respect of the Liquidity Facility Agreement).

**4.12    Notification of Breaches**

Each Party shall promptly notify the Company (and the Company shall promptly notify each other Party upon receiving such notification) of:

**(a)**    any representation or statement made or deemed to be made by it under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; and

**(b)**    the details of any breach by it of any undertaking given by it under this Agreement.

**4.13    Limitations on Undertakings**

Notwithstanding anything contained in this Agreement and notwithstanding any delivery of a consent or vote in support of the Schemes or the Restructuring by any Participating Creditor or Shareholder Party (as applicable), nothing in this Agreement shall:

**(a)**    be construed to prohibit any such Party from asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

**(b)**    be construed to prohibit any such Party from appearing as a party-in-interest in any matter to be adjudicated in a court of competent jurisdiction, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of delaying, interfering with, impeding, or taking any other action to delay, interfere with or impede, directly or indirectly, the Restructuring;

**(c)**    impair or waive the rights of any such Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring;

**(d)**    prevent any such Party from enforcing this Agreement;

**(e)**    require any such Party to incur any material financial or other material liability in connection with effectuating or otherwise implementing this Agreement, the Restructuring Documents or the Restructuring, except as specifically provided for in this Agreement or such Restructuring Document;

**(f)**    obligate such Party to deliver a vote or prohibit such Party from withdrawing such vote in each case on or after the RSA Termination Date or, if applicable to such Party, the Participating Party Termination Date or the Individual Participating Party Termination Date (in each case, other than as a result of the occurrence of the Restructuring Effective Date); provided that upon the withdrawal of any such vote on or after the RSA Termination Date, or, if applicable to such Party, the Participating Party Termination Date or the Individual Participating Party Termination Date (in each case other than as a result of the occurrence of the Restructuring Effective Date), such vote shall be deemed void *ab initio* and such Party shall have the opportunity to change its vote;

**(g)**    require any such Party to take any action which is prohibited by applicable law; or

**(h)**    prevent any such Party from taking any action which is required by applicable law.

## 5        PARTICIPATING CREDITOR PERMITTED TRANSFERS

5.1      Until the RSA Termination Date, or if applicable to such Participating Creditor, the Participating Party Termination Date or the Individual Participating Party Termination Date, no Participating Creditor shall assign any of its rights or transfer (by novation, sub-participation or otherwise) all or any part of its rights or obligations of, grant any proxies, or declare or create any trust over any of its rights, title, interest or benefits in respect of, its Locked-up Debt or this Agreement (including any monies owed and other assets owing to it under or in connection with the Locked-up Debt or this Agreement) to, or in favor of, any person who is not a Participating Creditor:

(a)      except as permitted under the relevant Existing Finance Documents; and

(b)      unless and until such assignee or transferee delivers to the Information Agent and Weil a duly executed and completed Creditor Accession Deed in accordance with Clause 2.2 (*Creditor Accession*) or a duly executed and completed Sub-Participant Accession Deed in accordance with Clause 2.3 (*Sub-Participant Accession)* (as applicable),

except that, where a Participating Lender grants a sub-participation in respect of any of its Locked-up Bank Debt, it shall be acceptable for such Participating Lender to include the relevant amount of Locked-up Bank Debt that is subject to sub-participation as part of its own Locked-up Bank Debt and for the sub-participant not to execute a Sub-Participant Accession Deed in respect of the Locked-up Bank Debt that is subject to sub-participation, provided that the Participating Lender retains the necessary voting and other rights and obligations in respect of the relevant Locked-up Bank Debt that is subject to sub-participation and complies with its obligations in respect thereof as part of its Locked-up Bank Debt under this Agreement (the requirements set forth in this Clause 5.1, the "**Transfer Requirements**").

5.2      Nothing in this Agreement shall prevent any Participating Creditor from purchasing or otherwise acquiring rights to control Debt in addition to its Locked-up Debt, provided that any such Debt shall automatically become Locked-up Debt of that Participating Creditor and any vote by the transferor in favor of any Scheme shall be binding upon the transferee.

5.3      Each Participating Creditor shall promptly, but in any event not later than three (3) Business Days notify the Information Agent of any increase or decrease in the principal amount of its Locked-up Debt from time to time.  If there is an increase in the aggregate principal amount of Locked-up Debt held by all of the Participating Creditors, the Information Agent shall promptly notify Weil of such increased aggregate amount.

5.4      A purported transfer (by novation, assignment, sub-participation or otherwise), the granting of any proxy, or the declaration or creation of any trust by any Participating Creditor which is not in accordance with this Clause 5 (*Participating Creditor Permitted Transfers*) shall be void and have no effect.

5.5      Upon transfer by a Participating Creditor of all of its Locked-up Debt in accordance with this Clause 5 (*Participating Creditor Permitted Transfers*), such Participating Creditor shall immediately cease to be a Party to this Agreement in its capacity as a Participating Creditor (and shall cease to be a Participating Creditor for the purpose of this Agreement) and this Agreement shall in such case continue among the remaining Parties, provided that this Clause 5 (*Participating Creditor Permitted Transfers)* shall be:

(a)      without prejudice to the accrued rights of the Participating Creditor against any other Party or the accrued rights of any other Party against the Participating Creditor with respect to any prior breaches of any of the terms of this Agreement; and

(b)      without limitation to the obligations of any Party against the remaining Parties under the terms of this Agreement.

**5.6**    If a Participating Creditor which ceased to be a Participating Creditor in accordance with Clause 5.5 above acquires Debt after ceasing to be a Participating Creditor, it shall automatically accede to this Agreement as a Participating Creditor again.

**5.7**    Notwithstanding anything in this Agreement to the contrary, a Qualified Market Maker that acquires any Debt with the purpose and intent of acting as a Qualified Market Maker for such Debt shall not be required to execute and deliver an Accession Deed in respect of such Debt if (i) such Qualified Market Maker subsequently transfers such Debt (by purchase, sale assignment, participation, or otherwise) on or by the earlier of (x) five (5) Business Days of its acquisition thereof to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor or (y) the Restructuring Effective Date; (ii) the Qualified Market Maker agrees that if it holds such Debt on or immediately prior to any voting deadline in connection with any matter on which a Scheme Creditor would be required to vote pursuant to Clause 4.6 (*Scheme Creditor Undertakings*), it will take all such necessary steps to promptly and timely vote or instruct its proxy or other relevant person to timely vote and comply with each other undertaking pursuant to Clause 4.6 (*Scheme Creditor Undertakings*) as if it were a Scheme Creditor; and (iii) the transfer and transferee otherwise satisfy the Transfer Requirements.  To the extent that a Participating Creditor is acting in its capacity as a Qualified Market Maker, it may transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Debt that the Qualified Market Maker acquires from a holder of the Debt who is not a Participating Creditor without the requirement that the transfer satisfy the Transfer Requirements.  In the event any Qualified Market Maker is a Participating Creditor as of the Effective Time, its obligations hereunder shall be limited to the Debt it beneficially owns as of the Effective Time.

**5.8**    Notwithstanding anything in this Agreement to the contrary, any HoldCo Group Party may assign or transfer any of its PCF Debt and/or any of its Notes to any of its Affiliates, including any of its direct or indirect holders of equity interests or affiliates thereof; provided that such assignee or transferee agrees to be bound to the terms hereof by acceding as an Additional Participating Creditor to, and in accordance with, this Agreement.

## 6    LIMITATIONS

**6.1**    Nothing in this Agreement, including in Clause 4 (*General Undertakings*), shall:

    **(a)**    require any member of the Group, Participating Creditor, Shareholder Party, direct or indirect holders of equity interests in a Shareholder Party or the members of their respective management boards or directors to (whether by action or omission) breach, or procure the breach of: (i) any law or regulation or fiduciary duties or comparable liability concepts under applicable law (such as capital or liquidity maintenance rules for upstream collateral) or its constitutional documents; or (ii) any order or direction of any relevant court or governmental, supervisory or regulatory body;

    **(b)**    restrict or attempt to restrict any officer of any member of the Group from complying with any legal obligation or any fiduciary duty of the members of its management board or its directors (reasonably taking into account the best interests of the relevant member of the Group) to commence Insolvency Proceedings in respect of that member of the Group, in each case provided that where possible and lawful, the Company shall in good faith give notice to the Participating Creditors and Shareholder Parties of its (or the relevant member of the Group's) intended actions in accordance with Clause 4.3(c) (*Insolvency Filings*);

    **(c)**    restrict or attempt to restrict any officer of any member of the Group from undertaking measures which, under applicable law in respect of this or any other member of the Group, are designed to cure otherwise existing mandatory insolvency grounds based on illiquidity or over-indebtedness, such as the subordination of intercompany receivables, the issuance of a letter of support or comparable instruments.

(d)    require any Party to take any action, or omit to take any action, which is inconsistent with the Schemes;

(e)    require any Participating Creditor or Shareholder Party to increase or extend any existing debt financing or to make any additional equity and/or debt financing available to the Company or any other member of the Group except as expressly contemplated in this Agreement or other Restructuring Documents;

(f)    prevent any Participating Creditor from exercising its rights in accordance with the Existing Finance Documents which are not suspended or forborne by such Participating Creditor in accordance with the terms of this Agreement;

(g)    prevent any Participating Creditor or Shareholder Party (or their respective Affiliates) from providing, debt financing, equity capital or other services (including advisory services) or from carrying on its activities in the ordinary course and providing services to clients (including to others who may have a conflicting interest to the Restructuring);

(h)    require any Party to bring or become party to any legal or arbitration proceedings (other than as expressly contemplated by this Agreement);

(i)    prevent or restrict any Party from bringing proceedings or taking such action or steps which the Company, Majority Participating Lenders and Majority Participating Noteholders consider to be reasonably necessary or desirable to implement or consummate the Restructuring, except as otherwise set forth in this Agreement; or

(j)    prevent any Party from bringing legal proceedings against any person solely for the purpose of:

(i)    obtaining injunctive relief (or any analogous remedy) to restrain any actual or putative breach of this Agreement; or

(ii)    obtaining specific performance in respect of any obligations set out in this Agreement.

6.2    Clause 6.1 above does not apply to, and shall not serve to restrict the taking of, any action which has the prior written consent of the Company, the relevant member of the Group, the Majority Participating Lenders and the Majority Participating Noteholders.

6.3    Solely by signing this Agreement:

(a)    none of the Participating Creditors shall have any fiduciary duty, any duty of trust or, subject to the terms of this Agreement, any confidentiality provisions under the Existing Finance Documents and any applicable confidentiality agreements, confidence in any form to any other Participating Creditor, any Shareholder Party, the Company, any Group Company or their respective affiliates, or their or their affiliates' creditors or other stakeholders, including, without limitation, any holders of Notes, any Liquidity Facility Lenders or PCF Lenders, or any holders of direct or indirect ownership or equity interests in the Company or any Group Company, and, other than as expressly set forth in this Agreement, any confidentiality provisions under the Existing Finance Documents and any applicable confidentiality agreements, there are no commitments among or between the Participating Creditors and the Shareholder Parties. Except as expressly set forth in the terms of this Agreement and any other applicable confidentiality agreement, no prior history, pattern or practice of sharing confidences among or between any of the Participating Creditors, the Shareholder Parties, the Company and/or any Group Company shall in any way affect or negate this understanding and agreement; and

**(b)**  none of the Shareholder Parties shall have any fiduciary duty, any duty of trust or, subject to the terms of this Agreement and any applicable confidentiality agreements, confidence in any form to any Participating Creditors, the Company, any Group Company or their respective affiliates, or their or their affiliates' creditors or other stakeholders; and

**(c)**  other than as expressly set forth in this Agreement, any confidentiality provisions under the Existing Finance Documents and any applicable confidentiality agreements, there are no commitments among or between the Participating Creditors and the Shareholder Parties.

**7**  **THE INFORMATION AGENT**

**7.1**  The Information Agent shall be responsible for, among other things, the receipt and processing of Creditor Accession Deeds and Sub-Participant Accession Deeds, and the decision of the Information Agent in relation to any such reconciliations and calculations (as applicable) which may be required shall be final (in the absence of manifest error) and may not be disputed by any Participating Creditor and each Participating Creditor hereby unconditionally and irrevocably waives and releases any claims which may arise against the Company or the Information Agent after the date of this Agreement (save in the case of wilful misconduct, fraud or gross negligence) in each case in relation to the Information Agent's performance of its roles in connection with this Agreement. The Information Agent shall provide any Participating Creditor with such information relating to the calculations and reconciliations referred to above as that Participating Creditor may reasonably request for the purposes of evaluating and checking such calculations and reconciliations.

**7.2**  In undertaking such reconciliation and calculation, the Information Agent and/or the Company may request, and the relevant Participating Creditor shall deliver, such evidence as may reasonably be required by the Information Agent and/or the Company proving (to the reasonable satisfaction of the Information Agent and/or the Company (as applicable)):

**(a)**  that it is the Beneficial Owner of the Locked-up Debt in relation to which a Participating PCF Lender, Participating Liquidity Facility Lender, or Participating Noteholder claims it has signed this Agreement, a Creditor Accession Deed or a Sub-Participant Accession Deed; and

**(b)**  with respect to a Participating PCF Lender or Participating Noteholder, its entitlement to receive the PCF Lender Lock-up Payment and/or Noteholder Lock-up Payment, as applicable, in respect of any Locked-up Debt of which it is the Beneficial Owner and in respect of which it claims such entitlement.

**7.3**  For the avoidance of doubt, the Information Agent will reconcile the entitlements of any Participating PCF Lender or Participating Noteholder to the PCF Lender Lock-up Payment and/or Noteholder Lock-up Payment, as applicable, based on verification from each Participating PCF Lender and Participating Noteholder:

**(a)**  that it is the Beneficial Owner of the Locked-up Debt; and

**(b)**  if relevant, of the details of any transfers (including without limitation the identity of any transferee) pursuant to which it has become or ceased to be the Beneficial Owner of Locked-up Debt.

**7.4**  Any incomplete or inaccurate information provided under this Agreement or otherwise by any Participating PCF Lender or Participating Noteholder may void such Participating PCF Lender's or Participating Noteholder's entitlement to the PCF Lock-up Payment and/or Noteholder Lock-up Payment (as applicable) under this Agreement.

**8**  **TERMINATION**

**8.1**  **Mutual Voluntary Termination**

This Agreement may be terminated with immediate effect by the mutual written consent of the Company, the Majority Participating Lenders, the Majority Participating Noteholders and the Shareholder Parties.

**8.2     Company Voluntary Termination**

The Company or the Borrower/Issuer may, upon five (5) Business Days written notice to the other Parties, terminate this Agreement with respect to all Parties if:

**(a)**     if, beginning on the day that is fourteen (14) days after the Effective Time, any Aggregate Locked-up Debt is less than the applicable Scheme Threshold;

**(b)**     the Restructuring is amended or modified other than in accordance with this Agreement (including Clause 4.2(a)(v) (*All Parties Undertakings*)) in any material respect which is likely to adversely affect or conflict with the terms of the Restructuring as set out in the Restructuring Term Sheet and, when applicable, the Steps Plan;

**(c)**     any Restructuring Document is amended, restated, varied or supplemented (or any combination thereof) in a manner inconsistent with Clause 4.9 (*Restructuring Documents*);

**(d)**     a final order of a relevant court or governmental body restraining or otherwise preventing the implementation of the Restructuring has been made and has not been revoked or dismissed within thirty (30) days of it being made (other than an order made at the instigation of or on the application of the Company purporting to terminate this Agreement under this sub-clause);

**(e)**     any representation or warranty of any Participating Creditor or Shareholder Party under this Agreement proves to have been incorrect or misleading in any material respect and, if capable of remedy, is not remedied within five (5) Business Days from the earlier of the date on which the relevant Participating Creditor or Shareholder Party becomes aware of the inaccuracy or is given notice of such breach; <u>provided</u> that the foregoing shall not apply if (x) other Scheme Creditors have timely submitted (and not withdrawn) votes that otherwise satisfy the Scheme Threshold (PCF) and the Scheme Threshold (Notes) in which case the Company may only terminate this Agreement in respect of the breaching Scheme Creditor; or (y) (i) Participating PCF Lenders not otherwise in breach as of the date of determination own or control PCF Debt in excess of the Scheme Threshold (PCF); and (ii) Participating Noteholders not otherwise in breach as of the date of determination own or control Notes in excess of the Scheme Threshold (Notes);

**(f)**     any Participating Creditor or Shareholder Party is in breach in a material respect of any of its obligations or undertakings under the terms of this Agreement and, if capable of remedy, such breach is not remedied within five (5) Business Days from the date on which the relevant Participating Creditor or Shareholder Party is given notice of such breach; <u>provided</u> that the foregoing shall not apply if (x) other Scheme Creditors have timely submitted (and not withdrawn) votes that otherwise satisfy the Scheme Threshold (PCF) and the Scheme Threshold (Notes), in which case the Company may only terminate this Agreement in respect of the breaching Participating Creditor; or (y) (i) Participating PCF Lenders not otherwise in breach as of the date of determination own or control PCF Debt in excess of the Scheme Threshold (PCF); and (ii) Participating Noteholders not otherwise in breach as of the date of determination own or control Notes in excess of the Scheme Threshold (Notes);

**(g)**     the Majority Participating Liquidity Facility Lenders, the Majority Participating PCF Lenders, the Majority Participating Noteholders or any of the Shareholder Parties terminate any of their obligations under and in accordance with this Agreement;

**(h)**    any Participating Creditor fails to timely vote all its Locked-up Debt in accordance with, and at the times specified by, this Agreement; provided that the foregoing shall not apply if (x) other Scheme Creditors have timely submitted (and not withdrawn) votes that otherwise satisfy the Scheme Threshold (PCF) and the Scheme Threshold (Notes) or (y) (i) Participating PCF Lenders not otherwise in breach as of the date of determination own or control PCF Debt in excess of the Scheme Threshold (PCF); and (ii) Participating Noteholders not otherwise in breach as of the date of determination own or control Notes in excess of the Scheme Threshold (Notes);

**(i)**    the board of directors, managers, members, or partners (or comparable body), as applicable, of any Company Party determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law in accordance with Clause 6 (*Limitations*);

**(j)**    the Court, the Bankruptcy Court or the Canadian Court enters an order authorizing (or otherwise authorizes) any party to proceed against any material asset of the Group or that would materially and adversely affect any of the Group's ability to operate their businesses in the ordinary course;

**(k)**    if any of the Chapter 15 Order, the Canadian Recognition Order or the order sanctioning the Schemes is reversed, stayed, dismissed, vacated, reconsidered, modified or amended in a manner inconsistent with this Agreement without the consent of the Company;

**(l)**    any Group Company or any of the members of their respective management boards or directors determines to pursue an Alternative Restructuring in reliance on any of their rights set forth in Clauses 6.1(a), 6.1(c) or 8.2(i); or

**(m)**    the Court refuses to (i) give leave to sanction the Creditors' meetings or (ii) sanction the Schemes.

**8.3    Participating Party Voluntary Termination**

This Agreement may be terminated by Participating Creditors as follows:  (x) the Majority Participating Liquidity Facility Lenders shall have the right, but not the obligation, upon five (5) Business Days written notice to the other Parties, to terminate the rights and obligations of the Participating Liquidity Facility Lenders under this Agreement; (y) the Majority Participating PCF Lenders shall have the right, but not the obligation, upon five (5) Business Days' written notice to the other Parties, to terminate the rights and obligations of the Participating PCF Lenders under this Agreement; and (z) the Majority Participating Noteholders shall have the right, but not the obligation, upon five (5) Business Days written notice to the other Parties, to terminate the rights and obligations of the Participating Noteholders under this Agreement, in each case, upon the occurrence of any of the following events, in which case this Agreement shall continue in full force and effect in respect to all other Parties:

**(a)**    if, beginning on the day that is fourteen (14) days after the Effective Time, any Aggregate Locked-up Debt is less than the applicable Scheme Threshold;

**(b)**    the Restructuring is amended or modified other than in accordance with this Agreement in any material respect which is likely to adversely affect or conflict with the terms of the Restructuring as set out in the Restructuring Term Sheet and, when applicable, the Steps Plan;

**(c)**    any Restructuring Document is amended, restated, varied or supplemented (or any combination thereof) in a manner inconsistent with Clause 4.9 (*Restructuring Documents*);

**(d)**    a final order of a relevant court or governmental body restraining or otherwise preventing the implementation of the Restructuring has been made and has not been revoked,

withdrawn or dismissed within thirty (30) days of it being made (other than an order made at the instigation of or on the application of the group of the Participating Creditors and/or Shareholder Parties purporting to terminate this Agreement under this sub-clause);

**(e)**     any representation or warranty of any of the Parties under this Agreement proves to have been incorrect or misleading in any material respect and it could reasonably be expected to have a material adverse impact on the consummation of the Restructuring and, if capable of remedy, is not remedied within five (5) Business Days from the earlier of the date on which the applicable Party becomes aware of the inaccuracy or is given notice of such inaccuracy; provided that a Party cannot rely on its own misrepresentation or breach of warranty and the foregoing shall not apply if:

       **(i)**     Participating PCF Lenders not otherwise in breach as of the date of determination own or control PCF Debt in excess of the Scheme Threshold (PCF); and

       **(ii)**    Participating Noteholders not otherwise in breach as of the date of determination own or control Notes in excess of the Scheme Threshold (Notes);

**(f)**     any Company Party or Shareholder Party is in breach in a material respect of any of its obligations or undertakings under the terms of this Agreement and, if capable of remedy, such breach is not remedied within five (5) Business Days from the date on which the relevant Company Party or Shareholder Party is given notice of such breach;

**(g)**     any Participating Creditor is in breach in a material respect of any of its obligations or undertakings under the terms of this Agreement and, if capable of remedy, such breach is not remedied within five (5) Business Days from the date on which the relevant Participating Creditor is given notice of such breach; provided that the foregoing shall not apply if (x) other Scheme Creditors have timely submitted (and not withdrawn) votes that otherwise satisfy the Scheme Threshold (PCF) and the Scheme Threshold (Notes), in which case, the Majority Participating Liquidity Facility Lenders, Majority Participating PCF Lenders and/or Majority Participating Noteholders may only terminate this Agreement in respect of the breaching Participating Creditor; or (y) (i) Participating PCF Lenders not otherwise in breach as of the date of determination own or control PCF Debt in excess of the Scheme Threshold (PCF); and (ii) Participating Noteholders not otherwise in breach as of the date of determination own or control Notes in excess of the Scheme Threshold (Notes);

**(h)**     the Company, the Borrower/Issuer or any of the Shareholder Parties terminate any of its or their obligations under and in accordance with this Agreement or the Majority Participating Liquidity Facility Lenders, the Majority Participating PCF Lenders or the Majority Participating Noteholders terminate any of their respective obligations under this Agreement;

**(i)**     any Company Party fails to satisfy any of the Restructuring Conditions by the applicable date set forth therein;

**(j)**     the ABL Lender takes any Enforcement Action in respect of any Company Party under the ABL Credit Agreement or any other Loan Document (as defined in the ABL Credit Agreement) and such action could reasonably be expected to have a material adverse impact on the consummation of the Restructuring;

**(k)**     any Company Party pays any amount in respect of any Excess Funding (as defined in the ABL Credit Agreement) in existence as of the Effective Time before the earlier of the Restructuring Effective Date or September 30, 2019;

**(l)**     (i) the commencement by or against a Company Party of a case under the Bankruptcy Code other than the U.S. Proceedings that is not dismissed within 21 days, (ii) the dismissal of

the U.S. Proceedings, or (iii) the appointment of a trustee, administrator, receiver or examiner with expanded powers beyond those described in section 1106(a)(3) and (4) of the Bankruptcy Code in the U.S. Proceedings or in related proceedings;

**(m)**     the Group incurs any additional third party financing under the Liquidity Facility Agreement or any other funded debt financing facility that is not contemplated by the Restructuring Term Sheet, this Agreement or otherwise consented to by the Majority Participating Lenders and the Majority Participating Noteholders;

**(n)**     the occurrence of any Default or Event of Default other than the Specified Defaults relating to facts and circumstances that arise after the Effective Time provided that the termination event set forth in this paragraph shall only be assertable by the Majority Participating Liquidity Facility Lenders and/or the Majority Participating PCF Lenders;

**(o)**     the Company or any other Party files a motion, application, or adversary proceeding (or the Company or other Party supports any such motion, application, or adversary proceeding filed or commenced by any third party):

    **(i)**     challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Bank Debt or asserting any other cause of action against a Participating Lender or with respect to or relating to such Bank Debt or the prepetition liens securing the Bank Debt provided that this termination shall only be assertable by: (x) the Majority Participating Liquidity Facility Lenders and/or the Majority Participating PCF Lenders to the extent that such motion, application, or adversary proceeding would adversely affect the Participating Liquidity Facility Lenders or Participating PCF Lenders, as applicable; or (y) CayCo in its capacity as a Participating PCF Lender to the extent that such motion, application, or adversary proceeding would adversely affect CayCo in its capacity as a Participating PCF Lender in connection with the Incremental Term Loans (as defined in the Restructuring Term Sheet), in which case this Agreement shall terminate in respect of CayCo in this capacity only and not in respect of any other Parties; or

    **(ii)**     challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, any portion of the Notes or asserting any other cause of action against the Participating Noteholders or with respect or relating to such Notes, provided that this termination event shall only be assertable by the Majority Participating Noteholders;

provided that the Participating Creditors seeking to rely on this provision are not in breach of the provisions of this Agreement;

**(p)**     either the Court, Bankruptcy Court, or Canadian Court (or any court with jurisdiction over the Schemes, the U.S. Proceedings or Canadian Proceedings) enters an order with respect to any of the foregoing at Clause 8.3(o) that is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect, provided that this termination shall only be assertable by: (x) the Majority Participating Liquidity Facility Lenders, the Majority Participating PCF Lenders and/or the Majority Participating Noteholders to the extent that such order would adversely affect the Participating Liquidity Facility Lenders, Participating PCF Lenders or Participating Noteholders, as applicable; or (y) CayCo in its capacity as a Participating PCF Lender to the extent that such order would adversely affect CayCo in its capacity as a Participating PCF Lender in connection with the Incremental Term Loans, in which case this Agreement shall terminate in respect of CayCo in this capacity only and not in respect of any other Parties;

**(q)**     the Court, the Bankruptcy Court or the Canadian Court enters an order authorizing (or otherwise authorizes) any party to proceed against any material asset of the Group or that

would materially and adversely affect any of the Group's ability to operate their businesses in the ordinary course;

**(r)**     if (A) any of the Chapter 15 Order, the Canadian Recognition Order or the order sanctioning the Schemes is reversed, stayed, dismissed, vacated, reconsidered, modified or amended in a manner inconsistent with this Agreement without the consent of the Majority Participating Lenders and the Majority Participating Noteholders, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Group has failed to timely object to such motion, <u>provided</u> that this termination shall only be assertable by: (x) the Majority Participating Liquidity Facility Lenders, Majority Participating PCF Lenders and/or the Majority Participating Noteholders to the extent that such order or such motion with respect to any such order would adversely affect the Participating Liquidity Facility Lenders, Participating PCF Lenders or Participating Noteholders, as applicable; or (y) CayCo in its capacity as a Participating PCF Lender to the extent that such order or such motion with respect to any such order would adversely affect CayCo in its capacity as a Participating PCF Lender in connection with the Incremental Term Loans, in which case this Agreement shall terminate in respect of CayCo in this capacity only and not in respect of any other Parties; or

**(s)**     any member of the Group or any of the members of their respective management boards or directors determines to pursue an Alternative Restructuring in reliance on any of their rights set forth in Clauses 6.1(a), 6.1(c) or 8.2(i).

## 8.4     Automatic Termination

This Agreement will terminate immediately upon the occurrence of the earlier of:

**(a)**     the Restructuring Effective Date;

**(b)**     the Longstop Date; and

**(c)**     the occurrence of Insolvency Proceedings in respect of the Company or the Borrower/Issuer, other than:

    **(i)**     as a result of a breach of the provisions of this Agreement by the Participating Creditors seeking to rely on this provision; or

    **(ii)**     that is contemplated in the Restructuring Term Sheet or the Steps Plan or instigated with the consent of the Company, Majority Participating Lenders and Majority Participating Noteholders,

provided that, an involuntary bankruptcy petition, winding-up petition (or equivalent under local law) filed against one or more Group Companies shall not constitute an Insolvency Proceeding giving rise to such a termination unless and until such petition has been granted or where such petition remains outstanding for not less than 45 days after filing;

## 8.5     Individual Participating Party Automatic Termination

**(a)**     Subject to Clause 5.6 (*Participating Creditor Permitted Transfers)*, upon any Participating Creditor assigning, transferring or otherwise disposing of all of its Locked-up Debt in accordance with Clause 5 (*Participating Creditor Permitted Transfers)* this Agreement will terminate immediately in respect of that Participating Creditor only.

**(b)**     In the event that a materially adversely or disproportionately affected Participating Lender, Participating Noteholder or Shareholder Party (the "**Non-Consenting Party**") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of such Non-Consenting Party under Clause 13.1(f) (*Amendments*) but such waiver,

change, modification, or amendment receives the consent of the Company, Majority Participating Lenders and Majority Participating Noteholders, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Party, but this Agreement shall continue in full force and effect in respect to all other Parties.

**8.6**    **Effect of Termination**

**(a)**    If this Agreement terminates as a result of the RSA Termination Date occurring, all Parties shall immediately be released from all of their undertakings and other obligations under this Agreement, provided that such termination and release:

   **(i)**    shall not limit or prejudice the rights of each Party against any other Party which have accrued or relate to breaches of the terms of this Agreement at the time of or prior to termination;

   **(ii)**    shall not limit the effectiveness of Clauses 1 (*Interpretation*), 3 (*Parties' Rights and Obligations*), 8.6 (*Effect of Termination*), 10 (*Specific Performance*), 11 (*Confidentiality*), 17 (*Miscellaneous*), 18 (*Notices*) and 19 (*Governing law and Jurisdiction*) the provisions of which shall continue to apply to each of the Parties; and

   **(iii)**    shall not affect the obligation of the Company to pay within five (5) Business Days of such termination date all Evidenced Adviser Fees actually incurred, provided that in no instance shall the Company have an obligation to pay Evidenced Adviser Fees incurred by a Party in breach of this Agreement.

**(b)**    If (1) CayCo, along with its Affiliates, exercise their rights as Majority Participating Noteholder pursuant to Clause 8.3 (*Participating Party Voluntary Termination*) to terminate the obligations of the Participating Noteholders under this Agreement or (2) CayCo exercises its rights as a Participating Creditor pursuant to Clause 8.5 (*Individual Participating Party Automatic Termination*) to terminate its obligations under this Agreement, the rights and obligations of each Shareholder Party and each HoldCo Group Party (in such Party's respective capacity as a Participating PCF Lender and Participating Noteholder) under this Agreement shall terminate simultaneously.

**(c)**    If this Agreement terminates as a result of the Participating Party Termination Date or the Individual Participating Party Termination Date occurring, the relevant Participating Liquidity Facility Lender(s), Participating PCF Lender(s), Participating Noteholder(s), or Shareholder Parties (as applicable) shall immediately be released from all of its or their undertakings and other obligations under this Agreement (as applicable), provided that such termination and release:

   **(i)**    other than in accordance with the terms of this Agreement, shall not terminate any rights or obligation of any other Party under this Agreement, which shall remain in full force and effect;

   **(ii)**    shall not limit or prejudice the rights of each Party against any other Party which have accrued or relate to breaches of the terms of this Agreement at the time of or prior to termination; and

   **(iii)**    shall not limit the effectiveness of (x) in the case of the occurrence of a Participating Party Termination Date, Clauses 1 (*Interpretation*), 3 (*Parties' Rights and Obligations*), 8.6 (*Effect of Termination*), 10 (*Specific Performance*), 11 (*Confidentiality*), 17 (*Miscellaneous*), 18 (*Notices*) and 19 (*Governing law and Jurisdiction*), and (y) in the case of the occurrence of an Individual Participating Party Termination Date, in addition to the foregoing, Clause 4.11 (*Restrictions on*

*Enforcement / Forbearance*), the provisions of which shall continue to apply to each of the Parties.

**8.7     Notification of Termination**

The Company shall promptly notify the Participating Creditors and the Shareholder Parties if it becomes aware of (i) any circumstances arising which could give grounds for this Agreement to be terminated or (ii) that this Agreement may be, or has been, terminated under this Clause 8 (*Termination*) or that a Participating Creditor may terminate, or has terminated, this Agreement with respect to itself under Clause 8.5 (*Individual Participating Party Automatic Termination*).

**9        REPRESENTATIONS AND WARRANTIES**

**9.1     Timing**

The representations and warranties in this Clause are made:

**(a)**     on the date of this Agreement;

**(b)**     in respect of an Additional Participating Creditor, on the date on which it becomes a Party; and

**(c)**     in the case of a Participating Creditor which automatically accedes to this Agreement pursuant to Clause 5.6 (*Participating Creditor Permitted Transfers)*, on the date of such accession.

Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is to be made.

**9.2     All Parties Representations and Warranties**

Each Party, severally and not jointly, represents and warrants to the other Party as follows:

**(a)**     it is duly incorporated (if a corporate person) or duly established (in any other case) and validly existing under the laws of its jurisdiction of incorporation or formation;

**(b)**     it and, if applicable, the duly authorized attorney acting on its behalf has all requisite power, authority and legal capacity to execute and deliver this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement and the Restructuring;

**(c)**     the execution, delivery and performance of this Agreement by it and, if applicable, the duly authorized attorney acting on its behalf do not and shall not require any registration, filing, consent, approval, notice or other action to, with or by, any governmental authority, court or regulatory body, except as expressly provided in this Agreement; and

**(d)**     this Agreement has been duly and validly executed and delivered by it and, if applicable, the duly authorized attorney acting on its behalf and this Agreement represents its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject to any applicable Reservations.

**9.3     Participating Creditor Representations and Warranties**

Each Participating Creditor, severally and not jointly, represents and warrants to the Company that:

**(a)**     it is the holder or investment adviser or manager of its Locked-up Debt;

44

**(b)**      in the case of each Original Participating Creditor, the aggregate outstanding principal amount of its Locked-up Debt as at the date of this Agreement is set out on its signature page to this Agreement and such Original Participating Creditor does not own any other Debt;

**(c)**      in the case of each Additional Participating Creditor, the aggregate outstanding principal amount of its Locked-up Debt as at the date of its accession to this Agreement is set out in its Creditor Accession Deed and such Additional Participating Creditor does not own any other Debt;

**(d)**      it is legally entitled and able to control the exercise and the casting of votes in relation to, and bind the legal entity which is the record owner of, its Locked-up Debt in order to comply with the terms of and its obligations under this Agreement and to implement the Restructuring (or, if any of its Bank Debt has been sub-participated with a transfer of voting rights to the sub-participant, it has obtained instructions authorizing it to do so and its sub-participant has acceded to this Agreement by executing a Sub-Participant Accession Deed);

**(e)**      other than pursuant to this Agreement and any sub-participation in respect of which its sub-participant has acceded to this Agreement by executing a Sub-Participant Accession Deed, its Locked-up Debt is free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Participating Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

**(f)**      has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company Parties that it considers sufficient and reasonable for purposes of entering into this Agreement; and

**(g)**      is an accredited investor as such term is defined in Rule 501(a) of Regulation D under the Securities Act.

**9.4**      **Shareholder Party Representations and Warranties**

**(a)**      Each Shareholder Party, severally and not jointly, represents and warrants to the Company that it:

         **(i)**      has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company Parties that it considers sufficient and reasonable for purposes of entering into this Agreement; and

         **(ii)**      is an accredited investor as such term is defined in Rule 501(a) of Regulation D under the Securities Act.

**10**      **SPECIFIC PERFORMANCE**

Each Party agrees and acknowledges for the benefit of the other Party that:

**(a)**      damages are not an adequate remedy for any breach of the terms of this Agreement by either Party; and

**(b)**    specific performance and/or relief to compel performance are appropriate remedies for any such breach and any such remedies shall not be exclusive but shall be cumulative and in addition to any other remedies available to any Party.

## 11    CONFIDENTIALITY

**11.1**    Except as provided herein, the Parties shall not disclose any Confidential Information to any other person without the relevant Participating Creditor's prior written consent provided that:

**(a)**    the Company may disclose at any time the Aggregate Locked-up Liquidity Facility Debt, Aggregate Locked-up PCF Debt and Aggregate Locked-up Notes;

**(b)**    the Company may disclose a copy of this Agreement (and any notices served hereunder) to the notes trustee under the Notes Indenture, the agents under the Liquidity Facility Agreement and the Parent Credit Facility Agreement and the Information Agent, provided (x) the copy of this Agreement so disclosed shall be redacted to keep the amount of Debt held by each Participating Creditor and the number of shares in syncreon Global Holdings Limited held by each Shareholder Party confidential and (y) such recipients keep the Confidential Information confidential on the same terms as this Clause 11 (*Confidentiality*);

**(c)**    the Company or the Borrower/Issuer may disclose this Agreement to the extent necessary to progress or implement the Restructuring to any member of the Group or to any of their or the Group's Connected Persons, provided that prior to such disclosure the relevant member of the Group or Connected Person has agreed with the Company or the Borrower/Issuer, as applicable, to keep the Confidential Information confidential on the terms of this Clause 11 (*Confidentiality*) (unless already bound by law, regulation, or professional duty to keep the same confidential);

**(d)**    each Participating Creditor and Shareholder Party may disclose this Agreement to its Connected Persons, provided that prior to such disclosure the relevant Connected Persons have agreed with such Participating Creditor or Shareholder Party to keep the terms of this Agreement confidential on the terms of this Clause 11 (*Confidentiality*) (unless already bound by law, regulation, or professional duty to keep the same confidential);

**(e)**    each Participating Creditor may disclose this Agreement and its terms to a proposed transferee or assignee, of all or part of its Locked-up Debt, provided that such transferee or assignee agrees in writing for the benefit of such Participating Creditor to keep the Confidential Information confidential on the same terms as this Clause 11 (*Confidentiality*);

**(f)**    the Parties may disclose this Agreement to any other Party;

**(g)**    the Parties and their respective Connected Persons who have received a copy of this Agreement may disclose this Agreement if they are required to do so by the laws, rules or regulations of any country with jurisdiction, or this Agreement is requested to be disclosed by a court of competent jurisdiction or any competent judicial, governmental, supervisory, tax or regulatory body or this Agreement is required to be disclosed to defend claims against them;

**(h)**    the Company and its professional advisers may disclose a copy of this Agreement to any Scheme Creditor with a view to procuring their accession to this Agreement provided that the copy of this Agreement so disclosed shall be redacted to keep the amount of Debt held by each Participating Creditor and the number of shares in syncreon Global Holdings Limited held by each Shareholder Party confidential; and

**(i)**    the Scheme Companies may disclose the terms of this Agreement in connection with the Schemes.

**11.2**   Notwithstanding anything else in this Agreement, for the avoidance of doubt:

**(a)**   no Party shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than to (i) the Company and its advisers, (ii) any Group Company, and (iii) to its own advisers, the principal amount or percentage of any holdings of (i) Liquidity Facility Debt held by any of the Participating Liquidity Facility Lenders, (ii) PCF Debt held by any of the Participating PCF Lenders, (iii) Notes held by any of the Participating Noteholders or (iv) and the number of shares in syncreon Global Holdings Limited held by any Shareholder Party, in each case, without the prior written consent of the applicable Participating Liquidity Facility Lender, Participating PCF Lender, Participating Noteholder or Shareholder Party; and

**(b)**   any public filing of this Agreement, with the Court, the Bankruptcy Court, the Canadian Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to (i) the amount of (1) the Liquidity Facility Debt held by each of the Participating Liquidity Facility Lenders, (2) the PCF Debt held by each of the Participating PCF Lenders, (3) the Notes held by each of the Participating Noteholders, and (4) the shares held by the Shareholder Parties, and (ii) in the case of managed accounts, the specific name of the account managed (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Court, the Bankruptcy Court and/or the Canadian Court under seal),

provided that (subject to Clause 11.1) nothing in this Clause 11.2 shall limit, condition or restrict the disclosure of the identity of any Party, including, for the avoidance of doubt, of any Participating Liquidity Facility Lender, Participating PCF Lender, Participating Noteholder or Shareholder Party to any person or entity.

**12**   **PUBLICITY**

**12.1**   Subject to this Clause 12 (*Publicity*), until the occurrence of the RSA Termination Date, no announcement regarding, or reference to, this Agreement, the Restructuring or any Restructuring Document will be made without the prior written consent (email being sufficient) of the Company, the Majority Participating Lenders and the Majority Participating Noteholders (each acting reasonably).

**12.2**   Promptly following the Effective Time, the Company shall make a public announcement relating to the Restructuring and the existence of this Agreement provided that such announcement shall have been approved by the Majority Participating Lenders and Majority Participating Noteholders (each acting reasonably) in advance.

**12.3**   Promptly following the Restructuring Effective Date, the Company shall make a public announcement relating to the Restructuring stating that the Restructuring Effective Date has occurred and the date on which it has occurred, provided that such announcement shall have been approved in advance by the Majority Participating Lenders and Majority Participating Noteholders (each acting reasonably).

**12.4**   Clause 12.1 above does not apply to any announcement required by any applicable law, regulation, statute or rule or any order or direction of any relevant court or governmental, supervisory, tax or regulatory body with jurisdiction; underlined, that, to the extent permitted under applicable law, prior to publicly making any such announcement, the Company shall provide a draft of any such announcement to the Participating Lenders and Participating Noteholders.

**13**   **AMENDMENTS**

**13.1**   This Agreement (including, the Restructuring Term Sheet and, once agreed and appended, the Steps Plan) may not be modified, amended or supplemented except in writing signed by the Company

with the prior written consent of the Majority Participating Lenders and Majority Participating Noteholders (such consent not to be unreasonably withheld, conditioned or delayed), save that:

**(a)**    for so long as the Ad Hoc Group and CayCo comprise the Majority Participating Lenders and the Majority Participating Noteholders, respectively, emails from the Advisers on behalf of the Ad Hoc Group and CayCo, as applicable, are sufficient for any waiver, modification or amendment (including any extension) to the definitions of "Longstop Date" and "Restructuring Conditions";

**(b)**    an email from Weil on behalf of the Company and the Borrower/Issuer, as applicable, is sufficient for any waiver of any right of termination in connection with Clause 8.2 (*Company Voluntary Termination*);

**(c)**    for so long as the Ad Hoc Group and CayCo represent the Majority Participating Lenders and the Majority Participating Noteholders, respectively, emails from the Advisers on behalf of the Ad Hoc Group and CayCo, as applicable, are sufficient for any waiver of any right of termination in connection with Clause 8.3 (*Participating Party Voluntary Termination*);

**(d)**    emails from (x) Weil on behalf of the Company and the Borrower/Issuer, as applicable, and (y) for so long as the Ad Hoc Group and CayCo represent the Majority Participating Lenders and the Majority Participating Noteholders, respectively, the Advisers on behalf of the Ad Hoc Group and CayCo, as applicable, are sufficient for any modification or amendment of any right of termination in connection with Clauses 8.2 (*Company Voluntary Termination*) and 8.3 (*Participating Party Voluntary Termination*);

**(e)**    any waiver, modification, amendment or supplement to this Clause 13 (*Amendments*) shall require the written consent of all of the Parties;

**(f)**    subject to Clause 4.9(a)(iii), any waiver, modification, amendment or change to this Agreement (including, the Restructuring Term Sheet and, once agreed and appended, the Steps Plan) or any Restructuring Document that treats or affects any Participating Lender, Participating Noteholder or Shareholder Party as set forth in the Restructuring Term Sheet materially adversely or disproportionately affects its economic treatment or legal rights of its Debt as set forth in the Restructuring Term Sheet, as compared to treatment of the other Participating PCF Lenders, other Participating Noteholders or other Shareholder Parties (as applicable) set forth in the Restructuring Term Sheet, shall require the written consent of such affected Participating Lender, Participating Noteholder or Shareholder Party (as applicable) (for the avoidance of doubt, any such waiver, modification, amendment or change in this paragraph (f) shall continue to be subject to Clause 4.9(a)(iii)); and

**(g)**    any amendment or waiver which affects the rights or obligations of the Information Agent may not be effected without the consent of the Information Agent.

## 14    TAX

**14.1**    To the extent practicable, the Company, Participating Lenders and Participating Noteholders agree to use commercially reasonable efforts in the available time to structure the Restructuring so as to preserve or otherwise maximize favorable tax attributes (including tax basis) of or with respect to the Group and to otherwise obtain an efficient structure for the Company or the Group and the holders of Reorganized syncreon Equity post-Restructuring Effective Date, and the Company, Participating Lenders and Participating Noteholders shall cooperate on a reasonable basis with each other in connection with making such determination, including by providing each other with reasonable information relevant to making such determination.

**14.2**    The entity form of Reorganized syncreon (and any subsidiary holding companies of Reorganized syncreon), and such entity's or entities' jurisdiction of organization, shall be reasonably acceptable

to the Majority Participating Lenders and the Company (it being agreed that the Netherlands and Ireland are reasonable acceptable jurisdictions of organization).

**14.3** The New Organizational Documents shall provide that  Reorganized syncreon (and any subsidiary holding companies of Reorganized syncreon, as reasonably determined by the Majority Participating Lenders) will elect to be treated as a corporation for U.S. federal income tax purposes, effective as of the Restructuring Effective Date, provided, however, that, if the Majority Participating Lenders so determine, the New Organizational Documents shall, in lieu of such an election, limit Reorganized syncreon and its disregarded subsidiaries from engaging in activities and/or owning assets that could give rise to material amounts of "effectively connected income" or "unrelated business taxable income" or "commercial activity income" for the holders of Reorganized syncreon Equity. If reasonably requested by the Majority Participating Lenders, the Shareholder Parties shall cooperate with the Majority Participating Lenders and the Company in making, or causing to be made, any such elections.

## 15 REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Participating Creditor, any right or remedy under any document in relation to any Debt shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 16 RESERVATION OF RIGHTS

**16.1** Unless expressly provided to the contrary herein, this Agreement does not modify, amend or waive any Creditor's rights or any member of the Group's obligations under, related to, in connection with or arising out of as applicable the Existing Finance Documents or those matters that are the subject of the Existing Finance Documents or any other documents and agreements, or any Creditors' rights as creditors of the Company or any member of the Group.

**16.2** Unless expressly provided to the contrary in this Agreement, the Parties fully reserve any and all of their rights.

**16.3** If this Agreement is terminated by any Party for any reason in accordance with its terms, the rights of that Party against the other Parties to this Agreement and those other Parties' rights against the terminating Party shall be fully reserved, and no failure to exercise nor any delay in exercising, on the part of any Creditor, any right or remedy available under any document in relation to any Existing Finance Document shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 17 MISCELLANEOUS

**17.1** This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns and transferees.

**17.2** This Agreement may be executed in any number of counterparts.  This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

**17.3** If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law or any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provisions under the law of any other jurisdiction will in any way be affected or impaired.

17.4    This Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

18      **NOTICES**

18.1    Any confirmation or notice under this Agreement must be in writing in the English language and may be given in person or by hand, post, courier, e-mail or fax.

18.2    The contact details of the Parties for all notices under this Agreement are as set out on their signature page to this Agreement or their Accession Deed, or such other contact details as the Parties may notify to the Information Agent by not less than five (5) Business Days' written notice and the Information Agent shall notify the other Parties within five (5) Business Days.

18.3    Any notice under this Agreement will be deemed to be given as follows:

(a)      if in person, at the time of delivery;

(b)      if by post, three (3) Business Days after being deposited in the post, postage prepaid, in a correctly addressed envelope;

(c)      if by international priority courier delivery, three (3) calendar days after delivery to such courier; and

(d)      if by e-mail or fax, when received in legible form.

18.4    For the purpose of this Agreement, an e-mail notice will be treated as being in writing.

19      **GOVERNING LAW AND JURISDICTION**

19.1    This Agreement and any non-contractual obligations arising out of or in connection with this Agreement shall be governed by and construed in accordance with English law.

19.2    The Parties irrevocably agree that the courts of England shall have non-exclusive jurisdiction to hear and determine any suit, action or proceeding and/or to settle any dispute which may arise out of or in connection with or in any way relate to this Agreement, the Schemes and/or the Restructuring and, for such purposes, irrevocably submit to the jurisdiction of the courts of England.

19.3    Each of the Parties irrevocably waives any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any suit, action or proceeding and/or any dispute which may arise out of or in connection with or in any way relate to this Agreement, the Schemes and/or the Restructuring and agrees not to claim that any such court is not a convenient or appropriate forum and further irrevocably agrees that a judgment in respect of any such suit, action or proceedings and/or dispute brought in the courts of England shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction.

20      **AGENT FOR SERVICE OF PROCESS**

20.1    Each Party which is not an entity incorporated or established in England and Wales shall at all times maintain an agent for service of process in England and for this purpose each Company Party irrevocably appoints the UK Guarantor as its agent (being an "**Agent**" in respect of its appointor).

20.2    Without prejudice to any other permitted mode of service, each Party agrees that service of any claim form, notice or other document for the purpose of any judicial, arbitral, administrative, regulatory or other action, claim or proceedings whatsoever commenced in England shall be duly served upon it if served on the Agent appointed by it in any manner permitted by the Civil Procedure Rules, whether or not it is forwarded to the Party.

**20.3**    If for any reason the Agent appointed by any Party at any time ceases to act as such, the Party shall promptly appoint another such Agent and promptly notify the other Parties of the appointment and the new Agent's name and address. If the Party concerned does not make such an appointment within seven (7) Business Days of such cessation, then any other Party may make such appointment on behalf of, and at the expense of, such defaulting Party and if it does so it shall promptly notify the other Parties of the new Agent's name and address.

**IN WITNESS** whereof this Agreement has been executed on the date first above written.

## SCHEDULE 1
## ORIGINAL GROUP COMPANIES

syncreon Acquisition Corp.

syncreon America Inc.

syncreon Asia Holdings (UK) Limited

syncreon Automotive (UK) Ltd.

syncreon Canada Inc.

syncreon Deutschland GmbH

syncreon EMEA Unlimited Company

syncreon European Holdings Unlimited Company

syncreon Global (Ireland) Designated Activity Company

syncreon Global Finance (US) Inc.

syncreon Holdings Limited

syncreon Hungary Logistics and Transport KFT

syncreon International Group Unlimited Company

syncreon (IOM) Holdings Unlimited

syncreon (IOM) Limited

syncreon Ireland Unlimited Company

syncreon Ireland Acquisition Designated Activity Company

syncreon Ireland B.V.

syncreon Ireland Holdings Limited

syncreon Logistics Polska Sp. z.o.o.

syncreon Netherlands B.V.

syncreon Polska Sp. z.o.o.

syncreon South America Holdings Inc.

syncreon (Technology) America Inc.

syncreon Technology Hungary KFT

syncreon Technology (UK) Ltd.

syncreon Technology (USA) LLC

syncreon Treasury Services Designated Activity Company

syncreon UK Holdings Limited

Total Distributions Systems Deutschland GmbH

Walsh Western Finance B.V.

## SCHEDULE 2

## CREDITOR ACCESSION DEED

**TO:**     The Company c/o the Information Agent via email to syncreon@lucid-is.com

**FROM:**  [Name of Additional Participating Creditor]

**[By Email]**

[•] 2019

Dear Sirs

**Restructuring Support Agreement dated [•] 2019 between, amongst others, syncreon Group Holdings B.V., the Original Participating Creditors and the Shareholder Parties (each as defined therein) (the "RSA")**

We refer to the RSA.  Capitalised terms in the RSA shall have the same meaning in this notice.

This is a Creditor Accession Deed for the purposes of Clause 2.2 (*Creditor Accession*) of the RSA. We hereby:

(a)     notify you that, as at the date of this notice, we hold or otherwise control in principal amount, Locked-up [PCF Debt][Notes] of US $[●];

(b)     enclose evidence of holdings acceptable to the Information Agent dated no later than one (1) Business Day preceding the date of this Creditor Accession Deed; and

(c)     agree to be bound by and to comply with the terms of the RSA with effect from the date of this Accession Deed as an Additional Participating [PCF Lender][Noteholder] and hereby give the undertakings, representations and warranties required to be given by Participating Creditors under the RSA, including, including pursuant to Clause 4 (*General Undertakings*), 9.2 (*All Parties Representations and Warranties*) and Clause 9.3 (*Participating Creditor Representations and Warranties*) of the RSA.

This notice and any obligations arising out of or in connection with it are governed by English law.

Without prejudice to the disclosure requirements under Clause 2.2 (*Creditor Accession*) and Clause 11 (*Confidentiality*) of the RSA, we request that you treat the contents of this accession deed with the utmost of confidence and that you do not disclose these to any person without our prior written consent.


Yours faithfully


Signed as a deed by [Name of Additional Participating Creditor]

acting by an authorised signatory

in the presence of

Name:
Address:
Occupation:

## SCHEDULE 3

## SUB-PARTICIPANT ACCESSION DEED

**TO:**        The Company c/o the Information Agent via email to syncreon@lucid-is.com

**FROM:**  [Name of Additional Participating Lender]

**[By Email]**

[•] 2019

Dear Sirs

**Restructuring Support Agreement dated [•] 2019 between, amongst others, syncreon Group Holdings B.V., the Original Participating Creditors and the Shareholder Parties (each as defined therein) (the "RSA")**

We refer to the RSA.  Capitalised terms in the RSA shall have the same meaning in this notice.

This is a Sub-Participant Accession Deed for the purposes of Clause 2.3 (*Sub-Participant Accession*) of the RSA. We hereby:

|       |       |
|-------|-------|
| **(a)** | notify you that, as at the date of this notice, we control by way of sub-participation US $[●] of [Liquidity Facility][PCF] Debt and the lender of record in relation to this [Liquidity Facility][PCF] Debt is [●]; |
| **(b)** | agree to be bound by and to comply with the terms of the RSA with effect from the date of this Accession Deed as an Additional Participating Creditor and to exercise all of our rights in respect of our Locked-up Bank Debt as if we were the legal and beneficial holder of such Locked-up Bank Debt; and |
| **(c)** | give the undertakings, representations and warranties required to be given by Participating Creditor under the RSA, including pursuant to Clause 4 (*General Undertakings*), 9.2 (*All Parties Representations and Warranties*) and Clause 9.3 (*Participating Creditor Representations and Warranties*) of the RSA. |

This notice and any obligations arising out of or in connection with it are governed by English law.

Without prejudice to the disclosure requirements under Clause 2.3 (*Sub-Participant Accession*) and Clause 11 (*Confidentiality*) of the RSA, we request that you treat the contents of this accession deed with the utmost of confidence and that you do not disclose these to any person without our prior written consent.

Yours faithfully


Signed as a deed by [Name of Additional Participating Lender]

acting by an authorised signatory

in the presence of

Name:

Address:
Occupation:


Signed as a deed by [Name of Lender of Record]

acting by an authorised signatory

in the presence of

Name:
Address:
Occupation:

### SCHEDULE 4

### GROUP COMPANY ACCESSION DEED

**TO:**      The Company c/o the Information Agent via email to syncreon@lucid-is.com

**FROM:**   [Name of Additional Group Company]

**[By Email]**

[•] 2019

Dear Sirs

**Restructuring Support Agreement dated [•] 2019 between, amongst others, syncreon Group Holdings B.V., the Original Participating Creditors and the Shareholder Parties (each as defined therein) (the "RSA")**

We refer to the RSA.  Capitalised terms in the RSA shall have the same meaning in this notice.

This is a Group Company Accession Deed for the purposes of Clause 2.4 (*Group Company Accession*) of the RSA.

We hereby agree to be bound by and to comply with the terms of the RSA with effect from the date of this Accession Deed as an Additional Group Company and hereby give the undertakings, representations and warranties required to be given by Group Companies under the RSA, including, including pursuant to Clause 4 (*General Undertakings*), 9.2 (*All Parties Representations and Warranties*) and Clause 9.3 (*Participating Creditor Representations and Warranties*) of the RSA.

This notice and any obligations arising out of or in connection with it are governed by English law.

Without prejudice to the disclosure requirements under Clause 2.4 (*Group Company Accession*) and Clause 11 (*Confidentiality*) of the RSA, we request that you treat the contents of this accession deed with the utmost of confidence and that you do not disclose these to any person without our prior written consent.


Yours faithfully


Signed as a deed by [Name of Additional Group Company]

acting by an authorised signatory

in the presence of

Name:
Address:
Occupation:

**SCHEDULE 5**

**RESTRUCTURING TERM SHEET**

*Execution Version*

# SYNCREON GROUP HOLDINGS B.V.

---

**Restructuring Term Sheet
Summary of Terms and Conditions**

---

This is the Restructuring Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated May 21, 2019 among syncreon Group Holdings B.V. as the Company, syncreon Group B.V. as the Borrower/Issuer, the Original Group Companies, the Original Participating Creditors, the Shareholder Parties, and the Information Agent (as amended, supplemented or otherwise modified from time to time, the "**RSA**").

This Restructuring Term Sheet should be read in conjunction with the RSA and, if and when agreed on in accordance with the RSA, the Steps Plan and is subject to the conditions set out therein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RSA.

**THIS RESTRUCTURING TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR CREATION OF ANY BINDING AGREEMENT (OTHER THAN THE RSA, WHICH SHALL BE BINDING PURSUANT TO ITS TERMS) IS SUBJECT TO THE NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION.**

| Term | Description |
|---|---|
| **Existing Capital Structure** | |
| **Existing Debt** | As of the date hereof, the Company Parties' funded debt consists of: |
| | (i) Liquidity Facility Debt – as of May 20, 2019, the aggregate outstanding principal amount of Liquidity Facility Debt was not less than approximately $15.5 million (the "**Existing Liquidity Loans**"), which amount may be increased by the additional borrowings prior to or during the pendency of the Restructuring, including the Additional Liquidity Facility Amount (as defined herein), to the extent set forth in the Liquidity Facility Agreement (and related credit documentation); |
| | (ii) PCF Debt – as of May 20, 2019, the aggregate outstanding principal amount of PCF Debt was not less than approximately: |
| | • $497.4 million of Term Loans (under and as defined in the Parent Credit Facility Agreement) (the "**Term Loans**"); |
| | • $109.5 million of Revolving Loans (under and as defined in the Parent Credit Facility Agreement) (the "**Revolving Loans**"), including any paid-in-kind interest accrued in respect thereof; and |
| | • $73.1 million of Incremental Term Loans (under and as defined in the Parent Credit Facility Agreement) (the "**Incremental Term Loans**"). |
| | (iii) Notes – as of May 20, 2019, the aggregate outstanding principal amount of the Notes was not less than approximately $225.0 million. |
| **Additional Liquidity Facility Amount** | Prior to commencement of the proceedings to obtain sanction of the Schemes, the Ad Hoc Group shall provide a commitment to the Company to provide new- |

| Term | Description |
|------|-------------|
| | money loans in respect of additional Liquidity Facility Debt in the approximate amount of (x) $60 million, consisting of (i) an initial draw of $9.5 million on a pro rata basis (the "**Initial Additional Liquidity Draw**") and (ii) a subsequent draw of $50.5 million (the "**Subsequent Additional Liquidity Draw**") plus (y) commitments for subsequent additional draws, which additional availability under this clause (y), together with the Initial Liquidity Draw and the Subsequent Additional Liquidity Draw, for the avoidance of doubt, shall not exceed the New Money Commitment, and shall be subject to approval by New Money Backstop Parties (as defined herein) that hold over 50% of the New Money Commitments held by the New Money Backstop Parties) (the loans pursuant to such commitment, the "**Additional Liquidity Facility Amount**").  For the avoidance of doubt, the Initial Additional Liquidity Draw shall have the economic terms set forth in the Liquidity Facility Agreement in effect on the date hereof and the Subsequent Additional Liquidity Draw and any borrowings under clause (y), above, shall have the economic terms as set forth in the section herein entitled "New First Out Term Loan", except for the addition of (i) an amendment payment (the "**Liquidity Loan Amendment Payment**") to the New Money Backstop Parties on account of their amendment of the Liquidity Facility Agreement, which shall be payable in cash equal to the value of 1.5% of the Reorganized syncreon Equity or, if the Restructuring Effective Date occurs, 1.5% of the Reorganized syncreon Equity, in each case, subject to dilution by the Warrants and the MEIP (each as defined herein), and (ii) a forbearance payment (the "**Liquidity Loan Forbearance Payment**") to the New Money Backstop Parties on account of their prior forbearance in respect of the Liquidity Facility Agreement and the continuing forbearance of the New Money Backstop Parties in respect of the Liquidity Facility Agreement set forth in the RSA, which shall be payable in cash equal to the value of 1.0% of the Reorganized syncreon Equity or, if the Restructuring Effective Date occurs, 1.0% of the Reorganized syncreon Equity, in each case, subject to dilution by the Warrants and the MEIP. |
| **CayCo Cash Collateral and Pledged Incremental Coupon Loans** | "**CayCo Cash Collateral**" means the cash collateral pledged by syncreon CayFinance Limited and/or syncreon Netherlands A B.V. in favor of the Revolving Lenders (as defined in the Parent Credit Facility Agreement) in accordance with that certain *Reinvestment Commitment Letter*, dated as of March 22, 2018 (the "**Reinvestment Letter**").<br><br>As of May 20, 2019, the CayCo Cash Collateral totaled not less than approximately $15.0 million.<br><br>"**Pledged Incremental Coupon Loans**" means those certain Incremental Term Loans pledged by syncreon CayFinance Limited, as a holder of the Incremental Term Loans, in favor of the Revolving Lenders in accordance with the Reinvestment Letter.<br><br>As of May 20, 2019, the Pledged Incremental Coupon Loans totaled not less than approximately $13.0 million. |
| **ABL Borrowings** | As of the date hereof, the funded debt of syncreon Financing Ltd. (the "**ABL Borrower**") consists of indebtedness under the ABL Credit Agreement. |

| Term | Description |
|---|---|
| | As of May 20, 2019, the aggregate outstanding principal amount of ABL Borrowings was not less than approximately $79.6 million. |
| **Existing OpCo Interests** | "**Existing OpCo Interests**" means, collectively, the outstanding equity interests in the Company.<br><br>As of the date hereof, 100% of the Existing OpCo Interests are legally and beneficially owned or controlled by syncreon Global S.a.r.l. |
| **Restructured Balance Sheet** | |
| **Post-Restructuring Balance Sheet** | Pursuant to the Restructuring, on and from the Restructuring Effective Date, the Group's reorganized capital structure shall consist of the: (i) New ABL Credit Facility; (ii) New First Out Term Loan; (iii) New Second Out Term Loan; (iv) Reorganized syncreon Equity; and (v) Warrants (each as defined herein). |
| **New ABL Credit Facility** | The "**New ABL Credit Facility**" means an asset based revolving credit facility with aggregate principal commitments of not less than $135.0 million to be entered into on the Restructuring Effective Date, which shall be documented under the "**New ABL Credit Facility Agreement**," which shall provide, among other things, that:<br><br>• obligors on the New ABL Credit Facility shall be selected by the Company, the lender(s) under the New ABL Credit Facility, and the Majority Participating Lenders (each acting reasonably), in consultation with the Majority Participating Noteholders (the "**ABL Obligors**"); and<br><br>• the New ABL Credit Facility shall be secured by (a) a first priority lien on accounts receivable and related current assets (the "**ABL Priority Collateral**") and (b) a second priority lien on the Term Loan Priority Collateral (as defined herein), in each case subject to customary exceptions and exclusions and an intercreditor agreement.<br><br>The Company shall solicit proposals from third party arrangers of asset-based revolving credit facilities which shall be shared with the Advisers and the New ABL Credit Facility shall be based on market terms and conditions including with respect to tenor and interest rate. |
| **New First Out Term Loan** | The "**New First Out Term Loan**" means new "first out" term loans in an aggregate amount not to exceed the New Money Commitment (as defined herein) (*i.e.*, subject to the terms of this Restructuring Term Sheet, $125.5 million).<br><br>The New First Out Term Loan shall be documented under the "**New Term Loan Facility Agreement**", which shall provide, among other things, that:<br><br>• obligors on the New First Out Term Loan shall be selected by the Company and the Majority Participating Lenders (each acting reasonably), in consultation with the Majority Participating Noteholders (collectively, the "**Term Loan Obligors**"); |

| Term | Description |
|------|-------------|
| | • the portion of the New Money Commitment that does not include (x) the Existing Liquidity Loans and (y) the Initial Additional Liquidity Draw shall be issued with 5.0% OID (the "**New Term Loan OID**"); |
| | • the New First Out Term Loan shall be secured by (i) a second priority lien (junior only to the New ABL Credit Facility) on the ABL Priority Collateral, which second priority lien shall be *pari passu* with the corresponding lien in respect of the New Second Out Term Loan and (ii) a first priority lien with respect to all other assets of the Term Loan Obligors (such other collateral, excluding for the avoidance of doubt the ABL Priority Collateral, the "**Term Loan Priority Collateral**" and the Term Loan Priority Collateral together with the ABL Priority Collateral, the "**Collateral**"), senior to the New ABL Credit Facility, which first priority lien shall be *pari passu* with the corresponding lien in respect of the New Second Out Term Loan, in each case subject to customary exceptions and exclusions; |
| | • obligations under the New First Out Term Loan shall rank *pari passu* in right of payment with the New Second Out Term Loan but shall be paid in full from the proceeds of the Collateral before obligations under the New Second Out Term Loan are paid from proceeds of the Collateral pursuant to a waterfall provision (the "**First Out Waterfall Provision**"); |
| | • the New First Out Term Loan shall mature 5 years after the Restructuring Effective Date, subject to a 90 day springing maturity ahead of all material secured debt other than the New ABL Credit Facility; |
| | • the New First Out Term Loan shall bear interest at L+500 bps with a 1% LIBOR floor, payable at the end of the relevant interest period but not less frequently than every three (3) months; |
| | • the New First Out Term Loan shall be amortized at 1.0% per annum in quarterly installments; |
| | • the New First Out Term Loan shall benefit from call protection at NC-1, 102, 101 and shall be callable at par anytime thereafter; |
| | • the New First Out Term Loan shall contain financial covenants specifying: (i) a maximum total net leverage ratio as of the end of any fiscal quarter at an initial level and step downs to be agreed, which shall be tested at the end of each fiscal quarter with the first such test to occur at the end of the first full quarter following the Restructuring Effective Date (*e.g.*, if Restructuring Effective Date occurs on September 15, first test on December 31; and (ii) minimum liquidity of not less than an amount to be agreed (with liquidity including all cash, including any "trapped cash" and availability under the New ABL Credit Facility); |
| | • the New First Out Term Loan shall contain customary mandatory prepayment events for financings of this type, including, without limitation, (i) prepayments from proceeds of asset sales and non- |

| Term | Description |
|---|---|
| | permitted debt, and (ii) an excess cash flow sweep starting in the fiscal year 2020;<br><br>• standard and customary conditions precedent;<br><br>• standard and customary reporting requirements; and<br><br>• the Company shall use commercially reasonable efforts to obtain one corporate family rating and one facility rating of the New First Out Term Loan from either Moody's or S&P prior to the Restructuring Effective Date, and shall use commercially reasonable efforts to maintain such ratings (but not any specific rating) thereafter. |
| **New Second Out Term Loan** | The "**New Second Out Term Loan**" means a new "second out" term loan entered into on the Restructuring Effective Date, which shall be documented under the New Term Loan Facility Agreement, which shall provide, among other things, that:<br><br>• obligors on the New Second Out Term Loan shall be the Term Loan Obligors;<br><br>• the New Second Out Term Loan shall be issued in the face amount of $225.0 million (the **"New Second Out Term Loan Amount"**);<br><br>• interest shall be payable at L+600 with a 1% LIBOR floor, payable at the end of the relevant interest period but not less frequently than every three (3) months, subject to 4 PIK elections which may be exercised by the Company in its sole discretion;<br><br>• mature 5.5 years from the Restructuring Effective Date;<br><br>• no scheduled amortization;<br><br>• the New Second Out Term Loan shall be secured by (i) a first priority lien on the Term Loan Priority Collateral, senior to the New ABL Credit Facility, which first priority lien shall be *pari passu* with the corresponding lien in respect of the New First Out Term Loan and (ii) a second priority lien (junior only to the New ABL Credit Facility) on the ABL Priority Collateral, which second priority lien shall be *pari passu* with the corresponding lien in respect of the New First Out Term Loan, in each case subject to customary exceptions and exclusions;<br><br>• the New Term Loan Facility Agreement shall contain the First Out Waterfall Provision;<br><br>• the New Second Out Term Loan shall benefit from call protection at 102, 101 and shall be callable at par at any time thereafter;<br><br>• the New Second Out Term Loan shall contain a stepped back Maximum Total Net Leverage Ratio and Minimum Liquidity Covenant when compared with the corresponding New First Out Term Loan financial covenant levels;<br><br>• the New Second Out Term Loan shall contain the same mandatory prepayment events as the New First Out Term Loan, with such |

| Term | Description |
|---|---|
| | mandatory prepayments to be subject to the First Out Waterfall Provision;<br><br>• standard and customary conditions precedent;<br><br>• standard and customary reporting requirements; and<br><br>• the Company shall use commercially reasonable efforts to obtain one corporate family rating and one facility rating of the New Second Out Term Loan from either Moody's or S&P prior to the Restructuring Effective Date, and shall use commercially reasonable efforts to maintain such ratings (but not any specific rating) thereafter. |
| **Reorganized syncreon Equity** | "**Reorganized syncreon Equity**" means, upon the occurrence of the Restructuring Effective Date, the shares of new equity interests in the Company, its successor entity formed in connection with the Restructuring, or such other entity as reasonably agreed in accordance with the RSA (the issuer of Reorganized syncreon Equity, "**Reorganized syncreon**"). |
| **Warrants** | "**Warrants**" means warrants representing the right to acquire 10.0% of the Reorganized syncreon Equity outstanding immediately after the Restructuring Effective Date, subject to dilution by the MEIP and subject to adjustment described below (the "**Warrant Shares**"), which shall be documented under the "**Warrants Agreement**," which shall provide, among other things, that:<br><br>• the issuer of the Warrants shall be the same entity that issues the Reorganized syncreon Equity;<br><br>• the Warrants shall be exercisable at any time, either in full or from time to time in part, from the date of issuance until the Expiration Date (as defined herein). The exercise price per share of Reorganized syncreon Equity shall be based on a total equity value as of the date immediately prior to the Restructuring Effective Date reflecting a full recovery on the claims in respect of the Secured Loans and accrued interest thereon at the values set forth on the table attached hereto as **Exhibit 1**. Holders of the Warrants may elect to exercise the Warrants on a cash or net-issue basis;<br><br>• the Warrants shall expire, if unexercised, on the date that is the fifth anniversary of the Restructuring Effective Date (the "**Expiration Date**");<br><br>• the exercise price and the number of Warrant Shares issuable upon exercise of the Warrants shall be subject to the following customary anti-dilution provisions for securities of this type: stock dividends, stock splits or combinations, below market warrants, rights or options (other than any issuance made in connection with any management incentive plan, including the MEIP), distributions of assets and securities, and cash dividends;<br><br>    o in the case of a merger, combination, consolidation, statutory share exchange, sale of all or substantially all assets or other |

| Term | Description |
|------|-------------|
|  | similar event in which the Reorganized syncreon Equity is changed or exchanged into the right to receive securities or other property or assets, then at the effective time of such transaction, the right to exercise the Warrants will be changed into a right to purchase the type and amount of securities or other property or assets that a warrantholder would have been entitled to purchase had the warrantholder owned a number of shares of Reorganized syncreon Equity immediately prior to such transaction equal to the number of shares of Reorganized syncreon Equity the warrantholder would have received if the Warrant was exercised immediately prior to such transaction (based on the then existing exercise price); and<br><br>    o   the Warrants shall not have Black-Scholes protection;<br><br>• standard issuer and warrantholder representations and warranties for securities of this type;<br><br>• upon exercise of the Warrants, the Warrant Shares shall be entitled to the registration rights provided for in the New Shareholders' Agreement (as defined herein);<br><br>• until exercised, holders of the Warrants shall not have any voting rights or board representation rights. Upon exercise of the Warrants, holders of the Warrant Shares shall have the same rights as holders of Reorganized syncreon Equity;<br><br>• subject to compliance with applicable securities laws and the New Shareholders' Agreement, the Warrants and the Warrant Shares shall be freely transferable by any holder thereof to the extent such holder could transfer the Warrant Shares upon exercise thereof; and<br><br>• upon exercise of the Warrants, the Warrant Shares shall be subject to, and the warrantholders shall become party to, the New Shareholders' Agreement. |

| Term | Description |
|------|-------------|
| **New Money Commitment; New Money Backstop; New Money Syndication** | The "**New Money Commitment**" means the commitment to loan an amount equal to the sum of (i) the aggregate principal amount of Liquidity Facility Debt (inclusive of the Additional Liquidity Facility Amount) as of ten days prior to the Restructuring Effective Date (or such other date as may be agreed upon by the Company and the Majority Participating Lenders (each acting reasonably)) (the "**Converted Liquidity Facility Debt**") (which Converted Liquidity Facility Debt shall be converted to New First Out Term Loans) and (ii) an amount in cash equal to $125.5 million, minus (1) the amount of the Converted Liquidity Facility Debt and (2) the New Term Loan OID. |
| | The New Money Commitment shall be backstopped (the "**New Money Backstop**") by the New Money Backstop Parties (as defined herein) in accordance with the backstop allocations set forth in the Backstop Agreement in exchange for a pro rata share of 5.0% of the Reorganized syncreon Equity, subject to dilution by the Warrants and the MEIP, in consideration for, among other things, the New Money Backstop, entering into the Liquidity Facility Agreement, and making the Additional Liquidity Facility Amount available (the "**New Money Backstop Payment**"). |
| | The administrative agent for the New First Out Term Loan, or another fronting bank acceptable to the Ad Hoc Group, shall season the loans in respect of the New First Out Term Loan for certain members of the Ad Hoc Group that request such seasoning. |
| | The Pledged Incremental Coupon Loans shall be included in the calculation of the New Money Backstop allocations, the Liquidity Loan Amendment Payment, and the Liquidity Loan Forbearance Payment as if such Pledged Incremental Coupon Loans were owned by the Revolving Lenders. |
| | "**New Money Backstop Party**" means a member of the Ad Hoc Group that agrees to provide the New Money Backstop. |
| | All PCF Lenders shall be given the opportunity to participate in the New Money Commitment (but excluding, for the avoidance of doubt, any amounts in respect of the Existing Liquidity Loans and the Initial Additional Liquidity Draw) (each such PCF Lender, a "**New Money Participating Lender**") on a pro rata basis (calculated as the proportion of (i) the principal amount of PCF Debt held by such New Money Participating Lender to (ii) the aggregate principal amount of PCF Debt held by each of the New Money Participating Lenders, including the New Money Backstop Parties), provided that a PCF Lender must deliver (x) to the extent such PCF Lender is not already a Participating PCF Lender, an Accession Deed and (y) a validly completed election form (together with all necessary "know your customer" requirements) by the record date for voting purposes under the Schemes (the "**Scheme Record Date**"). For the avoidance of doubt, any PCF Lenders that are not New Money Backstop Parties shall not receive the New Money Backstop Payment. |

| Term | Description |
|------|-------------|
| **Treatment of Claims & Interests** ||
| **Liquidity Facility Debt** | On and from the Restructuring Effective Date, the Liquidity Facility Agreement shall be terminated, or amended and restated, and the outstanding principal amount of the Liquidity Facility Debt shall be converted at par into outstanding principal of term loans under the New First Out Term Loan. Interest on the Liquidity Facility Debt (including the Additional Liquidity Facility Amount) shall be paid in full in cash on the Restructuring Effective Date. |
| **PCF Debt** | On and from the Restructuring Effective Date, the Parent Credit Facility shall be terminated and: |

*(PCF Debt continued):*

    (i)    a principal amount of the PCF Debt in an amount equal to the New Second Out Term Loan Amount shall be converted at par into term loans under the New Second Out Term Loan pursuant to the New Term Loan Facility Agreement; and

    (ii)    the remainder of the outstanding principal amount of the PCF Debt, and any unpaid and accrued interest thereon, shall be converted into 80.0% of the Reorganized syncreon Equity, subject to dilution by the Warrants and the MEIP

(collectively, the "**Secured Loan Distribution**"), in each case on a pro rata basis across the PCF Lenders by reference to the principal amount of their PCF Debt as of the Scheme Record Date.

Notwithstanding the foregoing, for the avoidance of doubt:

    1.    the Secured Loan Distribution that is distributable on account of the Pledged Incremental Coupon Loans shall be distributed to the Revolving Lenders on a pro rata basis on the Restructuring Effective Date; and

    2.    in addition to the Secured Loan Distribution, the holders of Revolving Loans shall receive their pro rata share of the CayCo Cash Collateral on the Restructuring Effective Date.

For the avoidance of doubt, the PCF Debt beneficially owned or controlled by any Shareholder Party shall be treated no more, or less, favorably than PCF Debt beneficially owned or controlled by entities other than the Shareholder Parties.

In addition to the foregoing, in accordance with the RSA, each PCF Lender that is a Timely Participating PCF Lender (which for the avoidance of doubt shall include the Shareholder Parties in their capacity as PCF Lenders to the extent they otherwise satisfy the conditions to being a Timely Participating PCF Lender) shall receive 5.5% of the Reorganized syncreon Equity (the "**PCF Lender Lock-up Payment**") on a pro rata basis across the Timely Participating PCF Lenders by reference to the principal amount of their respective PCF Debt as of the Lock-up Deadline, subject to dilution by the Warrants and the MEIP.

| Term | Description |
|------|-------------|
| **Notes** | On and from the Restructuring Effective Date, the Notes Indenture shall be terminated, the Notes shall be cancelled and the principal amount of the Notes, and any unpaid and accrued interest thereon, shall be converted into:<br><br>(i)  4.5% of Reorganized syncreon Equity, subject to dilution by the Warrants and the MEIP; and<br><br>(ii)  the Warrants,<br><br>in each case on a pro rata basis across the Noteholders by reference to the principal amount of their respective Notes as of the Scheme Record Date.<br><br>In addition to the foregoing, in accordance with the RSA, each Noteholder that is a Timely Participating Noteholder shall receive 2.5% of the Reorganized syncreon Equity (the "**Noteholder Lock-up Payment**") on a pro rata basis across the Timely Participating Noteholders by reference to the principal amount of their respective Notes as of the Lock-up Deadline, subject to dilution by the Warrants and the MEIP. |
| **Existing OpCo Interests** | On and from the Restructuring Effective Date, the Existing OpCo Interests will be transferred and/or cancelled in accordance with the Steps Plan, with no recovery on account thereof for the holders thereof. |
| **Trade and Other Unsecured Claims** | "**Trade and Other Unsecured Claims**" means all general unsecured claims against the Company Parties, excluding claims arising under or in connection with the Notes.<br><br>Trade and Other Unsecured Claims shall be unimpaired.<br><br>Each of the Shareholder Parties shall waive any and all Trade and Other Unsecured Claims such party may have (including any and all management or other service fees owed to them by any member of the Group under contract or otherwise) except for claims based on the PCF Debt and the Notes held by such Shareholder Party, which shall be treated as set forth herein. |
| **Liquidating Debtor** | The Steps Plan may provide for a liquidation of syncreon Technology (America) Inc., including pursuant to a proceeding undertaken pursuant to chapter 11 or chapter 7 of the Bankruptcy Code. |
| **Additional Terms** ||
| **Tax Attributes** | To the extent possible, the Restructuring will be structured so as to obtain a reasonably beneficial structure for the reorganized Company and its post-Restructuring equity holders, in accordance with, and subject to, the RSA. |
| **Indemnification Obligations** | The Group's indemnification obligations in place as of the Restructuring Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or |

| Term | Description |
|------|-------------|
| | formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the directors and the officers that are currently employed by, or serving on the board of directors of, any member of the Group, as of the date immediately prior to the Restructuring Effective Date, shall be unaffected by the Restructuring. |
| **Releases and Exculpation** | The documentation implementing the Restructuring (including the Scheme Documents, the Canadian Recognition Order, and the Chapter 15 Recognition Order) (the "**Implementation Documentation**") shall provide, effective as of the Restructuring Effective Date, customary releases (including third party releases) and exculpation provisions, in each case, to the fullest extent permitted by law and effective as of the Restructuring Effective Date, for the benefit of the Group, the Participating Creditors, the New Money Backstop Parties, the New Money Participating Lenders, the Shareholder Parties and the direct and indirect holders of equity interests in the Shareholder Parties and each such entities' respective current and former affiliates, and each such entities' and their affiliates' current and former officers, managers, directors, predecessors, successors, and assigns, subsidiaries, and each of their officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (collectively, the "**Released Parties**"); provided, however, that, notwithstanding anything in this Restructuring Term Sheet or the RSA, any member of the Group, any Participating Creditor, any New Money Backstop Party, any New Money Participating Lender and any direct holder of equity in syncreon Global Holdings Limited will be a Released Party solely to the extent that (a) it is a Party as of the Effective Time or becomes a Party after the Effective Time pursuant to an Accession Deed and (b) either (i) it ceases to be a Party by transferring all of its Locked-up Debt in accordance with the RSA or (ii) it is a Party as of the Restructuring Effective Date.

Without limiting the foregoing, each of the Participating Creditors, the New Money Backstop Parties, the New Money Participating Lenders, and Shareholder Parties shall further release and be deemed to have released, as of the Restructuring Effective Date, each member of the Group, the Participating Creditors, the New Money Backstop Parties, the New Money Participating Lenders, and the Shareholder Parties and Affiliates of the Shareholder Parties with respect to any and all liability arising from or related to the Liquidity Facility Debt, the PCF Debt, and the Notes (the releases and exculpation herein collectively, the "**Releases**").

As consideration for and a condition to the above releases for the Shareholder Parties, each of the Shareholder Parties shall agree to waive any and all claims against and rights to payment from the Group (including any and all management or other service fees owed to them by any member of the Group under contract or otherwise) except for claims based on the PCF Debt and the Notes held by the Shareholder Parties, which shall be treated as set forth herein. |

| Term | Description |
|------|-------------|
| **Fiduciary Duties** | Notwithstanding anything to the contrary herein, nothing in this Restructuring Term Sheet, the RSA, or any of the definitive documents implementing the Restructuring shall require the Group, or any of their directors or officers, to take or refrain from taking any action such person or entity believes is reasonably required to comply with its or their fiduciary duties and/or comparable liability concepts under applicable law, such as capital or liquidity maintenance rules for upstream collateral. |
| **Claims of the Group** | Except as otherwise provided in this Restructuring Term Sheet, but without limiting the Releases above, each Company Party shall retain all rights to commence, maintain, and pursue any causes of action and all claims, defenses, counterclaims, crossclaims, and rights in respect thereof, including affirmative causes of action against parties with a relationship with such Company Party. For the avoidance of doubt none of the Company Parties shall have any right to pursue claims, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any Company Party, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed in law, equity or otherwise that the members of the Group would have been legally entitled to assert against the Released Parties in their own right or on behalf of a holder of any claim against or interest in the company relating to or against any Company Party, the Restructuring, including the restructuring of their claims against or interests in the Company Parties, and the negotiation, formulation, preparation, or consummation of the Restructuring. |
| **Professional Fees** | In accordance with, and subject to, the RSA, the Company shall pay, or cause to be paid, all reasonable and documented fees and expenses of the Ad Hoc Group Advisers, in each case in accordance with the terms of their applicable engagement or reimbursement letters.  For the avoidance of doubt, the Implementation Documentation shall provide that any fees and expenses of the Ad Hoc Group Advisers that are unpaid as of the Restructuring Effective Date shall be paid on the Restructuring Effective Date.

In accordance with, and subject to, the RSA, the Company shall pay, or cause to be paid, the HoldCo Group Parties' reasonable and documented professional fees incurred in connection with the Restructuring, limited to the fees and expenses of (i) Simpson Thacher & Bartlett LLP, (ii) Houlihan Lokey Capital, Inc., (iii) Akin Gump LLP, solely with respect to English law issues in connection with the Schemes, and (iv) one local counsel in each of the following jurisdictions: (a) Cayman Islands, (b) Delaware (United States), and (c) Canada.

All such fees shall be invoiced to the Ad Hoc Group or one or more of the HoldCo Group Parties, as applicable, and paid (or caused to be paid) by the Company from the proceeds of the New Money Commitment.  For the avoidance of doubt, neither the Company nor any of its Affiliates shall pay, or |

| Term | Description |
|------|-------------|
| | cause to be paid, any professional fees not expressly set forth in the RSA or in this Restructuring Term Sheet. |
| **Limitations on Equity** | Except as specifically set forth herein, the Scheme Documents and in the MEIP (with respect to the Reorganized syncreon Equity reserved for the MEIP in accordance with the terms of this Restructuring Term Sheet) and the definitive documentation with respect to the Warrants, the Scheme Documents shall not provide for the issuance of any Reorganized syncreon Equity, any other classes of common stock, preferred stock, warrants, options, restricted stock units, or other instruments or securities exercisable or convertible into Reorganized syncreon Equity. |
| **Corporate Governance / Securities Registration Exemption** ||
| **Management Equity Incentive Plan; Key Employee Retention Plan** | Up to 10.0% of the Reorganized syncreon Equity, on a fully diluted basis, shall be reserved for issuance as awards pursuant to a management equity incentive plan (the "**MEIP**") with the terms and conditions of the MEIP, the participants and the terms and conditions of any awards granted pursuant thereto (including, without limitation, award amount and vesting) to be determined by the board of directors of Reorganized syncreon (the "**New Board**"); provided, that in any case not less than 4.0% of such Reorganized syncreon Equity shall be allocated by the New Board as an initial grant on or before 60 days after the Restructuring Effective Date; provided, further, that the compensation committee of the New Board shall consult with the Chief Executive Officer with respect to the MEIP and the awards granted thereunder.

In connection with the Restructuring, on the earlier of the (x) the Restructuring Effective Date and (y) the first payroll date occurring in the ordinary course of business on or after September 15, 2019, the Company will make supplement payments under, and subject to the same conditions of, the existing key employee retention plan in the aggregate amount of $984,552.20, with the individual participants and awards with respect to such supplemental payments subject to the reasonable consent of the Ad Hoc Group. |
| **Governance** | Corporate governance documents for the reorganized issuer of Reorganized syncreon Equity, shall include a charter, bylaws, operating agreement, shareholder agreement, and/or other organization documents, as applicable (collectively, the "**New Organizational Documents**") (including a shareholders' agreement, or other similar agreement, in either case, setting forth the rights and obligations of the holders of the shares of the Reorganized syncreon Equity upon the occurrence of the Restructuring Effective Date, including customary registration rights in respect of Reorganized syncreon Equity (the "**New Shareholders' Agreement**")), shall be agreed in accordance with the RSA.  The number and identity of the directors comprising the New Board shall be determined by the Ad Hoc Group; provided, that the Chief Executive Officer shall serve as a director on the New Board. |

*       *       *       *       *

**<u>Exhibit 1</u>**

**Warrant Exercise Price Table**

**Warrant Strike Price Calculation**

**NOTE WARRANTS STRIKE PRICE SCHEDULE | BASED ON EQUITY VALUES**
$ in millions

| Emergence Date | Strike | | Emergence Date | Strike | | Emergence Date | Strike |
|---|---|---|---|---|---|---|---|
| 7/31/2019 | $545.2 | | 8/26/2019 | $549.9 | | 9/21/2019 | $554.7 |
| 8/1/2019 | 545.4 | | 8/27/2019 | 550.1 | | 9/22/2019 | 554.8 |
| 8/2/2019 | 545.6 | | 8/28/2019 | 550.3 | | 9/23/2019 | 555.0 |
| 8/3/2019 | 545.7 | | 8/29/2019 | 550.5 | | 9/24/2019 | 555.2 |
| 8/4/2019 | 545.9 | | 8/30/2019 | 550.7 | | 9/25/2019 | 555.4 |
| 8/5/2019 | 546.1 | | 8/31/2019 | 550.8 | | 9/26/2019 | 555.6 |
| 8/6/2019 | 546.3 | | 9/1/2019 | 551.0 | | 9/27/2019 | 555.8 |
| 8/7/2019 | 546.5 | | 9/2/2019 | 551.2 | | 9/28/2019 | 555.9 |
| 8/8/2019 | 546.7 | | 9/3/2019 | 551.4 | | 9/29/2019 | 556.1 |
| 8/9/2019 | 546.8 | | 9/4/2019 | 551.6 | | 9/30/2019 | 556.3 |
| 8/10/2019 | 547.0 | | 9/5/2019 | 551.7 | | 10/1/2019 | 556.5 |
| 8/11/2019 | 547.2 | | 9/6/2019 | 551.9 | | 10/2/2019 | 556.7 |
| 8/12/2019 | 547.4 | | 9/7/2019 | 552.1 | | 10/3/2019 | 556.8 |
| 8/13/2019 | 547.6 | | 9/8/2019 | 552.3 | | 10/4/2019 | 557.0 |
| 8/14/2019 | 547.7 | | 9/9/2019 | 552.5 | | 10/5/2019 | 557.2 |
| 8/15/2019 | 547.9 | | 9/10/2019 | 552.7 | | 10/6/2019 | 557.4 |
| 8/16/2019 | 548.1 | | 9/11/2019 | 552.8 | | 10/7/2019 | 557.6 |
| 8/17/2019 | 548.3 | | 9/12/2019 | 553.0 | | 10/8/2019 | 557.8 |
| 8/18/2019 | 548.5 | | 9/13/2019 | 553.2 | | 10/9/2019 | 557.9 |
| 8/19/2019 | 548.7 | | 9/14/2019 | 553.4 | | 10/10/2019 | 558.1 |
| 8/20/2019 | 548.8 | | 9/15/2019 | 553.6 | | 10/11/2019 | 558.3 |
| 8/21/2019 | 549.0 | | 9/16/2019 | 553.8 | | 10/12/2019 | 558.5 |
| 8/22/2019 | 549.2 | | 9/17/2019 | 553.9 | | 10/13/2019 | 558.7 |
| 8/23/2019 | 549.4 | | 9/18/2019 | 554.1 | | 10/14/2019 | 558.8 |
| 8/24/2019 | 549.6 | | 9/19/2019 | 554.3 | | 10/15/2019 | 559.0 |
| 8/25/2019 | 549.7 | | 9/20/2019 | 554.5 | | | |

Note: Does not include all possible emergence dates.

[Signature Pages Intentionally Omitted]